# COUGHLIN BETKE LLP

**175 FEDERAL STREET**
**BOSTON, MASSACHUSETTS 02110**

TELEPHONE: 617-988-8050
FACSIMILE: 617-988-8005

*Please send all correspondence to our Boston office for scanning.*

Kevin J. O'Leary, Esq.  
Admitted in MA, CT, DC and VA  
CIPP/US

Direct Dial Number: (617) 988-8045  
Email: koleary@coughlinbetke.com

November 30, 2023

Judge S. Dave Vatti  
United States Courthouse  
915 Lafayette Boulevard  
Bridgeport, CT 06604

Re: <u>Stephen Deninno and Mary Deninno v. North Coast Sea-Foods Corp., et al.</u>  
*United States District Court District of Connecticut, Civil Action No. 3:22-CV-00580-RNC*

Dear Judge Vatti:

The Defendants in this case submit this letter brief, pursuant to your November 1, 2023 Order (Doc. No. 30).

### A. The Unique Properties of King Crab Legs

In this case, Plaintiffs allege that they experienced salmonella infections caused by their consumption of King Crab Legs sold by the Defendants. This is a product caught wild, cooked, and frozen on processing trawlers by manufacturer Arctic Seafoods.[1] The product remains frozen until thawed by the purchasing consumer. The unique component of King Crab Legs is that the sweet tasting crab meat arrives in a consumer's hands encased in an armored crab shell. Thus, the first time that consumable crab meat is exposed to an exterior environment is when the consumer meal maker cracks open the crab shell and digs out the crab meat.[2] It is these unique characteristics that separate this product from other types of seafood that may (rarely) constitute a source of salmonella bacteria or may be susceptible to cross contamination. This is also the reason why King Crab Legs are never listed as likely sources of food

---

[1] https://www.arcticseafoods.net/index.php?option=com_content&view=article&id=48&Itemid=55. See Exhibit A, attached to affidavit of Kevin J. O'Leary

[2] See S. DeNinno Dep. p 28., attached as Exhibit B.

| RHODE ISLAND | CONNECTICUT | NEW HAMPSHIRE | NEW YORK |
|---|---|---|---|
| 10 DORRANCE STREET | 100 PEARL STREET | 20 TRAFALGAR SQUARE | 1330 AVENUE OF THE AMERICAS |
| SUITE 700 | 14TH FLOOR | SUITE 435 | SUITE 23A |
| PROVIDENCE, RI 02903 | HARTFORD, CT 06103 | NASHUA, NH 03063 | NEW YORK, NY 10019 |
| TEL: 401-519-3637 | TEL: 860-249-7020 | TEL: 603-589-4025 | TEL: 212-653-0380 |

poisoning cases throughout the United States.³ The uniqueness of this crab product is relevant to Plaintiff's overreaching discovery demands because they do not apply to the product involved in this particular case.

**B. Because Actual Exposure Of The Shelled Crab Product To Gloved Human Hands Is Essentially Limited To Two Points In The Handling Of The Crab By The Two Defendants, Discovery Sought Outside Of Those Two Handling Points Has No Relevance To The Underlying Dispute**.

1. **Exposure Of The Subject Crab Meat To Humans And Other Sources Of Bacterial Cross-Contamination Only Begins When The Product Is In The Home Of The Consumer.**

The first time that the consumable crab meat can be exposed to human contact is when the home meal preparer breaks open the crab shells to dig out the crab meat. To the extent that a salmonella infection⁴ arises from a morsel of crab meat that somehow has been cross contaminated by another product or person, that cross contamination would only occur after the crab meat was released from the encased hard shell by the home cook. Due to this simple truth, the discovery that Plaintiffs press for in this case, whether they are incidents of complaints of other fish that allegedly caused illness, or in asking for information running back to many years before concerning employee health or even food handling practices that arise from years past, have no causal relationship to any possible illness.

