UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO *Plaintiffs* | ) | |
| v. | ) | CIVIL ACTION NO.: 3:22-CV-00580-SVN |
| NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC. *Defendants* | ) | AUGUST 14, 2026 |

**PLAINTIFFS' MOTION TO PRECLUDE DEFENDANTS' EXPERT WITNESS, LESLIE HODGES**

The plaintiffs, Stephen DeNinno and Mary DeNinno, hereby file this motion to preclude the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc., from offering into evidence any expert opinions or testimony from Leslie Hodges of L Hodges Seafood & Consulting, LLC.

**FACTUAL BACKGROUND**

The plaintiffs, Stephen DeNinno ("Stephen") and Mary DeNinno ("Mary"),[1] filed this lawsuit against the defendants, North Coast Sea-Foods Corp. ("North Coast") and Big Y Foods, Inc. ("Big Y"),[2] under the Connecticut Products Liability Act. (Compl. Doc. 1-2.) The lawsuit arises out of the purchase of king crab legs at a Big Y World Class Market on July 27, 2018. (*Id.*) The plaintiffs allege that the subject king crab was contaminated with salmonella. (*Id.*)

[1] Stephen and Mary may be referred to collectively as "the plaintiffs".

[2] North Coast and Big Y may be referred to collectively as "the defendants".



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

On July 27, 2018, Stephen purchased three (3) pounds of king crab legs ("subject king crab") from a frozen seafood case at a Big Y World Class Market located in Danielson, Connecticut. (S. DeNinno Dep. 21:4–25:4 (October 20, 2023), Ex. D.) Stephen never received any instruction that he needed to reheat the subject king crab before eating it. (*Id.* at 109:19–22.) After purchasing the subject king crab, Stephen drove home and placed it in his refrigerator. (*Id.* at 25:24–26:11.) Later that afternoon, Stephen thawed the crab legs, removed the meat from the shells, and shared a portion of the cold crab meat with his wife, Mary. (*Id.* at 29:3–23.) For dinner, Mary prepared baked king crab macaroni and cheese casserole by combining the remaining crab meat with other ingredients. (*Id.* at 36:12–22).

In the early morning hours of Saturday, July 28, 2018, both Stephen and Mary awoke violently ill. (S. DeNinno Dep. 38:8–39:12.) Both Stephen and Mary developed severe gastroenteritis within 14–17 hours of consuming the crab. (*Id.*) Throughout the weekend, the plaintiffs endured relentless diarrhea, cramps, and vomiting. (*Id.* at 38:8–40:1, 54:23–55:1.)

After being hospitalized at William Backus Hospital on July 31, 2018, for acute kidney failure from food poisoning, (S. DeNinno Dep. 41:16–45:17.), Stephen filed a complaint with Big Y on August 2, 2018, which included a written report titled "Food Borne Illness Investigation Report" ("Big Y Report"). (Big Y Food Report (Aug. 2, 2018), Ex. E.) Stephen specifically identified the king crab legs purchased on July 27 and reported that both he and Mary became sick. (*Id.*) Importantly, during the prior week of July 23, 2018, Stephen and Mary did not share any meals due to Stephen's extended work hours managing an emergency operations center at CharterCARE Health Partners, a hospital system in Rhode Island. (S. DeNinno Dep. 8:19–21, 19:16–20:12, 44:2–6.) Thus, Stephen specifically noted in the Big Y Report that the crab legs were the only food that he and his wife had eaten in common. (Big Y Report.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

In the fall of 2018, a rheumatologist, J. Scott Toder, MD, suspected that Stephen could be suffering from a condition known as reactive arthritis and ordered bloodwork that he underwent in October 2018. (S. DeNinno Dep. 48:8–49:22.) The blood test returned positive for *salmonella* antibodies and led to a diagnosis of reactive arthritis directly triggered by the food poisoning. (*Id.*) Over the next seven (7) years, this condition has left Stephen with severe, chronic joint pain and swelling in his knees, hands, and back, severely limiting his mobility. (*Id.* at 83:15–85:11, 112:2–10, 120:8–14.) He further developed lasting gastrointestinal issues causing chronic bouts of diarrhea and a severe magnesium disorder necessitating ongoing weekly infusions. (*Id.* at 86:24–96:25.)

