# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEPHEN DENINNO, ET AL., | : CIVIL ACTION NO.: |
| | : 3:22-CV-00580-RNC |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| NORTH COAST SEA-FOODS CORP., | : |
| ET AL., | : |
| | : |
| Defendants. | : APRIL 8, 2026 |

VIDEOCONFERENCE DEPOSITION OF:
LESLIE HODGES

A P P E A R A N C E S : (Via Videoconference)

FAULKNER & GRAVES, P.C.
501 Ocean Avenue
New London, Connecticut 06320
BY: SHELLEY L. GRAVES, ESQ.
slg@faulknerandgraves.com

For the Plaintiffs

COUGHLIN BETKE
175 Federal Street, Suite 1450
Boston, Massachusetts 02110
BY: BENJAMIN LEVITES, ESQ.
blevites@coughlinbetke.com

For the Defendants

Kathryn Little
Shea, Driscoll & Little, LLC
Court Reporting Associates
501 Ocean Avenue
New London, Connecticut 06320
sheadriscollandlittle.com

INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination by Ms. Graves | 5 |


INDEX OF EXHIBITS


| Plaintiffs' | | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 4 |
| Exhibit 2 | Les Hodges Expert Disclosure | 4 |
| Exhibit 3 | Les Hodges Report | 4 |
| Exhibit 4 | GAO Report of Foodborne Illness | 4 |
| Exhibit 5 | HACCP HARBIZ 2021 | 4 |
| Exhibit 6 | Curriculum Vitae of Les Hodges | 4 |
| Exhibit 7 | LHSC Invoice | 4 |


(Exhibits retained by Ms. Graves)

* * * * *

Deposition of LESLIE HODGES, an expert witness in the above-entitled action, taken at the request of the Plaintiffs, pursuant to the Federal Rules of Civil Procedure, before Kathryn Little, a Notary Public within and for the State of Connecticut, appeared via videoconference at 6125 Northeast 175th Street, Unit 302, Kenmore, Washington, commencing at 10:00 a.m.

* * * * *

STIPULATIONS

It was stipulated by and between counsel for the parties that the requirements of notice of the taking of the deposition have been complied; that proof of the qualifications of the Notary Public before whom the deposition is taken has been waived; that objections, except as to matter of form, be reserved to the time of trial; and that the deponent shall read and sign the deposition.

It is further stipulated and agreed that if the deposition remains unsigned thirty (30) days after delivery to counsel for the deponent, signature shall be deemed waived, and the deposition may be used as if signed.

* * * * *

WEDNESDAY, APRIL 8, 2026

10:00 A.M.

* * * * *

(Plaintiffs' Exhibits 1 through 7 were marked for identification)

THE REPORTER: Usual stipulations?

MR. LEVITES: Yes, thank you.

THE REPORTER: Is he going to waive reading and signing?

MR. LEVITES: He'll sign.

THE REPORTER: Okay. Mr. Hodges, can you please state your full name and address for the record.

THE WITNESS: Leslie Wayne Hodges, 6125 Northeast 175th Street, Unit 302 in Kenmore, Washington, 98028.

* * * * *

L E S L I E W . H O D G E S ,

an expert witness in the above-entitled action, having been duly sworn by Kathryn Little, a Notary Public within and for the State of Connecticut, was examined and testified under oath as follows:

* * * * *

MS. GRAVES: Good morning again, Mr. Hodges. I'm Shelley Graves. I represent Stephen and

Mary Deninno in their lawsuit against North Coast Sea-Foods and Big Y Foods concerning a food poisoning incident that took place in July of 2018.

EXAMINATION BY MS. GRAVES

Q Can you tell me, have you ever had your deposition taken before?

A Yes, I have.

Q Okay. Just approximately how many times?

A I believe two times.

Q Okay. So I'm just going to give you some ground rules. You have probably heard them before and talked with counsel about them, but just so we're on the same page. Okay?

So as you can see, we have a stenographer. She's trying to take down everything that we're saying, so try to keep your answers audible. Avoid "uh-huh's" and "huh-uh's" and shakes of the head.

And most importantly for you and I to try to do is not talk over each other and, you know, give each other enough time to complete our sentences before we begin. Okay?

A Sure, Shelley.

Q Okay. And if at any point you don't understand the question that I've asked you, please

just let me know and I'll try to rephrase it until we come to an understanding. Okay?

And if at any point you want to take a break, you know, I'll ask you to complete any question, answering any question that's pending, but we can take as many breaks as needed through the day. Okay?

A Thank you.

Q And of course we're doing this deposition remotely, so for that reason I'm asking is there anyone else in the room with you?

A No.

Q Okay. And you will let us know if that changes at any point?

A I -- I don't think that will change.

Q All right. Very good.

And would you also please agree not to review any texts or e-mails or any other types of electronic communications during the course of the depo? I mean, obviously you can on breaks, but while we're doing our back and forth?

A Yes.

Q Okay.

MR. LEVITES: And, Shelley, I forwarded him the exhibits. So I just let him know, you know, if

he wants to follow along on his computer or if you want to put them up, whatever works best for the two of you.

MS. GRAVES: All right.

THE WITNESS: I don't have those up right now, but I could put them up.

MS. GRAVES: And, Ben, I think my paralegal is still working on the file that you just produced, so as soon as she has it prepared, we'll send it to you marked as an exhibit. Okay?

MR. LEVITES: Absolutely. Sorry for not getting that over. It's just the -- you know, the materials provided to him.

MS. GRAVES: And does Mr. Hodges have a copy of that already, or will we need to forward that to him as well?

MR. LEVITES: If she could -- I could forward it to him. I mean, I assume he has all those things, but I can give it to him so they are all in one place.

BY MS. GRAVES:

Q Mr. Hodges, what did you do to prepare for your deposition today?

A I -- I went back and I reviewed the files that were sent to me.

Q Okay.

A I also reviewed Dr. Gustin's deposition.

Q Okay. You reviewed his entire deposition transcript?

A Yes, I did.

Q Okay. And with regard to your -- "the files" as you referred to it, did you review -- did you review and read all the documents, or were there just certain documents that you re-looked at in order to prepare?

A Just a few. I went back and looked at the North Coast processing operation. Also, I reviewed again the Big Y handling. And I went back and I reviewed the -- the HACCP program, which was for the HARBIZ, which is not from the vessel that the product came from, but all the Russian HACCP programs are the same.

Q Okay. And when you say you reviewed I think you said the Big -- I think you said Big -- excuse me, the North Coast processing operation, what did you mean?

What in particular did you look at?

A Well, I looked at their HACCP program, and I also reviewed their SSOPs, which is the standard operating -- the Standard Sanitary Operating

Procedures.

Q Are you able to identify for me that document, the Standard Sanitary -- Standard -- I'm sorry, Standard Sanitary Operating Procedures; is that what you said?

A Yes, uh-huh.

Q Are you able to identify for me what document that was in your file?

A I could go back and look at the file if you want me to, but I believe it was number 5 or number 6 on your -- I hate to guess.

Q Okay.

MR. LEVITES: Les, was it one of the deposition exhibits that you looked at?

THE WITNESS: No, it was a standard operating procedure that had the HACCP program on it. It -- it had HACCP, but then it also had the -- the SSOPs and the -- and the management's commitment to quality detailed.

BY MS. GRAVES:

Q I'm going to show you a document on my screen and then maybe you can tell me if I've picked the right -- the document that you're referring to, or that I have it. Okay?

Can you see a document on the screen?

A Yes, let me pull it over to my big screen. I have not seen this document.

Q Okay. So that's not what you were looking at?

A No.

Q Okay. All right. We'll go back to that later.

A Yes.

Q Yeah.

A If you want, during a break I can go and find that document for you.

Q That would be great. Thank you.

The notice of your deposition -- or actually, I just want to put on the record that the document that Mr. Hodges indicated that he had -- that he was not referring to was Exhibit S of the October 30th, 2023, North Coast production compliance, which was a document entitled, "Quality Management Program."

Mr. Hodges, your deposition notice required that you produce certain things for your deposition, one of which was your file. Was that produced to me, to your knowledge?

A To my knowledge, it was.

Q Within your file did you produce any types

of notes or outlines or summaries that you made involving the case?
A There -- there really were no notes or summaries.
Q In preparing for your deposition did you create any notes or summaries for yourself?
A No. I reviewed the various exhibits that were given to me to -- to see the control pass, but there was not -- I did not make notes on them.
Q I'm sorry, I didn't understand that. To -- to CV control pass did you say?
A No, I -- I -- I reviewed the information with the intent of confirming the process and the control of the product from the processing all the way to the -- to the consumer.
Q Okay. So you reviewed documents in order to refresh your memory of those things, but you didn't take any notes about those things as you did it?
A That's correct.
Q And in considering and forming your opinions in this matter, did you review any articles or literature or publications?
A I double-checked the -- the water temperature in the -- in the Barents Sea, as well as the depth of the fishing for -- for king crab after

talking to counsel who had a question on it, because the crab move. They normally -- when they are young, they start in shallow water, but by the time they get out for the -- for the harvest, they are in 500 to 1,000 feet.

Q Okay. All right. And where did you -- where did you confirm that information for yourself, if you remember?

A I went on AI, Chat.

Q Okay. Do you recall what the source was that gave you that information?

A Yes, ChatGPT.

Q Okay. And I understand that answer, but did you verify the source that Chat was giving you the information from?

A No, I did not, because it was basically confirming what I -- what I already knew.

Q Okay. All right. Any other articles, literature or publications that you reviewed during the time that you are considering in forming your opinions?

A Just my -- my -- my internal documents as far as processing the crab.

Q Okay. What do you mean by internal documents?

A I wrote standards for king crab processing that are actually used industry-wide. And since 2018 when I left Keyport, I have been no longer processing crab, except for advising certain people as far as qualities and -- and how to process crab.

Q When did you write the standards for processing?

A In the mid '80s.

Q And after you had created those standards, was that something that you then through the years would supplement or revise?

A No, the -- the standards were written to assure that the -- the customer had the same pack and breakdown in the king crab pack area every -- every time.

Q Okay. Are a copy of these standards amongst the materials that you produced?

A No. I can send them -- those to you at any time.

Q Okay. That would be great.

And does that -- those particular standards that you authored, do they have any relevance, if you will, to the subject matter of what we're talking about?

A The -- the only thing that would matter is the specification as far as the leg size. And I -- and I noted that North Coast did not process a -- a -- to the normal size range, which would be 9/12 count per 10 pounds, 12/14, 14/17, 16/20 and 20/24 and 20 up. They instead purchased very large crab, only 1100-up gram and 1300-up gram, which then they -- they packed and marketed as extra large, which made their -- their processing easier.

Q Why did that make their processing easier?

A They had no need to grade it. They -- they could take it to the line. They could cut the crab from the bulk clusters into -- into legs and claws and pack without having to do -- excuse me, without having to break it down into various sizes. There was only one size.

Q Okay. So it simplified the process for them?

A Yes, it did.

Q And so do I understand that the standard you wrote was having to do -- having something to do with uniformity of sizing?

A That is correct.

Q Anything about those standards have anything to do with the food safety?

A Yes.
Q And what would that be?
A There was one line that was a standard line put in as -- as far as the quality of the product. I can't recall the -- the specific off the top of my head, but it -- it is in the standards.
MS. GRAVES: Okay. All right.
So, Ben, would you see that I get a copy of those?
THE WITNESS: Absolutely.
MR. LEVITES: The standards that he -- the ones from the '80s?
MS. GRAVES: Yes.
THE WITNESS: Yes.
MR. LEVITES: Yep, I'll look into it.
MS. GRAVES: Thank you.
A Now, it may be revised, because I've revised it over the years as far as just putting a different date on it, but --
BY MS. GRAVES:
Q Okay. All right. And was that standard published somewhere?
A Most of the reprocessors in Seattle had it and various seafood companies who deal in crab had it.

Q And did you -- other than -- withdrawn.
Did you speak with defense counsel recently in preparation for your deposition?
A Yes.
Q And were you provided any new data or information by defense counsel that you are going to be relying upon as a basis for any expert opinion you intend to offer in this matter?
A No.
Q All right. And I marked as Exhibit 3 your May 22nd, 2025, report. Have you issued any other reports since that date?
A No.
Q Do you presently have any intention of issuing any type of supplemental report?
A Only if counsel asks me to.
Q And I've marked as Exhibit 7 an invoice from you to -- with regard to this case. And it looks to be dated May 28th of 2025. Is that the only invoice that you have issued in this matter to date?
A That is correct.
Q Other than time you have recently spent preparing for this depo, is there any other time that you haven't billed for since that invoice of May 28th, 2025?

A I'm sorry, repeat that question. I wasn't sure if that was a negative or a positive.
Q Okay. Sorry about that. Sure.
So you issued an invoice on May 28th of 2025, which looks like it covered work between May 9th and May 22nd of 2025, correct?
A Correct.
Q All right. And have you done any other work on this file since May 22nd of 2025?
A I -- I have reviewed the various documents again to refresh myself after being informed by counsel that -- that you wanted to depose me.
Q Okay. So you spent time preparing for your deposition, correct?
A That is correct.
Q All right. And you will likely issue a bill to defense counsel for that, correct?
A Yes. So you can smile, Ben.
Q All right. But other than that work preparing for your deposition and the work that you already billed for, did you do any work in between?
A Yes, for -- for other clients.
Q Okay. I was -- my question was directed at work for this case.
A No.

Q Okay. Thank you.
Unless you're billing defense counsel for that work. All right.
And I marked as, let's see here, Exhibit 6 a copy of your curriculum vitae that was provided to me. And I will share it here for you.
Is what we've marked here as Exhibit 6 a copy of your current CV, Mr. Hodges?
A Yes.
Q Okay. Do you have a copy of that up in front of you or do you want me to leave it up on the screen?
A Just a second. I just opened it.
Q Okay.
A Okay. It's on my -- on my other screen.
Q Okay. Thank you.
All right. And can you summarize for me your educational background?
A Yes. I have an MBA from Northeastern University in Boston, Mass. And I have a bachelor of arts degree from the University of California at Santa Barbara.
Q Okay. And when did you get your bachelor's of arts degree?
A 1967. I'm old.

Q It's okay. What was your major?
A Major ended up being in sociology. I went through about four or five majors.
Q On your path?
A Yes.
Q Okay. What were the prior paths that you took before you landed on sociology?
A I was an athlete, and I was -- and I really can't recall majors.
Q Okay. All right. And did you go straight from your -- receiving your bachelor of arts to going on for your MBA?
A No, I went to work for Armour Dial, a food company. And I worked for them until I was hired away by Castle & Cooke to head their -- their macadamia nut division. And they actually paid me for that. And then I ended up by -- by moving to the Dole Pineapple division, and from there to the seafood division when they bought a seafood company called Pan-Alaska Fisheries, and that's when I began my crab experience back in 1978.
Q Okay.
A In Alaska, by the way, not Russia.
Q And the first company that you mentioned, you said Armour Dial; is that correct?

A That's correct.
Q Okay.
A They have -- Armour canned meats and Dial soap.
Q Strange combination.
A Yeah.
Q What was your role in that company? What was your --
A I was -- I was in sales.
Q And when you went -- what year did you go to Castle & Cooke?
A I -- I can't recall.
Q Okay. Was that also a sales position?
A It -- it was -- the initial job was more than sales. It was -- it was vice president sales, but also a -- the marketing of macadamia nuts.
Q I know you don't recall when you were at Armour and Dial, but how many years were you there?
A Armor Dial, I believe three years.
Q And for that entire three years you were a salesman for that company?
A That's correct.
Q And when you went to Castle & Cooke did you start as vice president of sales?
A Yes, I did.

Q And how long were you with Castle & Cooke?
A Until 1981.
Q And how big of a company was Castle & Cooke?
A At that time -- this would be an estimate, but they were large. They were a $500 million company. They owned Dole Bananas. They owned Bumble Bee Seafoods, later Pan-Alaska Fisheries, Dole Mushrooms.
Q And at that time when you were there you were -- your role was in the macadamia nut division; is that what you said?
A That was my first role, yes.
Q Your first role, okay.
A Then I moved on to the Dole Pineapple division.
Q Okay.
A And then from Dole Pineapple I moved into the seafood operations.
Q Okay. All right. That was all at Castle & Cooke?
A Right.
Q And you were saying that the Dole Seafood division was in Alaska?
A They -- they had -- Castle & Cooke had Bumble Bee Seafoods, which was based in Astoria,

Oregon. They had -- and then the Alaska operations under Pan-Alaska Fisheries and also Bumble Bee Fisheries for Bristol Bay for salmon.

Q And your role as vice president of sales and marketing, where were you headquartered?

A I was headquartered in Seattle. And I was in charge of all seafood operations in Alaska and also the canning operations in Bumble Bee Seafoods. Wait, excuse me, not the can operations, the fresh and frozen for Bumble Bee.

Q And when you say you were in charge of all operations, are you talking about sales and marketing or are you talking about the operation of the processing facilities?

A I'm talking sales and marketing.

Q And what year did you go back to school to get your master's in business administration?

A I believe 1975.

Q Was that while you were at Castle & Cooke?

A Yes.

Q Do you have any formal education in biology?

A No.

Q How about microbiology?

A No.

Q Epidemiology?

A No.
Q Public health?
A No.
Q Chemistry?
A No.
Q Chemical engineering?
A No.
Q Toxicology?
A No.
Q Medicine?
A No.
Q Food safety?
A Yes.
Q Tell me about that.
A I've had various food safety courses over -- over my career put on by FDA, USDC and the seafood industry.
Q So would these be, like, one-day seminars put on by one of these outfits, or would it be more intensive than that?
A Normally one to two days.
Q And do you have anywhere a list of those -- that type of education that you had in food safety?
A No, I don't.

