UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO<br>*Plaintiffs*<br><br>v.<br><br>NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC.<br>*Defendants* | ) | CIVIL ACTION NO.:<br>3:22-CV-00580-SVN<br><br>AUGUST 14, 2026 |

**PLAINTIFFS' MOTION TO PRECLUDE DEFENDANTS' EXPERT WITNESS, THOMAS MONTVILLE, Ph.D.**

The plaintiffs, Stephen DeNinno and Mary DeNinno, hereby file this motion to preclude the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc., from offering into evidence any expert opinions or testimony from Thomas Montville, Ph.D.

## I. FACTUAL BACKGROUND

The plaintiffs, Stephen DeNinno ("Stephen") and Mary DeNinno ("Mary"),[1] filed this lawsuit against the defendants, North Coast Sea-Foods Corp. ("North Coast") and Big Y Foods, Inc. ("Big Y"),[2] under the Connecticut Products Liability Act. (Compl. Doc. 1-2.) The lawsuit arises out of the purchase of king crab legs at a Big Y World Class Market on July 27, 2018. (*Id.*) The plaintiffs allege that the subject king crab was contaminated with salmonella. (*Id.*)

On July 27, 2018, Stephen purchased three (3) pounds of king crab legs ("subject king crab") from a frozen seafood case at a Big Y World Class Market located in Danielson,

[1] Stephen and Mary may be referred to collectively as "the plaintiffs".

[2] North Coast and Big Y may be referred to collectively as "the defendants".

Connecticut. (S. DeNinno Dep. 21:4–25:4 (October 20, 2023), Ex. D.) Stephen never received any instruction that he needed to reheat the subject king crab before eating it. (*Id.* at 109:19-22.) After purchasing the subject king crab, Stephen drove home and placed them in his refrigerator. (*Id.* at 25:24–26:11.) Later that afternoon, Stephen thawed the crab legs, removed the meat from the shells, and shared a portion of the cold crab meat with his wife, Mary. (*Id.* at 29:3–23.) For dinner, Mary prepared baked king crab macaroni and cheese casserole by combining the remaining crab meat and other ingredient. (*Id.* at 36:12–22).

In the early morning hours of Saturday, July 28, 2018, both Stephen and Mary awoke violently ill. (S. DeNinno Dep. 38:8–39:12.) Both Stephen and Mary developed severe gastroenteritis within 14–17 hours of consuming the crab. (*Id.*) Throughout the weekend, the plaintiffs endured relentless diarrhea, cramps, and vomiting. (*Id.* at 38:8–40:1, 54:23–55:1.)

After being hospitalized at William Backus Hospital on July 31, 2018, for acute kidney failure from food poisoning, (S. DeNinno Dep. 41:16–45:17.), Stephen filed a complaint with Big Y on August 2, 2018, which included a written report titled "Food Borne Illness Investigation Report" ("Big Y Report"). (Big Y Food Report (Aug. 2, 2018), Ex. E.) Stephen specifically identified the king crab legs purchased on July 27 and reported that both he and Mary became sick. (Id.) Importantly, during the prior week of July 23, 2018, Stephen and Mary did not share any meals due to Stephen's extended work hours managing an emergency operations center at CharterCARE Health Partners, a hospital system in Rhode Island. (S. DeNinno Dep. 8:19-21, 19:16–20:12, 44:2–6.) Thus, Stephen specifically noted in the Big Y Report that the crab legs were the only food that he and his wife had eaten in common. (Big Y Report.)

In the fall of 2018, a rheumatologist, J. Scott Toder, MD, suspected that Stephen could be suffering from a condition known as reactive arthritis and ordered bloodwork that he underwent

in October 2018. (S. DeNinno Dep. 48:8–49:22.) The blood test returned positive for *salmonella* antibodies and led to a diagnosis of reactive arthritis directly triggered by the food poisoning. (*Id.*) Over the next seven (7) years, this condition has left Stephen with severe, chronic joint pain and swelling in his knees, hands, and back, severely limiting his mobility. (*Id.* at 83:15–85:11, 112:2–10, 120:8–14.) He further developed lasting gastrointestinal issues causing chronic bouts of diarrhea and a severe magnesium disorder necessitating ongoing weekly infusions. (*Id.* at 86:24–96:25.)

Under the Connecticut Products Liability Act (Connecticut General Statutes § 52-572m et seq.), the plaintiffs assert claims of strict product liability, negligence, breach of express warranties, and breach of the implied warranty of merchantability against North Coast and Big Y. The plaintiffs allege that the defendants, acting as product sellers who manufactured, distributed, or retailed the subject XL King Crab legs, placed an adulterated, defective, and unreasonably dangerous food product into the stream of commerce. The plaintiffs claim the crab legs were contaminated with salmonella.

## II. LAW

Rule 702 of the Federal Rules of Evidence provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court performs a "gatekeeping" function in deciding whether the expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In defining the gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-cv-01657 (JCH), 2024 WL 4866716, at *2 (D. Conn. Nov. 22, 2024).

As to the issue of reliability: "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "[I]n fulfilling its 'gatekeeping' function, district courts should 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . .'" *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

In *Daubert*, 509 U.S. at 593–94, "the Supreme Court identified several factors that may be considered in assessing reliability: (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Amorgianos*, 303 F.3d at 265 (quoting *Daubert*, 509 U.S. at 593–94)).

With that said, "[t]hese factors . . . do not constitute a 'definitive checklist or test.' . . . Instead, the inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Kumho Tire*, 526 U.S. at 150).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).

Turning to the third consideration; namely, relevance and assistance to the trier of fact: "[I]n order to determine whether the expert's testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702, the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case."[3] *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 364 (D. Conn. 2001) (citing *Daubert*, 509 U.S. at 591-92); *see also Amorgianos*, 303 F.3d at 265 ("[i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the

[3] Similarly, "expert testimony is also subject to Rule 403 and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' . . . Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595).

determination of the action more probable or less probable than it would be without the evidence'" (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401)).

## III. <u>General Background / Qualifications of Expert</u>

Dr. Montville holds a Ph.D. in Food Science and Technology with a concentration in microbiology. He worked as a research microbiologist for the U.S. Department of Agriculture ("USDA") from 1980-1984. (Montville Dep. 145-11, **Exhibit C**) For the next 31 years, through 2015, he was a professor of Food Science at Rutgers University ("Rutgers"). He testified that during his career at Rutgers it was "very rare" for him to directly engage in scientific research in the lab, rather he supervised the research of Master's students and Ph.D. students. (Montville, 22:19-25.)

About 15 years ago, he began acting as a Food Safety consultant in legal matters. (Montville Dep. 176:6-7.) He testified he has only served as an expert in one prior food poisoning case – he doesn't recall the pathogen involved – he testified on behalf of the defendant. (Montville Dep. 175:8-176:5.) He testified that his field of expertise is "food science with a specialization in food microbiology" explaining that food microbiology entails "knowledge of the various pathogens that can be found in foods, how to control them, what diseases they cause, and where [sic] they are particularly associated with." (Montville Dep. 46:17-47:3.) He agreed he is not an expert in epidemiology or public health. Other than food science and technology, inclusive of food microbiology, he does not consider himself to have expertise in any other fields of science, including medicine. (Montville Dep. 50:14-51:3.)

