UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO *Plaintiffs* | ) | |
| v. | ) | CIVIL ACTION NO.: 3:22-CV-00580-SVN |
| NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC. *Defendants* | ) | AUGUST 14, 2026 |

**PLAINTIFFS' MOTION TO PRECLUDE DEFENDANTS' EXPERT WITNESS, IAN STORCH, D.O.**

The plaintiffs, Stephen DeNinno and Mary DeNinno, hereby file this motion to preclude the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc., from offering into evidence certain expert opinions and testimony from Ian Storch, D.O.

**FACTUAL BACKGROUND**

The plaintiffs, Stephen DeNinno ("Stephen") and Mary DeNinno ("Mary"),[1] filed this lawsuit against the defendants, North Coast Sea-Foods Corp. ("North Coast") and Big Y Foods, Inc. ("Big Y"),[2] under the Connecticut Products Liability Act. (Compl. Doc. 1-2.) The lawsuit arises out of the purchase of king crab legs at a Big Y World Class Market on July 27, 2018. (*Id.*) The plaintiffs allege that the subject king crab was contaminated with salmonella. (*Id.*)

[1] Stephen and Mary may be referred to collectively as "the plaintiffs".

[2] North Coast and Big Y may be referred to collectively as "the defendants".



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

On July 27, 2018, Stephen purchased three (3) pounds of king crab legs ("subject king crab") from a frozen seafood case at a Big Y World Class Market located in Danielson, Connecticut. (S. DeNinno Dep. 21:4–25:4 (October 20, 2023), Ex. D.) Stephen never received any instruction that he needed to reheat the subject king crab before eating it. (*Id.* at 109:19–22.) After purchasing the subject king crab, Stephen drove home and placed it in his refrigerator. (*Id.* at 25:24–26:11.) Later that afternoon, Stephen thawed the crab legs, removed the meat from the shells, and shared a portion of the cold crab meat with his wife, Mary. (*Id.* at 29:3–23.) For dinner, Mary prepared baked king crab macaroni and cheese casserole by combining the remaining crab meat with other ingredients. (*Id.* at 36:12–22).

In the early morning hours of Saturday, July 28, 2018, both Stephen and Mary awoke violently ill. (S. DeNinno Dep. 38:8–39:12.) Both Stephen and Mary developed severe gastroenteritis within 14–17 hours of consuming the crab. (*Id.*) Throughout the weekend, the plaintiffs endured relentless diarrhea, cramps, and vomiting. (*Id.* at 38:8–40:1, 54:23–55:1.)

After being hospitalized at William Backus Hospital on July 31, 2018, for acute kidney failure from food poisoning, (S. DeNinno Dep. 41:16–45:17.), Stephen filed a complaint with Big Y on August 2, 2018, which included a written report titled "Food Borne Illness Investigation Report" ("Big Y Report"). (Big Y Food Report (Aug. 2, 2018), Ex. E.) Stephen specifically identified the king crab legs purchased on July 27 and reported that both he and Mary became sick. (*Id.*) Importantly, during the prior week of July 23, 2018, Stephen and Mary did not share any meals due to Stephen's extended work hours managing an emergency operations center at CharterCARE Health Partners, a hospital system in Rhode Island. (S. DeNinno Dep. 8:19–21, 19:16–20:12, 44:2–6.) Thus, Stephen specifically noted in the Big Y Report that the crab legs were the only food that he and his wife had eaten in common. (Big Y Report.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

In the fall of 2018, a rheumatologist, J. Scott Toder, MD, suspected that Stephen could be suffering from a condition known as reactive arthritis and ordered bloodwork that he underwent in October 2018. (S. DeNinno Dep. 48:8–49:22.) The blood test returned positive for *salmonella* antibodies and led to a diagnosis of reactive arthritis directly triggered by the food poisoning. (*Id.*) Over the next seven (7) years, this condition has left Stephen with severe, chronic joint pain and swelling in his knees, hands, and back, severely limiting his mobility. (*Id.* at 83:15–85:11, 112:2–10, 120:8–14.) He further developed lasting gastrointestinal issues causing chronic bouts of diarrhea and a severe magnesium disorder necessitating ongoing weekly infusions. (*Id.* at 86:24–96:25.)