2. **Assuming, Arguendo, That A Shelled, Protected Crab Product Can Be Contaminated, The Time Frame For Such Contamination Is Severely Limited Given The Product's Processing Timeline.**

If we momentarily suspend this truth and believe that any human contact with an enclosed, shelled product could lead to illness, we reach similar end results because potential sources of cross-contamination are very limited in the process. For example, King Crabs are caught in the wild by Arctic Seafoods and are immediately cooked on the ship that caught them.⁵ They are then frozen and packed into boxes for

---

³ Counsel for the Defendants has failed to locate any reported case of King Crab Legs causing a salmonella infection due to a King Crab somehow carrying the salmonella infection internally. Counsel has also failed to locate any reported incidents of cross-contamination based salmonella infections involving King Crab products.

⁴ According to the World Health Organization, salmonella bacteria are widely distributed in domestic and wild animals. They are prevalent in food animals such as poultry, pigs, and cattle; and in pets, including cats, dogs, birds, and reptiles such as turtles. Salmonella can pass through the entire food chain from animal feed, primary production, and all the way to households or food-service establishments and institutions. Salmonellosis in humans is generally contracted through the consumption of contaminated food of animal origin (mainly eggs, meat, poultry, and milk), although other foods, including green vegetables contaminated by manure, have been implicated in its transmission. Person-to-person transmission can also occur through the faecal-oral route. Human cases also occur where individuals have contact with infected animals, including pets. These infected animals often do not show signs of disease. World Health Organization, *Salmonella,* as of 11/30/2023. https://www.who.int/news-room/fact-sheets/detail/salmonella-(non-typhoidal)#:~:text=Person%2Dto%2D person%20transmission%20can,not%20show%20signs%20of%20disease.

⁵ See footnote 1.

| **RHODE ISLAND** | **CONNECTICUT** | **NEW HAMPSHIRE** | **NEW YORK** |
|---|---|---|---|
| 10 DORRANCE STREET | 100 PEARL STREET | 20 TRAFALGAR SQUARE | 1330 AVENUE OF THE AMERICAS |
| SUITE 700 | 14TH FLOOR | SUITE 435 | SUITE 23A |
| PROVIDENCE, RI 02903 | HARTFORD, CT 06103 | NASHUA, NH 03063 | NEW YORK, NY 10019 |
| TEL: 401-519-3637 | TEL: 860-249-7020 | TEL: 603-589-4025 | TEL: 212-653-0380 |

sale on that same ship. *Id*. When the boxes of King Crabs were purchased by North Coast, they are placed by shipper Arctic Seafoods in closed frozen boxes or cases to a third-party frozen warehouse and then the frozen boxes are later transferred to a North Coast freezer in its Boston processing location.[6] From receipt to the North Coast freezer, the shell-encased crab product remains in boxes and is not touched by anyone. *Id*. At some point, the frozen crab was taken to the North Coast saw room, where the frozen crabs were removed from the boxes by North Coast employees and processed for sale using a saw. *Id*. The shelled, pre-cooked frozen crab product is then placed in new North Coast boxes and returned to the North Coast freezer. *Id*. The boxes eventually then make their way to Big Y stores, and other customers, via a third-party distributor.

At the subject Big Y store, the North Coast boxes are placed in the Big Y freezer.[7] The boxes remain there until a gloved, Big Y seafood clerk takes a box of crab legs out of the freezer and places the crab legs on a bed of ice in a refrigerated seafood counter unit. *Id*. That clerk also would be the one serving Mr. DeNinno on the day he purchased the subject crab legs. *Id*. Mr. DeNinno noted that the clerk wore gloves and that the crab legs were frozen solid, not thawed at purchase. This is the second point on this timeline where a gloved human touched a shelled crab leg product. *Id*. The crab meat to be consumed remains in the shelled product. Thus, the relevant Big Y actors that could have spread possible contaminants to the frozen seafood product, if that proposition is even possible given the shelled protection of the crab meat, were the ones working on the day of sale to Mr. DeNinno.