Under the Connecticut Products Liability Act (Connecticut General Statutes § 52-572m et seq.), the plaintiffs assert claims of strict product liability, negligence, breach of express warranties, and breach of the implied warranty of merchantability against North Coast and Big Y. The plaintiffs allege that the defendants, acting as product sellers who manufactured, distributed, or retailed the subject XL King Crab legs, placed an adulterated, defective, and unreasonably dangerous food product into the stream of commerce. The plaintiffs claim the crab legs were contaminated with *salmonella*.

**DEFENDANTS' EXPERT WITNESS – LESLIE HODGES**

On May 22, 2025, the defendants filed an expert disclosure of Leslie Hodges ("Hodges"), which included, *inter alia*, his report. (Hodges Expert Disclosure (May 22, 2025), Ex. A; Expert Report of Hodges (May 22, 2025), Ex. B.) Hodges holds a Master of Business Administration (MBA) from Northeastern University, and a Bachelor of Arts (BA) from the University of California, Santa Barbara – majoring in Sociology. (Dep. of Leslie Hodges 18:17–19:9 (Apr. 8, 2026), Ex. C.) He is currently the principal of L Hodges Seafood & Consulting, LLC. (*Id.* at


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

49:16–20.) Hodges presents himself as an expert in king crab harvesting, processing/operations, quality assurance, and sales — with 46 years of experience. (Hodges Report at 1; Hodges Expert Disclosure.)

Hodges admits he does not possess formal scientific or technical training in biology, microbiology, epidemiology, public health, chemistry, toxicology, or infectious diseases. (Hodges Dep. 22:21–24:16, 28:25–29:8.) While he claims to have formal education in "food safety," that is strictly limited to attending irregular, one-to-two-day industry seminars sponsored by the FDA, the USDC, and "the seafood industry." (*Id.* at 23:12–24:8, 28:16–24.)

The primary conclusion to which Hodges opines is that the subject king crab purchased at Big Y did not cause the plaintiffs' salmonella infection, but rather, it came from another source. (Hodges Report pp. 1–2, 7.) As stated in his report, the grounds for his conclusion are as follows: (A) It is the industry standard that when king crab is caught in Russia, it is cooked on a processing vessel to an internal temperature of at least 165 degrees Fahrenheit, effectively killing any potential salmonella; (B) cross-contamination of the subject king crab after the cooking step to 165 degrees Fahrenheit is highly unlikely due to a "documented chain of custody" and "cold-chain logistics", i.e., it was maintained in a frozen state from its initial processing in Russia through its retail sale at Big Y; (C) an "empirical examination/test" that he conducted on a sample size of just four (4) king crab legs revealed an "average percentage of exposed meat in the shoulder" (7.38%), which in turn, means that exposure risk to salmonella is minimal; (D) Hodges has never encountered or been made aware of a salmonella outbreak associated with commercially processed king crab.

For the reasons set forth below, Hodges' opinions should be precluded in their entirety.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**LAW**

Rule 702 of the Federal Rules of Evidence provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court performs a "gatekeeping" function in deciding whether the expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In defining the gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-cv-01657 (JCH), 2024 WL 4866716, at *2 (D. Conn. Nov. 22, 2024).

As to the issue of reliability: "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "[I]n fulfilling its 'gatekeeping' function, district courts should 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . .'" *Russo v. Keough's Turn of the*



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

*River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

In *Daubert*, 509 U.S. at 593–94, "the Supreme Court identified several factors that may be considered in assessing reliability: (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Amorgianos*, 303 F.3d at 265 (quoting *Daubert*, 509 U.S. at 593–94)). With that said, "[t]hese factors . . . do not constitute a 'definitive checklist or test.' . . . Instead, the inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Kumho Tire*, 526 U.S. at 150).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).