Q Are you able to estimate how many classes or seminars you attended in food safety over the years?
A I can't recall the exact number, but they were -- they were given on a -- on an irregular basis to the industry.
Q Irregular basis, is that what you said?
A Yes. Yes. If there was an opportunity to learn salmon quality, I would take it.
Q So were most of those courses concerning salmon?
A No, they -- they concerned all species, but they would just rotate and be given at different times.
Q And you indicated that these were food safety courses. Can you tell me what -- what types of topics were being covered in these classes?
A Well, the one that comes to mind immediately was -- was a salmon course where we looked at the various qualities of salmon out of Bristol Bay, the sockeye run. And the quality varies a lot. And one of them involved a salmon smelling -- what would you call it, exhibition where you would walk up to a salmon that looked beautiful --
Q Uh-huh.
A -- smell it and tears would come to your

eyes.

Q Okay.

A And it was how to -- how to -- how to manage it and how to prevent that occurring on your -- you know, in your production.

Q What was the cause of that -- I'm assuming by the tears coming to your eyes that it was not a good smell, correct?

A That is correct, and that was because the salmon sat out too long prior to processing.

Q Okay. Do you recall any of these food safety courses concerning, you know, pathogens?

A I can't recall.

Q Did any of the food safety courses involve learning how to develop a HACCP plan?

A Yes, because when HACCP was first brought about was in the early '90s. And in -- and work began seriously in 1995. And I was involved in the creation of HACCP.

On my resume you will see that I was a member of the National Fisheries Institute and I was on the board of directors there. And when they came out with the HACCP program, they asked for volunteers from the various sectors from the salmon sector, from the crab sector, et cetera, to help

develop and see the critical control points, which is why if you look across the industry, the -- the seafood industry, you will see that most HACCP plans are actually very similar.

Q True, though, that each processor should be developing a unique HACCP plan for their particular processing facility and the products that they process there?

A That is correct, but the -- the company that actually led the way in developing most of the HACCP plans was a -- Surefish. And they are still in business today.

And if you review the -- the international HACCP plan that I sent you, I also have in my files U.S. -- U.S. company HACCP plans and for crab. And they are basically close to identical. Surefish is based in Seattle, and they are also in -- I think it's Japan or Korea.

Q All right. So you're referring -- you mentioned a HACCP plan that you sent to me. I'm going to show you --

A I have it.

Q I just want to verify that we're talking about the same thing. So is it what I've marked as Exhibit 5 --

A Yes, it is.

Q -- which is a HACCP plan for -- I think this is for a fishing vessel; is that correct?

A That's for a processing vessel, the HARBIZ that I had purchased product from. And I wanted to see their HACCP plan prior to moving forward with them.

I've seen the HACCP plans for -- for Arctic Seafood vessels, but that was back when I was with Keyport. And I don't have copies of that having left there.

Q Okay. All right. And we'll talk more about that later.

I think you indicated in your response a moment ago that you have other U.S. HACCP plans in your file. Is that what you said?

A I have a -- I have a HACCP plan for a company called Westward Seafoods in Alaska.

Q Okay. And is that in the file that's been produced to me?

A No. If you would like it, I would be more than pleased to send it to you.

Q Okay. Is that HACCP plan -- I'm sorry, what was the name of the company that it was for?

A I believe it was for Westward Seafoods.

Q Westward. Is that Westward HACCP plan something you reviewed and considered in forming your opinions in this case?

A I looked at -- at that plan to see any differentials between the Russian and the -- and the U.S. plan, just to refresh my memory.

Q Okay. And the Westward HACCP plan, is that also for a processing vessel?

A That is for a processing vessel, yes, for crab.

MS. GRAVES: Ben, I'd like a copy of that as well. It can be produced after the depo, but --

MR. LEVITES: Yeah, we'll take a look, Shelley.

MS. GRAVES: Thanks.

BY MS. GRAVES:

Q With regard to classes in food safety, do you recall when the last time you took any type of class like that?

A I can't recall exactly.

Q Do you recall what company you would have been associated with at the time that you last took a class?

A Most likely the -- The Talon Group.

Q Do you have any formal education in the

science of microbial pathogens?

A No.

Q Any formal education in infectious disease?

A No.

Q Any formal education in behavioral science?

A No.

Q And we were talking about some of your career roles. And what year did you leave Castle & Cooke?

A I believe 1981.

Q Okay. And where did you go next?

A To L. Hodges & Associates.

Q Okay. So that was a company that you formed?

A That is correct.

Q Okay. And can you tell me about that company?

A Yes. That company helped the first Russian -- well, excuse me, there was a company called Marine Resources who was the first importer of Russian crab in 1980 -- '82.

And they wanted -- and they requested my assistance as far as improving the quality of the

crab, because the crab -- the Russian crab back in those -- back at that time was of poor quality. It was -- it was -- it was cooked, but it was blast frozen and it was just -- it wasn't cleaned as well. And they retained me to -- to help the -- help improve the quality of the crab.

Q Was it purely a quality issue, or was it also a food safety issue?

A That was a quality issue more than food safety, because the product at that time whenever you would bring crab in -- and this is prior to HACCP -- you had to clear FDA. And -- and FDA inspector, if he had any doubts as far as food safety or quality would reject the product.

Q You would agree there's a difference between quality concerns and food safety concerns, correct?

A That is correct.

Q All right. And so if I -- so did you create L. Hodges & Associates in order to be a consultant of sorts to help in this endeavor?

A Not strictly for that, because I also at that time was buying and selling crab to -- to people like Red Lobster and -- you know, and other -- other major seafood companies around the

country.

Q Okay.

A I would buy from Alaska and -- and process down here -- process in Seattle and then sell.

Q So you had a processing facility in Seattle that was owned by L. Hodges & Associates?

A I had a processing facility, but initially I was -- I was processing in other -- in other plants and to my specifications. And eventually I was -- I was asked to open my own processing plant. And this by the Marine Resources, the Russian company. And that's when I opened Puget Sound Seafood Processing, which was primarily a crab processing -- crab processing operation, although we also did salmon.

Q All right. And so when did -- what time period were you operating Puget Sound Seafood Processing?

A I believe it was in the 19 -- 1988 to 1990. And the reason, the operation was producing over 30,000 pounds of king and snow crab every day. And it finally -- I had to cease operations because the cold storage which was attached to the plant burned down with 5 million pounds of Russian crab in it to be processed.

Q That must have brought tears to your eyes?

A Yes. Yes, that did --

Q I'm sorry to hear that.

A That cost me a lot of money.

Q Sure. Okay.

MR. LEVITES: Shelley, can we take a five-minute break?

MS. GRAVES: Oh, sure. No problem.

MR. LEVITES: Thanks.

(Recess taken)

BY MS. GRAVES:

Q All right. I think when we left off, Mr. Hodges, you had explained the unhappy demise of Puget Sound Seafood Processing, which occurred sometime I think you said around 1990; is that correct?

A That is correct.

Q Okay. And but for the several years that it was in operation, it was a seafood processing plant processing crab and salmon I think you said?

A That is correct.

Q Okay. And were you involved in the day-to-day operations of the plant, or did you have other people, management, that handled that aspect?

A I had a -- plant managers and I had quality control people. And I -- I oversaw it and I made

sure that the crab -- that the crab processing and salmon processing were to the customer's specifications. We processed for people like Red Lobster.

Q Uh-huh.

A That was primarily snow crab for them. And Marine Resources was king crab, and we processed for other crab people. We processed for salmon companies. We had a -- a separate room for fresh fish and -- and crab, because you never intermixed the two.

And we were putting out some substantial volumes. But when the cold storage burned down, the plant didn't burn down. In fact, I wish it had, because that would have helped a lot as far as insurance is concerned.

Q Yeah. Okay. So what did you do after that occurred? I don't know as to the details of wrapping up Puget Sound, but what was your next employment role?

A My next major employment role was with The Talon Group.

Q Okay.

A And I helped form that. And we became a major factor in the -- in Russian crab. We managed

a Russian crab fleet of seven vessels and sold the product off of it. And that was only terminated when the -- when the owner was assassinated in Moscow.

And we also were involved in Basa from -- from Vietnam or Pangasius as it's called today. And that was a very solid business.

Q Can you explain to me a little bit -- I'm not quite understanding what the -- what the business was.

Was it a consulting business for other businesses, or did you -- you know, for instance, you said you managed a fleet of seven Russian vessels. So did Talon Group own those vessels or --

A The Talon Group did not own those vessels. Although, as I said, I'm one of the few Americans who owned a Russian vessel. I bought -- I bought a tramper for our Russian partner and -- and sold it to him for crab.

Q Okay.

A The -- by -- by management is we provided for the vessels when they -- when they would go to Korea to offload everything from toilet paper to materials that -- that they would request, and we would buy for them.

We then sold their crab and their scallops primarily into the U.S. market and sometimes into the Japanese market. We were also directly importing from Vietnam. The -- under contract, by the way. And selling -- selling to people like Beaver Street Fisheries and -- and -- who are in Florida, and other major U.S. distributors and food service operations.

Q Okay. What -- go ahead.

A We were not a consultant.

Q Okay. And you were the chief executive officer of The Talon Group?

A Yes.

Q And that was per your CV from 1997 to 2007?

A That's correct.

Q And in your role as CEO -- or withdrawn.

Did The Talon Group have anything to do with food safety?

A We just assured -- well, the answer is yes. We assured that the food that we -- or the crab and seafood that we imported was -- was safe for consumers.

Q How did The Talon Group do that?

A We had inspections made on the product in --

in Korea or Japan or Vietnam and we had people supervising production of Pangasius fillets on the line in Vietnam.

In the case of crab, we employed NSTS Mark Tower, who is the same person that -- that Arctic Seafoods uses, or used.

Q Used, I'm sorry, Mark Tower of -- did you say of NSTS?

A Yes.

Q Okay.

A And he is now retired.

Q Okay. And what is NSTS?

A Northwest Seafood Technical Services.

Q Okay. And what does Northwest -- and I already forgotten the rest of the letters. What does NSTS do?

A They -- he is primarily -- well, he is known in the industry as a premier inspector of crab.

When I would inspect crab in Japan on my own and -- excuse me, let me back up to make this easier. Crab is normally trans-shipped. It doesn't come direct to the U.S. from Russia. It goes through either Korea or Japan and is shipped from cold storages in those locations.

When I would inspect crab in Japan on my

own, I would follow the same -- the same methodology as Mark Tower. Arctic Seafoods used it -- well, continued to use him as long as he was available, flying him to Netherlands to inspect crab, because that was also a sales document for Alex Gorelik. He would use the inspection reports to sell the crab to customers and then ship it to the U.S. because cold storage -- cold storages in the Netherlands are cheaper than the cold storages in the U.S.

Q Okay. What was the methodology that you used to inspect the crab?

A I haven't done that in a long time, but it was to take a distinct percentage of the cases by size and -- and random day codes. And you would open those -- open the product and count the clusters to -- to see that they -- they fell within the correct range.

You would take some, a limited amount, and thaw them and -- and smell and taste the product looking for salinity levels and -- and then assessing the overall quality as far as the amount of meat in the crab, was it full or not full. It was -- there was a whole procedure that I -- that I followed. And at my age, I'm not going to do it anymore, because these cases weigh 40 to 60

pounds.

Q And is it fair to say that that inspection was a quality inspection versus a food safety inspection?

A That is correct.

Q With regard to the box that you inspected, would you only be inspecting a small amount of a given box?

A You're actually -- you would actually inspect the whole box, because you would remove the -- the crab from the box in the cold storage to -- to count the clusters, because there's a certain -- the clusters had to match a certain size, be it -- normally 500 to 700 grams, 700 to 900 gram, 900 to 11, 11 to 13 and 13 to 1500 grams per cluster. So you would count the clusters and do the math.

Q Okay. And would the box that you sampled, would that be then returned with the rest of the boxes for sale to a customer?

A That is correct.

Q When you were inspecting the crab in this manner would you be wearing gloves at all times?

A Yes.

Q Both hands?

A Yes.
Q All right. And what you just described is the -- was mimicking the same type of inspection that Mark Tower, who you described as the premier inspector of crab, would perform when he did his inspections?
A That is correct.
Q Okay. All right. And so I think my original question concerned whether or not The Talon Group, or let's say your role in The Talon Group, had anything to do with food safety relative to the crab.
So I understand you did this quality inspection. Was there anything that you were doing in your role with The Talon Group that had to do with food safety?
A In regard to food safety, I was -- I was overseeing the -- the production at various plants. And as far as physically being there and doing it myself, no.
Q Okay. All right. So you were overseeing -- you were overseeing processing plants?
Did you hear my question?
A Oh, okay.
Q I was asking -- I was just trying to

confirm. So in your role for Talon Group you were overseeing processing plants?

A As I advised, in Asia obviously I was not there and I had quality control people in the plants inspecting, assuring the -- the safety of the product.

In the U.S. when I was reprocessing product for -- for various customers, such as Costco, we would -- I would personally go down to the plant to oversee and just make sure that things were going well. But we also had quality control people.

The inspections in Asia were mainly for buying purposes. I wanted to ascertain that the -- that the product was of the proper quality prior to purchasing because the purchases in Asia involved millions of dollars and by wire transfer.

Q The processing facilities, were they processing facilities owned by Talon Group?

A No. The -- the -- one of the processing facilities was North Star Cold Storage. They are the largest crab producer. You would ship it into -- into the cold storage and they would process it. And then you would put it back in cold storage until delivery to the customer.

Q Okay. So I'm trying to follow you. So

North Star was a processing plant here in the United States?

A Yes, in Stanwood, Washington.

Q Okay. It was not owned by The Talon Group?

A That is correct.

Q Okay. But it's your testimony that you played some role in the food safety aspect of North Star?

A No. They have their own Q/C people.

Q You say Q/C people. That's quality control?

A That is correct.

Q Do quality control persons, are they also responsible for food safety?

A Yes.

Q Okay. So was there a processing plant that you had responsibilities for food safety while you were CEO of Talon Group?

A No.

Q All right. And after Talon Group you went to Vantage Seafood, LLC; is that correct?

A That is correct.

Q Okay. And tell me what type of company Vantage Seafood, LLC was.

A It was a combination of a -- of a sales

company and a trading company focusing on crab. It was also a -- a consulting company as far as people -- people getting into the crab business. And while at that company I began writing a -- an industry newsletter and a blog to seafood executives, which I still write today and I will be writing after this deposition, because I'm behind this month.

Q I hope it's not about us.

A No. No. It's the crazy world situation on crab. And it's -- it goes to about 300 executives, and then it's also republished by the two largest online seafood magazines. It ends up in the hands of about 5,000 people a month.

Q Okay. Do any of the writings that you do for this newsletter have to do with food safety?

A No. It -- it is focused on the production, inventories and sales of crab worldwide in terms of production and also in terms of markets.

Q And was Vantage Seafood, LLC a company that you started yourself?

A That is correct.

Q All right. And did Vantage own any processing plants?

A No. I used custom processing plants which

worked out very well. You know, some of these plants have some capabilities that are very good. I would buy live Dungeness and have it processed and cooked. And I used North Star for that. And I would also buy frozen bulk product from Alaska, as well as from Russia and -- and process that into legs and claws for major customers.

Q Okay. So if I understand correctly, Vantage would import the crab, but you would use a third-party processor to process it to your specifications?

A That is -- that is true. In the case of the Dungeness, that was a Washington production.

Q And would you be involved with -- or withdrawn --

With regard to those third-party processing plants, would you be involved in their HACCP plan or any of the other food safety type systems?

A I would be aware of their HACCP plans, yes.

Q So you would be aware that they were in existence, in other words?

A I would be aware of it and I would have -- I would have seen it.

Q In any of your various employment roles did

you ever, yourself, develop a HACCP plan for a processing plant?

A Yes.

Q Which one?

A Puget Sound Seafood Processing, the processing company I owned.

Q Okay. Any other times?

A Yes, for the Russian company that we were consulting for at the -- not consulting, but obtaining all the product from at The Talon Group. We wrote a HACCP plan for them.

Q Okay. A HACCP plan for their processing vessel?

A Yes.

Q And I apologize if you already told me, but what was the name of that Russian company?

A I'm drawing a blank on it.

Q Okay.

A Sorry. I remember the owner's name, but that's it.

Q Okay. Was that the gentleman that was assassinated?

A Yes, Mr. Pouklo.

MS. GRAVES: Off the record.

(Discussion held off the record)

MS. GRAVES: All right. Back on the record.

BY MS. GRAVES:

Q All right. And so you were with Vantage Seafood, your company, from 2007 to 2015. And then I deduced from your CV that that company was purchased by another company, Keyport, LLC?

A That is correct. I was -- they thought I was making too much money selling to them.

Q Uh-huh, so they scooped you up. All right.

And so you became an employee of Keyport?

A Yes, for three years.

Q Okay. And what was your role at Keyport, LLC for those three years?

A I was the director of business development. I actually assisted them in the buying of crab. They had a major contract with Sam's Club and -- and I would evaluate the crab that -- well, interesting enough, from Alex Gorelik of Arctic Seafoods, which is why I'm very familiar with those -- with those companies.

And I have the -- and I still have many pictures of the processing, which I sent one to -- one to counsel as an example of what Arctic Seafoods Barents Sea red king crab looks like.

Q Okay. Was that a part of your file?
A That picture?
Q Yes.
A I believe so. I don't know if they produced it or not. If not, you can have that picture, and many more.
Q Okay. All right. So fair to say at Keyport, LLC your role was not a food safety role?
A No, it was a -- primarily a buying role, a role of educating the salespeople, and of -- and when they had production issues, I -- I would go to the various processing plants and help the processing plants solve the issue to make sure that the quality was to Keyport standards.
Q All right. On your CV you indicate that while at Keyport you oversaw regulatory compliance with FDA and HACCP for Russian seafood imports?
A That's correct.
Q And so can you explain to me what you mean by that?
A It meant that when I was buying from the companies, I would make sure that there was a HACCP plan in place, that the product was inspected properly, that -- and that the various documentation was available for FDA, because at Keyport we bought

from more than just Arctic Seafoods.

There were other companies out there that we were buying from. And I would evaluate the product and make sure that it would -- well, and not make sure, but assure that it met the standards of Keyport.