<u>Salmonella Experience:</u> He testified that he has never served as an expert witness in any matter concerning salmonella. (Montville Dep. 179:16-19) His work as a research microbiologist

for the USDA did not concern Salmonella[4]. (Montville Dep. 15:8-11). During his career at Rutgers, in or around 1989, he supervised the scientific research of a master student at Rutgers involving a methodology for enumerating the quantity of salmonella organisms in a food product. (Montville Dep. 15:21-20:13; 23:1-26:13.) He did not supervise any other scientific research concerning Salmonella, nor did he himself conduct any research on Salmonella. (Montville Dep. 26:19-23.) Regarding the courses he taught at Rutgers, one course included a single lecture on the topic of salmonella. (Montville Dep. 20:14-21:13.) He is a co-author of a textbook entitled "Food Microbiology – An Introduction" – there is a chapter on Salmonella but he did not recall if he wrote that chapter. (Montville Dep. 21:10-22:9)

He testified that he is not relying on any of his publications, or any scientific research he performed at USDA or Rutgers, as a basis for the opinions he is expressing in the subject matter. (Montville Dep. 26:24-28:3)

Rule 26 Disclosure of Dr. Montville as Expert Witness

Dr. Montville's signed Expert Disclosure dated May 13, 2025 (**Exhibit A)** states:

> A statement of my opinions and the basis and reasons for them are summarized within my signed report of May 13, 2025, attached hereto as Exhibit A. In summary, it is my opinion to a reasonable degree of scientific certainty that Stephen DeNinno and Mary DeNinno did not have a salmonella infection due to the ingestion of King Crab legs sold by Big Y and North Coast Seafoods. There is no scientific evidence to demonstrate that the crab product was contaminated or that any condition or illness allegedly sustained by the DeNinnos was causally related to the consumption of the King Crab product.

Dr. Montville's above referenced signed report of May 13, 2025 (hereinafter referred to as "Report") similarly sets forth the following as his "Opinion":

[4] From 1980-1984, when he worked as a research microbiologist for the USDA, he researched the safety of home-canned tomatoes in association with the pathogen Clostridium botulinum. (Montville Dep. 14:5-23)

> I can state with a reasonable degree of scientific probability that there is no supporting evidence that Mr. Deninno's alleged case of salmonellosis was caused by consumption of crab legs purchased at Big Y. It is in all probability transmitted from other sources.[5]

(Report 2:15-19, **Exhibit B**)

The "Analysis" section of his Report organizes the basis for this sweeping opinion into four underlying predicates as follows:

1) Mr. DeNinno's medical records do not support a salmonellosis diagnosis (Report 2:25-3:48.);

2) Correlation is not causation (Report 4:50-66.);

3) There are other possible causes for Mr. DeNinno's alleged case of salmonellosis (Report 4:67-5:77.); and

4) North Coast and Big Y kept crab legs frozen to prevent the growth of bacteria. (Report 5:78-8

## IV. ARGUMENT

### 1. <u>DR. MONTVILLE SHOULD BE PRECLUDED FROM OFFERING OPINION TESTIMONY THAT STEPHEN DENINNO'S MEDICAL RECORDS DO NOT SUPPORT A SALMONELLOSIS DIAGNOSIS</u>

#### A. At deposition, Dr. Montville abandoned his opinion that Mr. DeNinno's medical records do not support a Salmonella diagnosis

Dr. Montville states as the first section of his "Analysis", and the first predicate for his ultimate opinion, that Mr. DeNinno's medical records do not support a salmonellosis diagnosis. (Report 2:24-3:48.) However, at deposition, Dr. Montville abandoned any such opinion as follows:

---

[5] See also "Conclusion" section of Report Page 5, Line 84-86 similarly stating: "I can state with a reasonable degree of scientific probability that Mr. Deninno's alleged case of salmonellosis was not caused by consumption of crab legs purchased at Big Y.

- He testified it was his expert opinion that it was more probable than not that Stephen and Mary DeNinno were suffering from salmonellosis on 7/28/2018. (Montville Dep. 67:16-19; 68:23-69:1.)
- He also testified that even at the time of he issued his Report on 5/13/2025, it was his opinion that Stephen and Mary DeNinno were suffering from salmonellosis on 7/28/2018. (Montville Dep. 67:16-68:10.)

Moreover, other testimony elicited from Dr. Montville further evidences his abandonment of any opinion that the medical records do not support a Salmonella diagnosis. He testified as follows:

- With regard to Stephen DeNinno's 10/30/2018 Salmonella positive Salmonella antigen test, Dr. Montville testified that the positive findings are evidence that Stephen DeNinno had been exposed to Salmonella; that the antibodies to Salmonella antigens can persist in blood for months; that the positive finding on the 10/30/2018 was not inconsistent with the occurrence of a 7/27/2018 Salmonella infection; that a medical doctor can use positive results from such a test in conjunction with other clinical information concerning the patient to make a determination that a gastrointestinal illness is more likely than not from Salmonella.[6] (Montville Dep. 70:2-73:4);
- He conceded that Stephen DeNinno's initial emergency room records from his 7/31/2018 admission for acute kidney failure supported a diagnosis of salmonellosis - admitting that

[6] In his Report, he stated: "The presence of salmonella antibodies was noted, but antibodies can persist in blood for months. Thus, salmonella antibodies are not evidence of salmonellosis in the current litigation". (Report 3:41-43.) As evidenced by the referenced deposition testimony, Dr. Montville abandoned this opinion that the salmonella antibodies are not evidence of salmonellosis in this matter and the plaintiffs' motion to preclude any testimony that the medical records do not support a diagnosis of salmonellosis is inclusive of the 10/30/2018 antibody test.

his acute gastrointestinal illness described consisted of symptoms that are classically associated with salmonellosis.[7] (Montville Dep. 57:12-22.);

- He conceded that in his review of Stephen DeNinno's medical records concerning the July 2018 acute gastrointestinal illness, he did not find anything within those records that was inconsistent with a diagnosis of salmonellosis. (Montville Dep. 66:3-8.);
- He conceded Mary DeNinno's deposition testimony concerning her symptoms of acute gastroenteritis that also began on 7/28/2018 was likewise consistent with a salmonella infection. (Montville Dep. 66:12-24.);
- He testified that he did not hold any opinion that it was more probable that Stephen and Mary DeNinno's acute gastroenteritis symptoms were caused by some other pathogen or cause other than Salmonella. (Montville Dep. 67:4-11);
- He claimed he had offered the opinion that the medical records did not support a salmonella diagnosis in his Report because at the time the report was issued, he was unaware that salmonellosis could result in an arthritic condition. He testified that he subsequently learned that Salmonella is a recognized trigger for reactive arthritis. He learned this fact two weeks before the second session of his deposition from a journal article that he read in preparation for his deposition.[8] He stated Mr. DeNinno's

---

[7] It should be noted in his Report, he carelessly supported his now abandoned opinion by stating that the final diagnosis list in the admission record was low back pain, hypertension and long-term use of aspirin. Report 3:44-45. That final diagnosis was however for the wrong admission record. As indicated by his own footnote, he relied on an 8/14/2018 emergency room record from two weeks after Stephen DeNinno's 7/31/2018 admission for his acute gastrointestinal illness – whereas the 8/14/2018 admission was for the sudden onset of flank pain. Though his Report then quotes the discharge diagnosis from the correct 7/31/2018 admission of "toxic effect of noxious substance eaten as food", he chose to make no mention in his Report of Mr. DeNinno's gastrointestinal symptoms of severe diarrhea and abdominal cramping noted in that record, despite having himself noted at the start of his Report's analysis section that these are classic salmonellosis symptoms. His opinion that the medical records do not support a salmonellosis diagnosis was misleading at the start.