Under the Connecticut Products Liability Act (Connecticut General Statutes § 52-572m et seq.), the plaintiffs assert claims of strict product liability, negligence, breach of express warranties, and breach of the implied warranty of merchantability against North Coast and Big Y. The plaintiffs allege that the defendants, acting as product sellers who manufactured, distributed, or retailed the subject XL King Crab legs, placed an adulterated, defective, and unreasonably dangerous food product into the stream of commerce. The plaintiffs claim the crab legs were contaminated with salmonella.

## LAW

Rule 702 of the Federal Rules of Evidence provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court performs a "gatekeeping" function in deciding whether the expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In defining the gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-cv-01657 (JCH), 2024 WL 4866716, at *2 (D. Conn. Nov. 22, 2024).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "Lack of specific experience in a particular area is not determinative; rather, to find an expert unqualified, the court must find the expert's general experience insufficient to qualify the expert to testify about the issue in the case at hand." *Charter Pracs. Nternational, LLC v. Robb*, No. 3:12-CV-1768(RNC), 2015 WL 13000251, at *6 (D. Conn. Mar. 31, 2015).

As to the issue of reliability: "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "[I]n fulfilling its 'gatekeeping' function, district courts should 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

characterizes the practice of an expert in the relevant field . . . .'" *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

In *Daubert*, 509 U.S. at 593–94, "the Supreme Court identified several factors that may be considered in assessing reliability: (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Amorgianos*, 303 F.3d at 265 (quoting *Daubert*, 509 U.S. at 593–94)). With that said, "[t]hese factors . . . do not constitute a 'definitive checklist or test.' . . . Instead, the inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Kumho Tire*, 526 U.S. at 150).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

## ARGUMENT

**I. Dr. Storch Lacks the Qualifications to Opine on Seafood Processing, Cross-Contamination, and Grocery Store Operations.**

Dr. Storch is a board-certified gastroenterologist and internal medicine physician, but he seeks to offer sweeping opinions well outside the bounds of his medical practice. In his expert report, Dr. Storch improperly renders opinions regarding commercial food processing and supply chain safety, asserting that the subject king crab was "a carefully processed king crab by American standards as used by Big Y Foods" and concluding that "[i]t is highly unlikely that the infection was related to this specific food source." (Storch Report at 2.) He further opines on consumer handling practices, stating that "if an individual infection occurs, it would generally be from improper handling by the consumer." (*Id.* at 2.)

At his deposition, Dr. Storch explicitly conceded that he does not hold any degree in microbiology, food microbiology, or food safety. (Storch Dep. 53:11–54:18.) Furthermore, he admitted that he is not an expert in seafood processing facilities, he does not know what the field of food safety is, and he possesses no expertise regarding contamination practices within a grocery store setting. (*Id.* at 82:7–14, 86:16–88:12.)

Because Dr. Storch lacks the specialized education, training, and experience necessary to evaluate the safety protocols, cross-contamination risks, and processing standards of the commercial seafood supply chain or grocery store safety standards, he is wholly unqualified to testify that the king crab sold by the defendants could not have been contaminated before it reached the plaintiffs.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

## II. Dr. Storch is Unqualified to Render Epidemiological Opinions Regarding Foodborne Illness Outbreaks.

In his expert report, Dr. Storch improperly crosses the line from clinical gastroenterology into the specialized field of epidemiology by offering definitive conclusions regarding the existence and tracking of a foodborne illness outbreak. Specifically, Dr. Storch declares that "[i]t is highly unlikely that the infection was related to this specific food source as there was no outbreak and no other cases in the area were reported." (Storch Report at 2.) Rendering expert opinions on the presence, tracking, reporting, and statistical significance of foodborne disease outbreaks requires specialized expertise in epidemiology and public health. Under the Federal Rules of Evidence and the *Daubert* standard, Dr. Storch is wholly unqualified to offer such opinions.