1. **Discovery Sought By Plaintiffs From <u>North Coast</u> Goes Beyond The Scope Of Reasonable Discovery And Are Not Proportional To The Needs Of The Case.**

   a. **North Coast's Answers to Interrogatories**

Many of the Plaintiff's interrogatories focus on complaints relating to *any seafood product* as opposed to the one involved in this case, King Crabs. As noted above the characteristics and processing of this specific crab product is different than other seafood products and does not compare to other seafood products. See **Int. No. 28** (seeking complaints made about any seafood product, not limited to King Crabs), **Int. No. 29** (seeking complaints made about any seafood product, not limited to King Crabs), and **Int. No. 30** (seeking complaints from any supplier of any seafood product sourced to North Coast). Further, the time period for the requests is not proportionate to the needs of the case.[8] Many of the Interrogatories seek information from 2008 or 2013 to present, which is too far from the relevant window that the crab product was exposed to possible cross contamination. See **Int. Nos 8, 29, and 30** seeking information back to 2008 or 2013 to present. The crab product was likely processed by North Coast in the window of January through June of 2018 and so asking about information from 2013 or 2015 has no relevance to events in that window. A better window to examine is 2017 through 2019 which covers 18

---

[6] See Exhibit C, North Coast Supplemental and Amended Answer No. 4.
[7] See Exhibit D, Big Y Supplemental and Amended Answer Nos. 11 and 12.
[8] A party seeking discovery of relevant, non-privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case. *Gilead Scis., Inc. v. Merck & Co, Inc.*, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016).

| **RHODE ISLAND** | **CONNECTICUT** | **NEW HAMPSHIRE** | **NEW YORK** |
|---|---|---|---|
| 10 DORRANCE STREET | 100 PEARL STREET | 20 TRAFALGAR SQUARE | 1330 AVENUE OF THE AMERICAS |
| SUITE 700 | 14TH FLOOR | SUITE 435 | SUITE 23A |
| PROVIDENCE, RI 02903 | HARTFORD, CT 06103 | NASHUA, NH 03063 | NEW YORK, NY 10019 |
| TEL: 401-519-3637 | TEL: 860-249-7020 | TEL: 603-589-4025 | TEL: 212-653-0380 |

months before and after the subject incident and that window should focus on the product involved in this case, King Crabs from Arctic Seafoods.

**Int. No. 8** also seeks ten years of testing for microbiological and environmental monitoring versus a 2017-2019 timeframe. If undertaken, this type of testing captures moments of time at a processing facility. Any testing performed in the 2017-2019 timeframe could have some bearing on factors somewhat near the Incident of late July 2018. But snapshots of different time periods affected by different factors (such as managers, employees, processes in place) years before would not lead to admissible evidence or have any relevance to the underlying dispute. Finally, **Int. No. 27** asks for information relating to quality or illness relating to any crab product from the same lot. North Coast answered that it was not aware of any complaints relating to the product, other than the Plaintiff's complaint. North Coast withdraws its objection and leaves its answer.

### b. North Coast Document Responses.

Similarly, North Coasts objects to certain Plaintiff's Document Requests for similar reasons. Plaintiffs sought documents going back as far as *2008*. See **RPD No. 51** (recalls 2008 to present), **RPD No. 52** (complaints 2013-2023) and **RPD No. 53** (recalls 2013-2023). North Coast objected to that overly broad scope but provided responses for the three years leading up to the incident, in the spirit of compromise. [July 2015-July 2018]. There is simply no reason to wade back to events that occurred so many years before this incident because they would not lead to admissible evidence, even if such old records could be located. In addition, none of these requests are limited to King Crab product sold by North Coast. See **RPD No. 51** (any product), **RPD No. 52** (complaints of poisoning from a North Coast food product) and **RPD No. 53** (any product). North Coast employed specific safety precautions and hazard analysis tailored to pre-cooked King Crab products that would be different from other seafood products that could be raw or live or frozen but not wild caught or pre-cooked. See King Crab Hazard Analysis, attached as Exhibit E to affidavit of Kevin O'Leary. In seeking to obtain information on non-King Crab products, plaintiff is seeking information that is not comparable, as if one were attempting to compare Jet Skis, Honda Civics and motorized scooters. It is simply not reasonable to expand the scope of discovery beyond the product at hand, King Crab, because these seafood products are not comparable and not processed and handled in the same manner.

### 2. Discovery Sought By Plaintiffs From Big Y Goes Beyond The Scope Of Reasonable Discovery And Are Not Proportional To The Needs Of The Case.