Turning to the third consideration; namely, relevance and assistance to the trier of fact: "[I]n order to determine whether the expert's testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702, the testimony must not only be



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

reliable but must be relevant in that it 'fits' the facts of the case."[3] *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 364 (D. Conn. 2001) (citing *Daubert*, 509 U.S. at 591-92); *see also Amorgianos*, 303 F.3d at 265 ("[i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'" (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401)).

## ARGUMENT

### I. Hodges' ultimate conclusion that the subject king crab purchased at Big Y did not cause the plaintiffs' salmonella infection should be precluded in its entirety.

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 213–14 (2d Cir. 2009) (internal quotation marks omitted). "Expert opinions must likewise be excluded where the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.'" *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 244 (D. Conn. 2017), aff'd, 722 F. App'x 53 (2d Cir. 2018), (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331

[3] Similarly, "expert testimony is also subject to Rule 403 and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' . . . Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595).

(5th Cir. 1996) ("[e]xpert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation").

**A. Hodges' opinion that the subject king crab did not cause the plaintiffs' salmonella infection because cooking the king crab on a processing vessel to 165 degrees Fahrenheit effectively kills any potential salmonella should be precluded.**

A central pillar of Hodges' conclusion that the king crab purchased at Big Y did not cause the plaintiffs' salmonella infection is that cooking the king crab on a processing vessel to an internal temperature of at least 165 degrees Fahrenheit effectively kills any potential salmonella. While Hodges is confident as to the commercial protocols applied to the cooking of king crab on a processing vessel, he is missing the most important piece to render his conclusion admissible — there is no *factual* nexus connecting his abstract industry protocols to the actual cooking of the subject crab in the present case.

By way of background, Hodges' opinion is based upon his understanding as to the following *general* commercial processing protocols for king crabs that are caught in Russia before they arrive in the United States: King crab is caught by a "catching vessel" and then transferred to a separate "processing vessel." (Hodges Dep. 82:9–94:25.) Onboard the processing vessel, the king crabs are killed on a blade and severed into two halves, known as "clusters" (each containing three legs and a claw). (*Id.* at 88:21–25, 89:9–13.) The clusters are then cooked to a minimum internal temperature of 165°F. (*Id.* at 89:24–92:25; Hodges Report at 4.) The king crab is then promptly and rapidly brine frozen. (*Id.* at 94:17–96:11; Hodges Report at 2, 4, 7.)

Once it is brine-frozen, king crab is offloaded onto a "tramper" vessel for oceanic transport to a cold storage facility in Norway or the Netherlands. (Hodges Dep. 128:21–131:19.) From there, the king crab sits in a cold storage facility for an unknown duration before being loaded into freezer containers on an unknown cargo ship for transport to the United States. (*Id.* at 102:5–10,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

128:21–134:22; Hodges Report at 4, 7.) ("[s]hipment to the U.S. for secondary processing is in freezer containers"). When it arrives into a port of the United States, it is taken by a truck to a cold storage facility. (Hodges Dep. 134:19–22.)

While Hodges assertively recites general king crab processing protocols for a vessel to cook a king crab to an internal temperature of at least 165 degrees Fahrenheit, his testimony is inadmissible because a fatal analytical gap remains; there is no factual nexus tethering his abstract industry standards to the specific cooking of the subject crab. Specifically, Hodges admits he does *not* know the *specific* vessel that allegedly cooked the subject king crab:

> "Q. All right. Fair to say, though, you don't know what specific processing vessel the subject king crab was cooked on?
>
> A That's correct."

(Hodges Dep. 97:20–23.)

Since he does not know the specific processing vessel, he also admits — as he must — that he does not have any temperature monitoring records, sanitation checklists, or any other records from the processing vessel. (*Id.* at 126:21–127:21.) He also does not have, nor has he reviewed, any HACCP Plan for the specific vessel that allegedly cooked the subject king crab. (*Id.*) In fact, he testified:

> "Q. And would you agree that you're also making an assumption that there were sanitary conditions aboard the Russian processing vessel at the time the subject king crab was present on board?
>
> A. Yes."