Q Ensuring that the Russian companies had a HACCP plan, that was a requirement in order for the product to be imported to the U.S.?

A Yes.

Q And did that also hold true in terms of you mentioned product, some type of product inspections?

A Well, those would be separate from a HACCP plan. The -- the HACCP plan is the assurance of the reduction of risk. And the inspection report is like a -- an NSTS or Mark Tower report as far as the size and quality of crab so that you could ascertain how much to pay for it.

Q Okay.

A So two separate animals.

Q All right. And you also indicate under Keyport, LLC that you developed written specifications and quality assurance protocols for imported products.

A Yes, I did.

Q Okay. So can you tell me what you mean by that?

A I wrote specifications and -- and standards for the importation of crab and other -- and other seafood items so that each item was covered with a specification. And it's -- if it were halibut, I would have a specification on halibut. If it were salmon, salmon. King crab, snow crab, Dungeness crab, et cetera.

Q And can you explain to me what you mean by a -- give me a general sense of what a specification entails?

A In the case of crab, the specification would have the size within grade, the -- the quality -- the carton size, the -- the weight of the cargo as far as being overpacked or underpacked. It would have a whole series of -- of items. Probably -- and I can't recall them off the top of my head.

Q Okay.

A I would have to go back at files and look.

Q Are the specifications, do they go towards the quality of the product?

In other words, is a specification something that the customer is going to be looking at to determine whether they want to purchase that

particular product?
A Repeat that, please.
Q Sure. Let me ask it in a simpler way. What would the specification be used for?
A The -- the specification would be used for a buying guide for -- for Keyport, not for the customers.
Q I gotcha.
So it would be what Keyport is looking for when they are buying from the Russian market, or whatever market they are buying from?
A That is correct.
Q Anything in those specifications deal with food safety?
A No.
Q All right. And you left Keyport, LLC in 2018. And since that time you have been the president of L. Hodges Seafood & Consulting, LLC; is that correct?
A That is correct.
Q And tell me what type of business L. Hodges Seafood & Consulting, LLC is.
A It is a consulting company working with crab producers, governments, the -- the Norwegian Seafood Council, the New Brunswick, Canada Department of

Trade, and various -- and various Canadian seafood processors primarily on snow crab.

And also when sanctions came in, the company was retained by a U.S. company that had just received 3 million pounds of Russian -- of Russian crab, and obviously the U.S. was not very happy with Russian crab at that time. And they retained me to help them sell the crab and -- well, help them produce and sell the crab.

Q When you say help me produce, what do you mean by that?

A Well, make sure that the quality of the crab was produced in the secondary processing to the specifications that they wanted. Does that make sense?

Q Maybe. That who wanted, in other words?

A In other words, I wrote the specifications for those companies on -- on king crab. And then I assured that the processing plant produced it to those specifications.

Q Okay.

A And the remainder of the business is -- I get phone calls from people saying can you help me on this or what is your opinion on this. I should be well retired by now, but as long as the calls

come in, I'm going to continue.

Q Okay. All right. And one of the entries you have on your CV under your current company is that you were a former consultant to the Russian Crab Company?

A Yes. Yes. They are the largest Russian crab producing company. They contacted me and wanted me to help them with their HACCP plan and with overall quality. They wanted to expand their U.S. market.

And -- and I also served as the FDA agent in the U.S. for -- for their fleet registering their processors and was the interface between their vessels and FDA. I was also doing forecasting for them with their Moscow office.

In other words, it was a very nice job which -- with the easy hours and which was cut off when the -- when the sanctions were imposed. I had to resign.

Q Okay. You indicated that you -- did you say you helped them draft their HACCP plan?

A That's correct.

Q And does that mean that you wrote the HACCP plan for them or were you part of a team?

What did that entail?

A I was part of a team. They used Surefish, but they also informed me and had me look at the plan to make sure that the plan was correct.

Q I remember you saying Surefish before, but you're going to have to remind me who Surefish is.

A Surefish is an inspection agency based in -- I believe it's Korea with the head office in Seattle. And they early on were involved with -- in inspections and also HACCP. They were a competitor to -- to NSTS.

Q And so for the Russian crab company, Surefish developed their HACCP plan, but you also had oversight over that HACCP plan?

A Yes, I did.

Q And so you indicate here that they had 40 vessels. So was there a HACCP plan for each vessel?

A They have 40 vessels total. The -- that -- that includes their catcher boats. They had eight or ten processors, and they were all under one -- one master HACCP plan. The catcher boats themselves did not have HACCP plans.

Q Okay. Are HACCP plans required for the catcher vessels?

A No.

Q And tell me, explain to me, what your role

as an FDA agent for their fleet operations entailed.

A All -- all vessels have to be registered with the FDA to export to the U.S., and therefore, I had to fill out the various documentation assisted by the Russians to -- to -- to obtain an FDA number. And each processor had a separate number.

And then the -- the information had to be renewed on an annual basis; otherwise, buyers could not buy from that vessel and import.

Q Okay. So it's -- I think I understand. And it's not the type of position where you are then doing any type of inspections of product on behalf of the FDA or anything like that?

A Oh, no, you are correct.

Q Okay. And it's my understanding that you have served on a couple of occasions or maybe more, as an expert witness in various types of litigation; is that correct?

A That's correct.

Q And we started our day you said you had been deposed two times?

A Yes.

Q Okay. And have you ever had to testify in court?

A No.

Q And do you recall how many times you have been retained to be an expert witness in some type of litigation?

A Three times --

Q And --

A -- including this one.

Q Including this one. Okay. So we only have to cover two, then, right?

Okay. And I see on your CV that you describe one of those times as having to do with a Canadian lawsuit regarding a snow crab price dispute between processors and fishermen?

A Yes.

Q Okay. So I take it that that was not anything to do with food safety?

A No.

Q And it looks to me that when you were at Vantage you acted as an expert witness in some type of seafood import legal cases?

A Yes.

Q Okay. And did those have anything to do with food safety?

A No.

Q All right. Have we covered the world of expert witnessing?

A Yes, we have.

Q Okay. You mentioned earlier in your testimony that you had some positions with the National Fisheries Institute; is that correct?

A That -- that is correct.

Q Okay. And can you tell me -- can you tell me a little bit about that organization?

A The National Fisheries Institute in Washington, D.C. is the largest association of seafood companies. And I became involved with them actually back in -- in 1979 when they were at the -- when they had an annual conference.

The -- the notations on the -- on my CV are when I was employed by myself, and I was -- I was a -- a member and then I was also on the -- on the board of directors.

Q Are you still a member of the National Fisheries Institute?

A No. If you see the date that it -- the date's 2007. They invoice you on the basis of your dollar volume. They wanted -- when I closed Talon, I was paying I think 10 or $20,000 a year to be a member and I just simply could not afford it afterwards.

Q Seems a little steep.

A Yeah. I've actually -- the -- I have spoken to the -- to the membership since that time as a guest speaker.

Q Okay. Does the National Fisheries Institute put out publications at times?

A Yes, they do.

Q Are those publications considered authoritative resources for the seafood industry?

A Yes.

Q Are you familiar with the Ready To Eat Seafood Pathogen Control Guidance Manual issued by the National Fisheries Institute?

A I'm sorry, what?

Q Sure. Are you familiar with a publication called the Ready To Eat Seafood Pathogen Control Guidance Manual that's issued by the National --

A I -- I have not seen that.

Q With regard to a crab processing plant, in addition to the HACCP plan, what other type of standards or guidelines or protocols would you expect a crab processing plant to have?

A I would expect them to have a robust SSOP plan to make sure that surfaces are -- are clean, that employees wear gloves, beards masked, hair covers, aprons, et cetera. I would expect the plant

to -- to have, you know, sanitary glaze water, that the saws in the plant are -- are cleaned at every break and inspected, that the -- that the product doesn't sit out, that the product doesn't fall to the floor. And any product that does happen to fall off the belt, goes into a rapid chlorine dip. In other words, just solid food safety procedures.

Q The SSOP that you refer to, that's the Sanitation Standard Operating Procedures?

A That is correct.

Q And would you expect that that would be a written document?

A Yes.

Q Besides an SSOP are there any other written documents that you would expect a crab processor to maintain?

A A secondary -- or are you talking about the primary Russian or for the secondary processing?

Q I'm talking about a -- I believe, you can tell me if I'm wrong, but I believe I'm talking about a secondary processing facility like North Coast.

A Yes, I would expect them to have a HACCP plan.

Q So a HACCP plan, an SSOP?

A And then I would also expect them to have a -- to have written documentation to ensure that the SSOPs are followed.

Q And what type of -- what do you mean by that? In terms of what type of written documentation would you expect to see that validates that they are following the SSOP?

A Normally it would be a -- a check-off list that has everything from are they wearing, you know, aprons, gloves? This is a -- is the -- is the -- has the surface -- surface that the product will be processed on been cleaned properly? Are the saw blades being cleaned at the breaks and, you know, inspected?

In other words, everything would have a check-off list on it that should be done and monitored more than -- more than once a day. It should be a -- continual.

Q Prior to being retained as an expert witness for this matter, have you ever conducted any business with North Coast?

A I can't say definitely, but I would assume that in the various companies I belonged to or -- or was part of, there were sales to North Coast. But I have no -- no specific recollection. I know of

them.

Q All right. I take it by your answer, then, you're not familiar with any of their owners or officers or employees?

A Oh, no, I knew Norm Stavis.

Q Okay. How did you know Norm Stavis?

A I knew him from the NFI and also from the annual seafood show.

Q And how would you qualify your relationship with Mr. Stavis? Was he just an acquaintance or were you social with each other?

A An acquaintance.

Q And when you said NFI, you meant the National Fisheries Institute?

A Yes.

Q Okay. Did you serve on any boards or committees together?

A No.

Q Anyone other than Mr. Stavis?

A No.

Q Have you ever acted as an expert witness for Attorney Kevin O'Leary or his firm?

A No.

Q Since being retained for this matter have you spoken directly with any owners, executives or

employees of North Coast?

A No.

Q Do you have any connection to Big Y Foods?

A No.

Q Since being retained for this matter have you spoken directly with Arctic Seafoods?

A No, I have not.

Q And how about with any other entities that might be associated with the king crab that we're here about today?

A No.

Q Mr. Hodges, I'm going to turn to your report. Do you have a copy of your report up in front of you, or do you want me to put it up on the screen?

A I have it.

Q And for the record, we've marked your report as Exhibit 2.

A I thought it was 3.

Q You're right. Good paying attention. That was a test. Thank you.

All right. And I am turning to page 3 of your report.

A Okay.

Q And I am looking at what you have enumerated

as number 2, "Salmonella Risk in King Crab."

A Right.

Q And you indicate in subparagraph a. that you have never encountered or been made aware of a salmonella outbreak associated with commercially processed king crab.

Can you explain to me what you mean by a salmonella outbreak?

A There have -- there have been no reported cases of salmonella from -- from king crab in my experience. The -- that's not to say that it's not possible, but I just haven't seen it in the -- in any of my travels or in the industry. It's something that if it were salmonella, the industry would jump on it -- well, salmonella or listeria that the industry would rapidly move on.

Now, I know that there has been salmonella and listeria in crab meat, but that's a much, much -- that's like apples and oranges. It's a much different product. It's -- it's handled many more times and there's the opportunity for pathogens to -- to get on the product.

Q All right. So let's try to break that down a little bit. What is the differentiation that you were making in your response with regard to crab

meat from king crab?

A Crab meat is -- is -- well, an example is in king crab -- well, in frozen crab processing, there are two critical control points. One is the cook process -- the cooking, and the second one is the labeling because of king crab -- well, shellfish allergies, or -- an allergen.

In the terms of crab meat, there are four to five critical control points. And a lapse at any one of them can allow the -- the entry of pathogens of some kind.

Q Can you define for me what you -- you know, you're talking about crab meat. So I guess what I'm trying to ask you is what are you referring to when you use that word "crab meat"?

A This would be crab extracted from the shell.

Q So you're talking about a product that has already been entirely removed from the shell so it's just the meat of the crab?

A That is --

Q Is that fair?

A Yes.

Q Okay. And you're indicating that you're aware that there have been reported -- there's

reports that -- of contamination of salmonella in crab meat; is that correct?

A That is correct.

Q And you're not saying that there's anything different about the crab meat in a king crab that is different from the crab meat in any of the other many different types of crabs there are?

MR. LEVITES: Shelley, are you talking about the king crab that's been removed from the shell?

MS. GRAVES: Yes.

A To my knowledge or -- or right now nobody is extracting meat from king crab, because it's too expensive.

BY MS. GRAVES:

Q Well, that may be. But I guess what I'm trying to ask you is is there something physiologically different with the meat within a king crab that would make it immune from contamination by salmonella?

A I think I -- I don't understand the question as posed.

MS. GRAVES: Okay. Kathryn, could you re-read the question.

(Record read page 63, lines 15 - 19)

A What I was hearing was there -- there isn't

a distinct difference in king crab meat in the texture, et cetera, from other crab meats. They are all different. However, if it were simply the king crab meat itself extracted, it could be exposed to pathogens.

BY MS. GRAVES:

Q Like salmonella?

A Yes.

Q All right. And can you define for me your use of the word "outbreak"?

In other words, when you're indicating that you have never heard of a salmonella outbreak, what do you mean specifically by "outbreak"?

A What I would mean -- what I would refer to is a number of people becoming sick from eating king crab.

Q And you indicated that you have never been made aware of a salmonella outbreak involving king crab. And I take that to mean through your career it's never come to your attention. Is that what you mean by that statement?

A Yes. I mean, you know, anything is possible, but I have -- but it's extremely unlikely in this product. And I haven't seen anything personally over 46 years in king crab or snow crab.

You know, and there was a -- last year alone there was 150 million pounds imported.

Q All right. And I understand, and I understand you have opinions about that. But I'm just trying to focus on what you mean when you say "I've never heard of it."

So it's never been brought to your attention through your career, correct?

A That is correct.

Q Okay. Have you done anything to investigate whether there have been any reported outbreaks?

A No.

Q I'm going to bring up what I've marked as Exhibit 4. Can you see this document, Mr. Hodges?

A Yes, I can. Let me pull it up on to my big screen.

Q Yeah.

A Yes, I see the document.

Q Okay. And so what I'm showing you is a February 3rd, 2025, report by the U.S. Government Accountability Office concerning Food Safety Status of Foodborne Illness in the U.S. And I'm going to scroll to page 2.

And I'm going to read into the record this paragraph that's highlighted here in yellow.

"The precise magnitude of foodborne illness in the U.S. is unknown. According to CDC, only a small proportion of all foodborne illnesses are diagnosed and reported to public health authorities. For example, CDC has estimated that foodborne salmonella causes 29 illnesses for each case that is detected through laboratory testing. A foodborne illness case may go undiagnosed if, for example, a sick person does not seek medical treatment. Additionally, CDC largely relies on public health authorities across the country to voluntarily report cases of foodborne illness in their jurisdictions, but some possible cases of foodborne illness may not be reported for various reasons. For example, according to CDC officials, some cases of foodborne illness may not be investigated or reported because of resource limitations at the state or local level."

You're familiar with the Center for Disease Control and Prevention, also known as the CDC, Mr. Hodges?

A No.

Q No, you're not familiar with the CDC?

A I have heard of them, but I -- I -- but that's as far as it goes.

Q Okay. Do you have any reason to disagree with that government agency's finding expressed here that only a small proportion of all foodborne illnesses are diagnosed and reported to public health authorities?

A They don't cite any sources for that I notice.

Q Okay. Well, I'm -- do you agree -- do you have any familiarity with what they are stating in -- or withdrawn.

Do you disagree that many foodborne illnesses are not reported to public health departments?

A I -- I would agree with that statement, that a lot of illnesses are not reported.

MR. LEVITES: Which page is this, Shelley?

MS. GRAVES: It's page 2.

MR. LEVITES: Thanks.

BY MS. GRAVES:

Q And, Mr. Hodges, do you know the difference between an outbreak case of foodborne illness and a sporadic or non-outbreak case of foodborne illness?

A I -- I gave you my definition of an outbreak, which is just several incidents. So the terminology that you're using between the two I'm

not familiar with.

Q Okay. All right. You understand that there can be, let's say, isolated cases of foodborne illness that don't rise to the definition of outbreak; is that fair?

A That's fair.

Q All right. And I'm going further down on page 2 where it indicates that, "According to the CDC, while foodborne illness outbreaks are common, about 95 percent of foodborne illness occur as sporadic non-outbreak cases."

And I'm going to represent to you that a sporadic non-outbreak case is one of those isolated cases that you and I were just talking about. Okay?

A Okay.

Q All right. Do you have any reason to disagree with the CDC's finding that about 95 percent of foodborne illnesses occur as sporadic cases?

A I really can't address that because I'm seeing this for the first time and I have no idea as far as how they came to that conclusion.

Q Would you agree that a large number of foodborne illnesses -- or withdrawn.

In rendering your opinions in this matter,

did you consider that sporadic cases of salmonella food poisoning from king crab may have occurred that would not have been reported?

A No.

Q And why not?

A I -- my -- my process was to see -- was to follow the crab from the time of processing to the time of import to the time of -- of secondary processing that the crab was always frozen. And, you know, following the HACCP, the first step kills any pathogens and then the -- the freezing of the crab prevents the addition of pathogens. The freezing does -- does not kill pathogens.

But the crab was frozen coming to the U.S. and -- and my study was to look and see was the crab frozen throughout the process of secondary processing, which it was. It was never thawed. And the -- then going to Big Y it went from the -- their freezer into a freezer. And it was then sold to the consumer as frozen product.

So I was looking for was there a pathway for pathogens to enter this product -- this product, and I couldn't find any.

Q You could not find any pathways for a pathogen to enter this product through that entire

chain?

A That's correct.

Q All right. And turning to subparagraph B of number 2 of your report, also on page 3 --

A Hold on. I want to get that up again.