[8] The journal article, described by the deponent as "a paper by Sanchez about salmonella in domestic animals" was discovered by Dr. Montville as a result of a search performed within the two weeks before the second session of his deposition (5/4/2026). (Montville Dep. 44:14-45:19)

rheumatological records therefore also provide a record of salmonella having been associated with his reactive arthritis condition as diagnosed by his treating rheumatologist. (Montville Dep. 54:15-57:11.)

Rule 702 of the Federal Rules of Evidence requires expert opinion to be based upon "sufficient facts or data." Dr. Montville has conceded by the foregoing admissions that his analysis of the underlying facts no longer provides the basis for an opinion that Stephen DeNinno's medical records do not support a diagnosis of Salmonellosis. As such, Dr. Montville should be precluded at trial from expressing any expert opinion that the Stephen DeNinno's medical records do not support a diagnosis of Salmonellosis.

**B. Dr. Montville should be precluded from offering medical opinion testimony.**

Dr. Montville is not qualified to offer medical opinions on medical diagnosis, medical causation or medical treatment decisions. A threshold requirement under Fed. Rules of Evid. 702 is that an expert witness must be qualified by "knowledge, skill, experience, training, or education" in the specific field in which their opinions are offered. Dr. Montville holds a Ph.D. in Food Science and Technology with a concentration in microbiology. He testified:

- He is not a medical doctor, he does not treat patients or perform differential diagnoses (Montville Dep. 47:4-6, 14-20, 50:11–13);
- His only familiarity with medical records comes from reviewing them for legal defense consulting (Montville Dep. 47:21–48:13).

- He has no training in medical microbiology. He explains that medical microbiology is the study of diseases that patients get and what their causative agent might be. (Montville Dep. 47:7–13);
- His expertise is limited to food science, food technology and food microbiology (Montville Dep. 50:21-513.).

In accord with plaintiffs' position in this regard, defense counsel purposely solicitated an admission from Dr. Montville during cross examination at his deposition that he cannot offer medical opinions, and any medical opinions are outside his expertise. (Montville Dep.180:18–25; 181:10–13.)

**2. <u>DR. MONTVILLE SHOULD BE PRECLUDED FROM OFFERING OPINION TESTIMONY THAT THE PLAINTIFFS FAILS TO DEMONSTRATE CAUSALITY BECAUSE THEIR CLAIMS ARE BASED SOLELY ON CORRELATION</u>**

The second predicate of Dr. Montville's opinion is as follows:

> That Mr. DeNinno became ill after eating the crab leg does not speak to attribution. There is a temporal correlation between time of consumption and onset of illness, but correlation does not prove causation. The plaintiff's complaint fails to demonstrate causality. It is based solely on temporal correlation that the crab legs were the last thing eaten before Mr. DeNinno became ill.

(Report, 4:51-54)

He further provides a hypothetical example in explanation of "correlation is not the same as causation" and concludes with the following remark: "It is human nature to think that something that happened was caused by the thing that happened immediately before it. But this is not always the case."

In offering the above predicate opinion, Dr. Montville chooses to rely on catch-phrase

rhetoric - "correlation is not causation" - rather than undertake appropriate scientific analysis of the facts. Presumably Dr. Montville sets forth this factually void and baseless opinion concerning the plaintiffs' causation theory in an effort to confuse the jury with a scientific principle that simply does not fit the plaintiffs' claims.

The relevant question is whether temporal proximity, combined with biological plausibility and exposure context, adequately support a causal inference. When examined at deposition on those precise issues, he testified as follows:

- That the incubation period for Salmonella is 6 hours to 6 days from the time food is consumed until the person becomes symptomatic. (Montville Dep. 58:3-13)
- That the DeNinnos consumption of the crab on 7/27/2018, and their respective acute onset of symptoms at approximately 4am and 6am the next day, 7/28/2018, falls within the recognized incubation period for salmonella. (Montville Dep. 60:19-61:1)
- That the onset of gastrointestinal symptoms from Salmonella in two persons within approximately two hours of each other is indicative of a shared contamination source having been consumed **within the 24 hours before infection**. (Montville Dep. 64:3-66:2.)
- That the crabmeat of a King Crab is susceptible to contamination by Salmonella (Montville Dep. 87:25-88:4; 115:8-12.)
- That if the transmission source was a food source, then based upon the dietary history provided by Mary and Stephen DeNinno, he would agree that the king crab they ate for lunch on 7/27/2018 would be the most probable food source for their salmonella infection. (Montville Dep. 100:17-101:19.)

The objective of the Court's gatekeeping requirement with regard to expert testimony is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). To determine if an expert's analysis is reliable, "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand" is to be undertaken. *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2d Cir. 2002).

Here, Dr. Montville dismissed causality with a "correlation is not causation" opinion without reasoned consideration of the facts and applying no scientific methodology – it is therefore not scientifically reliable. Based on this lack of scientific rigor, and his above testimony responses when asked to consider the facts, he should be precluded from offering 1) any expert testimony asserting or suggesting that the plaintiffs' claims are based solely on temporal correlation, or 2) offering any hypothetical example to the jury prejudicially suggesting that the plaintiffs' claims are based on a mere assumption that it was the King Crab simply because that was what they ate the day before. His predicate opinion set forth in his Report Section of "Correlation is not Causation" (Report 4:51-66) is neither scientifically reliable, nor relevant, and should be precluded.

**3. DR. MONTVILLE'S OPINION TESTIMONY CONCERNING ALTERNATIVE CAUSES FOR MR. DENINNO'S SALMONELLOSIS SHOULD BE PRECLUDED.**

Dr. Montville's third predicate opinion contained within his Report states that there are other possible causes for Mr. DeNinno's salmonellosis. He separates those causes into two categories: other food sources and non-food sources. (Report 4:67-70.)

As to Other Food Sources**,** his Report states only:

> There is no objective evidence suggesting that the crab legs were any more likely to cause the illness than any of the other foods Mr. DeNinno ate in the six days prior.

(Report 4:67-69.)