During his deposition, Dr. Storch admitted that he possesses no formal education, degree, or credentials in the relevant fields. He explicitly testified that he does not hold a degree in preventive medicine, public health, epidemiology, or biostatistics. (Storch Dep. 52:21–53:9.) Beyond his lack of academic credentials, Dr. Storch also conceded a complete absence of practical experience in this area. He testified unequivocally that he has no formal education or training in foodborne illness investigations, nor does he possess any professional experience conducting such investigations. (*Id.* at 54:13–18.) He further admitted that he has never worked for a public health agency investigating foodborne illness outbreaks. (*Id.* at 54:10–12.)

Compounding his total lack of foundational expertise is Dr. Storch's failure to conduct any underlying investigation to support his epidemiological claims. Despite boldly asserting that "no other cases in the area were reported," Dr. Storch admitted under oath that he did not review a single record from any local public health department to verify this claim. (Storch Report at 2; Storch Dep. 65:8–10.) He agreed that he conducted no independent investigation whatsoever,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

relying exclusively on his review of reports by the plaintiffs' experts not mentioning other sick patients in their reports. (Storch Dep. 65:11–24.)

Dr. Storch admitted that he did not know the Centers for Disease Control and Prevention (CDC) definition of an outbreak. (Storch Dep. 65:25–66:23.) Furthermore, when confronted with established public health statistics—specifically, the CDC estimate that approximately 95 percent of foodborne illnesses occur as sporadic cases rather than as part of recognized outbreaks—Dr. Storch dismissively labeled such data as not "relevant to this case." (*Id.* at 66:24–68:18.) Because Dr. Storch is not an epidemiologist, possesses no relevant outbreak investigation experience, and conducted no public health research, his opinions regarding the likelihood of an outbreak are unreliable, speculative, and must be precluded.

**III. Dr. Storch Lacks the Requisite Expertise in Rheumatology to Opine on the Etiology of Mr. Deninno's Arthritis.**

In his expert report, Dr. Storch dismisses any causal connection between Mr. Deninno's acute gastrointestinal infection and his subsequent reactive arthritis, declaring that "[t]he patient had HLA-B27 and reactive arthritis/ sacroiliitis which is clearly genetic as it runs in his family" and claiming that "in this case it is clearly linked to Mr. Deninno's genetics and not an external cause." (Storch Report at 4.) He further opines that Mr. Deninno's arthritis must be genetic because "he has two siblings with similar rheumatologic disease, who assumedly did not eat crab from Big Y Foods." (*Id.* at 1.) Dr. Storch's deposition testimony revealed, however, a staggering lack of foundational knowledge regarding both the field of rheumatology and the specific medical histories of Mr. Deninno's family members, demonstrating that he is wholly unqualified to render these causation opinions.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Dr. Storch is a gastroenterologist, and he explicitly conceded that he is not board-certified in rheumatology. (Storch Dep. 54:2–5.) His lack of specialized training became glaringly apparent during his deposition when he struggled to articulate the basic clinical differences between reactive arthritis, seronegative arthritis, and rheumatoid arthritis. (*Id.* at 151:24–154:25.) When pressed to differentiate these conditions, Dr. Storch became evasive, testifying, "I mean, I don't—reactive arthritis would be reactive—so it's—it's tough, because we're assuming diagnoses. Arthritis can be caused by many things, so it's—it's very hard to answer the question without, like, a two-hour discussion." (*Id.* at 152:16–20.) He continually fell back on the admission that "I'm certainly not a rheumatologist," effectively confirming that these specific diagnostic distinctions fall outside his area of professional competence. (*Id.* at 133:7–8.)