### a. Big Y's Answers To Interrogatories

As discussed above, the boxed, shelled, pre-cooked, frozen crab product is only exposed to humans at one location during the entire time that the product is in the custody and control of Big Y – when the Big Y seafood clerks pull a frozen North Coast box from the Big Y freezer and places the frozen crab legs on a bed of ice in the refrigerated and then in the customer's hands at point of sale (in a plastic, closed bag). As the crab product that Mr. DeNinno purchased was frozen solid,[9] the crab legs were likely retrieved from the freezer the same day that Mr. DeNinno purchased them around mid-morning. In **Int.**

---

[9] See Exhibit B, p. 26.

| RHODE ISLAND | CONNECTICUT | NEW HAMPSHIRE | NEW YORK |
|---|---|---|---|
| 10 DORRANCE STREET | 100 PEARL STREET | 20 TRAFALGAR SQUARE | 1330 AVENUE OF THE AMERICAS |
| SUITE 700 | 14TH FLOOR | SUITE 435 | SUITE 23A |
| PROVIDENCE, RI 02903 | HARTFORD, CT 06103 | NASHUA, NH 03063 | NEW YORK, NY 10019 |
| TEL: 401-519-3637 | TEL: 860-249-7020 | TEL: 603-589-4025 | TEL: 212-653-0380 |

**No. 16**, Plaintiffs seek information about employees who worked at the counter from June 13, 2018 through July 27, 2018 and whether those employees were ill during the period of June 13, 2018 through August 10, 2018. No employee would have handled the subject crab legs before July 27, 2018 because they were in a box in the freezer. Thus, the health of employees prior to July 27, 2018 has no relevance. A sick employee working in the month of June or August of 2018 would have zero chance of contaminating the boxed product in the freezer. Notably, Defendant provided the initials of the only seafood employees who were sick in July. Neither was involved in handling the product in the July 27, 2018 transaction with Mr. DeNinno. Thus, this is a red herring type, unproductive search beyond the scope of reason and common sense. Similarly, **Int. No. 20** seeks a list of all employees working in the Seafood Department from January through October of 2018. As Defendant provided the identity of the employees who would have handled the crab product on the date of sale (from frozen boxes), the identity of other employees who would not have handled or contaminated the crab product has no relevance.

**Int. No. 28** and **No. 29** involve complaints to Big Y of any sickness from any seafood supplied by North Coast for 2013 to 2023. Big Y sells raw, live, frozen and frozen pre-cooked seafood. These requests, like those discussed above, go far beyond King Crab Legs and far beyond periods that are relevant or those that would lead to admissible evidence. Similarly, **Int. No. 31** identifies that the Defendant Big Y was not aware of any regulatory inspections at the Big Y store in the two years before the incident. It makes no sense to ask for information beyond that scope because it is not relevant.

    b. **Big Y Document Responses.**

**RPD No. 26** requests training records for all employees who worked at the store between June and July of 2018. Big Y produced the training records for all employees who were on duty on the date of purchase. As explained above, this would have included training records for the only individuals who allegedly could have mishandled the crab legs during the short period the crab legs were out of the North Coast box. There is no legitimate nexus between the Plaintiffs alleged illness and the training records of other employees who would not have come in contact with the crab legs Mr. DeNinno purchased. **RPD No. 58** and **RPD No. 59** seek documents relating to salmonella complaints and recalls relating to the sale of <u>any food product</u>. These requests blow past the gates of reasonableness, in seeking non-seafood item complaints, which are not involved in this case. Further, it is overreaching because it does not relate to King Crab legs from North Coast. Given all of the factors described above, such comparisons provide no material information to the underlying dispute.

For all of these reasons, Defendants request that the Court sustain the objections set forth in the identified discovery responses.

Sincerely,

*Kevin O'Leary*

Kevin O'Leary

| **RHODE ISLAND** | **CONNECTICUT** | **NEW HAMPSHIRE** | **NEW YORK** |
|---|---|---|---|
| 10 DORRANCE STREET | 100 PEARL STREET | 20 TRAFALGAR SQUARE | 1330 AVENUE OF THE AMERICAS |
| SUITE 700 | 14TH FLOOR | SUITE 435 | SUITE 23A |
| PROVIDENCE, RI 02903 | HARTFORD, CT 06103 | NASHUA, NH 03063 | NEW YORK, NY 10019 |
| TEL: 401-519-3637 | TEL: 860-249-7020 | TEL: 603-589-4025 | TEL: 212-653-0380 |