(*Id.* at 127:17–21.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Simply put, without knowing which vessel processed the subject king crab and without having any records from that vessel, it is logically impossible for Hodges to confirm that it was *actually* cooked to 165 degrees Fahrenheit. Hodges asks the Court to accept an impermissible analytical leap – rely on general industry practices and automatically assume that an *unknown* processing vessel followed those practices and cooked the subject king crab to the proper temperature. In other words, his opinion is devoid of the concrete facts to bridge the analytical chasm between how the industry should operate and how the subject crab was actually handled.

By substituting "general industry practice" for actual evidence of compliance by an unknown processing vessel, Hodges is also presenting an opinion based on a "fictitious set of facts" (*Guillory*, at 95 F.3d 1331) connected only by his own *ipse dixit* (*Joiner*, 522 U.S. at 146). In fact, by his own admission, Hodges concedes that his opinions are based merely on his "knowledge of the crab, having purchased it in the past," and that he is "simply working with the facts *as I saw them*." (Hodges Dep. 144:5–8.) (emphasis added.) This explicit reliance on his own subjective, unverified assumptions is the very definition of an ipse dixit opinion — precisely the type of unsupported assertion that *Daubert* and Rule 702 forbid. The analytical gap is simply too great, rendering Hodges' opinion inherently unreliable, based on pure speculation, and mandating preclusion.

**B. Hodges' opinion that cross-contamination of the subject king crab after the 165 degree cooking step is highly unlikely due to a "documented chain of custody" and "cold-chain logistics" should be precluded.**

The cascading series of unsupported assumptions by Hodges to support his conclusion continues. Hodges supports his conclusion that the king crab legs purchased at Big Y did not cause the plaintiffs' salmonella infection by opining that cross-contamination of the subject king crab after the critical cooking step to 165 degrees Fahrenheit is highly unlikely due to a "documented


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

chain of custody" and "cold-chain logistics", i.e., that it was maintained in a frozen state from its initial processing in Russia through its retail sale at Big Y. (Hodges Report at 2, 4.) ("[t]his crab was always frozen from Russia to the U.S. processing facility, cold storages, North Coast Seafood, distributor, and finally Big Y").

As will be shown below, Hodges paradoxically guarantees a safe chain of custody while admitting at his deposition he has no idea the identity of the companies that made up that chain or where the king crab actually traveled before arriving in the United States. In other words, Hodges remarkably — and not in a good way — vouches for an unbroken chain of custody while simultaneously admitting he does not know who actually handled the subject king crab. If he cannot identify who handled the subject king crab from Russia until it reached the United States, it necessarily follows that he cannot, within any realm of reliability, opine that the subject king crab was maintained in a frozen state from its two-year journey from Russia to the United States.

According to Hodges, the subject king crab's journey began in late 2016 — nearly two years before it was consumed by the plaintiffs in 2018 — when it was harvested in the Barents Sea. (Hodges Dep. 101:12–23.) But, after that, he does not know anything specific as to the subject king crab before it arrives in the United States. Again, he does not know the *specific* processing vessel in Russia that allegedly brine froze the subject king crab after it was allegedly cooked. (*Id.* at 97:20–23.) Without knowing the identity of that vessel, Hodges has no way of knowing if the subject king crab was *actually and correctly* cooked and then brine frozen at that time — beyond speculating that the processing vessel followed the general protocols to which he testified.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Even assuming, arguendo, that the subject king crab was cooked and then brine-frozen on the unknown processing vessel for which there is no evidence to support, the next step — according to Hodges' "cold chain logistics" — is for king crab, *in general*, to be offloaded onto a "tramper" vessel for oceanic transport to a cold storage facility in Norway or the Netherlands where it will stay for an unknown period of time after which it is loaded into freezer containers on cargo ship for transport to the United States. (Hodges Dep. 102:5-10, 128:21–134:22.) Hodges admits, however:

1. He does not know the name of the specific "tramper" vessel that transported the subject king crab in its alleged frozen state;
2. He does not even know whether it was transported to Norway or the Netherlands;
3. He does not know the name of the cold storage facility that it went to;
4. He does not know the procedures of whatever cold storage facility it went to;
5. He does not know how long the crab remained in the cold storage facility that was located in either Norway or Netherlands;
6. He does not know the identity of the ship that transported the subject crab to the United States; and
7. He does not have any information as to whether freezer containers were being properly monitored with respect to temperature by whatever ship was transporting the subject crab.