Q Let me stop sharing this.

A Oops, I clicked out of my e-mail, which I have to get back to to get to that.

Q No problem.

A I was wondering why all of a sudden my e-mail was up. Okay. Go ahead.

Q Sure. So you have indicated in your report that you're of the opinion that the king crab's natural environment in the Barents Sea, Russia is not conducive to salmonella; is that correct?

A That's correct.

Q And you have based that on that king crab inhabit cold, deep marine environments; is that correct?

A Yes. That is part of it, yes. And what page was that again?

Q Sure. Page 3.

A Okay. Hold on.

Q At the very bottom.

A Okay, yes.

Q All right. And what is your opinion as to the water depth at which the king crab is harvested at?

A The king crab is harvested generally in 500 feet to 1,000 feet. Now, when the king crab is -- is young, they are in shallower water, so then they crawl their way out to the deeper waters.

Q Okay. And when they are in those shallower waters, can you define what you mean by that? What depths are we talking about?

A That I am not aware of. The literature that I've read just says shallower waters and the actual harvesting is done in the 500 to 1,000 foot level.

Q Did you do any research into whether those more shallow waters might be conducive to contamination by salmonella?

A No.

Q And you indicated that the water temperature at time of harvest of the male king crab is 34 to 35 degrees Fahrenheit; is that correct?

A That's approximate, yes.

Q Do you know what the range is of what those waters might be at time of harvest?

A Generally speaking, the research I did said minus 1 to 1.5 Celsius.

Q Do you know how long the juvenile crabs live in the more shallow waters?

A No.

Q With regard to those cold waters, is it your opinion that the temperature of those waters would kill salmonella or just limit its growth?

A I would say that it would -- it would eliminate its growth. In contrast, most of the crab meat that is imported to the U.S. is where the highest area of production is from Indonesia. And in those areas the temperature of the water is 29 degrees Celsius.

Q And I'm sorry, I don't -- I'm not quite sure why you're telling us about Indonesia. I lost your train of thought there.

A Nor am I right now.

Q Okay. Fair enough. So --

A Let's stay on Russia.

Q Okay. And I -- let me just make sure I understood your -- the beginning of that answer, though.

You're indicating that cold water temperatures of the type you have indicated would be in the Barents Sea during harvest time would limit growth of salmonella, but not kill it?

A It would limit the growth of pathogens. You know, I wouldn't know if it's specifically salmonella or listeria or whatever.

Q Okay. And would you agree, at least in theory, that if the king crab was subjected to insanitary waters containing salmonella, that the king crab would be susceptible to contamination?

A I can't answer that question.

Q And is that because you don't have a background -- the background necessary to answer that question?

A I don't have the -- I haven't been in the Barents Sea, so I really haven't been exposed to that question. I know that the waters -- I have been told, okay, that -- that the waters in the Barents Sea are clean. And some of the inward areas by Murmansk there is some pollution, but out in the crab fishing grounds that it's very clean.

And the fishing grounds, Russia has the majority of the harvest, but fishing in the same area are the Norwegians for king crab. And there has been no issues that has been reported.

Q Okay. I'm going to ask my question again, though, because I don't think your answer was quite responsive to what I was asking. Okay?

A Great.

Q So what I'm asking you is if in theory the king crab was subjected to insanitary waters. So I'm not asking you whether they are, in fact, insanitary in Russia. I'm just saying to you if they were subjected to those types of waters.

And so if the king crab was subjected to insanitary waters containing salmonella, would the king crab be susceptible to contamination?

MR. LEVITES: Objection. You can answer, Les.

A The king crab -- you know, my mind shows the king crab crawling around. But yes, it -- it could be susceptible, but that would be -- but during the processing of the king crab, it's -- it's cooked to 165 degrees, which would kill any salmonella.

BY MS. GRAVES:

Q And that's a different factor, but --

A Okay.

Q If we could just stick to the simple question asked. Do you agree it would be susceptible to contamination by salmonella if it was subjected to insanitary waters containing salmonella?

MR. LEVITES: Objection. You can answer.

A It would be possible.

BY MS. GRAVES:

Q And would you also agree in theory that king crab would be susceptible to contamination post harvest from the water, again, if the king crab was exposed to salmonella in some manner during processing?

MR. LEVITES: Objection. You can answer.

A That's a long question. Could you -- could you break that up?

BY MS. GRAVES:

Q I don't think I can break it up, but I'll say it again for you. How about that?

A Okay.

Q So do you agree that in -- again, we're talking in theory --

A Right.

Q -- the king crab -- whether the king crab would be susceptible to contamination post harvest from the water if the king crab was exposed to salmonella in some manner during processing?

MR. LEVITES: Objection. You can answer.

A Possible.

MS. GRAVES: And I want to turn to a different area of my questioning, but I also need

to -- I also want to take a look at what was in the expert's files, so do you want to take a -- do you want to break for lunch now or just take a shorter break?

MR. LEVITES: Whatever works for you. Unless, Les, do you want to take a longer break, shorter break?

THE WITNESS: Shorter would be fine for me, but it's your lunch hour, so --

MS. GRAVES: That's right, it's only breakfast for you.

MR. LEVITES: Whatever you want, Shelley, is fine.

MS. GRAVES: We can go off the record.

(Recess taken)

BY MS. GRAVES:

Q Mr. Hodges, during the break I took a look at what was produced to me by Attorney Levites as your file which has been marked as Exhibit 8, 9, 10 and 11. I just have a couple of questions for you about that.

MR. LEVITES: Shelley, could you put those up just because of the size? I didn't circulate those.

MS. GRAVES: Sure.

MR. LEVITES: Or if you could direct him to what the files are. Maybe you don't need to put them up. That's fine, too.

MS. GRAVES: Yeah, I'm not sure that I do, but I certainly will if need be.

MR. LEVITES: Okay, great.

BY MS. GRAVES:

Q All right. So I know you indicated to me at the start of the deposition that you were provided a copy of the deposition transcript of Plaintiffs' expert Barry Gustin, correct?

A That's correct.

Q Okay. Were you provided any reports of any other experts, whether they be experts for the Plaintiff or experts for the Defendant?

A On that report it was one of one -- one file that had three experts on it --

Q Okay.

A -- including Dr. Gustin.

Q Okay. So you were provided Dr. Gustin's deposition transcript?

A Yes.

Q Okay.

A And he addressed two -- two other experts in his report.

MS. GRAVES: Okay. Let's just go off the record for a minute?

(Discussion held off the record)

MS. GRAVES: We'll go back on the record.

BY MS. GRAVES:

Q Mr. Hodges, we had a conversation, counsel and I and yourself, off the record and just to clarify something. I was asking you if it was the deposition transcript of Dr. Gustin that you read, but I think we've all clarified that.

A No. No.

Q Okay. All right.

A I haven't seen that.

Q All right. So what you read was Dr. Gustin's supplemental report that was dated sometime in 2026; is that fair?

A That's correct.

Q Okay. All right. And I understand that Dr. Gustin's report speaks about other experts in the case. My question to you, though, is did you review any other reports from any other experts in this case?

A No.

Q And with regard to -- it looks to me that you reviewed -- or withdrawn.

It looks to me that you had available for your review the deposition transcripts of the various persons from North Coast that have been deposed in this matter.

It appeared to me that there was one deposition from Big Y, a person by the name of Brandon Voga. Do you recall that deposition?

A Not specifically, but I -- I did -- I do remember reading about their procedures, which might have been in that deposition.

Q Okay. The question I wanted to ask was whether or not if you had read more than one deposition transcript from Big Y employees.

A I can't recall.

Q Okay. In this case we also deposed two managers of the seafood department; Douglas Martin and Virginia Ferragatta, or something to that effect. Does that ring a bell for you?

Do you know if you read those transcripts?

A It doesn't ring a bell because there was a lot of paperwork there. And -- and I -- I did review their various transcripts to -- to try and see what their seafood procedures were as far as handling of product and making sure that they separated the fresh fish from the -- from the cooked

product, which is mandatory.

And there were pictures also that showed that the -- it showed the seafood case and how they had the king crab frozen off to the side with the -- with all cooked products separated from fresh. And that's an important factor.

Q That picture that you saw, though, wasn't of the setup at the time that Mr. Deninno purchased his crab, or do you know?

A I have no idea.

MR. LEVITES: Shelley, he had the Marty Douglas, but not Ferragatta.

MS. GRAVES: Okay.

MR. LEVITES: I know you haven't had the chance to go through all of it, but that's what he was provided.

MS. GRAVES: Okay. Some things came up with a bookmark and others didn't, so I couldn't be sure what was or wasn't there. Okay. Thanks.

BY MS. GRAVES:

Q All right. So it sounds like you had two of the three, Mr. Hodges.

And it looked to me that you had the personnel file of Stephen Deninno from his employer. Was that of any relevance to you or was that

something that was just sent and --
A That was just sent. They sent me a lot of documents, and as we discussed earlier, I was just looking for the chain of custody.
Q Okay. That's fine. I just wanted to make sure I wasn't missing something and that there wasn't any value in that to you, so ...
A That's like the pictures. I had no interest in the pictures.
Q Okay. All right. I'm going to turn back to your report. And if you could turn to page 4. You have the first subsection on page 4 is subsection C, "Processing under Hazard Analysis" --
A Right.
Q -- "Critical Control Points"?
A Yes.
Q All right. So you have identified here that commercial king crab are cooked on board a processing vessel immediately after being delivered by the catcher vessel?
A I have my report up. Do I need to work off of yours or --
Q No. I just want you to have the reference.
A Oh, okay.
Q Are you following where I am in your report?

A I -- I actually pulled it up another page. Let me pull it up so we're looking at the same thing.
Q I mean, I can certainly put it up on the screen if that's what your preference is.
A Oh, no, I'm fine. I've got it.
Q Are you all set?
A Yep, all set.
Q All right. So you have indicated there that the commercial king crab is cooked on board a processing vessel immediately after being delivered by a catcher vessel. And we talked a little bit about those vessels earlier, right?
A Right.
Q Okay. How is it -- or let me ask you this. The processing vessels, do they ever do any of the catching of the crab or is it always catcher vessels that then transport to the processing vessels?
A The processing vessels, some of them also can harvest it as well as process.
Q All right. So with regard -- so let me give a preliminary remark here. I'm going to sometimes use the phrase "subject king crab." And so when I call it the "subject king crab," I'm talking about the king crab that we're, you know, here --

A Right.

Q -- about, okay, just to differentiate a little bit. Is that okay?

A Absolutely.

Q So in this matter pertaining to the subject king crab, do you know whether it was caught by a catching vessel or a processing vessel?

A I don't know.

Q Regardless of whether it was a processing vessel or catcher vessel, can you educate us as to how the king crabs are caught?

A Yes. They are caught in pots, in bin -- pots that are obviously on the bottom of the ocean. And the crab crawl in them and they on a regular basis will pull -- pull the pots up and harvest the king crab while -- while throwing back any female crab.

Q So the pots are brought up and then they have to be sorted in some manner -- the crabs have to be sorted in some manner?

A Yeah. The crab are sorted and then they are -- they go to a -- a butchering station where the crab are butchered. And then they are washed and gilled and placed in baskets by size.

Then they go from there to the cooking

station where it's cooked to 165 degrees, which is monitored on a regular basis. And if any crab is -- is not 165, they -- they re-cook the crab, because any crab that is undercooked is a problem because the crab blood has a high level of copper in it. And what happens is that the meat inside the crab will -- will actually turn a blue color. And that's not very appetizing. And I have seen that.

Q Okay. That's what happens if it's undercooked, in other words?

A Yes.

Q Does that always happen if it's undercooked, or it's just one of the possibilities?

A It -- it generally happens. Not very often.

Q All right. So --

A The -- do you want the -- the rest of the processing?

Q We'll get there. Let me -- you don't want to give me too much information all at one time. I'll forget it all.

All right. So they are caught by pots, regardless of whether it was the processing vessel or the catcher vessel. If we assume there was a catcher vessel involved, what -- other than the

catcher vessel bringing the pots up, is there anything else that would be done to the crab on the catcher vessel?

A Just the processing.

Q Well --

A So --

Q But --

A Wait, rephrase your --

Q -- let me make sure you understand my question.

A Yeah, I don't -- well, repeat the question.

Q Yeah, let me repeat it. All right. So I'm talking about a catcher vessel.

A Uh-huh.

Q Okay. And if the subject crab was caught by a catcher vessel, brought up onto the catcher vessel, does -- do the crew of the catcher vessel do anything else to the crab other than bring it to the processing vessel?

A No.

Q And when I say that they brought up the -- when they bring up the pots, are the crabs taken out of the pots at that point or are they -- are they, I don't know, the pots rigged up and transported in

the pots? What's happening there?

A What -- what normally happens is that the -- the catcher vessels will have a -- a -- what do you call it? An area inside the catcher vessel where they could place the crab prior to taking it to the processing vessel --

Q Okay.

A -- so that they will take it out of the pots.

And then when -- when they go to the processing vessel, the processing vessel will -- will put a sling over the side down to the catcher vessel and then pull the -- you know, and they will load up the baskets and -- and send it up to the processing vessel.

Q Okay. When you say that the crabs are kept inside the catching vessel, are they kept in some sort of like tank or are they just in these baskets you have described? What are we talking about?

A Normally in a tank, but -- but they are kept -- they are normally without water in the tank.

Q Okay. And why is that?

A Just the weight of the water on the -- on the -- on the catching vessel, which is much

smaller. And they deliver rapidly to the -- to the processor and the crab are alive, because the crab has to be alive to be processed.

Q And you anticipated one of my questions. Like, you know, what is the timing of all this?

In other words, is the processing vessel in the same area as the catching vessels?

A Yes.

Q And so how long might the crabs be on the catching vessel before they are brought over to the processing vessel?

A I can't be exact on that, but not very long. They -- they would have a string of pots and -- and go down the string and harvest all of the pots and then go to the processing vessel with the crab.

Q So it happens within hours?

A Yes, I -- I would say hours rather than days.

Q All right. And then you said -- so once they are on the processing vessel, the next thing that would happen would be sorting of the crabs?

A No, the sorting of the crab would -- would come after the butchering.

Q Okay. So maybe I misunderstood. I thought -- I thought the sorting -- and maybe I used

the wrong word, but I believe you indicated that only the male king crabs are used so that there would be some sort of inspection to make sure they were just male king crabs that were kept.

A The catcher vessels do that.

Q Okay.

A When they pull their pots up, they throw -- they throw the females right back.

Q Okay. All right. So that will already have been done?

A Yeah.

Q Okay. All right. And so once they are on the catcher vessel, then the first thing that happens is butchering?

A Well, on the processing vessel.

Q Sorry, processing vessel, yep.

A Yes, butchering and gilling.

Q Okay. And so can you explain to me what those two processes are?

A The butchering is -- they have a -- have a blade which extends up from a butchering station where they take the crab and they kill it instantly. And then the -- then is -- it is moved to a gilling station where they remove the gills and the crab is -- is washed. And then it -- and then it will go

to a -- to baskets according to size. And -- and from there to the -- to the first CCP point or --
Q Let's stop there. Let me ask you a couple more questions. Okay.
A Sure.
Q So with regard to the butchering, so is the -- is the crab being left intact as a whole crab, or is the crab being severed in some way?
A The -- the -- the crab is severed into two parts and --
Q Two halves?
A Yes, two halves, which is a claw and three legs. That is called a cluster.
Q And with regard to that butchering process, would there be any sanitation protocols there that take place, or is that not worried about because the cook step comes subsequent to the butchering?
A I'm not aware of a -- of protocols for that area, but -- but the crab does not stay in the butchering station very long. I -- moved within minutes.
Q All right. And you said it was -- from butchering it goes to -- it has to be gilled?
A That's correct.
Q Okay.

A And that's the removal of the gills from each side.
Q Okay. Those are still intact --
A Yeah.
Q -- in the half that it's been severed --
A Right.
Q -- into?
A Right.
Q And I think you mentioned -- does it get washed after it gets gilled?
A That is correct.
Q All right. And what is the washing process for and what does it entail?
A The washing process is -- is to make sure that there are no -- no gill fragments. And the -- the water on the -- on the vessel is desalinated freshwater with chlorine.
Q Okay. All right. And then the baskets is next?
A Yes.
Q They are sorted?
A Yes.
Q And that's -- they are sorted -- is it by size that they are being sorted?
A By size. And there's a pattern that the

vessels follow, which you can see in -- in the master case as to how it's put together.

Q All right. And where does this all take place?

Does it take place, like, outside on the -- on the -- or is it inside? Where is all this happening?

A The -- the vessels I've seen, it's been on the inside. And there are -- and everything is stainless steel. And, in fact, most of the equipment used on the Russian vessels were made in the U.S., because these are continual processing lines that were developed in Alaska. And the Alaska processors were the first people involved in the Russian fisheries besides the Russians.

Q All right. So after they are sorted by size is the cook step the next --

A Yes, it is.

Q Okay. And you referred to it as the first critical control point?

A Yes, ma'am.

Q Okay. And what did you mean by that?

A I mean the -- the crab is cooked to a minimum of 165 degrees to kill any pathogens. And you will see on the report of the -- of the Russian

vessel that it says 165, but there's also controls in there that if it goes more than -- I believe it's 190 degrees, you know -- you know, that's the maximum that they allow the cook. If the -- if the temperature is under 165, they -- they re-cook the crab.

Q How are the crab being cooked; in other words? What is the --

A The -- the crab are cooked in the desalinated chlorinated water, because if you cook it in saltwater, the crab will be very, very salty. And after the cook process, it goes into a cooling process. And then -- and then into a freezing process, which is either blast frozen or brine frozen.

Q So when you're saying they are being cooked with this special water with the chlorine, they are in some sort of large pot, if you will, some sort of -- boiled or --

A No, it's like a -- the best description would be a 4-foot wide by 25-feet long conveyor belt tank. So the crab are put in and submerged, and then they go along the conveyor belt with a timing of 20 to 25 minutes to make sure that the crab all reach the proper temperature.