As to Non-food Sources, Dr. Montville's report sets forth that "salmonella bacteria can come from non-food sources transmitted by a fecal/oral route." (Report, p. 4, lines 69-70.) Next, he offers several examples of possible non-food transmittal sources:

> Example 1: A person carrying salmonella, with poor hygiene after defecating, transfers the bacteria from their hand to a toilet lever or door knob, whereupon it is then transmitted to the next person who touches the toilet lever or door knob;
>
> Example 2: "Kitchens are notorious for the presence of food poisoning bacteria". Dr. Montville does not provide any explanation concerning how infection from this transmission might occur in the Report;
>
> Example 3: "Person-to-person transmission of salmonella bacteria is well documented." – Dr. Montville does not provide any explanation concerning how infection from this transmission might occur in the Report; and
>
> Example 4: "Dogs also transmit salmonella bacteria. Salmonella were reported to be present in up to 43% of asymptomatic dogs." – Dr. Montville does not provide any explanation concerning how infection from this transmission might occur in the Report

(Report, 4:69-5:77.)

The Report thereafter provides no application of any case specific facts to any of these possible transmittal sources, nor any other analysis.

When Dr. Montville was asked at his deposition to articulate the expert opinions he intended to express in this matter, his answer was twofold: 1) that it was probable that the

DeNinnos had salmonellosis; and 2) that there was a non-food transmission source that was more probable than the King Crab legs to have caused Mr. DeNinno's salmonellosis – "dogs". (Montville Dep. 68:20-69:23.) When asked if there was any other source besides dogs that he thought was more probable that the crab legs, he answered "No." (Montville Dep. 69:21-70:1.) Subsequently at the deposition, Dr. Montville changed that testimony to state that the DeNinno's kitchen was a more probable source of the Salmonella than the King Crab. (Montville Dep. 104:18-22.)

**A. Testimony as to other possible causes for Mr. DeNinno's salmonellosis should be precluded.**

Expert opinion testimony that is nothing more than conjecture as to other possible transmission sources for the DeNinno's Salmonella infection should be precluded on the basis that such testimony will be too speculative to assist the finder of fact and poses risk of confusing and misleading the jury. *See Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *10 (D. Conn. Feb. 28, 2022) (experts conjecture as to several possible manufacturing errors without any specific theory of failure was "too ambiguous and speculative to be helpful to a fact finder" and "rooted in a guess about what happened"), citing, *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 590 (noting that expert opinions that reflect "subjective belief or unsupported speculation" must be excluded). Dr. Montville's testimony concerning "other possible causes", as discussed more fully below, should therefore be precluded on this legal basis.

**1. "Other Food Sources" as a possible cause**

The singular statement expressed by Dr. Montville in his Report concerning "other food sources" is:

> There is no objective evidence suggesting that the crab legs were any more likely to cause the illness than any of the other foods Mr. DeNinno ate in the six days prior.

(Report 4: 67-69.)

At deposition, Dr. Montville testified that the lack of objective evidence referred to was that no microbiological isolate testing on a sample of the king crab legs that had been eaten by the DeNinnos had been undertaken. (Montville Dep. 90:10-91:1.) He further testified that it is not unusual in food poisoning cases for the suspected food to no longer be available for testing.[9] (Montville Dep. 90:10-91:1.) Notwithstanding, as elaborated in Argument Section 1, Dr. Montville conceded at his deposition that if the transmission source was a food source, then based on the dietary history testified to by the DeNinnos and the near simultaneous onset of their symptoms (two hours apart), the king crab eaten at lunch was the most likely food source for the DeNinno's Salmonella infection. Dr. Montville also did not identify in his report or deposition testimony any other food source eaten by the DeNinnos that he even considered to be the source of the DeNinno's salmonellosis. Indeed, at his deposition he could recall the details of the dietary history provided by either of the DeNinnos or their history of shared foods. (Montville Dep. 93:13-15)

As such, Dr. Montville should be precluded from offering any opinion testimony concerning possible alternative food sources as too speculative to assist the finder of fact and posing a significant risk of misleading the jury.

**2. <u>Non-food Source Examples 1 (toilet lever/door knobs) and 3 (person-to-person transmission).</u>**

---

[9] The 3lbs of king crab legs purchased by the DeNinno – half were consumed at lunchtime on 7/27/2018 by Mr. and Mrs. DeNinno and the other half were used in a baked crab macaroni and cheese casserole eaten at dinner. See Fact Section. The leftover casserole was discarded by Mary DeNinno on 7/29/2018. (M.DeNinno Depo 38:12-16, **Ex. N**.)

Dr. Montville should be precluded from offering any testimony concerning the types of transmittal sources exemplified by Examples 1 and 3 of his Report:

> Example 1: A person carrying salmonella, with poor hygiene after defecating, transfers the bacteria from their hand to a toilet lever or door knob, whereupon it is then transmitted to the next person who touches the toilet lever or door knob;
>
> Example 3: Person-to-person transmission.

(Report, 4:69-5:77.)

Neither in his report, or during his deposition, did Dr. Montville identify either Example 1 or Example 2 as being the likely source of the DeNinno's salmonellosis. Rather, Dr. Montville directly testified that in his opinion these two particular examples of alternative non-food sources were less probable than a shared food source to have been the source of transmission to the DeNinnos based upon their medical history of near simultaneous symptom onset of salmonellosis (within 2 hours of each other). (Montville Dep. 101:24–104:3; 121:21–124:8.)

Thus, the above hypothetical scenarios are not only based in pure speculation as to the manner in which the staggered infections of the spouses would have occurred, they do not plausibly fit the facts of the case as conceded by Dr. Montville. Therefore Dr. Montville should be precluded from offering any testimony concerning the types of transmittal sources exemplified by Examples 1 and 3 as too speculative to assist the finder of fact and posing a significant risk of misleading the jury.

**B. Dr. Montville's opinion testimony as to probable non-food alternative causes for Mr. DeNinno's salmonellosis should be precluded.**

**1. Rule 26 (a)(2)(B) Report Deficiencies**

As stated above, Dr. Montville testified at his deposition that two alternative non-food sources were more probable than the King Crab as the source of the DeNinno's salmonellosis – namely their kitchen and their dogs. The opinions expressed by Dr. Montville at his deposition

in regard to each of those alternative sources will be discussed in full below. However, Dr. Montville should not be permitted to express those opinions at trial on the basis that his Report was unjustifiably deficient in violation of the Rule 26(a)(2)(B). In fact, his Report provided no application of any case specific facts to <u>any</u> of the <u>possible</u> transmittal sources he listed, nor any other analysis. (Report, 4:67-5:77.) He did not articulate in his Report any opinion that after scientific consideration of these possible alternative sources, he had made any determination that any were a more probable source of the DeNinno's salmonellosis than the King Crab. See Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). An expert report should be "detailed and complete ... stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." Fed. R. Civ. P. 26 advisory committee's note to 1993 amend.

As the opinion stated in his Report was that these were merely "other possible causes", these opinions should be precluded as too speculative to assist the finder of fact and posing the significant risk of misleading the jury.