Dr. Storch's definitive conclusion that Mr. Deninno's arthritis is "clearly genetic" hinges entirely on the presence of the HLA-B27 genetic marker and the medical history of Mr. Deninno's siblings. (Storch Report at 4.) Yet, Dr. Storch admitted during his deposition that he is not an expert in HLA typing. (Storch Dep. 156:5–7.) More alarmingly, Dr. Storch based his genetic causation theory on the siblings' medical conditions without actually knowing what those conditions were. When asked what type of arthritis Mr. Deninno's sister suffered from, Dr. Storch admitted complete ignorance, testifying, "I don't—I don't recall. They both had autoimmune diseases. I'd have to see the records. I don't remember what they have." (*Id.* at 159:10–14.) He further admitted that he did not know whether the sister was diagnosed with rheumatoid arthritis, nor did he seek clarification from defense counsel regarding the specifics of either sibling's diagnoses. (*Id.* at 160:13–161:5.) It is fundamentally unreliable for an expert to declare a plaintiff's condition to be definitively genetic based on a sibling's medical history when the expert has no idea what the sibling's actual diagnosis is.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

By aggressively dismissing an infectious etiology for Mr. Deninno's reactive arthritis, Dr. Storch attempts to override the diagnosis and treatment plan of Mr. Deninno's actual treating rheumatologist, Dr. Toder. (Storch Report at 3.) Furthermore, Dr. Storch used his report to dismiss the positive Salmonella antibody test ordered by Dr. Toder as having "absolutely no clinical significance," only to later admit in his deposition that he had never seen the test used, had never ordered it, and could not even remember its name. (Storch Report at 3; Storch Dep. 136:18–137:4, 139:8–12.) A physician cannot reliably weaponize his own lack of knowledge to invalidate the diagnostic testing and etiology identified by a specialized treating physician. Because Dr. Storch is not a rheumatologist, does not understand the genetic markers he relies upon, and is ignorant of the family history that forms the basis of his opinion, his testimony regarding the etiology of Mr. Deninno's reactive arthritis must be precluded.

## IV. Dr. Storch's Dismissal of King Crab as a Vector for Salmonella Relies on Unscientific Methodology.

Dr. Storch's methodology for entirely ruling out the subject king crab as the vector for a Salmonella infection egregiously fails this standard. Rather than relying on objective microbiological principles or epidemiological data, Dr. Storch substituted his own limited, anecdotal clinical experience and a rudimentary internet search to declare that cross-contamination of king crab is a scientific impossibility.

In his expert report, Dr. Storch definitively concludes that Salmonella "has never been described in king crab legs in the United States making the likelihood of this virtually zero." (Storch Report at 2.) He further asserts as a matter of scientific fact that "there is no literature at all showing salmonella associated with the specific entity of king crabs." (*Id.* at 2.) Dr. Storch's deposition testimony revealed, however, that these sweeping statistical and epidemiological conclusions were based on nothing more than a superficial PubMed search. When asked what he



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

did to ascertain that Salmonella is not associated with king crab, Dr. Storch testified, "I did a literature review on PubMed." (Storch Dep. 78:11.) He stated that he searched "[a]nything I could think of with related to crab meat and salmonella infection." (*Id.* at 78:13–14.)

Finding only one article discussing Salmonella survival in crab meat—which he unilaterally deemed inapplicable because it did not specifically involve "king" crab—Dr. Storch decided the likelihood of contamination was "virtually zero." (Storch Dep. 79:12–25; Storch Report at 2.) When asked to identify the scientific method he used to reach this statistical conclusion, Dr. Storch offered the deeply unscientific rationale that "[i]f something's never been described in the past, it's unlikely." (Storch Dep. 84:4–5.) Relying on the mere absence of a highly specific published case report to declare a biological contamination event "virtually zero" is not a tested, peer-reviewed, or generally accepted scientific methodology.