(*Id.* at 130:6–134:18.)

It is entirely disingenuous for Hodges to tout a "documented chain of custody" when the identities of the companies in that chain remain a complete mystery to him. Moreover, since he lacks the foundational facts to even know the identities of the companies that handled the subject king crab, he cannot verify, in any way other than his *ipse dixit*, that the supply chain actually maintained the subject king crab in a continuous frozen state. Thus, his conclusion that a



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

"documented chain of custody" prevented contamination and that the subject king crab was maintained in a continuous frozen state is entirely speculative, fails the reliability requirements of Rule 702 and should be precluded as a matter of law.

**C. Hodges' alleged "empirical examination/test" of the four (4) king crab legs, his alleged data, and any opinions following from it should be precluded**

Acknowledging that industry data was unavailable to present the percentage of exposed crab shoulder meat, Hodges decided to conduct his own "empirical examination/test" on a sample size of just four (4) king crab legs to calculate "*average* percentage of exposed meat in the shoulder" (7.38%) to conclude that exposure risk to salmonella is minimal. (Hodges Report at 4.) Specifically, in his report, Hodges writes:

> "Industry data was unavailable to present the percentage of crab shoulder meat exposed after being cut by saw into leg and claw form rather than cluster form. I am very familiar working with crab and decided to do a test to attain a percentage of exposure compared to shell. A sample base of 4 king crab legs showed 65.9% of the total shoulder weight exposed. This results in 7.38% exposed shoulder meat with the remaining top and bottom shell after being processed into leg and claw form, reducing potential contact risk."

(*Id.*)

In other words, Hodges evaluated a sample base of just four (4) king crab legs, concluding that 65.9% of the total shoulder weight was exposed, which he calculated to mean that exactly 7.38% of the processed leg and claw form contains exposed shoulder meat. (*Id.* at 4.) He then uses this specific 7.38% figure to opine that this small percentage of exposed meat reduces any "contact risk" for contamination and that the physical surface area susceptible to salmonella contamination is severely restricted. (*Id.* at 4, 7.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

At the outset, Hodges's deposition testimony completely dismantled the reliability of this calculation. Hodges admitted that this purported "empirical examination/test" was not scientifically valid and it "takes a lot more than four legs to do":

> "Q. Okay. I want to ask you about while you're searching is I want to turn to the section which is subparagraph d. on that page which you have entitled 'Empirical examination/test to find an average percentage of exposed meat in the shoulder.' Can you tell me what your purpose was in attempting to find an average percentage of exposed meat in the shoulder?
>
> A. Give me just one second here.
>
> Q. Sure. . . .
>
> MS. GRAVES: Page 4, subparagraph d.
>
> A. Okay. That paragraph and that exam was a way for me to get the counselor to pay for my dinner.
>
> MS. GRAVES: Smart.
>
> A. Actually, it was a question that nobody had asked as far as the percentage of shoulder that was open. There were -- I can break down the king crab by the carpus, propodus, dactylus, merus, et cetera, but no one had asked that one. And so I said, okay, I will do an unscientific test and go out and buy four legs. And I'm familiar enough with -- with crab to give a pretty close estimate. But that -- that's not scientific. It takes a lot more than four legs to do and --
>
> MS. GRAVES: You knew where I was going with that, Mr. Hodges.
>
> A. Oh, no, counselor wouldn't pay for more legs, or else I could have made it scientific.
>
> Q. All right. ***So you would agree with me that that's not a scientifically valid test in terms of determining what the percentage of crab meat exposed was***?
>
> A. ***Exactly***."