Q So they are being moved through this water --
A Yes.
Q -- over -- during that period of time?
A Yes.
Q Okay. And when you say that, the water is being monitored in some manner?
A Yes, it is.
Q And how is the temperature of the water being monitored?
A Through their quality control.
Q Okay. Is there some sort of gauge built into this conveyor belt system, or is it by a -- by a thermometer of some sort?
A No, these are all automated systems.
Q Okay.
A And I'm not a production manager, but, you know, you would have to talk to one of them to find out precisely what gauges are being used, et cetera. But the key thing is that they are checking the -- the crab to -- to assure that it's 165 degrees or higher.
Q And you said there are on occasions times when they have to be recooked?
A Very seldom. I haven't personally heard of

that in a long time.

Q All right. And do you know how it would be observed that a crab through this process needed to be recooked?

A That would be the -- a tagnician [sic] testing the crab when it's pulled out -- when it's pulled out. They have instant thermometers that go into the cages at specific points.

Q Okay. So in other words, the crab meat itself is tested with some sort of gauge?

A Yes.

Q Okay. Is that just like a sample from each basket, or is that every crab is tested like that?

A No, that would be a sample per lot.

Q Okay. All right. And then you said after cooking there is a cooling process?

A Yes. Because again, if you -- the crab has come out of the cooker and it's very hot. And most of the -- most of the product for the U.S. is what they call brine freezing, which is freezing it in a -- in a salt solution. If you put boiling hot crab into a brine solution, what's going to happen? It's going to absorb the brine -- the brine. So they have to do a pre-chill and then it goes into the brine solution.

Q Okay. And is the brine solution made with that same water that you talked about earlier?

A Yes.

Q And I think you mentioned that there is another option besides brine freezing?

A That's true. Some vessels are equipped to blast freeze a crab. And there it goes into a freezer on -- on -- on trays, basically, still in the -- still in the -- in the stainless -- what do you call it -- basket that it was cooked in --

Q Uh-huh.

A -- and -- and frozen.

Q All right. So some type of freezer that --

A Yeah.

Q -- instantly freezes?

A Yes. And then it -- it comes out of there and then it's spray glazed to put a glaze on it to -- to protect the crab.

Now, that's not necessary on the brine freezing, because the brine freezing by definition automatically glazes the crab.

Q All right. And do you know with regard to the subject crab what type of freezing took place?

A Based upon the case size, it would be brine frozen.

Q And why do you say that?
A Normally blast frozen crab is in 5 kg to 7 kg packs and is destined for the Japanese market. The U.S. market prefers brine frozen, and those are normally 22 kg boxes or cartons.
Q Okay. All right. And so after the brine freezing of the crab what would happen next?
A They would -- they would take the baskets and put the crab in a box with a plastic liner and then seal the -- seal it and put it in the cold storage on board the vessel.
Q All right. So the vessel has some type of freezer?
A Yes.
Q Okay.
A These are large -- these are very large vessels.
Q Okay. And do you have any sense of the -- the size of the production crew that's, you know, going through these steps that we just talked about?
A I don't know exactly how many people are -- are there, but practically speaking, you would have to have at least 12 to 15 people, maybe 20 people.
Q Okay. All right. And do you know the name of the processing vessel that the subject king crab

was processed on?

A I believe the documentation said -- well, I read the names and I -- and I know the vessels. Glacier -- Glacier something I think was one of them. It's been a while, but I recognize their vessels because I have purchased product from those -- from those vessels in the past. And they have four or five.

Q Okay. The vessels that you're -- I recognize that name, Glacier. Are you referring to the vessels that were identified by North Coast employee Mr. Brisbois when he was doing his quality inspection of a sample of crabs?

A Yes.

Q Okay. You're aware, however, that that inspection sheet was not for the subject king crab?

A No, I'm not.

Q You were not aware of that?

A No.

Q All right. Fair to say, though, you don't know what specific processing vessel the subject king crab was cooked on?

A That's correct.

Q Do you know the name of the company that owned the vessels that the subject king crab was

caught and processed on?

A They are known as SZRK, and they are also known as -- I believe it's the Northwest -- I'm forgetting the second part of the name.

Anyway, it -- it's -- it's called the Northwest something and there is documentation showing that, maybe on the -- on the website of Arctic Seafoods. I know it, but I can't remember it.

Q Okay. Did you see anything that was produced in this case by North Coast that indicated who the fishing vessels were owned by?

A No, they did not show the bulk cases come in.

Q Okay.

A Or I saw no pictures of the bulk, which is the -- the unprocessed king crab, because the -- the labels on the bulk crab, which is the 22 kg, would have the name of the processing vessel on there along with the size.

Q Okay. How is it that you were able to say that the owner of the vessels that the king crab was caught on was this SZRK company that you referred to?

A Because I've dealt with them personally --

Q Okay. But --
A -- through -- through Arctic Seafood. Arctic Seafood is their U.S. agent.
Q Arctic Seafood is SRK's [sic] agent?
A SZRK.
Q Sorry, SZRK.
A Yes, they are.
Q All right. And is that the only Russian crab company that Arctic Seafoods would have been dealing with back in 2017 or 2018?
A That's correct.
Q And how do you know that?
A I just -- well, I know it from experience in dealing with them.
Q And what can you tell us about SZRK -- and I'm sorry, you mentioned two names. Is it the same company, SZRK Northwest?
A Well, it's the same company, and there's a U.S. name. The SZRK is the name that the Russians normally use in talking about it. The U.S. name may be the formal name for the U.S. product.
Q Okay. What name do you want to use?
A Well, I remember SZRK.
Q SZRK. All right. That's what we'll go with.

All right. So you have deduced that the subject king crab was caught on a vessel and processed on a vessel that was owned by SZRK because you believe SZRK was the only Russian crab company that Arctic Seafoods was dealing with in the 2017 to 2018 period?

A That is correct.

Q The vessels that you saw the names of on that sample inspection form of Mr. Brisbois, did you recognize the names of those vessels as being vessels being owned by SZRK?

A Yes.

Q Do you know how big of a fleet SZRK had in 2017 to 2018?

A I'm just aware of the processing vessels. I don't know the number of the catcher vessels.

Q How many processing vessels did it have?

A I believe -- well, I believe four.

Q The names that you saw on Mr. Brisbois' form, were those all processing vessels?

A Yes.

Q And the process that you described for us that happened on -- that you indicate would have happened on a catching or on a processing vessel, is that -- would that be in -- would it be your

testimony that that's the standard process that would happen on any catching vessel regardless of what company owned it?

A Yes, it would.

Q But I take it there would be varying features based on whatever type of equipment they have and what their setup was, things of that nature?

A Okay. The -- the processing vessels are all very similar in terms of equipment and the -- and the process.

Q On page 5 of your report you indicate that the king crab -- the subject king crab would have been produced in September to December 2017 in the Barents Sea Russia. Can you tell me where you -- where you learned that information from?

A Actually, I would like to correct that, if possible. That I believe that that particular king crab was harvested in -- in the September to December 2016 period. And that's because of the -- the time -- well, the time that the product was processed to the U.S. and -- and the purchase of the product came at an earlier time.

It was purchased in, like, June or July of -- of '17. And the processing for '17 season

didn't start until September. So it had to be from '16 production. The product is processed or the quota season is September 1 to December 31 on -- on red king crab when the quality is the best.

Then the process to take it to the Netherlands where it's off-loaded in their cold storages, it can sit in those cold storages for six months prior to being sold. And when it is sold, it normally takes a good 30-days plus to get it to the U.S. market.

Q Okay.

A And so in just doing the math, I looked at it and I said this can't be 2017. It has to be 2016. So I stand corrected.

Q Okay. That's fine.

Is it fair to say that North Coast does not know on what date they received the subject crab from or purchased the subject crab from Arctic?

MR. LEVITES: Objection. You can answer.

A I'm sorry, what?

BY MS. GRAVES:

Q He objected, but said you could answer.

A Okay. Yes, they would know, because when -- when they purchased the crab, they would purchase it on the basis of a NSTS report, or you know,

Northwest Seafood Technical Services inspection report. That report would have the -- the crab quality, the crab size, the fullness of meat and also the date of production on it. And -- and North Coast would have received that report.

Q Okay. That may be true, but are you aware in this case none of those documents have been produced?

MR. LEVITES: Objection. You can answer.

A I was somewhat surprised that that -- that there was mention of the -- of the NSTS report in the documents but there was not an NSTS report in the documents. And Arctic Seafoods, I am confident, had -- well, it's 2016 or '17, I don't know if they retain records back that far.

BY MS. GRAVES:

Q Okay. I'm going to share my screen with you. So what I've brought up is North Coast's interrogatory answers from October 30th of 2023. And this is their response to interrogatory number 2.

And I believe from my review of your file, you have seen this interrogatory before; is that correct?

A I don't see what you put up.

Q Oh, sorry about that. There we go. Like magic.

A Let me pull this on to my -- my big screen.

Q Sure.

A My eyes are not that good.

Q That's okay. And I can make the writing larger if that's helpful to you.

A Okay. That's perfect.

Q Okay. And I'm going to point your attention to -- as I said, this is interrogatory number 2. And you can see here it says, "At some point the subject crabs were purchased by North Coast. In 2017 North Coast had four deliveries from Arctic Seafoods. These four deliveries were April 3rd, July 26th, October 2nd and November 20th. The crab product purchased by the Deninnos could have been in any of these deliveries. All of the 2018 deliveries from Arctic Seafoods were after the Deninnos' incident." Okay?

A Uh-huh, yes.

Q All right. So the point I'm trying to ask you about is whether or not you have any idea of -- with regard to the dates in this chain of custody from the time the fishing vessels caught the crab,

you know, through the point that the crab was delivered to North Coast?

MR. LEVITES: Objection. You can answer.

A I am -- if -- if -- it's very hard to determine, because when the crab is -- is shipped to the Netherlands and inspected, it stays in the cold storage. The buyer is buying off of the NSTS reports. And he's buying a specific size. Basically, I believe it was 4L and 5L size.

Those 4L and 5L size could be in -- in different lots in the Netherlands and combined for shipment over here. So it -- it simply would not be possible to find out what dates it was produced without pictures of the inbound cartons.

BY MS. GRAVES:

Q Okay. And I'm not really trying to be tricky. I'm just trying to say you don't have any other documents that -- you haven't seen anything that gives you any further clarity, correct?

A That is correct.

Q You understand that North Coast does not know what shipment the subject crab came to them in?

MR. LEVITES: Objection. You can answer.

A I -- I -- I do not. North Coast is the

company that would -- would have the best information, because you can -- you can trace product being shipped. Normally it's -- it's -- if -- you would process the product that you had delivered on April 31st, followed by July, followed by October and November, but there's no documentation showing which -- which off-load this product came from.

BY MS. GRAVES:

Q Okay. And so I understand what you were indicating to me earlier, that if the product was delivered to North Coast on one of these four dates, all of which are in 2017, it becomes more likely than not that the king crab had been harvested at some point prior to the year 2017; is that fair?

A That's correct.

Q Is it possible that they were harvested in 2015, or do you feel like 2016 is the right timeframe?

A I can't answer that 100 percent because I don't know what the inventory status was at -- at Arctic Seafood. But generally, it's all sold in the -- in the -- in the year following processing.

Q Okay. Your report indicates that all processing vessels have quality control personnel on

board. What do you mean by that?

Do you just mean employees of the crab company that are trained in quality control?

A That is correct.

Q Okay. And you indicate in your report that the quality control personnel on board are -- excuse me. You indicate that all processing vessels have quality control personnel on board with continual testing and adhere to a HACCP plan.

With regard to your reference to "continual testing," are you referring to the temperature taking that we were talking about earlier, or something else?

A They would be -- the quality control people would be checking for temperature, checking for the gilling process, to make sure the -- the crab was clean and that the crab met the specifications of that packer.

Q Okay. I guess I was focused on your use of the word "continual testing." So I guess I'm interested in the word "testing." What type of testing were they doing?

A The -- the first -- the first test would be for -- for -- well, a -- a primary test is the -- is the temperature of the crab coming out, but also the

quality control people on board would be monitoring everything from the butchering to make sure that the crab were alive, the -- the gilling stations, the washing stations. In other words, the whole process would be monitored by the quality control people.

Q Okay. By observation and inspection, in other words?

A Observation, inspection and actually physically determining the temperature.

Q Okay. And I'm just trying to make sure that in that word "testing" that you used that there was no other, you know, invasive or physical testing or any type of microbiological testing, some sort of swabbing. Is there something that would fall under that word "testing"?

A No, that is not common.

Q All right. And you provided -- your report also indicates that the -- and you have discussed that they adhere to a HACCP plan. And you provided us a sample HACCP plan for a processing vessel that I marked as Exhibit 5 for the ship HARBIZ, correct?

This is not from the -- I forgot the initials already, but SRBZ [sic] company? Did I get that right?

A SRZK. And you will have it by the time

we're done.

Q Okay. How so?

A Well, because --

Q Oh, the name. I gotcha, yeah. Okay.

A The name.

Q You hope.

A That is not from these vessels. I do not have a HACCP plan for Arctic Seas. I have seen it in the past, but when I left Keyport, that record stayed with them. The --

Q The HACCP plan, did you just say you don't have it for Arctic Seas?

A That's correct. I have seen it, but I do not have an active one.

Q Okay. So my question, though, or I guess the clarifying question is the HACCP plan the HACCP plan for the SRZK company, for the processing vessel, or are you referring to a HACCP plan for Arctic Seas for their facility in the United States?

A I am referring to a -- a -- a HACCP plan that is very similar to all the other HACCP plans I've seen on -- on Russian vessels. It is not specific to -- to Arctic Seafoods' vessels. That -- the HACCP plan that I forwarded was a Russian HACCP plan from a company that I purchased crab from.

Q Okay. But the HACCP plan for the processing vessel is the HACCP plan of the SRZK company, correct?

A No.

Q No. Why not?

A Well, because SZRK are the Arctic Seafoods' vessels. This is not Arctic Seafood vessels.

Q I'm not following you.

A Okay. SZRK is the Russian or master name for the vessels -- or the master company name for the vessels that were managed by Arctic Seafoods. The HARBIZ HACCP plan is similar to the other HACCP plans that I've seen from various Russian companies, but it is not an Arctic Seafood.

Q I understand. And so maybe we've confused each other, Mr. Hodges. I understand that the exhibit, Exhibit 5, which is for the HARBIZ --

A Right.

Q -- is a similar HACCP plan, in your opinion, but it's not the same HACCP plan that would have been on the fishing vessels of SRZK, correct?

A Correct.

Q Okay. Where you're confusing me is that you keep referring to it as Arctic Seas HACCP plan.

A Oh, I'm sorry.

Q And in my mind, Arctic Seas does not own the vessels, and therefore, it is not Arctic Sea's HACCP plan.
A That is correct.
Q Okay. Thank you.
All right. So the HACCP plan that you have provided as Exhibit 5 is for a similar type of vessel and it is for -- the HACCP plan is for cooked crab clusters, which is what you're saying would have been produced on the vessel that was producing the subject king crab, correct?
A Correct.
Q All right. But we don't have any way of knowing what the precise HACCP plan for the subject king crab on that -- for that specific processing vessel looked like?
A Correct.
MR. LEVITES: Objection. You can answer.
A Oh, I'm sorry.
BY MS. GRAVES:
Q You can answer.
A Okay. Correct. We -- we do not have Arctic Seafoods' HACCP plan.
Q You mean SRZK's HACCP plan?
A Yes. Yes, SZRK.

Q All right. And with regard to Exhibit 5, the HACCP plan for the HARBIZ, it looks to me to be a 33-page document; is that correct?

I can represent to you that it's 33 pages, but it's -- it's lengthy, right? It's got a few different components to it.

A That is correct.

Q Okay. All right. And do you have that up on the screen for yourself?

A I just put it up now.

Q All right. And if we scroll through, there's a table of contents. And that sort of identifies for us what the -- what the HACCP plan consists of; is that fair?

A Yes.

Q Okay. So it's got a Process Flow Chart, a Hazard Analysis worksheet, a Hazard Analysis, it's got some documents concerning two different critical control points; is that fair?

A That is correct.

Q Okay. And it's got some verification procedures. And there's also a copy of the Sanitation Standard Operating Procedures; is that right?

A Yes.

Q And then there's a series of forms and records that are part of the plan, a Daily Sanitation Checklist, a Compliance Checklist, Chlorine Content Log, Crab Core Temperature Log, Belt Speed Check Log, Thermometer Calibration Log, Carton Label Check Log, Corrective Action Report and FDA regulations?

A Yes.

Q All right. And if so is it your testimony that the -- different sections that we see here of this HACCP plan are what you would typically see in a HACCP plan --

A Yes.

Q -- for a processing vessel?

A Yes.

Q Okay. Would you expect to see these same types of sections with regard to a HACCP plan for a secondary processor?

MR. LEVITES: Objection. You can answer.

A No. A -- a secondary processor has different critical control points, because the crab is already cooked when delivered to them in a -- in a frozen state. So their HACCP plan would be different.

BY MS. GRAVES:

Q Okay. Would you expect to see in a secondary processor's HACCP plan a process flow chart?

A Yes, I would.

Q And would you expect to see a hazard analysis worksheet? It's page 7.

A Let me look at page 7 for a second. Yes, I would.

Q And at page 9 we have a hazard analysis for the frozen cooked crab clusters, which is essentially a narrative about the product and what different hazards would be related to it.

Is this type of narrative, this hazard analysis, something you would expect to see in a HACCP plan of a secondary processor?

A No, I would not.

Q Okay. And why not?

A I just have -- I have not seen the -- this -- this -- this particular form in -- on a set -- on a secondary processor.

Q Okay. You would expect to see a hazard analysis, but maybe just in a different format in other words?

A That -- that's correct.

Q Okay.

MR. LEVITES: When you get to a good stopping point, Shelley, can we take a break?

MS. GRAVES: Sure.