**2. <u>The "Pet Dog" Transmission Theory</u>**

At his deposition, Dr. Montville offered an opinion that it was "more probable than not" that the DeNinnos contracted a *Salmonella* infection from their pet dogs rather than the king crab legs. (Montville Dep. 69:2-70:1; 124:9-19.) When asked to articulate the basis of his pet dog opinion, his reasoning was that there is "lots of evidence" of dogs harboring salmonella, but no documented evidence of Salmonella contaminating King Crab. (Montville Dep. 124:15-125:11).

In summary, and as will be set forth more fully below, Dr. Montville's scientific method was as follows. He searched and located literature supporting asymptomatic dogs as a plausible causation source of a Salmonella infection in a human. He then searched for documentation that

would evidence contamination of crab and King Crabs specifically by Salmonella using Google Scholar, PubMed and the CDC's National Outbreak Reporting System online database for recorded outbreaks. Then, premised on an assertion based on the literature that "up to 43% of dogs" may be asymptomatic carriers of Salmonella - in comparison to having found no documentation evidencing the contamination of crabmeat generally, or King Crab specifically, by Salmonella - he reached his opinion that it was more probable that the DeNinnos pet dogs were the transmission source of the Salmonella than the King Crab.

As will be discussed in detail below, Dr. Montville's opinion is scientifically unreliable and only connected to the facts by ipse dixit. "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266, quoting, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d508 (1997). See *Ruggiero v. Warner-Lambert Co*., 424 F.3d 249, 255 (2d Cir. 2005).

**a. Literature concerning dogs and Salmonella relied on by Dr. Montville**

In his Report, Dr. Montville supported his opinion that the DeNinnos' pet dogs were the probable source with four scientific publications.[10] Two of the publications were studies regarding the presence of Salmonella in the feces of asymptomatic dogs. The first is a book

[10] Dr. Montville testified that with regard to scientific literature, he relied only on the literature cited in his report and a new article (Sanchez) provided at his deposition. (Montville Dep. 153:11-15.). He also testified that he had not relied on any research (lab research or publications) pertaining to Salmonella of his own in the formation of his opinions in this matter. (Montville Dep. 26:24-28:7)

chapter entitled "Salmonella Infections in Dogs and Cats" by Carter & Quinn, *Salmonella in Domestic Animals* (2000) (**Exhibit F**) (hereinafter referred to as "Carter") and the second is an article by Cantor, et al, *Salmonella Shedding in Racing Sled Dogs*, J. Vet. Diag. Invest. 9:447-448 (1997) (**Exhibit G)**

(hereinafter referred to as "Cantor").

Carter was identified as the source for the assertion in his Report that Salmonella was reported to be present in up to 43% of asymptomatic dogs. (Report 5:76-77.) He conceded during the deposition that what Carter specifically indicated was that salmonella excretion rates ranged from zero percent to 43%, depending on the study. (Montville Dep. 127:23-128:12.) He further conceded that the 43% statistic came from a singular study of racetrack dogs and stray dogs, both sets of dogs ate raw meat as part of their diet. (Montville Dep. 128:13-18.) He further agreed that many of the studies attribute the presence of salmonella in the dogs to diets of raw meat or a connection to their environment such as dogs working in a farm environment around poultry or livestock. (Montville Dep. 128:23-129:4.) Dr. Montville further agreed that his second article, Cantor, was a study of sled dogs that likewise concluded that the presence of Salmonella in the sled dogs studied was likely increased due to feeding practices that involved feeding them raw meat. (Montville Depo. 134:7-20.). Dr. Montville conceded that dogs whose diet included eating raw meat were much more likely to have salmonella than dogs that ate commercially processed dry kibble. (Montville Dep. 128:19-22.)

Of further note, Table 14.4 of Carter specified that of the 4 studies considered that focused on household pets the percentages were far less than Dr. Montville's asserted "upwards of 43%" (specifically 0%, 1.2%, 4.4% and 15%). Carter, p.234. Similarly, the Cantor study indicated that "many studies" have found the prevalence of Salmonella in asymptomatic dogs to

be approximately 1-4%. (Cantor, p.47) Dr. Montville's third article by Wu (**Exhibit H)**, that will be discussed below, indicated the prevalence of Salmonella in pet dogs in Thailand and Ethiopia was 13.2% and 11.7% respectively, noting those countries rates to be much higher than rates reported in the United States of 2.5%. (Wu, p.7-8.) Thus, Dr. Montville based his assessment on an unscientific overstating of the potential risk of an asymptomatic dog being a carrier of Salmonella.

More significantly, Dr. Montville fails to take this data on asymptomatic dogs as carriers to the next step – he does not in his Report or his deposition testimony include in his assessment consideration of the risk that an asymptomatic dog carrying Salmonella will cause an infection to be transmitted to a person. Rather, his opinion that DeNinnos dogs are the more probable source is based purely on a statistic that asymptomatic dogs may harbor Salmonella, or as he stated "lots of evidence of dogs harboring salmonella".

Notably, Dr. Montville's Report did cite one study in his List of Materials Reviewed (it was not discussed in his Report) bearing on the risk of transmission issue - Wu et al., "Risk of Antimicrobial Resistant Non-Typhoidal Salmonella during Asymptomatic Infection Passage between Pet Dogs and Their Human Caregivers in Khon Kaen, Thailand," *Antibiotics*, p. 477 (2020) (**Exhibit F)** (hereinafter referred to as "Wu"). Asked about the Wu article in his deposition, Dr. Montville conceded the study revealed that the authors' hypothesis, that being an assumption that there may be a high-risk of infection between pet dogs and close-contact caregivers, was not substantiated, characterizing it as "doubtful." The study instead evidenced that close contact between dogs and owners was not a major factor of human Salmonella infections and that household pet dogs as a source of salmonella was found to be less important than other exposure sources. (Montville Dep. 130:25–134:1.).

With regard to the fourth and final publication pertaining to dogs, Sanchez, Dr. Montville testified that it was a publication he'd located about two weeks before his deposition and the only thing of significance in that publication was the sentence "Many animals, both domestic and wild, are colonized by Salmonella species usually harboring the bacteria in their intestinal tracts with no apparent sign of illness." He testified there was nothing else in the article that was significant to his opinion that dogs were a more probable source. (Montville Dep. 134:21-136:4.)

**b. Documented Evidence of Contamination of Crab by Salmonella**

As indicated above, when asked to articulate the basis of his pet dog transmission opinion, his offered reasoning was that in comparison to documentary evidence of asymptomatic dogs harboring salmonella, there was no documented evidence of Salmonella contaminating King Crab. (Montville Dep. 124:15-125:11). The details of Dr. Montville's document search and timing of the formation of his opinion bear on any assessment of the validity and reliability of his scientific analysis and opinions in this matter.

It should first be noted that his Report provided only the following statement concerning any opinion about the prevalence of Salmonella in crab:

> There have been no reported outbreaks due to salmonella being associated [with] crab legs. There are no data reporting isolated singular cases of salmonellosis.

(Report 3:36-37)

By footnote, he referenced the National Outbreak Reporting System ("NORS") as the basis for this statement concerning reported outbreaks. His Report is devoid of any further commentary or analysis incorporating or explaining his reliance on "no reported outbreaks" or any other information pertaining to crabs as the primary factual foundation or predicate of his opinion concerning the DeNinnos' pet dogs.