Dr. Storch's ultimate conclusion that "[s]almonella does not cause infection in prepared king crab legs" is fatally contradicted by his own sworn admissions regarding microbiology. (Storch Report at 4.) Despite his repeated attempts to rule out seafood as a source of Salmonella based on his clinical history, Dr. Storch was forced to admit under cross-examination that seafood is, in fact, scientifically capable of being contaminated by the bacteria. When asked directly, "Are you aware that seafood can be contaminated by salmonella?" Dr. Storch answered, "Yes." (Storch Dep. 88:18–20.) Furthermore, when asked if the crab meat of a king crab is biologically susceptible to contamination by Salmonella if exposed to the pathogen, Dr. Storch conceded: "Hypothetically, but I've never seen it in my 20 years of experience." (*Id.* at 82:22–83:2.) He further admitted that he could not offer an expert opinion that the subject king crab could not become contaminated in a seafood processing plant. (*Id.* at 87:13–20.) By explicitly



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

acknowledging that king crab is susceptible to Salmonella cross-contamination, Dr. Storch effectively dismantled his own written opinion.

Because Dr. Storch's methodology relies on superficial internet searches rather than reliable microbiological science, his causation opinions must be excluded.

## V. Dr. Storch's Alternative Causation Theories Regarding Workplace and Pet Infections Are Purely Speculative.

In his expert report, Dr. Storch attempts to obfuscate the source of the Plaintiffs' shared illness by floating baseless alternative causation theories. Specifically, his report theorizes that Mr. Deninno's illness could have been caused by an alternative pathogen, stating that "[o]ther possibilities could be a nosocomial (hospital) acquired infection from his workplace or from a pet like his dog." (Storch Report at 1.) He further points to emergency room records to suggest that "the main medical thought from the physicians in the ER was that he may have a Clostridium Difficile infection obtained from the hospital." (*Id.* at 3.) However, inventing hypothetical vectors of transmission without a shred of affirmative, objective evidence connecting those vectors to the Plaintiffs is the hallmark of inadmissible speculation.

During his deposition, Dr. Storch was forced to abandon his own alternative causation theories, admitting that they were formulated in a complete evidentiary vacuum. When pressed on his theory that Mr. Deninno could have contracted a zoonotic infection, such as *Giardia*, from a pet dog, Dr. Storch confessed that he undertook absolutely no investigation to validate this claim. (Storch Dep. 113:8–10.) He explicitly testified, "I've never met the patient. I've never met his wife. I've never been in their house, and I've never met the dogs." (*Id.* at 115:1–3.) Furthermore, he admitted that he possessed no actual data regarding the health of the animals, stating, "I have no veterinary records of Mr. Deninno's dogs." (*Id.* at 115:12–14.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Similarly, Dr. Storch dismantled his own workplace exposure theory regarding a *Clostridium difficile* (C. diff) infection. After outlining a highly convoluted hypothetical scenario where Mr. Deninno was colonized with C. diff at work and subsequently infected his wife, Dr. Storch admitted that he did not actually believe this sequence of events occurred. (*Id.* at 109:10–111:7.) He testified, "Again, as you're suggesting, I don't think this is a likely scenario, just as I don't think salmonella is a likely scenario, but I'm just posing other possibilities as we're listing a differential diagnosis." (*Id.* at 112:11–17.) He ultimately conceded the complete lack of evidentiary support for any of his alternative theories, stating, "Again, there's no way for me to tell any of these things likely or not." (*Id.* at 114:9–10.)

An expert's differential diagnosis must be grounded in reliable methodology and tied to the specific facts of the case. Dr. Storch's approach of merely "posing other possibilities" without conducting any independent investigation, reviewing any veterinary records, or even believing in the likelihood of those possibilities himself, renders his alternative causation opinions inherently unreliable. (Storch Report at 1; Storch Dep. 112:15–17.)

## CONCLUSION

Accordingly, the plaintiffs' motion to preclude Dr. Storch should be granted.

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on August 14, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428