(Hodges Dep. 169:14–171:3.) (emphasis added.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Under *Daubert*, key factors in assessing reliability include whether a theory or technique can be (and has been) empirically tested, whether it has a known error rate, and whether standards exist to control its operation. A sample size of 4 crab legs — purchased at retail for personal consumption — lacks statistical power, control groups, margin-of-error calculations, or peer acceptance. Hodges explicitly conceded under oath that four legs are legally and scientifically insufficient to establish a valid baseline and that his test is "not a scientifically valid test." Permitting an expert to present a "7.38%" statistic to a jury under the guise of an "empirical examination" would be highly prejudicial and misleading. Based on Rule 702 and the *Daubert* test, Hodge's "empirical examination/test" of the four (4) king crab legs, his alleged data, and any opinions following from it should be precluded.

**D. Hodges' opinion that he has never encountered or been made aware of a salmonella outbreak associated with commercially processed king crab should be precluded.**

Hodges states that he has "never encountered or been made aware of a salmonella outbreak associated with commercially processed king crab." (Hodges Report at 3; Hodges Dep. 61:4–22, 64:9–25.) Hodges defines outbreak as a "number of people becoming sick from eating king crab." (Hodges Dep. 64:9–25.)

An expert's bare assertion that he has been made aware of a phenomenon does not constitute a reliable scientific or technical methodology. During his deposition, Hodges admitted that his opinion merely meant that a salmonella outbreak had never been brought to his attention during his career. (Hodges Dep. 64:17–65:9.) Most notably, when asked, "Have you done anything to investigate whether there have been any reported outbreaks?", Mr. Hodges bluntly answered, "No." (*Id.* at 65:10–12.) Admissibility under Rule 702 requires an expert to apply intellectual rigor, not merely rely on a passive lack of awareness. Because Mr. Hodges conducted



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

absolutely no research or investigation to verify whether outbreaks have actually occurred, his opinion is factually baseless and unreliable.

Expert testimony must also "fit" the facts of the case to assist the jury. Mr. Hodges defined an "outbreak" strictly as "a number of people becoming sick from eating king crab." (Hodges Dep. 64:9–25.) The present matter, however, involves a sporadic, isolated case of food poisoning, not a mass outbreak. When confronted with government data indicating that about 95% of foodborne illnesses occur as sporadic, non-outbreak cases, Mr. Hodges admitted he was unaware of this and did not consider it. (*Id.* at 65:13–69:23.) Specifically, he conceded that in forming his opinions, he did not consider that sporadic, unreported cases of salmonella from king crab may have occurred. (*Id.*) Because his opinion focuses solely on mass "outbreaks" and completely ignores the likelihood of sporadic, isolated cases like the plaintiffs, it is irrelevant and unhelpful to the trier of fact.

Finally, Mr. Hodges is entirely unqualified to offer epidemiological opinions regarding the prevalence, tracking, or history of foodborne illness outbreaks. While he has experience in seafood sales and processing, he admitted he possesses no formal education in biology, microbiology, epidemiology, public health, medicine, infectious diseases, or the science of microbial pathogens. (Hodges Dep. 22:21–24:16, 28:25–29:8.) Shockingly, when asked if he was familiar with the Centers for Disease Control and Prevention (CDC) — the premier public health agency tracking foodborne outbreaks in the United States — Mr. Hodges testified that he was not, stating: "I have heard of them, but I -- I -- but that's as far as it goes." (*Id.* at 66:19–25.) An expert who is functionally unaware of the CDC and has no epidemiological training should not be permitted to opine on the epidemiological history of salmonella outbreaks.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

For the foregoing reasons, Hodges should not be permitted to support his ultimate conclusion with a statement that he has never encountered or been made aware of a salmonella outbreak associated with commercially processed king crab.

**CONCLUSION**

Based on the foregoing, Hodges' ultimate conclusion is based upon inadmissible opinions. Accordingly, the plaintiffs' motion to preclude Hodges should be granted.

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Kevin G. Smith* (ct29416)
Kevin G. Smith, Esquire (ct29416)
Shelley L. Graves (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
kgs@faulknerandgraves.com
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Kevin G Smith, certify that on August 14, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Kevin G. Smith* (ct29416)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428