BY MS. GRAVES:

Q And how about the critical control point worksheets; would you expect to see those in the HACCP plan of the secondary processor?

A What page is that?

Q Sure. I think the first one starts on page 12, so pages 12, 13, 14 and 15.

A I would not -- I would not expect to see a form like this on a secondary processor. This is in reference to the -- to the actual processing and critical control points, which are different in the secondary processing than the first processing.

This is about cooked, et cetera. Well, about cooking; whereas the -- the secondary processor you will see critical control points such as the sawing process.

Q Okay. And I understand the substance might be different. Would you expect to see these types of worksheets, though, for whatever critical control points there are at a secondary processor?

I'm having trouble with that word today.

A I would expect to see critical control

points as far as how often they check the saws and --

Q But I'm not really asking you so much about the substance. I'm just asking you about the form -- you know, this critical control point worksheet.

Would they have these types of critical control point worksheets as a part of their plan for whatever critical control points are applicable to the secondary processor?

A I would expect to see a critical control sheet. And it could be -- I know that on the -- on the company I owned it was a one-page document where items were checked off on a regular basis.

Q So are you referring to some sort of checklist that would be used --

A Yes.

Q -- by the processor on a daily basis?

A Yes. And an example would be when the product is processed and you give the -- the employees a break, you would want to make sure that the -- that the belt was sanitized during the break, that the saw blades were checked during the blade [sic], that there was no crab on the floor, that, you know, any crab that is not fully processed in

the room is covered.

You would -- you would also check the temperature of the room. And I -- I believe in the North Coast records they said that the processing room was kept at 45 degrees.

But those are generalizations as far as what items you would want to see.

Q All right. The HARBIZ has at page 16 a document that they have entitled "Verification Procedures." Is that a typical part of a HACCP plan?

MR. LEVITES: For a secondary processor?

BY MS. GRAVES:

Q No, first was just generalized, whether it is a normal part of a --

A Yes. Yes, because -- as I advised early on, the company Surefish wrote most of the plans for the Russian vessels --

Q Uh-huh.

A -- because number one, they all had to be written in -- in English --

Q Okay.

A -- no matter where in the world you are. And when they write the plans, this is their standard wording.

Q Okay. All right. And so what's the purpose of this Verification Procedures section?

A It -- it's confirming that -- that -- that this processor has committed to -- to follow FDA procedures. At the top of the page you will see adopted from CFR 21 Part 123 pound. So it's a boilerplate document.

Q Okay. Would you expect to see a verification procedures section for a HACCP plan of a secondary processor?

I can't say processor.

A No. No.

Q And then at page 17 is the start of the Sanitation Standard Operating Procedures. And I think you indicated earlier that you would expect that to be part of a HACCP plan of a secondary processor?

A That -- that is correct. Now, they may not call it the SSOPs.

Q Okay.

A I mean, I've always called it SSOPs.

Q Okay.

A But there should be written somewhere in the documentation a -- a manual for employees, as well as their procedures for sanitation.

Q And when you say -- are those two different things; a manual for employees and procedures for sanitation?

A No, it's one -- it's -- it's one continual flow. The employees have to be trained, and then they have to -- they have to perform, for example, the cleaning of the -- of the processing room for -- to maintain sanitation.

Q All right. And you indicated that they might not be called SSOPs. Are there other names that you have heard them called?

A Operating procedures or standard -- standard operating -- you know, the -- the Sanitation Standard Operating Procedures is -- is -- is a word that was generated by FDA during the -- the formation of the HACCP programs. The point is not the name itself, but whether the -- whether the procedures are followed.

Q Okay. The Sanitation Standard Operating Procedures would typically be focused on sanitation, correct?

A Well, it's -- it's -- it's focused on sanitation. It's -- it's focused also on the employees wearing hair nets, beard nets, gloves, aprons and -- and the overall, you know, cleanliness

that the product is -- of the area which the product is being processed. Because this is a food product, and they want it to be -- and it -- it has to be done safely.

Q How about the procedures for the processing of the product itself; would a secondary processor usually have some sort of written operating procedures in terms of how their particular processing rooms operate?

A That I would not know. Processing can change from -- from plant to plant. Some have very precise specifications, and -- and other plants do not.

Q Okay. When you operated your seafood processing plant did you have operating procedures for your production rooms?

A I had operating procedures for every -- for every product and every room.

Q So you were that end of the extreme; is that what you're telling me?

A Well, the product that I was processing was going to people like Red Lobster, Costco, and they would actually send their own inspectors in. In addition, we had USDC come in for inspections, and also FDA.

These larger chains are very precise and very cautious as far as making sure that what they put out for consumers is good product. And -- and as a processor, you have to make sure it is.

Q So you would have written procedures for each product about how it would flow through your production facility?

A Right.

Q But you're indicating to me that not every secondary processor would have that?

A That's right.

MS. GRAVES: All right. Ben, you wanted to take break?

MR. LEVITES: Yes, please.

MS. GRAVES: Okay. How long?

MR. LEVITES: Five minutes should be fine.

MS. GRAVES: All right. Great.

(Recess taken)

BY MS. GRAVES:

Q Mr. Hodges, would you agree with me that you're making an assumption that all food safety protocols were followed on the catching or the processing vessel that would have cooked the subject king crab?

MR. LEVITES: Objection. You can answer.

A Yes. The processors of crab, be it in Alaska or Russia, are all very cautious and follow the procedures because the value of those goods is so high that you -- that a small mistake can cost you a lot of money, and your reputation.

BY MS. GRAVES:

Q Sure. But they all have employees who work for them, correct?

A That is correct.

Q And an employee could make a mistake, correct?

A That -- an employee can -- can -- can make a mistake, but if you have procedures in place, it shouldn't be serious and -- and damage the product.

Q Well, that's the hope, right?

A That's the goal, not --

Q That's the goal. Then we can say it that way.

But with regard to this particular case and the subject king crab that we're here about, you have not had access to any records from the processing vessel that would -- that you could turn to to substantiate your position that the protocols were followed, correct?

A What -- what I'm aware of is that the product was inspected by NSTS in the Netherlands after being inspected by the -- by the vessel's Q/C people. The product again was inspected by North Coast and the product was again inspected by --

Q Well, those are quality inspections, right, though, sir?

A Correct.

Q We're talking about whether a product has been subject to contamination by a pathogen. And those quality inspections don't detect that; isn't that true?

A The -- the HACCP procedures with the critical control points control that -- control the ability of pathogens to -- let me back up.

The critical control points in the processing procedure are -- are designed to prevent pathogens from getting on the product.

Q If they are followed, correct?

A If they aren't followed, the -- the -- the major critical control point is the cooking. And as I discussed earlier, you could have bluing on the product.

Q I'm sorry, you could have what?

A Bluing on the king crab. It was cooked to 165 degrees, and then --

Q Okay. But, Mr. Hodges, my point is a different one. I understand that you believe that there are good processes and protocols in place to protect the food product, and for good reason, correct?

Yes?

A Yes.

Q Okay. But my point is that, through no fault of your own, in this case you do not have any documents that support one way or another what happened on the cooking vessel that cooked the subject king crab?

MR. LEVITES: Objection. You can answer, Les.

MS. GRAVES: I'm sorry, what's the objection?

MR. LEVITES: He's answered the question already multiple times.

MS. GRAVES: Well, I think his answer was --

MR. LEVITES: The documents that he has to support it is the multiple processes of quality assurance that it went through after the cooking.

MS. GRAVES: Right. I don't need a statement.

MR. LEVITE: It would have been disclosed during that process.

Well, you invited it. I was happy to just say objection.

BY MS. GRAVES:

Q All right. Do you remember the question?

A No.

MS. GRAVES: Could you read it back, Kathryn?

(Record read page 124, lines 10 - 14)

MR. LEVITES: Same objection. You can answer, Les.

A Okay. And I would go back to the fact that the -- that even if documentation aboard the vessel is not -- from the vessel is not available, that the inspection procedures and the secondary inspections would -- would verify that the product was processed properly.

BY MS. GRAVES:

Q What documents would verify that it was processed properly?

A The NSTS report.

Q What does the NSTS report contain that would

verify that it was processed properly?

A It -- it would be a -- a report that -- that gives the -- that shows the quality of the product.

Q Quality is not food safety, correct?

A Quality and food safety go -- go hand in hand.

Q They may go hand in hand, but the NSTS report does nothing to detect whether or not there's been contamination by a pathogen, correct?

A The NSTS report also --

Q Could you answer my question?

A What is the question?

MS. GRAVES: Read it back to him, please. Kathryn.

(Record read page 126, lines 8 - 10)

A There is nothing listed on the report as far as a pathogen.

BY MS. GRAVES:

Q Thank you.

You don't have the HACCP plan for this particular catching vessel that -- or excuse me, processing vessel that cooked the king crab, the subject king crab, correct?

A Correct.

Q You don't know the date that it was cooked, correct?
A I -- from the sales date I can ascertain the period was -- that -- that it -- the period that it was processed in within about three months.
Q Okay. In 2016, correct?
A That's correct.
Q Okay. But you don't know -- have any records from that processing vessel, correct?
A No.
Q No temperature monitoring records, correct?
A I would not expect to have them, so the answer is no.
Q No sanitation checklists?
A No.
Q And would you agree that you're also making an assumption that there were sanitary conditions aboard the Russian processing vessel at the time the subject king crab was present on board?
A Yes.
Q And you indicated that the crab would have been stored frozen on the processing vessel until I think the next stop would be, did you say, to the Netherlands?

A Most likely, yes.
Q I think somewhere in your report you might have also referenced it could have been Norway?
A That's correct.
Q Are those the two locations that would --
A Those -- those are -- I'm sorry. I didn't mean to step on you.
Q No, that's okay. That was pretty much the end.
Would there be any other locations other than Netherlands or Norway in that time period?
A Not for the Russian vessels.
Q Okay. And how long would it be on the Russian vessel before it would go to the Netherlands or Norway?
A I don't know.
Q Okay. Is there anything -- not knowing how the harvesting works, I mean, are they usually out there for weeks and then they move -- you know, then they move to bring it, or is it months?
I know you indicated there's a period of time for the harvest, but how does that generally work?
A There are two ways that it's transported. One is they will have a -- a refrigerated tramper

pull -- pull up alongside and -- and transfer the product into the tramper. And -- and then that tramper will deliver the product to the cold storages. That's the normal way that I saw it when I was buying.

Q Okay. Did you say it was -- is it a trapper or a tramper?

A Tramper.

Q Tramper with a M?

A A transport vessel with freezers.

Q Okay. All right. So that would pull up alongside the processing vessel and it would go aboard?

A Correct. They would pull -- pull up alongside, and then they would transfer the frozen crab into the frozen hull of the -- of the transport vessel.

Q Okay. And so those transport vessels, they would have to be monitored in some way with regard to the temperature control of whatever area the crab was stored in?

A That is correct.

Q And that vessel would then travel to the Netherlands or Norway?

A Correct.

Q And we don't know -- we don't have any details about -- with regard to the subject crab what tramping vessel delivered it to the Netherlands or Norway, correct?

A Correct.

Q And we don't know whether it went to the Netherlands or Norway either, correct?

A Correct.

Q And you indicated that in the Netherlands or Norway, this is where there would be cold storage facilities?

A Yes.

Q And so these are yet another company that would own the cold storage and would possess the product for a certain amount of time?

A That is correct.

Q So would -- in other words, would Arctic Seafoods have had, you know, some sort of contract with one of these cold storage facilities where they would keep their product?

A Normally what happens is that it -- in the crab businesses, there is -- there is not a contract, but they -- they accept your product and then bill you on a monthly basis for cold storage.

Q Okay. But a relationship with one of these

cold storage facilities?

A Correct.

Q All right. Are they just like a giant warehouse that is essentially a big freezer?

A Yes.

Q Okay. And do those cold storage facilities have HACCP plans?

A I don't know.

Q Do you know anything about the procedures or protocols that they follow to ensure that the product remains frozen?

A I spent a lot of time -- well, I have spent time in cold storages, and they -- they have protocols, but I don't know what they are.

Q And we don't know with regard to this product how long it was in the cold storage facility in either the Netherlands or Norway; is that correct?

A That is correct.

Q And what would have happened -- where would the subject king crab have gone after the cold storage unit in the Netherlands or Norway?

A Arctic Seafood would have either shipped to their -- to cold storages on the west coast or on the east coast. I did not see documentation on any

of the North Coast provided documents that showed that it -- that it was shipped directly to them from -- from the Netherlands or Norway.

Q Okay. And Arctic Seafoods, they have a processing facility as well?

A No, they do not.

Q They do not. Okay.

A Well, not -- not in the U.S.

Q Okay. So their role is to connect with the customer in the U.S. and secure the crab from Russia and store it?

A There's a very tight relationship between Arctic Seafoods and SZRK. And they manage all of the -- all -- all of the crab that comes from their vessels. They -- they sell their goods to various people in the U.S. and invoice and collect.

Q Okay. It's my understanding that before the subject king crab went to the North Coast facility, it was kept in a cold storage facility known as Wilmington Cold Storage, which is I believe also in Massachusetts. Are you familiar with that facility at all?

A I'm familiar with it.

Q From this case or from your career?

A From -- from my career. Overall, there are

a lot of cold storages in Boston.

Q Okay. Knowing nothing other than that, do you believe that the subject king crab would have went from the Netherlands or Norway directly to this Wilmington Cold Storage?

A I don't know. It -- it could have been put in another cold storage prior to that, but I have no idea and no knowledge.

Q Okay. And in terms of its passage here to the U.S. from Norway or Netherlands, would that -- would that have been by some type of ship as well, or could it have been by air?

A That would have been in refrigerated -- or freezer containers which are either 20 feet long or 40 feet long. And -- and in each freezer there is a -- or in each container is a temperature monitor to -- to make sure that the temperature protocols are -- are met.

Q Okay. And those freezer containers, would they have gone by ship?

A By -- by ship and -- I think we've all seen them come in with these containers stacked up on ships --

Q Okay.

A -- to the ports. And they pull them and

then they would be off-loaded at the port at -- at a port, and a trucker pick it up and ship it to the cold -- and take it to cold storage.

Q And these shipping containers, who owns those?

Are they owned by Arctic or some other third-party entity?

A They are owned by the shipping companies.

Q By the shipping companies. Okay.

And it's employees of the shipping company, then, that monitor whether the particular containers are operating properly with regard to temperature?

A Yes.

Q All right. And in this matter we don't have any idea what company that was or what ship or have any information about those -- any type of monitoring that was done, correct?

A Correct.

Q All right. And so when it comes into port, you indicated then typically it would be taken by some type of truck to a cold storage?

A That is correct.

Q Okay. So again, we would presume some type of truck with a freezer, temperature regulated trailer?

A The -- the -- the truck most likely would take the freezer container itself --

Q Oh.

A -- directly to the cold storage.

Q Okay.

A And then -- and then return the container back to the port.

Q Okay. All right. And so again, I understand that the protocol would have been that the product would have stayed frozen from the point it was frozen on the processing vessel all the way until the time it was brought to Wilmington Cold Storage.

But with that said, would you agree that you're making an assumption that that, in fact, happened, that the subject king crab stayed frozen that entire time?

MR. LEVITES: Could you rephrase the question, Shelley?

MS. GRAVES: Sure. I'm going to try to repeat it.

MR. LEVITES: I just lost you a little bit. Sorry.

MS. GRAVES: That's okay.

BY MS. GRAVES:

Q I was saying that I understand your -- that your position is that the protocol -- that by the -- by all the protocols in place, that the product would have -- your position is that the product would have been frozen on catching -- processing vessel, and then it should have stayed frozen from that point through all these many transportation --

MS. GRAVES: Ben, you made me ask a far worse question, so I'm going to -- I can't put it together anymore.

MR. LEVITES: I'm trying to -- I'm just listening.

MS. GRAVES: I'm having flashbacks to the end of Dr. Cumbo's deposition.

Kathryn, can you read my original question back?

(Record read page 135, lines 8 - 17)

A No. If the king crab had -- had undergone a temperature abuse, it is -- it is quite easy to tell because the -- the glaze would have melted off of the crab and it would have been rejected by North Coast.

BY MS. GRAVES:

Q All right. At what point would they have detected that?

A When -- when it arrived at their plant or at their processing facility, because the cases would be closed and when they first opened it, they would see that -- that something was wrong. And it's -- it's very easy to see.

Q And what is it -- if you're looking at a case where that had happened, what is it that you would see? How would you know?

A You would see that there's -- there's -- there is little or no ice on the top of the crab, and that the water would have been on -- on the bottom of the box and possibly all refrozen on the bottom of the box. And yes, I have seen that.

Q So that's something that would likely be identified when the crab was brought to the production line and the boxes were uncovered?

A That probably would -- would have been identified when they inspected the product on arrival at the plant or at their processing facility before it went to the line.

Q Is it your understanding that some inspection of the product happens when it arrives at the plant?

A I -- I saw that they -- they did inspect the crab. I saw the report.

Q All right. Are you talking about the sample report?

A Yes.

Q And that sample report that we're talking about, do you believe that that's a sampling of the lot that the subject king crab came from?

A That, I don't know. But the fact that they do sample, you know, inbound king crab is a positive item.

Q Understood.

I'm looking at page 4 of your report. And you have a line that says, "The crab is packed in 22 kg cartons and shipped to the Netherlands where it undergoes a second inspection for quality prior to shipment to the market."

That second inspection that you're referring to, is that the NTIS [sic] inspection we referred to earlier?

A The -- Northwest Seafood Technical Services.

Q Did I use the wrong initials?

A I think so, but it's -- it's not important at this stage.

Q Okay. And you called that the second inspection for quality. Is the first inspection an

inspection done by the employees on the processing vessel?

A Yes.

Q Okay. Page 4 of your report, subsection e., it's entitled, "Chain of Custody and Control Points."

A Yes.

Q Your first bullet, "Cross contamination in king crab is very unlikely as there is a chain of custody in each step" ...