**i. NORS**

Upon deposition inquiry concerning the above lines of his Report, he explained that Salmonella and "crab legs" do not appear in the National Outbreak Reporting System. (Montville Dep. 73:23-74:5). He was asked to clarify his answer whether he was referring specifically to "king crab legs or crab legs in general", to which he replied, "crab legs in general". (Montville Dep. 73:6-10). Asked to specify the parameters of his NORS search, he indicated that his search revealed no "cases of salmonella in crab legs" (Montville Dep. 74:21-75:5) and further, that there were also no outbreaks associated with "crab". (Montville Dep. 75:9-11.). He testified that it was significant to him that the NORS system did not show outbreaks related to "crab", because it "indicates that no such cases have been reported, which I would interpret as they do not exist." (Montville Dep. 75:12-16.) Asked to explain if he was relying on this information with regard to his opinions, he affirmed, stating "if salmonellosis was associated with crab legs, it would appear in the NORS report" and "it supports my opinion that salmonellosis was not caused by crab legs." (Montville Dep. 75:9-76:2.). He was then asked: "If the NORS System did show that there were outbreak cases of salmonella related to crab, would that change your opinions in terms of the likelihood that the crab in this case was the source?" To which he replied, "Yes.". (Montville Dep. 76:13-18).

The National Outbreak Reporting System (NORS) is a web-based platform launched by the Centers for Disease Control and Prevention ("CDC") in 2009.[11] It is used by local, state, and territorial health departments in the United States to report waterborne and foodborne disease outbreaks. Centers for Disease Control and Prevention (CDC), National Outbreak Reporting System, https://www.cdc.gov/nors/index.html, accessed 08/14/2026. (**Exhibit I**). An outbreak

---

[11] The NORS View includes data from 1998 through the most recent year of available data for foodborne outbreaks. https://www.cdc.gov/beam/faq/index.html accessed 08/14/2026 (**Exhibit I**).

reported to NORS is defined as "the occurrence of two or more cases of a similar illness resulting from a common exposure." Centers for Disease Control and Prevention (CDC), NORS Data – Standard Data Restrictions, https://www.cdc.gov/nors/data/index.html, accessed 08/14/2026, (**Exhibit I**). NORS provides an interactive tool called the Bacteria, Enterics, Amoeba, and Mycotics (BEAM) Dashboard to access and visualize data from NORS. Centers for Disease Control and Prevention (CDC), BEAM (Bacteria, Enterics, Ameba, and Mycotics) Dashboard, www.cdc.gov/beam/dashboard/index.html, accessed 08/14/2026, (**Exhibit I**). The CDC notes specifically that there are limitations to NORS, including the following:

- Reporting of outbreaks to CDC is voluntary. Outbreaks are likely underreported, which might vary by outbreak mode of transmission because of limited resources and training in health departments.
- Only a small proportion of illnesses reported are identified as associated with outbreaks. The extent to which the distribution of various sources and settings implicated in outbreaks reflects the same sources of infection and settings of sporadic illnesses is unknown.
- Outbreaks occurring on cruise ships with international ports of call and those where the exposure occurred outside the United States are not reported through NORS.
- Additional limitations may apply to the content or use of outbreak surveillance datasets.

Centers for Disease Control and Prevention (CDC), NORS Data - Limitations, https://www.cdc.gov/nors/data/index.html, accessed 08/07/2026, (**Exhibit I**).

Additionally, NORS does not collect information on disease outbreaks that result from an exposure in a non-U.S. location. Centers for Disease Control and Prevention (CDC), NORS Data

– BEAM FAQs – Using the NORS view, https://www.cdc.gov/beam/faq/index.html, accessed 08/14/2026, (**Exhibit I)**.

Dr. Montville acknowledged he was aware that sporadic illness cases (individual cases of illness not linked to an outbreak) do not appear in the outbreak system. (Montville Dep. 77:19-21) He also clarified that Line 37 of his Report that "[t]here are no data reporting isolated singular cases of salmonellosis" is not intended to mean that isolated singular cases of salmonellosis involving salmonellosis in crab legs do not exist, but rather that there is simply no database for him to access information on sporadic illness cases. (Montville Dep. 76:19-77:5.). Furthermore, Dr. Montville acknowledged that salmonella is one of the leading causes of foodborne illness (Montville Dep. 77:25-78:2); that 95% of foodborne salmonellosis cases occur as sporadic illnesses (Montville Dep. 76:12-15.); and that only 1 in every 30 salmonella infections are ever diagnosed according to the CDC (Montville Dep. 78:3-9.). He also acknowledged that he was aware of the magnitude of foodborne illnesses from sporadic cases at the time he rendered his opinion. (Montville Dep. 80:16-19). He conceded that it is possible sporadic illness cases of salmonellosis associated with crab legs exist. (Montville Dep. 82:24-83:4)

ii. **Scientific Literature Search**

He was next asked whether he agreed there were documented incidents of contamination of various types of crabs and crab products with salmonella in scientific literature, he stated he disagreed explaining that he conducted a computerized search for "crab or crab legs and salmonella or salmonellosis" which did not reveal any studies that showed "crab" could be infected with salmonella. (Montville Dep. 83:10-21.). He confirmed that this belief - that there was a lack of scientific support that "crab" could be infected by Salmonella was significant to his

opinion that "the more likely source was dogs as opposed to the crab legs." (Montville Dep. 84:4-9). He also testified this was significant to his opinion that the DeNinnos kitchen was also more probable than the crab legs. (Montville Dep. 111:20-19)

He was then asked, "So if I show you some sources that show you that there is scientific proof that crab can be contaminated and have been contaminated by Salmonella, your opinion would change?", to which he replied: "Yes." (Montville Dep. 111:20-24). He was then shown several documents evidencing the contamination of crab by Salmonella:

- **FDA Import Alert 16-81(Exhibit J).:** Marked Ex. 8 in his deposition, Dr. Montville was permitted to review this document on a recess – after that review, he acknowledge that the FDA Import Alert identified a number of crab products from international suppliers that the FDA had identified as having been contaminated by Salmonella - notably, amongst the various described products, some were frozen crab products and some were precooked crab products (Montville Dep. 114:5–25).
- **Canadian Government Safety Recall:** Official recall alert for frozen crab meat contaminated with *Salmonella* in 2025. **(Exhibit K)** Dr. Montville testified he was unaware of this recall. (Montville Dep. 116:18–21).
- **Maine Outbreaks:** Food Safety News article documenting a 2021 *Salmonella* outbreak linked to crab meat in Maine. **(Exhibit L)** Dr. Montville testified he was unaware of this outbreak. (Montville Dep. 116:8–17).
- **Scientific Literature:** Roy et al., "Comprehensive Analysis of Predominant Pathogenic Bacteria and Viruses in Seafood Products"*, Compr. Rev. Food Sci. Food Saf.* (2024) **(Exhibit M)** Dr. Montville acknowledged Table 2, p.5, showing confirmed Salmonella in

outbreaks between 2001 to 2021 in cooked crab and crab cakes. (Montville Dep. 117:4-118:3).