And I guess I wanted you to explain what you mean by there is a chain of custody in each step.

A The -- the -- the -- the chain of custody means that there -- there is a control on the product from the vessel to the cold storage to the U.S. to the customers for -- excuse me, for -- facility.

Q Uh-huh. That particular bullet, are you essentially referring to what we've just gone through in terms of your testimony?

In other words, is that what you're calling the chain of custody?

A Yes. The -- the product does not sit out on a dock somewhere.

Q Well, we don't know that, though; do we?

A Well, we -- we would find out.

Q Well, with all due respect, we don't have any actual information as to what happened to that box that contained the subject king crab, correct?

MR. LEVITES: Objection. You can answer.

A We don't have any -- any documentation as far as visually seeing that box go from -- from point to point. But on the other -- but the -- the lack of -- of issues such as water or the glaze melting and going to the bottom of the box, it is a strong point that -- that the crab arrived in its original condition.

BY MS. GRAVES:

Q Okay. Well, you haven't seen any inspection report concerning this particular lot of king crab, correct?

A No, I haven't, because I don't know what lot they used.

Q Exactly.

The second bullet in that same subparagraph e. says, "Processing in the U.S. is performed in dedicated sanitary facilities handling only crab."

What do you mean by that?

A You never process crab -- well, a cooked product and a fresh product in the -- in the same

room, because you could have cross contamination.

In North Coast -- in the plant that I owned, I had separate rooms for processing of fish, such as salmon, and then crab.

In -- in North Coast's case, they process fish, as well as crab. And they followed a -- a HACCP program as far as a full sanitation and cleaning of the processing area before the crab is processed.

Q So it would be below the standard of care to process the crab in the same production room where fresh -- fresh seafood products were also being processed?

A That would not be good.

Q And is it fair to say that would heighten the risk of cross contamination in a serious way?

A If -- if you were processing fresh fish and crab in the same room at the same time, that would seriously increase the odds of cross contamination.

Q And the third bullet down, "Crab is transported to markets via cold-chain logistics in sealed cartons with plastic liners."

What part of the process are you referring to there? Are you talking about when the crab would

have been -- left North Coast?
A That can be from Wilmington Cold Storage to North Coast or North Coast to the Big Y supermarkets.
Q And what do you -- what's the "phrase cold-chain logistics" mean?
A It's just a terminology in the seafood business.
Q Okay. I'm not in the seafood business, so that's why I asked.
A I know. The -- the cold-chain means that you -- you keep the product frozen through the entire process.
Q Okay. And going back for a moment to Wilmington Cold Storage, you have not seen any records concerning the temperature monitoring from that storage facility, correct?
A No.
Q And do you recall how the crab was taken from Wilmington Cold Storage to North Coast?
A No.
Q The testimony in the case was that -- that the crab would have been taken to North Coast by North Coast owned trucks with a freezer unit.
And what type of -- do you have any opinion

as to what type of monitoring or documentation should be done with regard to trucks of that nature transferring -- transporting product?

A It -- it actually varies. When I had my plant, I owned it, a freezer truck, which is something you throw money into. And I had temperature monitoring guidelines. They were small and cheap to put in -- to put in the truck to make sure that the temperature were correct.

I have no idea what North Coast did.

Q With regard to Arctic Seafoods, I know you mentioned that obviously you are very familiar with them. Are they a company that you -- you, yourself, had worked with in the past?

A Yes.

Q And have all of your dealings with Arctic been professional dealings?

A Professional and difficult.

Q Okay. What do you mean by "difficult"?

A He's a very hard negotiator.

Q Okay.

A Nice guy, but very hard negotiator.

Q All right. And that's the owner of the company that you're referring to?

A Yes.

Q Are you relying on any information or experience that you have had -- that you had in the past with Arctic Seafoods in rendering your opinions that you set forth in your report?
A No. I have knowledge of the crab, having purchased it in the past, so I have a good feel for it. And -- but -- but in -- in this case, I was simply working with the facts as I saw them.
Q And I think you answered this. I apologize if I already did ask you this, but have you communicated with anyone from Arctic Seafoods since being hired as a consultant?
A No.
Q And it's fair to say from -- from what you know that Arctic Seafoods did not do any processing of the king crab?
A Arctic Seafoods does -- does processing through a secondary processor. And that's for some of the smaller accounts that they --
Q I'm sorry, I think I -- I probably didn't phrase the question -- I was talking about with regard to the subject king crab.
In other words, they didn't do any processing with regard to the subject king crab?
A Correct.

Q Okay. And how about do you know whether any repackaging would have been done?

I know it was -- we talked about it being packaged on the processing vessel. Would -- at that point would it have been packaged into Arctic Seafoods' packaging, or would it -- at any point have gone through any repackaging once it left the processing vessel?

A The -- the -- I -- I believe, okay, and this is -- is a -- I believe that the product is processed on board those vessels into Arctic Seafoods' boxes in bulk, and they are not further processed.

Q Packaged?

A Or packaged.

Q Or processed. Okay.

THE WITNESS: If you get to a breaking point, could I have about 15 minutes to grab --

MS. GRAVES: Okay.

MR. LEVITES: -- to grab a cup of soup?

MS. GRAVES: Whatever you -- absolutely. Right now is perfect if you would like to.

THE WITNESS: Okay, yes, let's do that.

MS. GRAVES: Okay, thank you.

THE WITNESS: Thanks.

(Recess taken)

BY MS. GRAVES:

Q All right. I want to go through the North Coast HACCP plan. Do you want me to put it up on the screen or do you have a copy handy? How would you like to proceed?

A You can put it on the screen, because I don't see a copy of it here in front of me.

Q Sure, no problem.

A Then I'll drag it over to the big screen.

Q Okay. All right. Can you see it there? I'll make it a little bigger for you.

A Yes, I see it.

Q Okay. And so I have -- what I have up right now is Exhibit -- it's Exhibit B to North Coast's October 30th, 2023, interrogatory responses. And so this is -- this is their Hazard Analysis; is that correct, Mr. Hodges?

A Yes, it is.

Q Okay. And you have seen this document before?

A Yes, I saw it amongst the various documents.

Q And can you -- can you explain this document to me?

A Yes, but I have -- gee, I can't scroll it.

Q Oh. Where would you like me to go? I can.

A Okay. This is a HACCP document they use from -- for king crab. Receiving, they have potential hazards of environmental chemicals, pathological bacteria, metal inclusion and allergens. And -- and then they have, "Is the hazards significantly likely to occur," and the allergens is the only one that they state.

And they say crab is an allergan, which is true. And the control is the labeling. And that would be the labeling on the -- on the -- on the package. And they have the -- a CCP as "Yes" at the weighing and packing and -- and labeling portion of the line.

Q Okay.

A The next one is frozen storage.

Q Before you go -- before you skip down with regard to the entry of pathogenic bacteria as a potential hazard, they indicated "No," correct?

A Correct.

Q And they indicated that that fourth column provides -- is a column where they provide the reason as to whether they include or exclude a significant hazard; is that correct?

A That's what it states, yes.

Q Okay. Is that your understanding of what the purpose of this -- that column is?

A Yes.

Q Okay. And so as to the receiving step, pathogenic bacteria, they say "No," and they say, "Controlled by primary processor." And so what do you take that to mean?

A I would -- I would take that to mean that the crab was processed properly and to the proper internal temperature of 165 degrees, although I don't -- I cannot explain exactly what -- what the purpose of their writing that.

Q Okay. All right. And if we go to frozen storage, they again have identified allergens as a critical control point, correct?

A Right.

Q Okay. And for pathogenic bacteria, they have excluded it indicating that the product is frozen?

A That is correct.

Q Okay. And if we move down to the next section, which is cutting, is it fair to say this would be the processing step at North Coast?

A Yes.

Q And --
A Well, the first processing step.
Q Okay. And what would -- what would they be doing during this processing step?
A Well, the -- the processing step -- the cutting or the sawing of the crab, the -- the -- they want to be sure that there's no metal inclusion in the -- in the product, so the saw blades are checked at -- at every break.
The crab itself, the worker will -- will pull up a full cluster of crab, three legs and a claw, and will run it through -- through the saw while holding the legs of the crab. And then throw the -- the cut crab on the belt where it should go from there to a glazing station to put -- to put one more coat of ice on the product to protect where the cuts were made. And then the -- wait, we're at the cutting. I don't want to go beyond that.
Q Okay. So all right. So right, we're at the cutting step. And so they indicated that -- so I'm trying to follow here.
So the metal inclusion, they indicated that it's not a potential hazard, or I should say, "Is the potential significantly" -- "is significant," and they said "No." But --

A Where are you? Are you looking at frozen storage or cutting?

Q Cutting.

A Oh, cutting. Okay.

Q Yeah. So could you take me through what their decisions were there?

A Metal inclusion -- scroll back to the top for a second.

Q That's why -- sorry, I was doing that for myself before.

A Okay, yes.

Q Make it --

A Okay, now.

Q Can you still see it okay if I have it at that size?

A Yeah, that's fine.

Q Okay.

A Metal inclusion, they are saying it's not likely to occur, but it is a hazard because if a saw blade breaks, it could -- it could stick to the crab. And for a cure, they have saw blade checks.

Q Okay.

A That's in -- that's --

Q They deem this as a critical control point?

A Yes. I -- I know on the plant that I owned -- and I can't speak for North Coast, but we cleaned the saw blades at -- at every -- at every break. And in some cases we replaced the blades.

Q Okay.

A I can't speak for them, though, as far as what they do.

Q All right. And then if we turn to "Pathogenic Bacteria," they indicated "No." And they indicated their justification was that the product is frozen and will be thoroughly heated prior to consumption; is that correct?

A I would not have written it that way.

Q Okay. But they did, correct?

A They did, you are correct.

Q All right. And so their justification as to why this is not a critical control point is because pathogenic bacteria will be controlled because the product will be thoroughly heated prior to consumption; is that correct?

A That is --

MR. LEVITES: Objection. You can answer.

A That is what they are stating.

BY MS. GRAVES:

Q And if we go to the top of the Hazard

Analysis, there is a box. I don't know if you can see my cursor.

A Yeah.

Q But it's for "Intended Use and Consumer." And what does it say there?

A It says, "Intended use and consumer. To be consumed, heated and cooked by end user."

Q So per their Hazard Analysis, their -- North Coast is indicating that this is a product that is intended to be heated and cooked by the end user, correct?

A Yes, that is what their HACCP plan says.

Q And they have also made a decision about pathogenic bacteria at the cutting stage based on the intended use being a product that's thoroughly heated prior to consumption, correct?

A Correct.

MR. LEVITES: Objection. You can answer.

A Correct.

BY MS. GRAVES:

Q And if we go to page 2 of that document to the next -- they list the next step as weigh, pack and label. Do you believe that they should have had another step in here for the reglazing of the product?

A Yes.

Q If that had been included, would they be looking at the same factors; environmental, chemicals, pathogenic bacteria, metal inclusion -- well, not metal inclusion probably, but -- or maybe I guess that's for all of them -- allergens?

In other words, all four of those things would be looked at again?

A I -- I am not aware of where they got the information to -- for their HACCP program. It's a bit different than what I would do.

Q Okay.

A But I'm not questioning them.

Q What would you have addressed in the -- if you had a step for reglazing, what would you have addressed for that step?

A I would put cutting, and then I would put glazing, and perhaps sanitize water. Well, sanitize ice water with no hazard analysis. Just very simple.

Q When you say with no hazard analysis, do you mean to say no critical control point because of the sanitized water?

A Correct.

Q Okay.

A Ice -- ice water. Normally what happens is there -- is there is a water control and -- and it -- it goes through a -- a -- a tank that has ice in it to make sure that the water is very cold when it goes back on the crab so it will freeze instantly.

Q Okay. All right. And when we look at the weigh, pack and label step, fair to say that with regard to pathogenic bacteria, they, again, indicated that it did not need to be a potentially -- a significant potential hazard because the product is frozen and will be thoroughly heated prior to consumption?

MR. LEVITES: Objection. You can answer.

THE WITNESS: Hold on one second. There's a -- there's a condo cleaning person outside my -- my window --

MS. GRAVES: Okay.

THE WITNESS: -- blowing dirt.

MS. GRAVES: Okay.

THE WITNESS: Should be gone in a second. I'm sorry.

MS. GRAVES: That's okay.

THE WITNESS: Okay. She's walking away. I'm sorry. Question again, please?

BY MS. GRAVES:

Q Sure. I was just confirming with you that in the weigh, pack and label section, that with regard to pathogenic bacteria, they, again, deemed this to not be a -- there didn't need to be a critical control point here as to pathogenic bacteria because the product is frozen and will -- and the intent is that it will be thoroughly heated prior to consumption?

A That is what they say.

Q And have you seen photographs of the box that the North Coast processed king crab was contained in?

A I don't believe so.

Q Do you recall in your report at page 6 you have a section concerning reheat instructions and safety labeling?

A Yes. If I can get back to that page. Yes, I see that.

Q Okay. So you have quoted there, "Heat before serving. Boil, steam or broil for four minutes." Does that refresh your recollection as to the instruction that was contained on their box?

A I don't recall having seen their box.

Q Okay. Where did you get that -- the

information we're looking at from in your report?

A That's information that is normal to put on crab boxes. And even though crab is basically an RTE product, or ready to eat, if you're going to -- if you're going to heat it for -- boil or steam for four minutes, if you go longer than that, the quality is going to go down.

Q All right. So you just happened to decide to talk about that in your report without being aware that it was on the North Coast box?

A It's -- yes.

Q What did that instruction have to do with your opinions in this report?

A I was -- I was looking at all elements.

Q Okay. Well, I'm going to represent to you that their box does contain that precise instruction. And would you -- given what we have just read on the Hazard Analysis, would you agree that that North Coast box instruction was consistent with their Hazard Analysis that North Coast did not deem it necessary for further control measures concerning pathogenic bacteria at the cutting and the packing stages be taken because the product would be thoroughly heated prior to consumption by the end user?

MR. LEVITES: Objection. You can answer.
A I can understand what -- what they wrote in the HACCP document. However, I do not agree with the HACCP document on that point.
BY MS. GRAVES:
Q All right. Well, they had their own people decide what was appropriate for their HACCP plan, correct?
A That is correct.
Q All right. And the folks at North Coast determined that they were going to justify not making a critical control point with regard to pathogenic bacteria at those two steps because their product was going to be thoroughly heated prior to consumption by the end user, correct?
MR. LEVITES: Objection. You can answer.
A Correct.
BY MS. GRAVES:
Q All right. And they then on their boxes ensured that there was an instruction on the box that the product was to be heated before serving; boil, steam or broil for four minutes, correct?
MR. LEVITES: Objection. You can answer.
A That -- that's -- that statement is on all finished crab boxes. Well, all finished king crab

boxes.

BY MS. GRAVES:

Q All finished crab boxes have that statement?

A All -- all king crab boxes.

Q Okay. And how do you know that?

A Experience. And I've packed millions of pounds of crab.

Q All right. Well, even if that's true, North Coast felt as a result of their Hazard Analysis that their product required reheating, correct?

MR. LEVITES: Objection. You can answer.

A That is what North Coast felt in the -- in the development of their HACCP plan.

BY MS. GRAVES:

Q And this document is an important part of food safety, correct?

A Yes.

Q Are HACCP plans and Hazard Analysis reviewed at times by various auditing agencies like USDA, U.S. Department of Commerce?

A No. HACCP plans tend to be reviewed by customers more than -- more than agencies.

Q And if we -- I'm going to scroll up to Exhibit A, I think. Yeah, Exhibit A. And this

document -- so this is Exhibit A to the October 30, 2023, interrogatory responses of North Coast. And this particular document is also a two-page document. And it's entitled "HACCP Plan."

Have you seen this document before?

A Yes, I did, in the documents.

Q Okay. And what is the nature of this -- excuse me, this particular document?

A They are describing the critical control point of cutting --

Q Okay.

A -- on page 1.

Q Okay. And do I understand correctly that this -- this portion of the HACCP plan is where they would address anything that was deemed a critical control point on that Hazard Analysis that we were just looking at?

A Scroll up to page 2 for me, please.

Q Sure.

A Now back to page 1.

Q Yep.

A There -- the critical control points, there are actually two, and they only respond to one on this HACCP plan. The first one is the cutting that they have, and the -- and the second one is the

allergen that is not on here.

MR. LEVITES: I think the allergen is on page 2, Shelley, if you want to blow it up for him.

MS. GRAVES: Yeah, I was just looking.

BY MS. GRAVES:

Q I think the -- so if we look at the -- if we look at the Hazard Analysis, they indicated allergens for each step, correct, Mr. Hodges?

A Correct.

Q All right. And so would it be your expectation on the HACCP plan that it be listed for each step?

A This is a very unusual HACCP plan.

Q Okay.

A The -- I -- I see on page 2 they have allergen log.

Q Over here (indicating)?

A Yeah. But that's the only place I see it addressed.

Q Okay. And so that allergen log is --

A Wait. Wait. Wait. Go --

Q Oh, sure.

A Okay. Yeah, page 2 should -- should be -- should have above it allergens, because page 2

addresses the allergens. It's just -- you know, it is not clear without a label on top of it. Sorry.

MR. LEVITES: Yeah, the headers are missing from page 2.

A Yeah, that's why I couldn't find it. Do you see that?

BY MS. GRAVES:

Q Right. Well, I think I know what you mean, but --

A The allergens, weigh, package and label --

Q Uh-huh.

A -- allergens properly -- product must be properly labeled.

Q Yeah.

A A case label, you must visually look at it. Every lot has to be done -- the person in charge is the room manager, and put the correct labels on the cases. There should be an allergen log with each checked by quality assurance.

Q Okay. And so our belief would be this section is dealing with it as the answer for all of the places where they indicated that it was a critical control point?

A That is correct.

Q Okay. All right.