Faced with this evidence, Dr. Montville admitted that his original premise upon which his opinion was based – namely that there was no documented evidence of outbreaks or Salmonella infecting crabmeat was factually wrong. Acknowledging he had previously testified that it would be significant to his opinion if he learned there was documented evidence of Salmonella in crab – he retracted that testimony stating his opinion concerning the probability of the King Crab being contaminated by Salmonella was not at all affected because the documentation did not specify that the crabmeat of a King Crab specifically was contaminated. (Montville Dep. 119:23–120:19).

Other noteworthy admissions by Dr. Montville pertinent to this issue are as follows: 1) there is no physiological difference between king crab meat and meat from other crab species regarding *Salmonella* susceptibility (Montville Dep. 115:8-12; 118:10-14); 2) Salmonella can infect crabmeat due to improper food handling like improperly washed hands and cross contamination. (Montville Dep. 84:10-22); 3) King Crab would be susceptible to contamination by Salmonella if exposed to it in the processing environment (Montville Dep. 87:25-88:4); 4) Salmonella could contaminate the outside of a crab shell and that contamination could be transferred by a food handler to exposed crab meat (Montville Dep. 152:22-153:3) and 4) that he did not know whether King Crab was susceptible to contamination by harvest waters – indicating he was not familiar with the microbiology of sea water. (Montville Dep. 87:18-24).

**c. Methodology – Facts and Analysis Unreliable and Flawed**

An expert opinion must be excluded if there is "too great an analytical gap between the data and the opinion proffered". See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The dog-related literature upon which Dr. Montville predicated his opinion exhibits several critical flaws:

- **Overstating the Risk:** Dr. Montville asserted in his report that "up to 43% of dogs" may harbor *Salmonella*. However, during his deposition, he conceded that this top statistic applied to a specific subset of racetrack/stray dogs fed raw meat diets. Literature cited in his own materials showed prevalence in normal household pet dogs to be drastically lower (e.g., 1% to 4.4% in household pets, and 2.5% in U.S. dogs).
- **Failure to Account for Transmission Risk:** He cited statistics on asymptomatic carriage but provided no indication he properly considered the actual risk of an asymptomatic dog *transmitting Salmonella* to a human, especially in light of the *Wu* article cited in his own materials.

Dr. Montville then relied heavily on the absence of *Salmonella* outbreaks linked to crab in the CDC's National Outbreak Reporting System (NORS) to conclude if salmonellosis was associated with crab legs, it would appear in the NORS report." (Montville Dep. 75:9-76:2.). This logic is scientifically unsound because:

- NORS only captures multi-person outbreaks, not sporadic individual cases, it does not capture outbreak cases outside the United States, and it specifically recognizes that outbreaks are likely underreported in NORS.
- Dr. Montville acknowledged that **95% of foodborne *Salmonella* cases occur as sporadic illnesses** and that only 1 in 30 cases are ever diagnosed.

He further predicated his analysis of the likelihood that the king crab was contaminated on a premise about the susceptibility of crab in general to be contaminated by Salmonella – after that premise was proven factually false, he defaulted to illogical distinctions (*King Crab* vs. *other crab*) without any scientific justification.

Because Dr. Montville's premised his opinion on factually false assertions concerning both pet dogs and the susceptibility of crab to be contaminated by Salmonella, assertions he was forced to retract, his opinion that the DeNinnos' pet dogs were the more probable source of the Salmonella than the King Crab is fundamentally unreliable under Rule 702(b) that requires expert testimony be based upon "sufficient facts or data". When an expert opinion rests upon a baseline empirical premise that is shown to be false and is subsequently retracted by the expert, the opinion lacks scientific validity. *See Amorgianos*, 303 F.3d at 266.

Moreover, Dr. Montville failed to analyze his pet dog theory in the setting of the case specific facts. Dr. Montville admitted he did not know the breed of the DeNinnos' dogs, how many dogs they owned, whether the dogs lived indoors or outdoors, or whether the yard was fenced. He testified those details were not important to his analysis. (Montville Dep. 125:12–18, 130:6–21). While acknowledging that the diet of the DeNinnos dogs would have been important to his opinion that their dogs were a more probable source than the crabmeat, Dr. Montville testified he could not recall what the DeNinno's dogs ate.[12] (Montville Dep. 129:16-23.) He admitted that dry commercial kibble is at low risk for Salmonella. (Montville Dep. 129:24-130:1) He also testified that he knew the DeNinnos did not live on a farm and didn't own

[12] The DeNinnos' pet dogs were fed commercial dry kibble once per day and were not given any other treats or snacks. (M.DeNinno Dep. 16:11-17:5)

livestock. (Montville Dep. 130:2-5). His Report is devoid of any facts considered concerning the DeNinnos's dogs. [13]

When asked to explain his scientific methodology for rendering his opinion, he explained he formulated two columns and "my process is I think is it likely or is it not likely, and then I go through the records to find out which of those is supported by the documents I received." (Montville Dep. 153:21-154:10). Dr. Montville then confirmed that the only things he put into those two columns was the discussed scientific literature supporting dogs as carriers, and the lack of documentation relative to crabs. (Montville Dep. 154:11-20).

At this juncture, consideration of Dr. Montville's experience and training is also warranted in the consideration of the strength of validity of his opinions. Dr. Montville is a food microbiologist. He has no expertise in veterinary medicine or animal science. (CV of Dr. Montville.) Throughout his career, the majority of which has been spent as a Professor of Food Science, his experience with Salmonella has been extremely limited as summarized in the Qualifications section above. He also has no expertise in epidemiology or public health.

"[A] court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Amorgianos*, 303 F.3d at 266 quoting *Heller v. Shaw Indus.,Inc.,* 167 F.3d 146, 153 (3d Cir. 1999).

> To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. As Chief Judge Becker of the Third Circuit has explained, the Daubert "requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis —means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible. *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 745 (3d Cir.1994); see also *Heller*, 167 F.3d at 155("[T]he reliability analysis applies to all aspects of an expert's testimony: the

[13] Additional information about the DeNinno's dogs and their habits was also available to Dr. Montville via the deposition testimony of Mary and Stephen DeNinno at the time he issued his Report.

> methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.”).
>
> In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. “The judge should only exclude the evidence if the flaw is large enough that the expert lacks ‘good grounds' for his or her conclusions.” *In re Paoli*, 35 F.3d at 746; see *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

*Amorgianos*, 303 F.3d at 267.

Dr. Montville’s opinion that it is more probable than not that the DeNinnos contracted a *Salmonella* infection from their pet dogs rather than the king crab legs fails Rule 702 and *Daubert* criteria because it is not based on reliable methods or accurately applied facts.

> While the focus of the court's Daubert inquiry should be “on principles and methodology, not on the conclusions that they generate,” *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, “conclusions and methodology are not entirely distinct from one another,” *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Accordingly, “nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Id. Consequently, “when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.” *Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 255 (2d Cir. 2005), quoting *Amorgianos*, 303 F.3d at 266.

*Precision Trenchless, LLC v. Saertex multiCom LP,* No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *19 (D. Conn. Feb. 28, 2022).