A Just a little confusing.
Q That's okay.
And so you kind of went through it with the allergens, but essentially if a critical control point is identified, then this form is how they indicate what things need to be done at that step to monitor and verify and keep records concerning it?
A That is correct.
Q And the HACCP plan document at Exhibit A also indicates at the top that the intended use and consumer would be that it is heated and/or recooked by end user?
A That's correct.
Q All right. And you indicated to me earlier in the deposition that the HACCP plan should also have other documents that are a part of it; is that correct?
A I indicated that there should be a section on glazing.
Q Okay. Yes, no, I -- I was referring to other physical documents such as the sanitation standard of operation.
A Documents like the -- yes --
Q Okay.
A -- there --

Q And I think you indicated to me that you believed you had seen a document like that for North Coast. Did you have a chance on any of the breaks to identify that document?

A No, I did not.

Q And I'm showing you -- we're in the same document, which is the October 30th, 2023, interrogatory responses of North Coast. Interrogatory 6 asked them to identify all policies, rules, instructions, protocols, practices and/or procedures followed by North Coast concerning safe food handling.

And if we look at their answer, they indicated that with regard to written policies, they are set forth in Exhibits A and B, which are what we just looked at, the HACCP plan and the Hazard Analysis, and Exhibit C attached to this pleading. So I'll show you what is attached as Exhibit C.

And this is a document I showed you earlier which is entitled "Quality Management Program." And you indicated that this wasn't a document that you recalled seeing before. And so we can agree that this isn't their sanitation standard?

A I would have to see the whole document,

because some people don't call it an SSOP, as we discussed.

Q Okay.

A Let's see.

Q You can let me know when you want me to scroll.

A Actually, can you make it a little larger?

Q Yeah.

A My eyes are 80 years old.

Q Yeah, no problem. No problem. Just tell me when you want me to scroll.

A Okay. Not now.

Q Oh, I thought you said "okay," meaning you wanted me -- sorry.

A Back to the top. Okay.

MS. GRAVES: Off the record.

(Discussion held off the record)

MS. GRAVES: Let's go back on.

A Okay. I would -- you know, in -- in just briefly looking at this, I would not call it a -- a quality management program, but this is an overall operating management manual. It -- it includes SSOP. I can clearly see -- see some of that in 557 and 562.

BY MS. GRAVES:

Q Okay. So in 557 it refers to some documents, logs used at North Coast, including daily sanitation, thermometer accuracy checks and pest control record?

A That's correct. That's an SSOP.

Q Okay. But you have not seen those documents; have you?

A I have not seen those documents.

Q So you don't know the extent or adequacy of those documents; isn't that fair?

A That is correct.

Q All right. And you said 6.2? Was that the other one?

A Right, 6.2.

Q 6.2 says "Human Resources"?

A No, wait, 5.62.

Q Oh, sorry.

A I'm sorry.

Q No. 5.62, "Review Input"?

A Yes, uh-huh.

Q And what do you see with regard to Sanitation Standard Operating Procedures there?

A The results of the internal and external audit reports. That would include, for example, a USCC inspection of the plant and that the managers

would review to make sure that they were following the -- the correct SSOPs.

Customer feedback not so much, but customer feedback would give them information as to how to improve the product.

Then Process Performance and Product Conformance, the Product Conformance Analysis would be part of the SSOP. The actual process performance would probably be on the speed of the processing.

The Status of -- of Preventing and Corrective Actions would, again, go back to the SSOP that they found a fault and what are they doing to fix this.

And then it says, "Follow-up Actions From Earlier Review," so this is a constantly ongoing process.

Q Okay.

A That's how I see it anyway.

Q All right. But we don't know whether these are documents or whether these -- you have not seen any documents of the nature described here; have you?

A No, I haven't. I'm just -- this is the first time I've read this.

Q Okay. And did you review in this matter

the -- sorry, I don't remember the -- the Retail Food Store Sanitation and Food Safety Policies by Big Y?

A Yes, I did.

Q And is that the type of document -- type of document that you would expect there to be something similar at North Coast detailing in writing the various procedures and protocols?

A That I can't --

MR. LEVITES: Objection. You can answer, Les.

A I can't answer to that. I could just say that retailers normally have a -- have documentation like that. I can't speak for North Coast.

BY MS. GRAVES:

Q Well, I guess my question was whether you would expect there to be a similar type of document at North Coast.

MR. LEVITES: Objection. You can answer, Les.

A My mind goes back to when I had a plant, and what -- what I had. I -- I think that North Coast has a -- a checklist on sanitation and -- and procedures, because I saw one day where things were all checked off.

And that's the more common way of doing it, because you have -- in these plants I -- I don't know how -- how big theirs was, but I had 50 to 60 people working there of which English was their second language. So whatever instructions you gave them had to be clear, and most of them were verbal, not -- not written. But that's -- that's just my case.

BY MS. GRAVES:

Q Okay. Well, the checklist you saw was the checklist that Mr. Brisbois from the quality assurance department would fill out, correct?

A That is correct.

Q That wasn't a checklist meant for the employees; was it?

A I don't believe so.

Q With regard to Big Y, have you ever worked in the grocery store industry?

A I sold to -- to the grocery store industry, yes.

Q I'm sure you did, but did you work for any grocery stores?

A No.

Q Okay. So is it fair to say that you don't have experience or training in terms of the food

safety protocols that a grocery store needs to follow?

A That is correct.

MR. LEVITES: Objection. You can answer.

BY MS. GRAVES:

Q And if we go to page 4 of your report, are you on that page?

A No, I'm not.

Q Okay.

A I'm -- every time we get off on to other documents, I lose that document.

Q That's okay.

A I'm still searching for it.

Q Okay. What I want to ask you about while you're searching is I want to turn to the section which is subparagraph d. on that page which you have entitled "Empirical examination/test to find an average percentage of exposed meat in the shoulder."

Can you tell me what your purpose was in attempting to find an average percentage of exposed meat in the shoulder?

A Give me just one second here.

Q Sure.

A Let's see, copy of the file. Oh, here we are.

MR. LEVITES: Got it, Les?

THE WITNESS: Yeah, page 4, right? Okay.

MS. GRAVES: Page 4, subparagraph d.

A Okay. That paragraph and that exam was a way for me to get the counselor to pay for my dinner.

MS. GRAVES: Smart.

A Actually, it was a question that nobody had asked as far as the percentage of shoulder that was open. There were -- I can break down the king crab by the carpus, propodus, dactylus, merus, et cetera, but no one had asked that one.

And so I said, okay, I will do an unscientific test and go out and buy four legs. And I'm familiar enough with -- with crab to give a pretty close estimate. But that -- that's not scientific. It takes a lot more than four legs to do and --

MS. GRAVES: You knew where I was going with that, Mr. Hodges.

A Oh, no, counselor wouldn't pay for more legs, or else I could have made it scientific.

BY MS. GRAVES:

Q All right. So you would agree with me that that's not a scientifically valid test in terms of

determining what the percentage of crab meat exposed was?

A Exactly.

Q Okay. And is it your opinion that the surface area of exposed crab meat on the king crab leg would be insufficient to allow for contamination by salmonella or another microscopic pathogen?

A That's a long question. Please --

Q Do you need me to repeat it?

A Yes.

MS. GRAVES: Kathryn, can you repeat that one?

(Record read page 171, lines 4 - 7)

A I would say that -- that it would not be open to salmonella or another pathogen because immediately after cutting on the processing line, it is refrozen with another layer of ice.

And if the table is sanitized, there is -- which is -- is part of the SSOPs, the -- the chances are extremely small.

BY MS. GRAVES:

Q Okay. Well --

A Not impossible, but just, you know, extremely small.

Q If contamination occurred as a result of the

cutting process, the refreezing of the crab would not kill the pathogen, correct?

A Correct, because refreezing does -- does not kill pathogens. The cooking process does and the proper -- and having sanitary saw blades.

Q Sure, but we're talking about a situation where if contamination did happen at that cutting phase, because for whatever reason there had not been proper sanitation, the refreezing would not have changed that situation, correct?

A That is -- that is correct.

Q And the original question was whether the -- what you measured as an average surface area of the exposed crab meat, whether that -- whether it was your opinion that that was insufficient to allow for contamination by salmonella or a microscopic organism?

A Very unlikely.

Q What's very unlikely?

A That -- that it would be exposed to salmonella. Am I answering the question?

Q I don't think you are, so let's try it again. Okay.

A Okay.

Q You conducted this unscientific test --

A Right.

Q -- to identify -- to give a guesstimate as to what the percentage of exposed meat in the -- in the shoulder was, correct?

A Right.

Q All right. And my question to you is whether that amount of exposure of the crab meat, right, a certain amount of the crab meat is exposed, is it your opinion that that's not a large enough area of exposure to allow for contamination by a microscopic organism like salmonella?

MR. LEVITES: Objection. You can answer, Les.

A Not impossible, but very unlikely.

BY MS. GRAVES:

Q Why? Why is it very unlikely?

A Well, because the -- the -- when the crab is processed and the cutting of the shoulder -- the workers do not touch the shoulders at any time. The -- or would normally not touch the shoulders.

They would hold the cluster by itself and there are small spines on the crab. Their hands are gloved and they would push it through the saw so that they are cut. It would go on -- from there on to the belt. And I haven't seen their processing

line, so I don't know how many seconds it would take before it was reglazed and reprotected.

An example of the speed of a line, the processing line I had did 8 or 10 cases per minute. So you could see how fast it went down the line.

In North Coast's case, it's entirely different. And I haven't seen the plant. I have no idea as far as their volume that they could do in a day, so I'm kind of lost on this and can't address it, you know, any further.

Q Okay. I want to try to ask the question one more time, though, because I understand what you are explaining to me, but I'm focusing specifically on what you were attempting to measure; how much shoulder -- how much crab meat was exposed. Okay?

And can we agree that if that exposed shoulder meat came in contact with salmonella, it's a sufficient enough area that it could be contaminated?

A It's possible.

Q You understand that salmonella is microscopic, right?

A Yes, I do.

Q It doesn't require much -- much space. If it comes in contact with something, it can

contaminate it, correct?

A That is correct.

Q And that happens instantly, right?

A That I don't know. That's for the doctors.

Q Did North Coast have any -- did you see any written policies for their employees concerning medical conditions for which they should not come to work concerning?

A Yes, there was something -- there was something in their procedures that said if you're sick, go home.

Q Okay. Did it elaborate in any manner what type of sicknesses would require them to stay home?

A Not that I recall.

Q Would you expect a -- would you expect a crab processing facility to provide specific guidance to employees about the nature of sicknesses that would be considered a risk in a -- from a food safety perspective?

A I would expect an overall policy as far as sickness and employees not -- not coming to work when sick.

Q All right. Would you expect that policy to

flush out the types of symptoms that sick -- the type of symptoms that would require someone to stay home, the particular medical conditions, the length of time that they should stay out, things of that nature?

A No. I would -- I would not expect it to be in detail.

Q So is it your opinion that the -- it would be discretionary to the employee as to whether they felt sick or not?

MR. LEVITES: Objection. You can answer.

A Not totally. If the -- if the employee came there even while they are sick and the manager saw they were sick, they would send them home.

BY MS. GRAVES:

Q Do you have an opinion as to whether a processing facility like North Coast should have an environmental monitoring program in place?

A No.

Q No opinion, or no, you don't believe they need to?

A No, I don't believe they -- they need to, and I don't believe that there are very many processing plants that do, or seafood processing plants.

Q Okay. And I just want to make sure the record is clear. You're saying you don't think that many secondary processing plants do?

A That's correct.

Q Do you think any type of swabbing of the facility should be done to check on -- as a control for whether sanitation procedures are being followed?

A That is done at some facilities.

Q And do you think the standard of care requires that?

A I think for -- for my own self in my own plants I would say yes.

Q Mr. Deninno notified Big Y and North Coast within a week of his -- within a week of the incident. Did you find it surprising that North Coast did not take any steps to identify the job number or lot number of the subject king crab?

A North Coast should have known the lot number of the -- of the king crab that was sold to Big Y. That -- that should be in their records. Simply because when crab is processed, it goes into a specific -- a specific lot at -- at -- at the cold storage. When it's sold, there is paperwork showing that -- that that product from that lot left and

went to a designated customer.

Q Can you tell me what your understanding of how the crab was stored and sold at Big Y is?

A From -- from the documents that I read, when the crab comes in, it is -- inspected in the store or looked at in the store to make sure -- make sure that the quality is good. And then it goes in the store freezer.

Then from there there's a freezer chest alongside the seafood where the product is placed until sold. And then it's -- the product is removed from that and put into a bag that then is given to the customer with the weight.

Q Okay. And so it's your understanding that when it's put into the freezer in the fresh seafood department, that it's removed from the North Coast box and placed into that freezer loose?

A No. And first it would -- it would not be in the same freezer as fresh fish. It would be a -- a frozen section. And -- and what the crews normally do is -- is when the freezer outside -- the visible to the consumer freezer, which is next to the line, when the crab volume gets down, they would take the original box, bring it out, open it, put more frozen legs in, and then put the box back in

the cold storage.

Q Okay. So I --

A Or in the store's cold storage.

Q Okay. So the question I was asking, I wasn't indicating that the king crab was put in with fresh seafood. I think you misheard me when I said fresh seafood department --

A Yeah.

Q -- because that's what they called the area it was in.

A Yeah.

Q So we're in agreement it was placed into a freezer in that department? Okay?

A Correct.

Q All right. And what I was asking you is whether at the point it was put into that smaller freezer so that the consumer could, you know, see it, was it taken out of the North Coast box and put loose into that freezer?

A This is the freezer by the -- by the seafood counter?

Q Yes.

A Yes, you are correct.

Q Okay. And as you indicated, at the time that a customer, like Mr. Deninno, purchased it, the

Big Y worker would remove it from that freezer and place it into a bag that he would be given, correct?

A That's what I understand, yes.

Q I noticed on the break in your report on page 2 you indicated that you concur with Thomas Montville opinion that based on the documentation and knowledge, that salmonella was not caused by the Russian Barents Sea red king crab legs.

So do I take it from that sentence that you did see a report of Dr. Montville?

A That was included -- he sent -- well, counsel sent the entire report to me. And obviously, out of curiosity, I looked at the other two. No, wait -- which one is that? You know, I can't recall off the -- off the top of my head, so I would -- I would rather say nothing than something dumb.

Q Okay. So you're not sure whether or not you have the -- Dr. Thomas Montville, who is a microbiologist, whether you have read his report?

A I can't recall.

Q Is it fair to say that you did not rely on anything from Dr. Montville's report in expressing

your own opinions?

A No, I -- I used my own opinions.

MS. GRAVES: I think I'm done, but give me just a couple more minutes to check my notes here.

Okay. Thank you, Mr. Hodges. You have been very patient. I appreciate it. Ben might have some questions for you.

MR. LEVITES: I don't have anything further. Thanks, Les.

THE WITNESS: Thank you, Shelley, Benjamin, Kathryn.

MS. GRAVES: Nice meeting you.

MR. LEVITES: Have a great afternoon, everyone -- evening.

(Discussion held off the record)

THE REPORTER: Ben, can I get your transcript order, please?

MR. LEVITES: Just a PDF. Thank you.

(Time Noted: 5:22 p.m.)

* * * * *

INSTRUCTIONS FOR READING AND SIGNING

Attached or enclosed is your copy of the transcript for the above-mentioned deposition, the reading and signing of which were not waived. After reviewing your copy of the deposition, please make any corrections on the attached errata sheet (NOT on the deposition transcript itself). After noting any corrections, if any, on the errata sheet, please then sign the errata and signature page before a Notary Public.

Within the required thirty (30) days, please return ONLY the notarized signature page and errata sheet, along with a copy, to the attorney who took the deposition, as well as a copy to our office. Please contact our office if you have any questions.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEPHEN DENINNO, ET AL., | : CIVIL ACTION NO.: |
| Plaintiffs, | : 3:22-CV-00580-RNC |
| vs. | : |
| NORTH COAST SEA-FOODS CORP., | : |
| ET AL., | : |
| Defendants. | : APRIL 8, 2026 |

VIDEOCONFERENCE DEPOSITION OF:
LESLIE HODGES

J U R A T

I, LESLIE HODGES, do hereby certify that the foregoing testimony given by me on April 8, 2026, is true and accurate, including any corrections noted on the Errata Sheet, to the best of my knowledge and belief.

______________________
LESLIE HODGES

Subscribed and sworn to before me this _____ day of

___________, 2026

____________________
Notary Public

My Commission Expires:___________________

# ERRATA SHEET

Please note any error(s) and/or correction(s) thereof on this sheet. The rules require a reason for any change or correction. It may be general, such as "to correct stenographic error," or "to clarify the record," or "to confirm with the facts."

This must be accomplished within thirty (30) days from the date on Errata Sheet. A copy should be sent to the attorney who took the deposition. All other counsel of record should be sent a copy, along with a copy to our office for our records.

3:22-CV-00580-RNC
DENINNO, ET AL. V. NORTH COAST SEA-FOODS, ET AL.
DEPOSITION OF: LESLIE HODGES
TAKEN: APRIL 8, 2026

| Page | Line | Correction | Reason for Change |
|---|---|---|---|
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |

______________________________
LESLIE HODGES

Subscribed and sworn to before me this _____ day of ___________________, 2026.

My Commission Expires:________________

Copy



STATE OF CONNECTICUT)
COUNTY OF NEW LONDON)

I, Kathryn Little, a Notary Public within and for the State of Connecticut, do hereby certify that I took the deposition of LESLIE HODGES, an expert witness in the above-entitled action, pursuant to the Federal Rules of Civil Procedure, on April 8, 2026, at 6125 Northeast 175th Street, Unit 302, Kenmore, Washington, commencing at 10:00 a.m.

I further certify that said witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, and that the testimony was taken by me stenographically and thereafter reduced to writing under my supervision; and that I am not an attorney, relative or employee of any party hereto nor otherwise interested in the event of this cause.

In witness whereof, I have hereunto set my hand and affixed my seal this 1st day of May 2026.

Kathryn Little

My Notary Public Commission Expires: March 31, 203