Based upon all the foregoing, exclusion is warranted.

### 3. <u>The “Home Kitchen” Cross-Contamination Theory</u>

At deposition, Dr. Montville offered a new opinion that the DeNinno’s kitchen was a probable source of the Salmonella. (Montville Dep. 104:18-22.) His Report merely articulated an ambiguous statement that “Kitchens are notorious for the presence of food poisoning

bacteria." Indeed, he seemingly developed this new opinion during the deposition itself, as at an earlier point in his deposition, when asked to articulate the opinions he was intending to express in this litigation, he noted only two: 1) that it was probable that the DeNinnos had salmonellosis; and 2) that there was a non-food source (dogs) for of the Salmonella. In fact, he specifically denied having an opinion that any other source was more probable than the King crab. (Montville Dep. 68:20-70:1.)

When asked the basis of this new opinion, he stated:

- a scientific report entitled *Prevalence of Pathogens and indicator Organisms in Home Kitchens and Correlation with Unsafe Food Handling Practices and Conditions* by Borrusso and Quinlan. (Montville Dep. 104:3-17);

- "Because there's very little or no data on salmonella and crab legs, but there are lots of data or published data on salmonella in kitchens." (Montville Dep. 104:18-105:1.)

However, when confronted with the single study he based his kitchen opinion on (*Borrusso & Quinlan*), Dr. Montville admitted that the study found **0% *Salmonella*** across all 100 home kitchens tested for microorganisms. (Montville Dep.106:20–24.) Dr. Montville conceded on the record: "Okay. So kitchens are not a common source of salmonella." (Montville Dep. 107:1–2).

He also admitted he had previously been retained as an expert in a matter involving the New Jersy Home Bakers Association and the New Jersey Department of Health wherein he provided his expert opinion that there was *no realistic risk* of the baked goods in question causing illness because of bacteria regardless of whether they were made in a home kitchen or in a licensed and inspected commercial grade kitchens. (Montville Dep. 107:5-108:13.)

After conceding that a crab leg could be contaminated with Salmonella, he was asked why it is less probable a source than a kitchen, to which he replied, "because there are no reports

of pathogens being associated with crab legs as opposed to reports of pathogens in kitchens." (Montville Dep. 111:20-19). When asked if showing him sources that there is scientific proof that crabs can be contaminated and have been contaminated by Salmonella, would change his opinion, he replied: "Yes." (Montville Dep. 111:14-19). As Dr. Montville relies on the same stated basis of no documented evidence of Salmonella contaminating King Crab in connection with both his opinions concerning pet dogs and kitchens, the contents of Argument Section 2(b) entitled "Documented Evidence of Contamination of Crab by Salmonella," from the Pet Dog Transmission Theory section above, is hereby fully incorporated into this Section.

Importantly, Dr. Montville further testified that he had analyzed information provided concerning the DeNinno's kitchen and their kitchen sanitation routines. He admitted that his opinion after reviewing the details concerning the DeNinnos kitchen, his opinion was "that they kept their kitchen clean and sanitized" and that he did not identify any food safety violations by the DeNinnos. (Montville Dep. 120:20-121:5.)

At the time he expressed his new opinion at deposition, he also provided a theorized example that raw poultry could have been prepared on a cutting board or countertop that was subsequently used to prepare the crab. (Montville Dep.105:2-10.) This hypothetical contamination of a cutting board or countertop is also pure speculation, having no basis in fact. Dr. Montville admitted he did not analyze any information about how the DeNinno's went about preparing the crab that day and as such, he had no opinion as to whether Mr. DeNinno abided by safe food handling procedures when handling the crab that day. (Montville Dep. 121:6-15.) He didn't even know whether a cutting board was used for the preparation of the crab by the DeNinnos. (Montville Dep. 192:16-24.)

The legal arguments made in Argument Section 2(c) entitled "Methodology-Facts and Analysis Unreliable and Flawed", from the Pet Dog Transmission Theory section above, are hereby fully incorporated into this Section. For the same reasons his pet dog transmission opinion should be excluded, so should his opinion that it is more probable that the DeNinnos' kitchen was the source of the Salmonella than the King Crab. Because Dr. Montville premised his opinion on factually false assertions concerning both kitchens and the susceptibility of crab to be contaminated by Salmonella, assertions he was forced to retract, his opinion that the DeNinnos' kitchen were the more probable source of the Salmonella than the King Crab is fundamentally unreliable under Rule 702(b). He also failed to analyze his kitchen theory in the setting of the case specific facts admitting he did not analyze any information about how the DeNinno's went about preparing the crab that day. His opinion is devoid of true scientific analysis, rather it is mere ipse dixit and as such should be excluded.

**4. Rule 26 Disclosure and Report Opinions**

Rule 26 Disclosure of Dr. Montville as Expert Witness

Dr. Montville's signed Expert Disclosure states:

> A statement of my opinions and the basis and reasons for them are summarized within my signed report of May 13, 2025, attached hereto as Exhibit A. In summary, it is my opinion to a reasonable degree of scientific certainty that Stephen DeNinno and Mary DeNinno did not have a salmonella infection due to the ingestion of King Crab legs sold by Big Y and North Coast Seafoods. There is no scientific evidence to demonstrate that the crab product was contaminated or that any condition or illness allegedly sustained by the DeNinnos was causally related to the consumption of the King Crab product.

Dr. Montville's above referenced signed report of May 13, 2025 (hereinafter referred to as "Report") similarly sets forth the following as his "Opinion":

> I can state with a reasonable degree of scientific probability that there is no supporting evidence that Mr. Deninno's alleged case of salmonellosis was caused by consumption of crab legs purchased at Big Y. It is in all probability transmitted from other sources.[14]

(Report 2:15-19.)

Dr. Montville should be precluded from offering the opinions set forth above from his Expert Disclosure and the "Opinion" section of his Report, inasmuch as they set forth improper legal conclusions. In this regard:

> [E]xpert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it", United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), does not aid the jury in making a decision. In re Mirena IUD Prod. Liab. Litig., 169 F.Supp.3d at 413. Accordingly, this court permits experts to state opinions, not "conclusions." See Bilzerian, 926 F.2d at 1294 (holding that while expert "may opine on an issue of fact within the jury's province", he "may not give testimony stating ultimate legal conclusions based on those facts").

*Precision Trenchless, LLC v. Saertex multiCom LP,* No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *4 (D. Conn. Feb. 28, 2022)

Additionally, and as argued above, Dr. Montville's predicate opinions have either been abandoned by Dr. Montville or should be excluded under Rule 702 and *Daubert* criteria. Accordingly, Dr. Montville should not be permitted to offer this sweeping opinion.

## V. CONCLUSION

Based on the foregoing, the plaintiffs' motion to preclude the defendants' expert witness, Thomas Montville, should be granted.

[14] See also "Conclusion" section of Report Page 5, Line 84-86 similarly stating: "I can state with a reasonable degree of scientific probability that Mr. Deninno's alleged case of salmonellosis was not caused by consumption of crab legs purchased at Big Y.

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on August 14, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428