UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEPHEN DENINNO, ET AL., | : CIVIL ACTION NO.: |
| | : 3:22-CV-00580-RNC |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| NORTH COAST SEA-FOODS CORP., | : |
| ET AL., | : |
| | : |
| Defendants. | : MAY 30, 2026 |

VIDEOCONFERENCE DEPOSITION OF:
IAN STORCH, D.O.

A P P E A R A N C E S : (Via Videoconference)

FAULKNER & GRAVES, P.C.
501 Ocean Avenue
New London, Connecticut 06320
BY: SHELLEY L. GRAVES, ESQ.
slg@faulknerandgraves.com

For the Plaintiffs

COUGHLIN BETKE
175 Federal Street, Suite 1450
Boston, Massachusetts 02110
BY: BENJAMIN LEVITES, ESQ.
blevites@coughlinbetke.com

For the Defendants

Kathryn Little
Shea, Driscoll & Little, LLC
Court Reporting Associates
501 Ocean Avenue
New London, Connecticut 06320
sheadriscollandlittle.com

INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination by Ms. Graves | 5 |


INDEX OF EXHIBITS


| Plaintiffs' | | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 4 |
| Exhibit 2 | Disclosure of Expert Witness | 4 |
| Exhibit 3 | Report dated May 14, 2025 | 4 |
| Exhibit 4 | Invoices | 4 |
| Exhibit 5 | Records provided to Dr. Storch | 4 |
| Exhibit 6 | Invoices | 4 |
| Exhibit 6B | Invoice number 5011 | 61 |


(Exhibits retained by Ms. Graves)

* * * * *

Deposition of IAN STORCH, D.O., an expert witness in the above-entitled action, taken at the request of the Plaintiffs, pursuant to the Federal Rules of Civil Procedure, before Kathryn Little, a Notary Public within and for the State of Connecticut, appeared via videoconference at 2001 Marcus Avenue, Suite East 240, New Hyde Park, New York, commencing at 9:00 a.m.

* * * * *

STIPULATIONS

It was stipulated by and between counsel for the parties that the requirements of notice of the taking of the deposition have been complied; that proof of the qualifications of the Notary Public before whom the deposition is taken has been waived; that objections, except as to matter of form, be reserved to the time of trial; and that the deponent shall read and sign the deposition.

It is further stipulated and agreed that if the deposition remains unsigned thirty (30) days after delivery to counsel for the deponent, signature shall be deemed waived, and the deposition may be used as if signed.

* * * * *

SATURDAY, MAY 30, 2026

9:00 A.M.

* * * * *

(Plaintiffs' Exhibits 1 through 6 were marked for identification)

THE REPORTER: Usual stipulations?

MR. LEVITES: Yes, please.

MS. GRAVES: Yes.

THE REPORTER: Could you please state your full name and address for the record.

THE WITNESS: My full name is Ian Michael Storch. And would you like home address or business address?

THE REPORTER: Business, please.

THE WITNESS: 2001 Marcus Avenue, Suite East 240, New Hyde Park, New York, 11042.

* * * * *

I A N S T O R C H , D . O . ,

an expert witness in the above-entitled action, having been duly sworn by Kathryn Little, a Notary Public within and for the State of Connecticut, was examined and testified under oath as follows:

* * * * *

MS. GRAVES: Goods morning. Again, my name is Shelley Graves. I represent Stephen and

Mary Deninno in this lawsuit.

EXAMINATION BY MS. GRAVES

Q Have you had your deposition taken before in other matters?

A I have been deposed before, yes.

Q I'll just quickly go through a few ground rules as a refresher. Obviously, we'd like you to keep your answers audible for the ease of Kathryn, our stenographer. If you could try to keep your voice up and speak slowly, and if you could wait until I complete asking my question before you start to answer it, and I'll try to give you the same courtesy.

And, of course, if you don't understand a question that I've asked, please let me know and I will attempt to rephrase it so that we come to an understanding. Okay?

A Okay.

Q If you want to take a break at any time, just let us know. And we're doing this deposition remotely. Your screen background is blurred. Can you just confirm for us that there's no one else in the room with you?

A I confirm that there's no one else in the room.

Q Okay. Thank you. And if that changes, would you let us know?
A Absolutely.
Q Would you please agree that you will not review any text messages or e-mails while you're testifying during this deposition, other than if we take a break?
A Yes, I'll do that. I'm going to turn off my ringer now. Okay.
Q Do you have any materials related to this case, you know, in front of you now?
A I do have a printed copy of my response and Barry Gustin's response printed, and everything else is online.
Q Okay. And by your "response," are you referring to your report?
A Correct.
Q Okay. And with regard to Dr. Gustin, are you referring, likewise, to a report authored by Barry Gustin?
A Correct, dated March 9, 2026.
Q When did you receive a copy of that report?
A I don't recall the date.
Q Was it within the last few weeks?
A I don't recall exactly when I received it.

Q When did you first read it?
A When it was sent to me.
Q And again, do you recall reviewing that recently or was it months ago?
A I don't recall. A few weeks ago maybe.
Q All right. And you indicated that you have the other documents related to this case available to you on the computer?
A Correct. I have a folder with all the documents provided.
Q All right. And do you have any of those open now for your use?
A I don't have them open now, no.
Q Okay. And I'm going to ask that if during the course of the deposition if you want to consult any document in order to respond to a question that I've asked, that prior to actually reviewing that document you just let me know of your intention to do so we can identify for the record the document you intend to review. Is that fair?
A It's fair.
Q And I'm going to show you Exhibit 1, which is a copy of your deposition notice. Just bear with me for a second. Okay. Can you see Exhibit 1 on the screen?

A I can.
Q Okay. And have you seen this document before?
A It was sent to me, yes.
Q And I've turned to page 4 of Exhibit 1, which is a Schedule A Request for Production. Have you seen this document before?
A I don't recall reading it specifically.
Q Okay.
A Should I read it now?
Q I'll take you through --
A Okay.
Q -- the things I'm most interested in.
The first Request for Production was an up-to-date curriculum vitae. I do have your CV that was provided back in 2025 when you were first disclosed as an expert. Do you have a more current CV than that 2025 version?
A I don't believe so.
Q And we'll take a look at your CV shortly.
A Okay.
Q But has anything significant occurred between early 2025 and the present with regard to your professional career?
A I don't believe so, no.

Q Counsel for the Defendants provided me with a number of documents yesterday, which I've marked as Exhibit 5 consisting of various records that were provided to you for your review in this matter.
Other than documents that were provided by counsel, do you have any other documents in your file with regard to this matter?
A No.
Q Did you receive any communications from defense counsel concerning facts or data that were provided by defense counsel concerning this matter?
A I don't understand the question.
Q Sure. So counsel provided you with documents, you know, medical records, deposition transcripts, you know, obviously documents that are a part of the case. And what I'm asking is if in any correspondence provided to you by defense counsel you were provided additional facts or information that you considered in rendering your opinions in this matter?
A I don't believe so.
Q Do you have any notes or outlines or summaries that you or anybody else created concerning the data information you considered in forming your opinions?

A No.

Q So is it fair for me to conclude by that answer that you took no notes as you reviewed the various medical records and other documents in this matter?

A No, I did not take notes.

Q Did you highlight in any way documents, either electronically or in hard copy?

A No.

Q Did you have any -- do you have any communications, whether they be hard copy or electronic, with any other experts or other persons with regard to this matter --

A No.

Q -- excluding defense counsel? Sorry.

A No. Yeah, I understand. No.

Q Do you have a -- did you and defense counsel -- or withdrawn.

Do you have any retainer agreements for your services as an expert in this matter?

A "Retainer" meaning? Can you be a little more specific?

Q Sure. Oftentimes expert witnesses when they first agree to become a consultant on the case have something akin to a letter contract in terms of, you

know, the agreement with regard to their services.
A I don't believe so.
Q Were you hired in this case through some type of expert referral service?
A Yes.
Q And what's the name of that referral service?
A Homestead.
Q And how long have you been a part of that referral service?
A I don't recall exactly. Maybe two years.
Q And how does that referral service work?
In other words, do you pay some sort of membership fee to be a part of it, or is it -- or is there some sort of compensation to Homestead as a result of you providing services?
A Homestead contacts me if they have a case that they feel I may be appropriate for. As far as compensation to Homestead, it doesn't come directly from me. I'm not aware of how they are compensated.
Q When you do work in a case, are you -- through Homestead are your fees paid by a check from Homestead or are you paid directly by the law firm who has retained you?

A A check from Homestead.

Q Have you issued invoices for the time you have spent working on this case?

A Yes.

MS. GRAVES: Ben, I don't believe that those invoices were contained in what was sent yesterday. You can correct me if you think I'm wrong, but --

MR. LEVITES: Yeah, I don't think so. I can take a look for those.

MS. GRAVES: All right. Is that something you're going to be able to do today on a break, because I would like to see them?

MR. LEVITES: Sure.

BY MS. GRAVES:

Q And number 3 of Request for Production requested you provide a copy of any supplemental opinion report you prepared since the time of your expert disclosure.

Have you prepared any supplemental opinion report since your initial report from 2025?

A The "initial report" meaning the report that we just discussed?

Q Your report from, I believe, May of 2025, that you said you had in front of you?

A Yes. No, I have not. There has not been

any subsequent report produced.
Q So you have the one report, in other words?
A Correct.
Q Okay. Other than what preparation you might have done in terms of reviewing your report and whatnot for this deposition, have you done any other work of substance on this file since the time of issuing your report back in -- I'm looking for the date -- May 14th of 2025?
A No, I have not.
Q And, Dr. Storch, I'm sharing on the screen Exhibit 3, which is a copy of a May 14, 2025, report issued by you. Is this the report we've been referring to?
A Yes, that's correct.
Q Okay. And is this, the contents of this report, was this drafted by you?
A Yes, that's correct.
Q Do you have any plans presently to issue any type of supplemental report?
A No, I do not.
Q In preparation for your deposition today, did you reread your May 14, 2025, report?
A Yes, I did.
Q And when did you last do that?

A This morning.

Q Does your report set forth a complete statement of all the opinions you intend to express in this matter?

A I can't answer that question.

Q Why not?

A Because I don't know what you're going to ask me. I don't understand.

Q Sure. Let me ask it again and tell me what you need clarification on.

So you said you recently, as of this morning, you had reread your report, correct?

A Yes.

Q And so does this report that's been marked as Exhibit 3 set forth a complete statement of the opinions you intend to express in this matter?

A I mean, I can't answer that question.

Q Was your intent when you wrote this report back in May of 2025 to set forth the opinions that you intended to express in this matter?

A Yes.

Q When you reread your report this morning did you feel like you left some opinion you had out of the report?

A I didn't have that feeling, no.

Q So your concern is merely that myself or Attorney Levites might ask you a question that calls for some additional opinion that's not contained in the report?

A That's correct.

Q All right. And does your report reference the facts and data -- facts and data that you considered in forming the opinions contained in your report?

A Yes.

Q And I'm changing the screen to Exhibit 2, which is the Defendants' disclosure of you as an expert witness. And as a part -- have you seen this document before?

A I don't recall reading it.

Q Okay. If I scroll down here, there's a section "Data and information considered in forming opinions." And it reads, "In addition to the data and information referenced in Dr. Storch's report, a list of materials provided to me is contained in Exhibit B." So I'm just going to flip to Exhibit B, okay?

All right. And this is a list, as I understand it, of materials that were sent to you for your review. Have you seen this list before?

A I don't recall seeing that specific list.

Q Okay. Do you recognize the list as containing the -- or referring to the various treating medical providers of Stephen Deninno?

A I do.

Q Okay. As a part of your file which I've marked as Exhibit 5, which are the records that were sent to me by counsel as representing that they were the records that were sent to you, can you -- did you review all of the records that were provided to you, or did you choose to review only select records?

A I believe I reviewed all the records that were provided to me.

Q Do you recall whether you were provided the medical records in one batch or if you were provided the records at different varying times?

A I believe the majority of the records were given to me at one time.

MR. LEVITES: Shelley, I just sent over the invoices as well.

MS. GRAVES: Okay. Thank you, Ben.

BY MS. GRAVES:

Q Were you provided any medical records of Mary Deninno?

A I don't believe so, no.
Q All right. At the bottom of Exhibit B of -- or excuse me -- well, yeah, I guess it's Exhibit B of Exhibit 2, it says, "Dr. Storch may also rely on a number of the transcripts of depositions taken in this case."
Do you recall what deposition transcripts you reviewed in this matter?
A I don't believe I reviewed any transcripts of depositions, that I recall.
Q Do you recall reviewing the deposition transcript of Stephen Deninno?
A I don't recall reviewing it.
Q And same question, do you recall reviewing the deposition transcript of Mary Deninno?
A I don't recall.
Q With regard to medical records of Stephen Deninno, were you provided any medical records of Stephen Deninno after you had authored your May 14, 2025, report?
A No.
Q When you reviewed the medical records of Stephen Deninno, did you do that online or did you print those records off?
A Online.

Q Did you use any type of AI to summarize those records in order to conduct your review?

A No.

Q Can we agree that your expert report does not specify that you considered any deposition testimony of any witness in this matter in the formulation of your opinions?

A Again, I don't -- I don't recall.

Q Okay. You indicated you reviewed your report this morning, correct?

A Correct.

Q Do you recall seeing any indication in your report that you were relying on the deposition testimony of any witness in rendering your opinions?

A Again, I don't recall what I reviewed prior to writing the report a year ago.

Q Okay. And I was simply asking whether you -- whether your report specifies that you considered any deposition testimony of any particular witness.

A It's not specified in the report.

Q Did you review any deposition testimony of any representatives of North Coast Sea-Foods?

A I don't believe so, but I don't recall.

Q Did you review any testimony by any representatives of Big Y?

A I don't believe so, but I don't recall.

Q Are you able to look on your computer to see whether you have deposition transcripts of any representatives of North Coast or Big Y?

A Again, I have to see what was in that folder. Can you repeat the question, please?

Q I believe my question was whether you had copies of the -- of any transcripts from representatives of either North Coast Sea-Foods or Big Y.

A I don't see those in my folder.

Q You indicated earlier that you did have a March 2026 report of Dr. Barry Gustin. Were you provided copies of reports of any other experts in this case?

A I believe I was, but I don't recall the name.

Q The records that were provided to me and which have been marked as Exhibit 5 by defense counsel indicate that you were provided a copy of Dr. Thomas Cumbo's report dated February 18th, 2025. Dr. Cumbo is an infectious disease expert retained by Plaintiffs' counsel.

Do you recall reviewing that report?
A Yes.
Q Did you review that report prior to authoring your own report?
A I don't recall.
Q The records provided as part of Exhibit 5 also show that you were provided the February 14, 2025, disclosure of Dr. Gustin which contained his July 6th, 2024, report.
Do you recall reading Dr. Gustin's July 2024 report?
A I read his report. I don't recall when.
Q So you don't recall if you read that before issuing your own report?
A I don't recall.
Q Okay. And the Exhibit 5 also includes a copy of Barry Gustin's February 7th, 2025, report. Do you recall reading that second report of Dr. Gustin?
A Not specifically.
Q Fair to say you don't recall whether you reviewed that prior to issuing your report?
A I don't recall.
Q Were you provided the reports of any other experts that have been retained by defense counsel?

A No, not that I recall.
Q Do you recall seeing a report of Dr. Allan Gibofsky, who is a rheumatologist?
A I don't, not that I recall.
Q Do you recall seeing a report by Dr. Thomas Montville, who is a food microbiologist?
A Not that I recall.
Q Do you recall seeing a report by Mr. Les Hodges, who is a seafood industry expert?
A No, not that I recall.
Q Were you advised by defense counsel as to the opinions held by the other experts in this matter?
A Not that I recall.
Q Is it fair to state that the opinions you have expressed in your report are not -- that in expressing those opinions you're not relying on the opinions of any other expert in this matter?
A Yes, that's correct.
Q Can we agree that if you are provided any other additional materials for your file of any nature, that you will keep those separate in a separate folder on your computer from the records you currently possess, either in hard copy or

electronic format?

A Yes.

Q Exhibit 5 contained a number of records of audits by the State of Massachusetts on North Coast Sea-Foods. Are those records that you reviewed in formulating your opinions?

A Not that I recall. I don't recall that.

Q Okay. Would those records have any value to you in the opinions that you have expressed in this matter?

A I don't know what they contain, so I wouldn't know.

Q Okay. Well, they are a part of your file, so I'm left only to ask you --

A Yeah.

Q -- whether they are relevant to you or not.

A Everything that I reviewed was taken into account when I wrote my report last year.

MR. LEVITES: Shelley, I just couldn't follow along. I didn't know that those were in there. Are they in a folder or something?

MS. GRAVES: So I have -- I think it was a -- I think it must have been a folder. Ben, you sent things as folders, right? Do you want to go off the record for a minute?

MR. LEVITES: Thanks.

(Recess taken)

MS. GRAVES: Back on the record. Thank you, Kathryn.

BY MS. GRAVES:

Q Dr. Storch, we were talking about some records concerning audits by the State of Massachusetts of North Coast. And I'm just going to bring one up on the screen to see if you recognize the type of record I'm talking about.

Okay. Can you see --

A Yes.

Q Okay. Do you recall looking at a number of records that the majority of which would be in a similar sort of format as this?

A Can you stop at the bottom?

Q Yeah, I'm sorry.

A On the last page. The next page.

Q Yep.

A I -- I don't recall.

Q Okay. You don't recall if you reviewed these?

A I don't.

Q Okay. Fair to say did you not indicate in your report having reviewed these records?

A It's not indicated in my report. I don't recall.

Q Okay. Is it fair to say that if you were relying on information from these various audit reports, you would have specified that in your expert report?

A No.

Q It's not fair to say that?

A If -- if it was pertinent, it would have been mentioned. If it wasn't pertinent, it would not have been mentioned.

Q Okay. I guess that's what I'm asking. Let me try my question again.

If you had read something in one of these reports that you felt was pertinent to an opinion that you had, is it fair to say you would have referred to this piece of evidence in your report?

A Yes.

Q Your report does not cite any medical or scientific literature as a basis for any of the opinions you have offered. Is it fair for me to conclude that in formulating your opinions you did not rely on any specific studies, articles or texts for your opinions?

A I -- I used my clinical experience, judgment

and knowledge.
Q Okay. So you used your clinical experience, judgment and knowledge and did not rely on any specific studies, articles or texts for your opinions?
A I'd have to review the whole report.
Q The purpose of that review would be to see whether or not you cited to any article, text or --
A Correct.
Q -- literature?
A Correct.
Q If there's no such articles, studies or literature cited, you would agree it's fair to conclude that you didn't consult or rely on any specific studies, articles or texts for your opinions?
A Again, I'd have to review the report.
Q Okay. But if it's absent mention of any specific articles, texts or medical or scientific literature, you would agree that's because you didn't rely on anything of that nature in the formation of your opinions?
A My personal knowledge may be based on those things, but the report -- it would be indirect, yes.

Q Okay. And I understand you have obviously in the course of your career reviewed many -- many a medical study or things --
A Yes.
Q -- correct?
A Correct.
Q Okay. Aside from reviewing your report this morning, can you tell me what else you did in preparation for your deposition today?
A As stated, I also read the March 9, 2026, report by Dr. Barry Gustin.
Q Okay. And did you do anything else to prepare for your deposition?
A Did not.
Q Other than those two reports, did you review any of the -- re-review any of the medical records from this case?
A I did not.
Q Did you review any other records that had been provided to you?
A I did not.
Q Did you do any searches online or other for medical literature or scientific literature?
A I did not.
Q Did you speak with defense counsel in order

to prepare for your deposition?
A Yes.
Q And when did you speak with defense counsel?
A I -- in the last few days.
Q Do you recall for what period of time you and defense counsel spoke?
A Approximately an hour.
Q Were you provided any new data or factual information concerning this case by defense counsel during that preparation that you intend to rely on?
A I don't believe so.
Q I've put on the screen the copy of your CV that is a part of Exhibit 2, your expert disclosure. And the CV is contained at page 9. Do you recognize this, Dr. Storch, as your CV?
A Yes.
Q And as we look at the education section, is there any updates that need to be made to that section?
A No.
Q Okay. And could you summarize for us your educational background after high school?
A I attended college at Binghamton University from 1991 to 1995. I subsequently attended the New York College of Osteopathic Medicine from 1995

to 1999. I was a resident in internal medicine and subsequently chief resident from 1999 to 2002 -- I'm sorry, 2003. I then did a gastroenterology hepatology fellowship at University of Miami from 2003 to 2006.

Q And are you board certified in any specialties?

A I'm board certified in gastroenterology and internal medicine.

Q Do you have to recertify periodically for either or both of those specialties?

A Yes. Previously it was required an exam every 10 years, and currently there's ongoing education called MOC.

Q Okay. And I'm sorry, do you still have to recertify every 10 years, or are you saying something changed?

A It changed. For internal medicine a few years ago and for GI this year where it's called maintenance of certification. There's no exam currently needed. You need to do question sets every quarter to keep your board certification active. That's what I'm enrolled in.

Q Okay. All right. And so are your board certifications active by virtue of doing that

currently?
A Yes, that's correct.
Q Okay. And what organization are your board certifications through?
A The American Board of Internal Medicine, ABIM.
Q And the next section on your CV is your work experience. Is there anything that needs to be updated with regard to that section?
A No.
Q And could you summarize your professional career for us?
A I was an emergency medical technician prior to -- prior to going to medical school. And in medical school subsequently I worked briefly as a hospitalist during residency. I've been doing expert review and testimony since 2006.
I worked as a front line worker on a COVID floor for a brief time during the pandemic. And currently I work for a private GI practice -- I'm president from 2006 to present -- called Gastroenterology Consultants of Long Island. And I'm actually on the board of directors of PRIMMA insurance company from 2020 to present.
Q And can you explain to us what a hospitalist

is?
A A hospitalist is a physician who works in the hospital and takes care of acutely ill patients while they are admitted to the hospital.
Q And you held that role from -- for some period of time between 2002 and 2003 at Franklin General Hospital in New York?
A Correct. I worked shifts while I was chief medical resident.
Q And do you continue to hold a medical license in both New York and California?
A Yes, that's correct.
Q Any other states?
A No.
Q Have you ever held a medical license in any other states?
A Yes, Florida for a brief time.
Q And why did you hold a license in Florida?
A I was doing my GI fellowship in Miami, and I thought I might stay there.
Q All right. And why do you hold a medical license in California?
A I do some consulting work for companies -- for a company that requires a California license.
Q And what company do you do consulting work

for?

A It's a remote capsule endoscopy company.

Q And what type of consulting work do you do for that company?

A I read video capsule endoscopy reports, studies for them, occasionally.

Q And what's the name of that company?

A I don't recall. It's not -- it's not something I do frequently.

Q Okay. So are these actual reports from video capsule endoscopies completed on patients in California --

A Correct.

Q -- at a hospital that you then are reading and issuing the report for?

A I -- it's -- they sent me a -- they send me a video and I issue a preliminary report.

Q If you know, is it for a particular hospital or other facility?

A No.

Q No, you don't know, or no, it's not?

A Typically, for an individual patient.

Q I guess what I meant is are all of these coming out of the same facility?

A No. No.

Q All right. And it sounds like you do that fairly infrequently?
A Correct.
Q But can you give me a sense of is it once a month or --
A Three times a year.
Q And how long have you been doing that work for that company?
A Two years.
Q And with regard to Gastroenterology Consultants of Long Island, are you the owner of that medical practice?
A Yes, that's correct.
Q And how many office locations does your practice have?
A Just one.
Q And how many other doctors are employees of that practice?
A Just me.
Q And can you describe for us the nature of that medical practice?
A It's a clinical gastroenterology consulting practice, private practice.
MR. LEVITES: Shelley, can we take five minutes?

MS. GRAVES: Sure.
(Recess taken)
BY MS. GRAVES:
Q Okay. So, Dr. Storch, I think you had just told me that the nature of your practice was a private gastroenterology practice; is that correct?
A That's correct.
Q All right. And can you just -- can you just fill that out a little for me and describe for me, you know, the types of medical conditions patients that you treat in your private practice?
A Yes. So I take care of patients with a full range of GI diseases ranging from diarrhea, reflux, liver disease, pancreatic disease. Anything that's within the scope of a gastroenterologist I would consult on. I do procedures which include endoscopies, colonoscopies, and as previously discussed, video capsule endoscopy.
In the past I've done advanced GI procedures like ERCPs and endoscopic ultrasound. But in recent years just due to volume of my practice I stopped doing those procedures.
Q All right. And fair for me to presume you're working full time at that practice?
A Yes, correct.

Q Okay. And with regard to the procedures that you continue to perform, endoscopies, colonoscopies, video capsule endoscopies, can you tell me where are those procedures performed by you?

A I have a suite in my office and also in the hospital if the patients have comorbidities or are hospitalized. You know, when appropriate, in the hospital.

Q Okay. And do you have admitting privileges at a certain hospital?

A I have admitting privileges at North Shore University Hospital in Manhasset, and the Long Island Jewish Hospital in Queens.

Q Is it fair to say that if you were to do one of the procedures at a hospital, it would be one of those two hospitals?

A That's correct.

Q And with regard to the procedures that you're performing at your office in that specialized suite, is that -- in other words, do you have a certain day or days of the week that you designate for procedures versus, you know, days that you're just seeing patients for regular appointments?

A No. I see -- I see patients every day. There are specific times that we do procedures.

Q Is there a certain number of procedures that you do per week on average?
A I can estimate maybe 40 procedures a week.
Q With regard to your time as to a procedure, approximately how long does a typical colonoscopy, endoscopy take?
A I mean, it depends on difficulty, but maybe 20 minutes to a half hour.
Q And approximately how many patients per week do you see in your practice?
A I don't know. Again, I can't give you a number off the top of my head. I don't know.
Q And you indicated that you're on the board of directors for PRIMMA insurance company of New York. Does PRIMMA stand for something?
A I believe it's EmPRO. I don't know if it's mistyped. It's E-m-P-R-O. PRI is Physician Reciprocal Insurance.
Q And what type of insurance company is this?
A It's malpractice for doctors.
Q And can you explain to us what your role as a member of the board of directors is for this insurance company?
A I mean, I sit on -- I attend meetings. I sit on the board. I help make decisions with the

rest of the board. Standard board of director responsibility.

Q Do you have some type of ownership interest in this company?

A Not directly. It's a reciprocal insurer, so as a policyholder, I believe all policyholders do have some ownership, but not -- not directly as a board member, no.

Q And your CV further down also indicates that you are on some type of board for Catholic Health Services IPO?

A That's sort of one -- the IPO, I believe I still have a position, but I was more active in the past. It's sort of wound down.

Q And what is Catholic Health Services IPO?

A It's an independent physician organization affiliated with a hospital system called Catholic Health. It's to help physicians with -- independent physicians with contracting and purchasing.

Q And your CV lists that you are a professor, correct?

A I believe my exact title is --

Q Assistant professor?

A Correct, assistant professor at

Hofstra Medical School and New York Institute of Technology College of Osteopathic Medicine.
Q Can you tell me, explain to me -- let's start with Hofstra. You know, tell me about your role as assistant clinical professor of medicine.
A I occasionally teach residents and fellows, sometimes they rotate through my office.
Q So are you teaching a class, per se, or is this solely that the residents and fellows are coming to your office to get, you know, hands-on training?
A They don't get hands-on, they observe. But yes, for -- for Hofstra Zucker, that's correct.
Q And how long have you been an assistant clinical professor for Hofstra?
A A long time. More than 10 years.
Q And how often do you have either residents or fellows in your office observing?
A It varies, but I would say monthly. You know, short -- short period of time monthly.
Q And how about for New York College of Osteopathic Medicine?
A Yeah, I give some lectures for them and I also occasionally have students, similarly, rotate through my office for -- for observation and

teaching.

Q And your CV doesn't indicate the time period. What time period have you been an assistant clinical professor of medicine for New York College of Osteopathic Medicine?

A Again, more than 10 years, but I don't recall when I was granted that title.

Q And with regard to the lectures that you occasionally teach there, are these a full course, or are you going in for an individual lecture as a part of a course?

A I used to go in. Now they are frequently virtual, yes. But intermittent lectures. You know, short lectures, not the full course.

Q All right. And just tell me within the last two years how many lectures have you given?

A Maybe three.

Q And what were the topics of those lectures?

A Colon cancer. That was one. Infectious diarrhea was one. I believe pancreatic disease.

Q Okay. Do you use any written materials in connection with the lectures?

A No.

Q Are the lectures, to your knowledge, videotaped?

A I don't know.
Q When was the lecture on infectious diarrhea given?
A I -- I don't remember off the top of my head.
Q Do you have any notes or outline for that lecture?
A I don't.
Q Just get up there and --
A I just wing it.
Q -- on the fly?
A Exactly. I've been doing this for a long time.
Q Okay. And so was that lecture a -- what type of students was that lecture to?
A Medical students.
Q Do you know for what course that lecture --
A Yeah, I don't recall.
Q And with regard to that lecture on infectious diarrhea, was it about something specific or was it a lecture -- a generalized lecture about that particular condition?
A All the lectures I give there are general lectures.
Q All right. And on your CV you also have a

section for -- entitled "Fellowship." And you indicate 2008 FACP-Fellow College of American Physicians. Can you tell me what that is?

A Those are sort of honorary titles that are granted based on specific accolades. I don't -- I don't recall exactly what needs to be submitted to get those designations, but you could be a member and then above the member would be a fellow. It's a distinction, you know, honorary distinction for those organizations.

Q Okay. And so the date indication, is that the -- so --

A The date that they were conferred, I believe. I would have to see it.

Q Okay. Do you know whether you're still an active fellow?

A I am, yes.

Q And to be clear, you're active with regard to both of the fellowships listed there; one is for the American College of Physicians, the other is for the American College of Gastroenterology?

A Correct.

Q And you have a section "Academic Interests" with a number of different medical topics. Can you tell me what that section of your CV is meant to

capture?

A Can you show me?

Q Yeah. Sorry.

Do you see it there on the screen?

A Yes. I don't fully understand the question, but those are things that I've been involved with, research or education within the past, or specific areas that maybe general gastroenterologists would not have interest in.

Q So I guess I was just -- I wasn't certain by the title of the section --

A Uh-huh.

Q -- "Academic Interests."

So are those things that you were interested in when you were going through your education, or are you telling me that you are currently still doing some sort of research and studies in those particular area?

A I would say both.

Q Are you currently actively researching or writing any type of academic paper?

A Yes.

Q And what is that paper about?

A Motility -- GI tract motility, movement.

Q And what's the purpose of the paper? What

are you studying in particular or attempting to articulate to the masses?

A I -- I think I have an NDA for the research. I don't know if I'm allowed to discuss it.

Q Okay.

A But it's to -- I think generally it's to evaluate, again, the movement -- the movement of the GI tract, stomach, small bowel, colon.

Q Anything about that research have anything to do with the topics we're talking about here in the Deninno matter?

A To some extent maybe movement related to irritable bowel syndrome.

Q And you list on your CV, journal appointments, that you're an ad hoc editor for several different journals. Can you describe what an ad hoc editor is?

A Sometimes they send articles if it's something they think you may be an expert in for -- for review.

Q All right. And with regard to any articles you have reviewed as an ad hoc editor, if those articles are published, are you listed on the articles as such?

A No.

Q Do you know how many times a year you might do that type of review as an ad hoc editor?

A Maybe once or twice a year.

Q Are the journals all referenced in peer reviewed journals?

A Yes.

Q And your CV contains a number of publications that you have authored or contributed to. Do any of those writings bear significance to the opinions that you have expressed in the Deninno matter?

A I don't believe so.

Q And the same question with regard to the final section on your CV, which is "Abstracts, Posters, Oral Presentations"?

A I don't believe so.

Q You indicated earlier that you are part of an expert referral service called Homestead. Do you subscribe to any other expert referral services?

A I don't understand "subscribe."

Q Sure. Are you -- we'll just use the word "associated" for lack of a better word. But --

A I've done some work for Expert Institute.

Q Do you know, are you -- do you continue to be on their roster, if you will, as an expert?

A Yes.
Q Okay. So other than Homestead and Expert Institute, any other expert referral services that you're currently associated with?
A No.
Q And how about in the past; have there been any other expert referral services that you were associated with?
A I've reviewed cases for PRI, the company that I'm on the board of, but it's -- I don't do it currently.
Q Okay. So the cases you reviewed for PRI, those would be medical malpractice cases?
A Correct.
Q And for what period of time did you review cases for PRI?
A I don't recall, but it's since I've been on the board, I'm not reviewing cases because of possible conflict.
Q And fair to say the cases that you would have reviewed for PRI would have been reviews for the defendant?
A Correct.
Q When you were doing reviews for PRI do you remember approximately how many cases per year you

were reviewing?
A It was years ago. I don't recall.
Q Do you advertise your services as a legal expert witness anywhere?
A I do not.
Q With regard to Homestead and Expert Institute, what type of -- what specialties do you hold yourself out as an expert in with regard to those two companies?
A Gastroenterology.
Q Do you know how many times you have been retained as an expert witness? And by that I want to exclude any times that you were a treater, in other words.
A Yes.
Q But I'm speaking of the situations where you were hired to be an expert witness by a law firm.
A Including this case, two.
Q Yes.
A Yeah, including this case, two.
Q So I'm a little confused. So you have been doing expert work since 2006 --
A Right, but I don't work for a firm. I review cases. So in answer to your question, two.
Q All right. So you're making a distinction

that you can think of two cases where you served as an expert where a law firm was involved?
A Correct.
Q Any other matters you were retained as an expert for or work you did for an insurance company reviewing the matter?
A Or -- or another company asked to review the case for validity or for my opinion on the case, and not for a firm? I don't -- I don't know how to answer the question.
Q Sure. And maybe I'm not asking it --
A Yeah.
Q -- correct.
A Sorry.
Q But so I guess what type of cases -- putting aside the two cases where you were retained by a law firm, in those other matters, I know you have done work as a -- for PRI reviewing medical malpractice cases, correct?
A Correct.
Q Is all of the work you have done as an expert in terms of the reviews we're talking about, have those all been review of medical malpractice cases?
A Of alleged medical malpractice, yes,

correct.

Q Alleged is always implied.

A Yeah, okay. Just making sure.

Q Sure. All right.

Have you done any of those types of reviews on behalf of a plaintiff looking to bring a medical malpractice case?

A Yes.

Q And in those cases would you have been asked to review those cases by a law firm?

A Not directly, no.

Q Okay. Would it be going through Homestead or Expert Institute, in other words?

A Correct.

Q In those cases that you reviewed for a plaintiff with regard to a medical malpractice, alleged medical malpractice, did you ever find grounds for bringing a medical malpractice action?

A I -- when I review cases, I merely state whether I believe there was a deviation in the standard of care, not whether a case should be taken action on.

Q Fair enough. So I'll rephrase my question to ask it in that manner.

With regard to any alleged medical

malpractice cases that you reviewed on behalf of a plaintiff, have you ever made a finding that there was a deviation?

A Yes.

Q Were you hired as an expert in any of those matters?

A No.

Q And what is the other case where you have served as an expert for a law firm?

A I looked. I -- I can't recall off the top of my head, but I believe it was provided with my CV, potentially.

Q So if I look at Exhibit 2, your expert disclosure, testimony history, there is a case referenced as Ana Espinoza versus -- and I cannot say the first name of the doctor, but the last name is A-j-a dash O-n-u, M.D.

A Yes, that's correct.

Q Okay. And was that a medical malpractice case?

A That's correct.

Q And you were representing -- you were an expert for the plaintiff in that matter?

A Yes, that's correct.

Q Okay. And just generally, what was the

alleged malpractice in that case?

A There was an endoscopic ultrasound procedure done without fully informed consent.

Q All right. So some complication occurred and the issue was whether they had been informed of that complication in advance, essentially?

A No.

Q All right. And was that a deposition you gave, or did you testify at trial, or both?

A Testified at trial.

Q Had you also given a deposition in that matter?

A I don't believe so.

Q Do you know whether it turned out to be a Plaintiffs' or defendant's verdict in that case?

A Plaintiffs' verdict.

Q All right. And so other than that testifying during that trial, you have not been deposed or otherwise testified as an expert in any other matters?

A No, not that I recall.

Q Have you ever been retained as an expert to perform record review or an independent medical examination in either a personal injury or Workers' Comp. case?

A Maybe once.
Q Have you ever been retained as an expert in any other case involving an alleged claim of food poisoning?
A Not that I recall.
Q Have you ever been retained as an expert in any other case involving an alleged salmonella infection?
A Not that I recall.
Q Have you ever been retained as an expert in any other case involving an alleged infection by some other bacterial pathogen?
A Not that I recall.
Q Have you ever been retained as an expert in any other case involving a diagnosis of post infection -- post-infectious IBS?
A Not that I recall.
Q Ever been retained as an expert in any case involving reactive arthritis?
A No.
Q Ever retained as an expert in any other cases involving hypomagnesemia?
A No.
Q Have you, yourself, ever been a defendant in a malpractice case?

A Yes.
Q How many times?
A Two previous that I can recall, and one current.
Q Can you tell me the circumstances of the two prior cases?
A One was alleged failure to diagnose appendicitis, and the second was alleged anesthesia complication from a procedure.
Q Did you have to testify at deposition in either of those matters?
A Yes, both.
Q Did you have to testify at trial in either of those matters?
A No.
Q Did both of those cases resolve by way of some sort of settlement, if you know?
A No, they were dropped.
Q All right. And how about the current pending matter; what's the nature of the allegation against you in that case?
A Failure to diagnose anal cancer.
Q And is that a current lawsuit or is it in a claim stage?
A It's a current lawsuit.

Q And that's pending in New York?
A Correct.
Q Have you ever worked with Attorney O'Leary or Attorney Levites before or their firm?
A No.
Q In any legal matter has any party ever challenged your ability to offer an expert opinion on any topic or issue?
A Not that I recall.
Q And the only case where that might have happened is the case we talked about earlier that's on your testimony list?
A I -- I would -- I don't understand the question.
Q Sure.
A No, it didn't happen during that case. There was no issue during that case.
Q And you haven't been involved in any other court cases as an expert to date?
A No, that's correct.
Q All right. Do you hold any degree in preventive medicine or public health?
A No.
Q Do you hold any degree in epidemiology?
A Explain a degree.

Q Sure. Are you an epidemiologist or do you have a concentration in epidemiology?

A No.

Q Do you hold any degree in biostatistics?

A Define degree, please, in biostatistics. I don't understand.

Q Have you had any concentrated formal training in biostatistics?

A No.

Q Do you hold a degree in microbiology?

A I have a bachelor degree in biology.

Q You recognize that microbiology is a separate field, if you will, from biology?

A It's a subconcentration of biology. And my degree -- my bachelor's in biology with a concentration in microbiology. Cellular and microbiology, I believe.

Q Are you considered a medical microbiologist?

A I don't know what that is.

Q What is cellular microbiology?

A It's the study of cells and organisms on a microscopic level.

Q Do you hold a degree in food microbiology?

A No.

Q Do you hold a degree in food safety?

A No.

Q You're not board certified in rheumatology, correct?

A I am not board certified in rheumatology, that's correct.

Q And you are not board certified in infectious disease?

A I'm board certified in internal medicine and gastroenterology. So yes, that's correct.

Q Have you ever worked for a public health agency investigating foodborne illness outbreaks?

A No.

Q Do you have any formal education or training in foodborne illness investigation?

A No.

Q Do you have any experience conducting a foodborne illness investigation?

A No.

MS. GRAVES: Ben, can we just take another quick five-minute break?

MR. LEVITES: Sounds good.

(Recess taken)

BY MS. GRAVES:

Q Dr. Storch, I have made as Exhibit 6 the invoices that defense counsel e-mailed a little

while ago. Can you see them up on the screen?
A Yes, I see one.
Q Okay. And so if we look at this first invoice, it's dated March 17th of 2025. And it looks to be an invoice for a -- for the payment of a retainer; is that correct?
A I don't recall. I don't recall.
Q All right. Well, if we look here, we see "Retainer" --
A Yeah.
Q -- and "Retention Fee."
A Yeah, yeah.
Q We don't --
A Yeah.
Q Do you agree it doesn't seem to be an invoice for the actual performance of work at this point?
A I generally -- my general practice is not to ask for a retainer. I usually just get paid as I do the work, but I -- I don't recall.
Q Okay. All right. Anything on this invoice suggest to you that you were actively working on the file?
I don't see any, in other words, indication, you know, three hours, X dollars. It looks to be

just for payment of an advance retainer.
A Again, my general practice is not to ask for an advanced retainer, so I don't know.
Q All right. Well, how does Homestead Experts get your hours?
A I submit them and then they bill and they pay me.
Q Okay. So do you have some other invoice that you submit to Homestead?
A Their -- their -- I send them my hours. I don't know that I have a record of that that I kept from that time.
Q All right. Do you see any reflection here that you spent a certain number of hours on the file for March 17th of 2025?
A It's not written on this invoice, no.
Q Can we presume that this was when you were -- first became involved in this matter, somewhere in the vicinity of March of 2025?
A I think that's a reasonable assumption.
Q All right. I'm going to scroll to the next page, which is an invoice dated May 15th of 2025. Can you see that document?
A Yes.
Q All right. And on this document we see

"Record review Stephen and Mary Deninno." And the next column over it says, "Quantity 4." Can we presume that represents four hours of work?

A I would assume so, yes.

Q Okay. And the rate of -- the rate is the hourly rate of $600?

A Correct.

Q All right. And if we look further down under "Activity," it indicates that you spent two hours reviewing records; is that correct?

A Correct.

Q And it indicated that you spent two hours legal discussion/document edit; is that correct?

A Correct.

Q So can we assume that other two hours involved the drafting of your report and perhaps conversation with defense counsel?

A Again, I don't -- I don't recall from last year exactly what that entailed.

Q Well, I'm presuming that that's your entry, so ...

A No. Yeah, I don't believe -- again, it doesn't look like something I would necessarily write, so that's from Homestead. All this is generated from Homestead. I never saw -- I never

saw these submissions before now.

Q Okay. Do you think Homestead would have made their own decisions about how you spent your time, or do you think that those -- that time would have come from you?

A I -- I don't -- I don't recall. I mean, I don't recall. This is last year. I don't recall the -- you know, what was discussed and how the invoice -- again, I haven't seen the invoice prior to today. This is from Homestead to the attorney.

Q How do you typically send your invoices to Homestead?

A I believe I just send the e-mail with my hours.

Q Fair to say that the entirety of your work on this matter through May 14th, 2025, which is the date of your report and the date reflected on this invoice was four hours?

A It seems likely, yes.

MR. LEVITES: Shelley, I just wanted to add, when I was looking through to get these invoices, there was one other invoice number that I found referenced, but I couldn't find the corresponding invoice. I believe it to be substantially similar to the one you have displayed on the screen now as

page 2 of Exhibit 6.

I'll try to confirm that, but there was one other number, but I don't know if it was subsumed within these other invoices or not. So I'll try and run that down to see if there's any difference. But I believe that it was either the same or included with the invoices that you have here as Exhibit 6.

MS. GRAVES: Unfortunately, it does not appear that the invoices are, you know, sequential as to the case here, so it doesn't -- can't really tell if one's missing, in other words.

MR. LEVITES: Yeah. Yeah, I know. I grabbed everything that was in my e-mail, but as I said, there was one other -- in the e-mails, there was one other number referenced, but I know that one of them was reissued also. So I believe this is the complete set, but there may be one other that's substantially similar to the number 2 that you have there.

MS. GRAVES: Okay. But are you thinking that there's another date with, you know, separate hours, or do you think it's just a re-billing of the same?

MR. LEVITES: I think it's the same as the number 2 that you have there.

MS. GRAVES: Okay. So same as invoice number 5056?

MR. LEVITES: That's my belief, yes.

MS. GRAVES: Okay. Thanks.

BY MS. GRAVES:

Q All right. And if we go to page 3, Dr. Storch, we have invoice 5868. And that's dated March 30th of 2026. So that's from just two months ago. And there is billing for seven hours more of work.

Can you tell me what that seven hours of work entailed?

A I believe it was mainly discussions with the attorneys of my opinion on the case.

Q Would this be the period of time when you were provided Dr. Gustin's third report?

A I -- I believe that is part of that bill. Yes, I believe that's correct, part of it. But again, I don't recall exactly.

Q And the final invoice I have is invoice 6020, which is dated May 27, 2026. And that is a bill for this depo in the amount of $8,000; is that correct?

A That's correct.

Q You indicated that you did spend some time

talking to defense counsel and some time in preparation for your depo today. Have you issued yet an invoice to Homestead for that time?

A I have not, no.

Q Fair to say you intend to at some point?

A I do.

MR. LEVITES: Shelley, I found that last one, so I'm going to try to send it to you now. Just give me a sec.

MS. GRAVES: Is it a new bill?

MR. LEVITES: I think it's a re-billing, but it has some hours that are different than the one you marked, so I'll send it to you now.

MS. GRAVES: Kathryn, we can just go off the record for a moment.

(Recess taken)

(Plaintiffs' Exhibit 6B was marked for identification)

BY MS. GRAVES:

Q All right. Dr. Storch, can you see the invoice marked Exhibit 6B?

A Yes.

Q It's invoice number 5011?

A Yes.

Q Okay. So this is an invoice just provided

by your counsel in addition to the invoices that we previously marked as Exhibit 6. And this invoice is dated May 5th, 2025. So it appears -- well, it's a little confusing. I'm not sure if I understand it. So it appears to bill for 11 hours of work --

MS. GRAVES: Let's go back off the record.

(Recess taken)

MS. GRAVES: We can go back on, Kathryn.

BY MS. GRAVES:

Q So, Dr. Storch, this appears to show billing that you -- and work that you did through May 5th of 2025. So it would appear that you reviewed -- you spent 9.5 hours reviewing records. Do you see that entry?

A I do.

Q Okay. And that you had legal discussion/document editing of 1.5 hours during that time; is that correct?

A I see that, yes, that's what was billed.

Q All right.

A And as previously stated, on the bottom shows no retainer.

MS. GRAVES: Off the record.

(Discussion held off the record)

MS. GRAVES: We can go back on the record,

Kathryn.

BY MS. GRAVES:

Q All right. Dr. Storch, I have brought up on to the screen Exhibit 3, which is a copy of your May 14, 2025, report. And I think you also said you have a hard copy there, so I don't know what your preference is in terms of what you prefer to look at.

A Maybe both, if that's okay.

Q Sure, yeah.

So I'd like to direct your attention to page 2. And you have a section that starts on page 2 called "Case Review and Analysis." And if you could take a moment and review the third full paragraph in that section to refresh your memory as to its contents, and just let me know when you're ready for my question.

A Just to confirm, we're talking about the "It is highly unlikely"?

Q Yeah, the sentence starts, "It is highly unlikely that the infection."

A Okay.

Q All right. Can you tell me what training or experience you have, Dr. Storch, that you believe qualifies you to render the various opinions that

you're opining in that paragraph?
A I'm a practicing clinical gastroenterologist for 20 years and a professor of gastroenterology at two medical schools. Associate professor.
Q All right. Well, the topic of this paragraph doesn't seem to be gastroenterology, though; is it?
A Absolutely it is.
Q Okay. So tell me, what did you do to establish that there was no outbreak concerning king crab or other cases in the area reported?
A I don't understand the question.
Q Okay. The first sentence says, "It is highly unlikely that the infection was related to this specific food source, as there was no outbreak and no other cases in the area were reported."
So I'm asking what you did to establish that there was no outbreak concerning king crab or other cases in the area reported.
A In the records that I was provided, there were no references to any other patients having been sick at that point, other than the -- Mr. Deninno and his wife, potentially.
Q Okay. What records were you provided that would have told you that there were no other

outbreaks or reported cases?

A The records that we discussed that I had reviewed.

Q Mr. Deninno's medical records?

A All of the records that are contained -- that are contained in the file that -- that I was sent.

Q Okay. Well, did you review any records from any local public health departments?

A I did not.

Q Did you, yourself, conduct any investigation into whether there were any reports to any local health departments?

A I -- I did not. I only reviewed the allegations from the experts that were submitted from the prosecution, which did not reference any other patients that were ill.

Q So are you indicating to me that you're referring -- you're relying on information contained in the reports of either Dr. Gustin or Dr. Cumbo?

A Correct.

Q But you, yourself, did no such investigation?

A I did not.

Q Do you know how many persons are required to

be infected to constitute an outbreak?
A In my definition, it would be multiple patients.
Q Multiple meaning how many?
A I couldn't give a specific number.
Q Is two patients enough?
A In my opinion, no.
Q Would three patients be enough?
A I -- I don't know. Potentially. Depends on the case.
Q Do you know how many --
A In --
Q Do you know -- sorry.
A In this case I would not consider Mr. Deninno and his wife an outbreak.
Q Do you know how many persons are required to constitute an outbreak with regard to the CDC?
A Again, in this case, I would not consider two patients an outbreak.
Q That wasn't my question, though. I'm asking you if you know whether -- what the definition of an outbreak is with regard to --
A I can't quote the CDC definition.
Q Are you familiar with any statistics concerning what proportion of foodborne illnesses

are diagnosed and reported to public health authorities?

A I don't think it's relevant to this case.

Q Would you consider The Center for Disease Control and Prevention an authority with regard to foodborne illness in the United States?

A I don't think there's any specific authority on foodborne illness in the United States.

Q Are you familiar with any statistics concerning what proportion of foodborne illnesses occur as outbreaks versus sporadic cases?

A I don't think that's relevant to this case.

Q Regardless of whether you think it's relevant, are you familiar with those types of statistics?

A Can you please rephrase the question?

Q I'm asking you whether you're familiar with any statistics concerning what proportion of foodborne illnesses occur as outbreaks versus sporadic cases?

A The majority of cases would be sporadic.

Q At the time you rendered your opinions in your report, were you aware that the CDC estimates that while foodborne illness outbreaks are common,

about 95 percent of foodborne illnesses occur as sporadic cases?

A As previously stated, most cases are sporadic --

Q Did you know --

A -- in my --

Q Excuse me?

A Excuse me, sorry.

Q You can go. Did you have something else to say?

A I -- no, that's all.

Q Were you aware it was as high as 95 percent?

A In my clinical practice I'm aware that most cases are sporadic.

Q Do you know whether foodborne illness cases are -- that are sporadic are largely underreported to public health departments and to hospitals?

A I don't think it's relevant to this case.

Q Do you agree with that statement, nonetheless?

A I'm -- I don't work for the public health department. I'm -- I'm not aware.

Q You have offered the opinion that it's highly unlikely that the infection was related to this specific food source as there was no outbreak

and no other cases in the area reported. But you don't think it's relevant that the majority of cases which are sporadic cases go unreported?

A It's impossible to define an outbreak based on cases that you don't know exist. That's not logical.

Q But you find it logical to in this case indicate that it's highly unlikely that the Deninnos' infection was related to king crab on the basis that there was no outbreak and no cases reported?

A That's correct.

MR. LEVITES: Shelley, do you mean this king crab?

MS. GRAVES: I'm sorry?

MR. LEVITES: You mean this king crab, right?

MS. GRAVES: Yes.

MR. LEVITES: Okay.

MS. GRAVES: That's what he's saying.

BY MS. GRAVES:

Q Dr. Storch, what is the scientific basis for your statement that if an individual infection occurs, it would generally be from improper handling by the consumer?

A Typically, proper handling by the consumer would kill most infectious organisms.

Q All right. But what's the scientific basis for your statement that typically infections are a result of improper handling by a consumer versus contamination at some other part of the food supply chain?

A Again, proper handling by the consumer would kill -- as previously stated, would kill most infectious organisms. Hence, that would be the final barrier.

Q Did you do any research to determine whether or not that opinion by you that typically infections occur as a result generally from improper handling by the consumer?

A I'm a board certified gastroenterologist. That's my opinion.

Q Well, in your clinical practice as a gastroenterologist, are you making those distinctions when you treat patients with gastric infections from foodborne illness?

A I frequently discuss with them their preparation, and many times there's an issue with food handling.

Q Can you give me an example of a conversation

that you had with a patient in that regard?

A I can remember one specific case of a woman who had a salmonella infection. She had made homemade dog food for her dog using raw eggs and tasted it herself and became quite ill, was subsequently diagnosed with salmonella infection. And in my opinion, it was based on improper handling of the dog food. Raw meat and uncooked eggs, I believe.

Q Are you able to cite any scientific literature that supports your opinion that if an individual infection occurs, it would generally be from improper handling by the consumer?

MR. LEVITES: Objection. You can answer.

A Yeah, as a -- I'm using my experience and knowledge as a board certified practicing gastroenterologist.

BY MS. GRAVES:

Q That generally when people become infected by a contaminated food product, that it is the individual consumer's improper food handling that resulted in the infection?

A When obtained at home, yes, I would say that's correct, in my clinical experience.

Q What do you mean by the "when obtained at

home"?

A If they were at a restaurant, it's possible the preparation was by someone other than themselves.

Q How do you know as a gastroenterologist whether the infection occurred at home or at the restaurant?

A It's often difficult to pinpoint exactly what the cause of the infection was due to incubation period. So most infections can take, you know, hours to days to cause clinical symptoms. So defining exactly what meal caused the infection is oftentimes difficult outside of an outbreak.

Q As a practicing gastroenterologist, do you, with your patients, attempt to determine what the source -- what the food source of an infection is?

A When there's a defined infection in the stool defined by a positive stool test, I -- yes, sometimes we do try to discuss and determine what the source was.

Q And how do you go about doing that?

A History.

Q Patient history?

A Patient history and testing. Specifically, stool test to try to determine the infectious cause

of the symptoms.

Q Okay. And I understand what you're saying. So let's say a patient's stool test came back for salmonella. But in terms of identifying what the source of the infection was, your practice would be to then speak with the patient about their dietary history?

A Correct. But as previously stated, it's often difficult to pinpoint because of the long incubation period. So outside of cases such as the one that I described with the woman with the dog food, it's -- it's very difficult to pinpoint the exact source many times.

Q But despite that, you have been able to determine that typically it is the patient's improper handling of a food that caused their illness?

A Frequently when the food is prepared at home that is the cause, in my experience.

Q And your testimony in that regard is based on your experience treating patients in your private practice?

A Based on my medical knowledge, based on my board certification in gastroenterology, and my 20 years of clinical experience, correct.

Q Do you consider yourself an expert in food handling safety?

A I consider myself knowledgeable.

Q Your report offers no opinion with regards to any food safety violations by the Deninnos with regard to their kitchen or their handling of the king crab. Is it fair to say that you did not form such an opinion in this case?

MR. LEVITES: Objection. You can answer.

A I've never been in the Deninnos' kitchen, nor have seen it, so it's impossible for me to comment on what it looks like.

BY MS. GRAVES:

Q So is it fair for me to believe that you do not have an opinion with regard to any food safety violations by the Deninnos with regard to their kitchen or the handling of the king crab?

MR. LEVITES: Objection. You can answer.

A It's unclear if the king crab was the source of their illness. But if it were the source of their illness, it would be unlikely to be salmonella, as stated, and it would likely have been related to improper food handling, in my clinical opinion.

BY MS. GRAVES:

Q Well, what did you do to undertake in this matter an evaluation of whether the Deninnos abided by proper food handling practices in July of 2018?

A As previously -- I would go back to my prior answer. It's unclear if their illness was even related to the king crab. However, if it were related, it is unlikely to be from salmonella and likely to be from another agent, as stated in my report, such as Vibrio. And that would be related to improper food handling. So I don't have a better answer to that question.

Q Well, you could answer it better by focusing on my question, which is what did you do specifically to determine whether or not the Deninnos abided by proper food handling practices in July of 2018?

A I don't know if the Deninno -- it's impossible to tell if the Deninnos' infection was even from the king crab.

Q That's not the point, Dr. Storch, and I'm going to ask your answer be struck as nonresponsive.

Did you do anything in this case to make a determination whether the Deninnos abided by proper food handling practices in July of 2018?

MR. LEVITES: Objection. You can answer.

A No.

BY MS. GRAVES:

Q The third sentence in that paragraph starts out with "Typically steaming or boiling is recommended which would kill any infection."

What do you mean by that?

A Temperature is used to denature proteins and kill infectious agents. And that's typically what we use for crab.

Q And I guess I don't understand when you say "that's typically what we use for crab." What --

A What is used for crab.

Q Used by who?

A The -- these crabs are specifically cooked and frozen prior to sale, and then should have been prepared by the Deninnos with boiling or steaming.

Q When you say in your report, "Typically steaming or boiling is recommended," are you indicating -- who are you indicating is recommending that?

A It's common practice.

Q Do you know whether North Coast or Big Y indicated in connection with the king crab product that was sold to the Deninnos that it should be steamed or boiled prior to consumption?

A I'm not aware.

Q It's your opinion that if the subject king crab were contaminated with a bacteria like salmonella, boiling or steaming would eradicate that organism?

A Again, I'm not aware of any case of king crab causing salmonella, so I don't know how to answer that question.

Q But that's not the question. The question asked you to presume that a -- the crab was contaminated with a bacteria or other infecting organism.

A Yes, if it was contaminated with an infectious organism, steaming or boiling should kill the infection.

Q And it's your opinion that though this king crab product was sold as a precooked product, that steaming or boiling should have been performed by the consumer prior to consumption?

MR. LEVITES: Objection. You can answer.

A Yes.

BY MS. GRAVES:

Q Are you intending to offer an opinion as to the adequacy of North Coast Sea-Foods' food safety practices?

A No.

Q Are you intending to offer an opinion as to the adequacy of Big Y supermarket's food safety practices?

A No.

Q You state in your report specifically that there's no literature at all showing salmonella associated with the specific -- this specific entity of king crab. Can you tell me what you did to ascertain that?

A I did a literature review on PubMed.

Q And what did you search?

A Anything I could think of with -- related to crab meat and salmonella infection.

Q Did you save anything as proof of this search?

A No.

Q And what did you -- what types of articles did you locate with regard to your search concerning anything related to crab meat and salmonella infection?

A I think I -- I put one case there in my -- in my reference.

Q Okay. You have in your report a reference to T.J. Cho's article "Survival of foodborne

pathogens in ready-to-eat crab marinated in soy sauce." Is that what you're referring to?

A Yes.

Q All right. Is that the only case you found -- excuse me, is that the only article you found?

A That was pertinent to this case, yes, potentially pertinent. And I felt it not to be pertinent.

Q Did you find any other literature indicating linking salmonella infection to crab?

A Again, I was specifically searching for king crab, and I didn't find anything that was pertinent.

Q Dr. Storch, can you hear my question?

A No, I'm sorry, I didn't hear it.

(Discussion held off the record)

BY MS. GRAVES:

Q Did you find other scientific literature, however, that indicated that crab meat can be infected by salmonella?

A I wasn't looking specifically for -- I wasn't looking generally for crab meat. I was looking specifically for this type of crab meat, king crab. And this was all that I found.

Q Okay. But you told me that your search was related. Was anything related to crab meat and salmonella infection?

A And then I reviewed the literature to look for anything pertinent to this case, which I did not find. So I did not find anything that I felt was pertinent to this case.

Q So it would only be pertinent to you if you found a study that found that there was an infection of king crab by salmonella?

A Correct.

Q Is it your opinion that the crab meat of a king crab is not physiologically susceptible to contamination by salmonella?

A Salmonella is generally an infection of chicken, beef and eggs. It's not generally -- it's not felt to be obtained from seafood.

Q Well, it's not endemic to seafood, correct?

A I don't understand what that means.

Q In other words, it's not naturally within seafood?

A If a patient comes into my office with complaints of diarrhea and gastrointestinal distress, I would not -- I would ask them for a food

history, but it would not generally include issues with seafood, because that's not a general source of salmonella infection if they had a stool test that was positive for salmonella.

Q Well, do you understand that any food product can become contaminated with salmonella if it's exposed to salmonella?

A With all due respect, I'm a board certified gastroenterology. I understand how foodborne illness works.

Q Well, please answer my question then.

MR. LEVITES: What was the question, Shelley?

MS. GRAVES: Excuse me?

MR. LEVITES: What was the question?

MS. GRAVES: Kathryn, could you read it back.

(Record read page 81, lines 5 - 7)

A In my clinical experience, I've never had a patient with a foodborne illness of salmonella from shellfish or seafood.

BY MS. GRAVES:

Q That's not the question, Doctor.

If crab meat from a king crab is exposed to salmonella in a food processing plant, could it

become contaminated with salmonella?

A I don't even --

MR. LEVITES: Objection you can answer.

A I don't understand how that would happen, so I can't answer the question.

BY MS. GRAVES:

Q Are you an expert in seafood processing?

A I'm not.

Q Are you an expert in food safety?

A Food safety meaning -- I don't understand the question.

Q Well, you're aware there are folks out there who are experts in food safety, correct?

A No.

Q Do you know what cross-contamination is?

A I do.

Q So do you understand how a food product like king crab could become cross-contaminated?

A I guess I could imagine a way that it would be cross-contaminated, but I've never seen a case of that in my clinical experience of 20 years.

Q Do you agree that the crab meat of a king crab is susceptible to contamination by salmonella if exposed?

MR. LEVITES: Objection. You can answer.

A Hypothetically, but I've never seen it in my 20 years of experience.

BY MS. GRAVES:

Q You have made that abundantly clear, Dr. Storch. So hypothetically, though, scientifically, is it susceptible to contamination by salmonella?

MR. LEVITES: Objection. You can answer.

A I can't even imagine what the source of the salmonella would be.

BY MS. GRAVES:

Q I'm not asking you to. I'm asking you whether the crab meat of king crab is susceptible to contamination by salmonella. And if that's not within your field of expertise, please feel free to say so.

A Yes.

MR. LEVITES: Objection. You can answer.

A Yes.

BY MS. GRAVES:

Q In that same paragraph you have a statement that, "It has never been described in king crab legs in the United States, making the likelihood of this virtually zero." Do you see that sentence?

A I do.

Q What scientific method did you use to reach the conclusion that the statistical likeliness is virtually zero?

A If something's never been described in the past, it's unlikely.

Q Is that a scientific opinion?

A I believe that's a scientific opinion, yes.

Q What are the ways that a food product can become cross-contaminated?

A The food product would have to come in contact with something else that was contaminated.

Q What are some examples of that?

A If it's processed in the same machine as another food product or a food handler touched the product.

Q Is salmonella spread by pests, if you know?

A Define pests.

Q Flies, mice, rodents, birds.

A In humans it's generally spread by ingestion of a contaminated food product that's improperly cooked.

Q Do you know whether pests can spread salmonella in processing facilities?

A I'm not aware of that.

Q How does a worker, a food handler, in a processing facility potentially cross-contaminate a food product?

A If they were infected and used the bathroom, maybe didn't wash their hands properly then weren't wearing gloves when they were handling the food product, the food could potentially become infected.

Q Do you agree that it is not within your expertise to offer an opinion that a seafood product like the subject king crab could not become contaminated by salmonella in a seafood processing plant?

MR. LEVITES: Objection. You can answer.

A I think it's within my realm of expertise to say that seafood typically does not cause salmonella infection.

BY MS. GRAVES:

Q Okay. Not my question, though. Do you want me to repeat the question?

A I -- I don't think it's relevant to this case.

Q You don't think what's relevant to this case?

A What you just said.

Q Okay. Well, I'm going to ask my question again, okay, and ask you to answer it. All right?

Do you agree that it is not within your expertise to offer an opinion that a seafood product like the subject king crab could not become contaminated by salmonella in a seafood processing plant?

MR. LEVITES: Objection. You can answer.

A I don't agree with that.

BY MS. GRAVES:

Q You think that's within your realm of expertise?

A Infection -- general infection from seafood product or any other food product is within the realm of my expertise.

Q Okay. But what do you know about seafood processing facilities and their practices?

A I -- I know about human ingestion of foods and their likelihood of causing disease.

Q Okay.

A I don't know -- yeah. As far as processing I don't know, but I know about humans obtaining infection from ingestion.

Q Okay. But that's not the topic of my question.

A So it's not irrelevant.
Q That's not the --
A But it's inferred.
Q You can be an expert in that, Dr. Storch. What I'm trying to find out is if you think you're an expert in something else. Okay.
So my question is --
MR. LEVITES: Shelley, before you ask the question, could you just rephrase, because I don't know if there's a double or triple negative. Could you just rephrase it so it's just a little more straightforward.
BY MS. GRAVES:
Q Is it fair to say, Doctor, that you're not an expert with regard to whether a seafood product like the subject king crab can become contaminated by salmonella in a seafood processing plant?
MR. LEVITES: Objection. You can answer, Doctor.
A Yes.
BY MS. GRAVES:
Q And is it likewise fair to say that you're not an expert with regard to whether a seafood product like the subject king crab can become contaminated by salmonella in a grocery store

setting?

A I've never seen a patient get a salmonella infection from a seafood product, so it's hard to answer that question.

Q Are you an expert in grocery store practices, sir?

A No.

Q Do you consider yourself to have expertise concerning the contamination whether -- of the susceptibility of cross-contamination of food products in a grocery store?

A No.

Q Did you just indicate that you have never seen a seafood product contaminated by salmonella?

A In my clinical practice I have not seen a patient get salmonella infection from a seafood product over the past 20 years.

Q Are you aware that seafood can be contaminated by salmonella?

A Yes.

Q So the fact that you have never seen in your -- seen that in your clinical practice over the last 20 years does not make it so; isn't that correct?

MR. LEVITES: Objection. You can answer,

Doctor.

A It makes it very unlikely, but not impossible.

BY MS. GRAVES:

Q Very unlikely just because you, as a doctor in Long Island at a GI practice, have never seen it with one of your patients?

MR. LEVITES: Objection. You can answer.

A That, plus my board certification in gastroenterology, my professorship at two medical schools, and extensive clinical experience makes it very unlikely, correct.

BY MS. GRAVES:

Q What does your board certification have to do with whether or not it's likely that a -- that seafood could be contaminated with salmonella?

A Because I'm an expert in the field.

Q Expert in the field of?

A Gastroenterology.

Q Okay. Didn't you earlier tell me that it's very difficult to know what food caused a person's illness in your practice?

A Many times, that's correct.

Q So how do you know these many times when you're not able to tell what food caused your

patient's infection that it wasn't caused by seafood?

A I'm basing my opinion based on the times that we were able to identify the cause, which has never been seafood in my clinical experience --

Q So in those limited --

A -- for salmonella.

It's a large number of 20 years experience.

Q Can you define that number for me?

A Hundreds of patients.

Q Hundreds of patients where you have been able to confirm what the source of the food contamination was?

A Correct, based on positive stool tests.

Q Well, in those hundreds of patients with the positive stool test, how were you able to link it to the food source?

A Again, it's frequently related to history and improper food handling by the -- by the patient.

Q So the patient describes a food source that you recognize as something commonly infected by salmonella and they also describe some sort of improper food handling process as well?

A It happens commonly, yes.

Q Your report on page 1 states that you treat foodborne illnesses on a daily basis. Can you explain further what you mean by that representation?

A People feel like -- patients feel like they are ill, and it's commonly related to an infectious cause, which many times is related to something that they ate.

Q So are you typically seeing in your practice people who are suffering from acute gastroenteritis like the type that Mr. Deninno was suffering?

A Yes.

Q And I just want to make sure I understand clearly. Are these existing patients of yours who call because they are having diarrhea and you get them into the office quickly, or are they new patients?

A A mixture of both.

Q And so when you say -- when you say that you're treating foodborne illnesses on a daily basis, are you -- is it these types of acute gastric infections you're treating on a daily basis?

A Sometimes acute and sometimes chronic, but yes.

MR. LEVITES: Shelley, it's 12:30. Do you want to break for lunch now, do you want to keep going? Doctor, do you have a preference?

THE WITNESS: I need five minutes, but I could go either way.

MR. LEVITES: What do you say, Shelley? Do you want to take a short one now or do you want to take lunch now?

MS. GRAVES: Yeah, let's take lunch now and then we'll --

MR. LEVITES: You think like 1 o'clock?

MS. GRAVES: Is that good for you, Kathryn?

THE REPORTER: Yes.

MR. LEVITES: We'll see you back at 1:00.

(Recess taken)

BY MS. GRAVES:

Q I think we were last talking about in your daily practice that you see both acute and chronic foodborne illnesses; is that correct?

A Acute and chronic diarrhea I would say more than foodborne illnesses.

Q Okay. So in your report where it says that you treat foodborne illnesses on a daily basis, is that not written --

A That's correct. That's correct. It's

usually acute, though.

Q When you see a foodborne illness, in other words, you're saying it's usually acute?

A Correct. And just for your definition, chronic diarrhea is usually defined more than a month. Some places it's six weeks, yeah.

Q And with regard to medical conditions from foodborne illnesses that you treat, can you tell me what some of the chronic conditions from foodborne illnesses are?

A Again, I would say the majority of times if they are acute, there is no chronic sequelae. A person gets sick and they resolve on their own. There is certainly some parasites that we don't see so much in the United States, but when people have foreign travel, that can cause a chronic diarrhea and that's usually the complaint of diarrhea and loose stool.

Q What are the most common pathogens that cause foodborne illness?

A It's usually viral. The majority of cases are viral. Acute infectious diarrhea is usually viral.

Q And what about with regard to bacterial infections?

A Right, so it would be -- you know, there's a pretty standard list of things like E. coli, salmonella, Shigella, Campylobacter. And there's a long list of others, as well as -- you didn't ask about parasites, but parasites are a separate list.

Q How frequently do you treat patients with salmonella infections?

A It's not infrequent. Again, the stool culture -- with a stool culture positive how many cases? I mean, I would say at least 20 to 30 cases a year.

Q And those are typically acute gastroenteritis cases?

A Correct. Patient comes in with diarrhea. We do a stool culture and the stool culture comes back positive for salmonella.

Q Have you ever had a patient with chronic problems post an acute GI infection from salmonella?

A Salmonella can sometimes be chronic. It can be stored in the gallbladder. Again, those patients you take a stool test and it comes back positive for salmonella. That's how you make the diagnosis. And again, by "chronic," we're talking more than a month, more than four to six weeks.

Q All right. And I may not have understood your answer. So a person has an acute infection that's subsequently diagnosed by stool culture as confirmed salmonella.

A Yes.

Q And my question is have you ever had a patient with a chronic condition that developed as a result of that initial acute infection?

A I mean, that's a very general question, obviously. Can you be more specific?

Q I'm just trying to get a sense of have you ever treated patients who had some sort of chronic post-infection complications from salmonella?

A Again, typically treat them for the salmonella and they get better.

Q I do. I understand that.

A Yeah.

Q I'm trying to find out if you have had any experiences with patients who didn't follow that typical pattern.

A There are patients that require extended courses of antibiotics to get -- you know, you retest -- they are still having diarrhea, you recheck the stool test. They still have salmonella. Sometimes it can be resistance to antibiotics which

can be an issue.

Specifically sometimes they are quinolone resistant and you have to use something like a macrolide antibiotic to kill it. It's not uncommon.

Q So these are patients with -- where the active infection has not cleared?

A Correct.

Q Is an acute salmonella infection typically treated with antibiotics?

A In my clinical practice, yes, I would treat with antibiotics. Some people -- some authors suggest that acute infectious diarrhea doesn't always have to be treated, but I think the standard of care in my area would be to give antibiotics.

Q Is there a particular antibiotic you would use in that situation?

A Again, many times because of resistance, I would use a macrolide like Zithromax.

Q What gastrointestinal conditions beyond the initial episode of acute enteritis are salmonella infections known to cause?

A Very infrequently they can be related to arthritis issues and joint pains afterward, like sort of autoimmune issues. So those cases you would

have a positive stool test, and then subsequently the patient has some joint issues, usually in the setting of HLA-B27. We used to call it Reiter's syndrome. We don't call it that anymore.

Q My question asked for gastrointestinal conditions.

A Right.

Q Do you consider reactive arthritis a gastrointestinal condition?

A Again, I'm board certified in internal medicine and GI, so I kind of look at the whole patient. But yeah, it is related, you know, in diseases like Crohn's disease, for example. There are many -- there's a lot of overlap.

So Crohn's disease has extraintestinal manifestations. That doesn't mean that a gastroenterologist shouldn't be versed in those sequelae. You need to know the whole disease process of everything you're dealing with. Many, many GI problems have extraintestinal manifestations. I thought that was your question.

Q That's fine.

A Yeah.

Q And I wasn't suggesting that --

A Yeah.

Q -- it didn't --
A Yeah.
Q -- but I was trying to limit it to gastrointestinal conditions.
A Okay.
Q So --
A Yeah, it doesn't -- yeah, again, it kind of doesn't -- you know, it's the whole body. You know, you treat the patient as a whole, so there's no disease process that only affects one system. I mean there are, but most have broader reaching sequelae that you need to be aware of and able to treat.
Q So are there any specific gastrointestinal conditions beyond the initial episode of acute enteritis that salmonella infections are known to cause?
A Specifically for salmonella, again, I -- maybe some issues with the gallbladder. You know, we talked about it can live in the gallbladder for an extended period of time when you talk about chronic salmonella. But again, you would have to have positive stool cultures, and it's not something that I -- that I typically see.
Q You told me about reactive arthritis. Are

there any other non-GI conditions that salmonella infections are known to be associated with?

A Specifically salmonella, not that I'm aware.

Q What is the recognized incubation period for salmonella?

A It's generally felt to be six hours to six days, but generally, about 24 hours. You know, somewhere from six hours to 36 hours. Somewhere around that time period.

Q Does a higher infective dose of salmonella correlate to a shorter incubation period?

A I would have no way to -- again, I would give you from my clinical experience there's no way for me to determine what the inoculum looks like, so it's hard for me to answer that question.

Q And do you agree that an incubation period of five to six days for salmonella would more likely than not be a result of a low dose inoculum?

A Again, I -- I have no way to determine that. I don't know. Yeah, I -- I don't know what the inoculum is in any specific case. It's impossible to know that. You would have to measure it before you gave it to the patient, and obviously that wouldn't be nice.

Q Would you agree that if when -- if two persons had the onset of symptoms from a salmonella infection within two hours of each other on the same day, that it would be less likely that they had been originally infected five or six days earlier?

MR. LEVITES: Objection. You can answer.

A No, I don't think -- I -- I wouldn't say that, no.

BY MS. GRAVES:

Q And why not?

A I mean, if the -- just understand if two people are both infected with salmonella, my -- I would make a logical assumption that they both obtained it at the same place, right, that they both got it at the same place, assuming they are together, right, not in different countries, but if they are both together and they both got it at the same time, it could be within six days. You know, the incubation period is up to -- it's six hours to six days.

So you would assume somewhere within the past six days and as short as the past six hours they both got it, but I don't know why that would make it more likely that they got it more recently. That doesn't seem logical.

Q Do you consider yourself an expert on what factors are likely to affect the duration of the incubation period of a salmonella in an infected person?

A I'm an expert in gastroenterology and the pathophysiology of salmonella as a gastroenterologist.

Q Okay. Well, what are the factors that would likely affect the duration of the incubation period for salmonella?

A I would think the dose -- the inoculum dose. But again, there's no way to determine what that would be, unless you tested the thing that was ingested prior to the person ingesting it, in which case they wouldn't ingest it, I would think.

Q All right. But the inoculum dose would -- regardless of whether you know it or not, but you believe the inoculum dose would affect the incubation period, correct?

A I think that's likely, yes. I think that's a reasonable statement.

Q What else might affect the duration of the incubation period in any particular person for a salmonella infection?

A I would think probably the patient's own

physiology, maybe medications, if they were taking, things that affected acid production. Things of that sort. If they were immunosuppressed, you know, could be a factor.

Q Do you think those things -- those types of things with regard to individual people might be a reason why the duration -- the incubation period might differ in two people if they were infected at the same time?

A Yes, that's possible.

Q Do you agree that the sudden onset of symptoms of acute enteric infection by Stephen Deninno and Mary Deninno two to three hours apart makes it more probable than not that the spouses were exposed to the same infectious agent at or about the same time?

MR. LEVITES: Objection. You can answer.

A I think based on the prior answer, again, it depends on the person to person, how long it takes them to get sick. So it doesn't define that they both got the same illness, but it's possible. You know, it's only two cases, so it's possible, but not necessarily the fact.

BY MS. GRAVES:

Q You think that it's only possible?

It doesn't make it more probable when two people experience the sudden onset of acute infections -- excuse me, acute symptoms from an enteric infection within a -- two to three hours of each other that it's not more probable than not that they were exposed to the same infectious agent at about the same time?

MR. LEVITES: Objection. You can answer.

A You know, the question is asking me to assume that the patient has a foodborne illness, and I don't think that's proven in this case.

BY MS. GRAVES:

Q I --

A That's my GI -- you can disagree with my GI opinion, but you know, there are lots of viral causes that are not foodborne that can give you acute diarrhea illness.

Q Dr. Storch, in a deposition I'm allowed to ask you hypothetical questions.

A Okay.

Q So I'm not placing -- I haven't asked you hey, specifically Mr. and Mrs. Deninno. I'm saying to you is it more probable when two persons --

A Right. I apologize. I thought the question specifically referenced the Deninnos getting sick at

the same time.

Q It may have earlier. In the first question I think I might have.

A Yeah. Yeah, so I apologize. No offense meant.

Q And if I answered incorrectly, then I apologize as well, but -- so let me re-ask the question. I'm going to ask a different question, okay?

A Okay.

Q And then I'll clarify it based on what you just said if you need me to.

A Okay.

Q Do you agree that the sudden onset of symptoms of acute enteric infection by Stephen Deninno and Mary Deninno two to three hours apart makes it more probable than not that the spouses were exposed to the same infectious agent at or about the same time?

MR. LEVITES: Objection. You can answer.

A I think that could be a reasonable assumption.

BY MS. GRAVES:

Q As a part of your work in this matter did you undertake to evaluate the dietary history of

Stephen Deninno and Mary Deninno for the days before their symptom onset in July of 2018?

A I've never met nor questioned Stephen Deninno nor Mary Deninno.

Q Okay. I understand that. But did you undertake, through records or any other way, to evaluate their dietary history for that period?

A I -- I don't recall the full medical records from -- from last year.

Q Was it relevant to you in forming your opinions what their dietary history was?

A As previously stated, it's frequently not possible to identify -- if -- if a patient has an infectious cause of diarrhea, it's often very difficult, again, to identify the meal that caused it in cases with -- with a documented infection such as salmonella.

Q Okay. And I understand you have indicated to me that in general, you find that to be the case.

And I'm merely trying to find out as part of your work as an expert in this case, did you make an evaluation of their dietary history as a part of your work?

A I reviewed the records that were presented to me. I don't recall if there was a list of their

diet over the past -- over the prior six days it was presented as part of those records.

Q Do you not remember because it wasn't relevant to the opinions you were going to offer?

A I don't remember, period. I just don't remember. But objectively even if they had submitted a list of everything that they ate for the past six days, it would still be hard to determine whether it was the infectious cause of the diarrhea because there's no positive stool test to suggest an infectious agent.

Q So is it your testimony that because there was no stool sample identifying the infectious agent in this case, you were not concerned with what their dietary history was?

MR. LEVITES: Objection. You can answer.

A As previously stated, if there was a specific incident with poor food handling or an outbreak or something of that such in their history would be relevant. But a general list of what they ate for the past six days would be unlikely to help with the diagnosis, especially in light of no stool test that's positive.

BY MS. GRAVES:

Q Okay. Did you review information with

regards to the Deninnos to make a decision about whether their dietary history together was such that it did have some relevance to your opinions?

MR. LEVITES: Objection. You can answer.

A I -- I recall that there was some subjective statements in the records that they hadn't eaten together, but, you know, that's not objective evidence of a diet -- would help me make a diagnosis or form an opinion.

BY MS. GRAVES:

Q Well, aren't the subjective statements your patients make to you in the cases where you make a determination with your patients about what caused their foodborne illness the same thing?

A Again, you need a positive stool test. It's impossible to make a diagnosis of a specific infectious agent without a stool test being positive. There are many causes of diarrhea.

Q So is that the crux of your opinion here, that because there was no stool sample, it's absolutely impossible to prove this case?

MR. LEVITES: Objection. You can answer.

A So I'm a physician. Yeah, I base my opinion based on science, so I need data to make a conclusion. And the basis of my opinion in this

case is that there's no data.

BY MS. GRAVES:

Q No stool sample?

A No data.

Q No data at all because there's no stool sample?

A You can't make a diagnosis of salmonella without a stool sample. I can rephrase that. Without a culture. So obviously if you cultured -- if it was in the blood, you could culture the blood. And if that was positive, you could make the diagnosis. But you need a culture. So I apologize. I revise that.

Q It's okay.

I put your report back on the screen.

A Uh-huh.

Q And at page 1 here in the second paragraph, you can see where my cursor is?

A Uh-huh.

Q Okay. So you have a sentence here, "Mr. and Mrs. Deninno's acute gastrointestinal issue could have been from anything he ate within a few days of the onset of his illness and would most commonly have been from a virus."

And the next line reads, "Other

possibilities could be a" -- you're going to have to help me out with how to pronounce that word.

A I'm sorry, yes. Nosocomial.

Q -- "nosocomial," and in parenthesis, "a hospital acquired infection from his workplace or from a pet like his dog."

Can you break those down for me how -- explain to me the nosocomial acquired infection from his workplace, how is that a possibility?

A Right. So specifically when -- when he was in the ER, that was one of the concerns for his infection. They were concerned about an infection called C. diff. C. diff is an infection, a bacteria, that usually you -- it's fecal/oral, so it's from stool to mouth. You touch something that's infected potentially with stool and then touch your mouth, and then it colonizes your GI tract, specifically your colon.

Many times the infection becomes relevant after a patient is colonized and then gets antibiotics, but there are definitely sporadic cases of this happening.

Specifically in this case, it's possible that Mr. Deninno -- and again, this was not proven, just like the other infection, so it's hard to say

that that's what it was, but he touched his stool and then he touched his wife and his wife touched her mouth and she got infected or colonized with the bacteria. So that would be nosocomial.

And things --

Q Before you leave -- before you leave that topic --

A Uh-huh.

Q -- if that was -- if that is what happened here, does it -- does it make sense that Mr. Deninno and Mrs. Deninno presented with symptoms two hours apart?

A Yeah, that could happen. If he got infected and then she got infected, it's possible.

Q Well, he would -- he would have gotten -- in your scenario he's infected at work, correct?

A Colonized at work.

Q Colonized at work?

A Yes.

Q Okay. And I guess explain the difference between infected versus colonized.

A Yeah, colonized means he has it in his colon. You know, again, if he touched his stool and then touched something household -- again, these are all just as unlikely. You know, the most common is

going to be viral, so I'm just posing other possibilities.

Most -- you know, again, viral, viral, viral I think in most cases. But again, nosocomial would be colonized and then infection. Again, if he had touched his wife, he certainly could have spread it to his wife.

Q Okay. But I -- so you're talking about that he's at work. He's infected by -- and you can tell me if I'm using the wrong word.

A Yeah, that's fine.

Q But when he is exposed to the C. diff --

A Yeah.

Q -- I'm assuming it means he's infected by the C. diff --

A Yes.

Q -- is that correct?

A Yes.

Q And then you're saying his colon is colonized by that infection?

A Correct.

Q And then as a result of that when he defecates, he's got the ability to unintentionally now infect -- if he touches his feces and then he touches something else that somebody else touches,

it can go on to infect that other person?
A That's correct.
Q Okay.
A Yes, that's correct.
Q Okay. And the point I'm trying to make is -- or withdrawn. Let me ask another question.
So if he's at work and he is exposed to C. diff and he is infected by it, is there an incubation period in Mr. Deninno in terms of when he himself would then be able to spread the C. diff?
A Again, I -- as you're suggesting, I don't think this is a likely scenario, just as I don't think salmonella is a likely scenario, but I'm just posing other possibilities --
Q Okay.
A -- as we're listing a differential diagnosis.
Q Well, I hope you understand that it's sort of my job --
A I understand.
Q -- to figure out whether --
A Yeah, I got it.
Q -- he --
A We're good.
Q Okay. All right.

A Yeah, we're good. Don't worry.
Q So --
A But, yes. Yeah, it's possible, not likely.
Q Okay. Thank you.
All right. And then the other example you gave was "or from a pet like his dog"?
A Yeah. Those would be infections like Giardia lamblia. Again, it's fecal/oral, so he would have to touch -- you know, I don't know Mr. Deninno's hand washing practices after handling -- going to the bathroom himself or handling the dog, but there are definitely cases of humans that touch, you know, dog excrement and then either prepare food or touch something, and then, you know -- well, they could pick it up themselves by obviously touching their mouth and they could potentially give it to somebody else by touching another surface and then -- or touching someone else or it going into their mouth.
Q And I understand that you're posing that as a possibility. Did you do anything to determine whether that would be a more likely circumstance in this case than a shared food source?
A Just -- just the facts. Again, I think it's

just as likely as the other things, because they -- you know, I believe somewhere in the records it said that they had dogs. And certainly Mr. Deninno worked in the hospital. And again, the ER was even concerned about that as a possibility.

Q Okay. Well, I thought we established that the C. diff example you posed was not likely?

A Again, I think salmonella is not likely. I think C. diff's not likely. Again, there's no way for me to tell any of these things likely or not. All of them would require a stool test that's positive, and we don't have any stool test that's positive in this case.

Q Why do you think salmonella is not likely?

A Because we don't have a positive stool test, and he didn't ingest an agent -- there's not a -- as previously discussed, he didn't ingest something that's typically related to salmonella infection.

Q Well --

A And I would say it's more likely to have C. diff than salmonella because he does work in the hospital. He would be more likely to have Giardia than salmonella because he does have dogs.

Q Do you know anything about the health history of his dogs?

A I've never met the patient. I've never met his wife. I've never been in their house, and I've never met the dogs.
Q And that would be unusual for any defense expert?
A Right.
Q But that doesn't mean that you --
A Yeah.
Q -- wouldn't have been provided information that this regard --
A No.
Q Did you --
A No, I have no veterinary records of Mr. Deninno's dogs. Some things I don't remember. That I do.
Q Okay. I want to go back to something you said a moment ago when I asked you why you were indicating that you thought it was unlikely that Mr. Deninno's infection was from salmonella. And you indicated that -- I believe that it was because he had not been -- there was no positive culture for salmonella, correct?
A Correct.
Q How does that -- the fact that there was not -- I understand that not having a culture

doesn't provide for a definitive diagnosis of salmonella, correct? That's what you're saying?

A It's impossible to make a definitive diagnosis without a culture, that's correct.

Q Okay. But why does that make it unlikely that his infection was from salmonella?

He had no stool culture. In other words, this is not a situation where he had a culture and tested negative for salmonella?

A Right.

Q The facts are, correct, that he had no -- no culture was taken?

A Right. Well, no culture was taken because he wasn't having diarrhea. Yeah, it was ordered but not taken, because he couldn't produce a stool.

Q Right.

A Right. However, again, we're talking about science. You want to have, you know, facts that are logical. So logically he would have needed to be -- is it possible that he had salmonella from raw eggs that he ate two days prior or the day before? That's possible.

Again, I think it's unlikely, as I've stated before, that he had salmonella from king crab legs which are not typically an agent that causes

salmonella. And again, it's impossible to say that he had salmonella without a culture. So it's the same -- same answer.

Q All right. But your indication was that it was not likely he was infected by salmonella?

A There's no reason for me to think that he was infected with salmonella, just like there's no reason for me to think that he was infected with Giardia. But if we're talking about possibilities, it's also possible that he had C. diff, and it's also possible that he had infection from his dog.

Q Your opinion would be because there was no culture, everything is as likely as anything else --

A That's correct.

Q -- within the realm of things that would cause this type of acute gastric --

A That's absolutely correct. Yes, that's correct. But if I could add to that, I think it's less likely he had salmonella because he wasn't -- there's no evidence he was exposed to a foodborne agent that would be suggestive that he would get salmonella from it.

Q And your opinion is that it is highly unlikely that there would -- that the crab would have been infected, correct?

A Again, as it's never -- as it's preprocessed crab, if it was treated the way it was supposed to be, on top of the fact that it's never been reported that king crab gives salmonella, I would think that's very unlikely.

Q Okay. But we don't know if it was treated the way it was supposed to be; do we, Doctor?

A I guess that's true. However, again, even that being the case, it's never been reported in king crab. Why would I assume that it was -- why would anyone assume that the king crab caused a disease that's never been shown before, that's never been reported before? That doesn't seem logical.

Q Never reported in an outbreak?

A Never been reported in -- in king crab.

Q Do you think every study that's done is testing every type of crab out there?

A That's not how we practice medicine. You know that's -- I mean, I can't answer that question.

Q And you agree that the king crab could be cross-contaminated in some manner?

A Anything's possible, but it's never been reported that someone got salmonella from king crab, to my knowledge. And I've never seen it in clinical

practice.

Q So until some food product has been contaminated for the first time, it's impossible. But once it's been infected, then it's possible?

A Again, we don't even know if Mr. Deninno had salmonella because we don't have the stool culture or any other culture showing that he had salmonella. So it's kind of a circular discussion.

Q You agree that Stephen Deninno began suffering symptoms of acute gastroenteritis on July 28th of 2018?

A I don't remember the exact record. I -- I do know that he went to the ER complaining of acute GI symptoms. I would need to see the report to know the date.

Q What were the symptoms that he was reporting as you recall?

A Again, I need to see the -- I haven't reviewed that record in a long time, but I believe he was complaining of -- of GI symptoms, of diarrhea, and I believe some nausea, vomiting.

Q Do you recall that he was also having abdominal cramping?

A I do seem to remember that as well, yes.

Q Are those all symptoms of acute

gastroenteritis?

A It's in the differential diagnosis of acute gastroenteritis, yes.

Q And is it your understanding that his wife, Mary Deninno, was suffering those same symptoms at that time?

A I know that's what he subjectively reported. I never saw any medical -- I don't believe I saw any medical records from Mary Deninno.

Q Do you agree that it's more probable than not that Stephen Deninno's symptoms were caused by a acute gastrointestinal infection?

MR. LEVITES: Objection. You can answer.

A Again, there's a differential diagnosis for his symptoms, but a gastrointestinal infection being viral, bacterial or parasitic would be high on the differential diagnosis.

BY MS. GRAVES:

Q And did Stephen Deninno's bout of acute gastroenteritis cause him to be hospitalized on July 31st, 2018?

A I'm not clear that he was hospitalized. I believe he did have an emergency room visit, so I believe he did go to the emergency room for those symptoms and was discharged. But again, I don't

recall specifically if he was admitted to the hospital. I'd have to see the records.

Q Why did he go to the emergency room?

A For the symptoms that you surmised.

Q It's your understanding that he went to the emergency room for his symptoms of diarrhea, nausea, vomiting and abdominal cramping?

A That's what I recall, correct.

Q Are the acute gastroenteritis symptoms described in Stephen Deninno's medical records consistent with an infection by salmonella?

A Again, the differential does include infection, which includes most commonly viral and less likely multiple bacterias which are already discussed or parasitic infection or C. diff.

MS. GRAVES: Okay. Well, I'm going to move to strike that answer. And, Kathryn, could you read back my question.

(Record read page 121, lines 9 - 11)

A Can you rephrase that question?

BY MS. GRAVES:

Q Sure. I'm simply asking whether those symptoms, diarrhea, nausea, vomiting and abdominal cramping, that are described in his medical records concerning an acute gastric infection are consistent

with an infection caused by salmonella?

MR. LEVITES: Objection. You can answer.

A I can't answer the question the way it's stated.

BY MS. GRAVES:

Q Why?

A Because there's a differential diagnosis. I'm going to repeat my same answer again.

Q You can't answer whether a salmonella infection causes those types of symptoms?

A The way the statement -- can you reread -- I'm sorry to ask, but the question is -- I can't answer the question the way it's stated.

Q Okay. Were the symptoms described in Mr. Deninno's medical records with regard to his acute gastrointestinal illness in July of 2018 symptoms that are consistent with an infection caused by salmonella?

MR. LEVITES: Objection. You can answer.

A I'm going to give the same answer again. They can be consistent with an acute infection which would include a viral source, a bacterial source or a parasitic source.

BY MS. GRAVES:

Q Somebody has a salmonella infection

resulting in an acute gastrointestinal illness. What would the symptoms be?

A If someone had a salmonella infection based on a stool culture that was positive, they would likely have diarrhea, abdominal pain and vomiting. That -- that I would say.

Q Okay. Might they have nausea?

A Yes.

Q And those are the symptoms that Stephen Deninno had, correct?

A Stephen Deninno did not have a stool culture positive for salmonella.

Q He had those symptoms is what I said. Those are the symptoms that Stephen Deninno had.

A Stephen Deninno had symptoms with a very broad differential diagnosis, including infection, which can be viral, bacterial or parasitic.

Q I am again going to move to strike the answer. I'm going to ask my question again.

Those are the symptoms that Mr. Deninno had, correct?

A Mr. Deninno had symptoms of nausea, vomiting and diarrhea, as well as abdominal cramping, that is true.

Q Do you agree that an elevated white blood

count with a left shift is clinically indicative of a bacterial infection?

A Not necessarily.

Can I please -- can I see the -- do you have those labs as well? Can I see those?

Q Sure. Here's the date right here.

A Uh-huh.

Q July 31st.

A Yeah, so I mean, a white count with -- with a neutrophil predominant and immature granulocytes is not definitive for infection, specifically not definitive for bacterial infection. It can happen with any acute inflammatory issue. It does not even have to be infectious, especially in the setting of his symptoms. It could be other things as well.

BY MS. GRAVES:

Q Does an elevated white blood count with a left shift rule out viral infection?

A No, it does not.

Q Does it make it more probable than not that his acute enteric infection was caused by a bacterial infection than a virus or a parasite?

A Again, there's no diagnosis of enteric infection. It could still be an inflammatory process. You know, there is a differential

diagnosis. No, I don't think this blood work is definitive that it's a bacterial infection.

Q So explain what you mean by that. You're saying he doesn't have an acute enteric infection?

A Again, it could be an inflammatory process. He could have Crohn's disease, he could have ulcerative colitis, just based on this blood work and symptoms.

Q Has he been diagnosed with Crohn's disease or ulcerative colitis?

A It could be a new onset.

Q Excuse me?

A Based on the ER evaluation of this, could include that.

Q It could, but we have the benefit of eight years gone by.

A Right. So no, this doesn't -- again, this does not define a bacterial infection, no.

Q Are you indicating that an elevated white blood count with a left shift is not clinically indicative of a bacterial infection?

A It would make it more likely to be a bacterial infection, but not definitive.

Q Thank you.

Do you agree that it's not uncommon for

foodborne infections to go unconfirmed by stool culture?

MR. LEVITES: Objection. You can answer.

A Can you repeat the question, please?

BY MS. GRAVES:

Q Sure. I was asking whether you agree it's not uncommon for foodborne infections to go unconfirmed by stool culture due to, you know, a variety of reasons. Could be absence of testing, delayed testing, lack of specimen availability.

A Can you ask it -- can we rephrase the question without the double negative?

Q Do you agree that it is common for foodborne infections to go unconfirmed by stool culture due to absence of testing, delayed testing, lack of specimen availability or resolution of bacterial shedding by the time of evaluation?

A I would say it's not relevant to this case, because in this case the patient went to the ER with acute gastrointestinal symptoms and couldn't present -- produce a stool.

But in general -- as in patients that are having diarrhea, sometimes you do -- they -- the diarrhea goes to the lab, the stool goes to the lab, and it can be negative. The diarrhea stool can be

negative, that is correct. But this patient did not have a diarrhea stool. He had no stool.

Q Okay. And there are foodborne infections where people don't go for treatment, correct?

A Meaning that they are -- they are self-limited and they resolve on their own?

Q Yeah.

A In mild cases, yes.

Q Do you ever see patients in your practice where they have had -- where they haven't had a stool culture? They come to you having indicated that they had an acute episode of gastric illness but they don't have any stool culture from that time period?

A I would say generally patients don't come see me unless they are having acute symptoms. So it would be uncommon for me to see a patient that had a resolved infection, because usually I would assume they would not come to see me.

Q Okay. Do you know what reactive and post-infection syndromes are?

A The reactive syndrome I would need a little more clarification on exactly what you're referring to. Post-infectious, I again would need a little clarification also, but I would assume that you're

talking about irritable bowel syndrome. Is that correct?
Q Yes, sure, that's what I'm talking about.
A Yes. So yes, I am familiar with that.
Q Do you treat irritable bowel syndrome?
A Yes, commonly.
Q Do you also treat post-infectious irritable bowel syndrome?
A Yes.
Q Do you diagnose -- can post-infectious irritable bowel syndrome be diagnosed based on clinical history and timing rather than organism isolation?
MR. LEVITES: Could you repeat the question, Shelley?
A I can answer. Do you want --
MR. LEVITES: Yeah, I just didn't hear you. Sorry.
MS. GRAVES: It's okay. Kathryn, can you read it.
(Record read page 128, lines 11 - 14)
MR. LEVITES: Objection. You can answer.
A Yes. So post-infectious irritable bowel syndrome can come from any infection in the GI tract. The most common infection in the GI tract to

cause gastroenteritis, as previously stated, is viral. Most of the time -- almost all of the time we don't make a specific pathogen diagnosis in viral.

So yes, absolutely, as it can be viral, bacterial or parasitic causing a post-infectious irritable bowel syndrome. A history is used for that and not a culture.

Although, again, I would say that in order to diagnose the post-infectious irritable bowel syndrome, you would absolutely at the time that you're making that diagnosis need a negative culture, because if the patient had a positive culture, it wouldn't be a post-infectious irritable bowel syndrome, it would be an infectious enteritis or colitis, if that makes sense. So it's an exclusion diagnosis at the time of diagnosis.

Q Did you review the medical records of Dr. Toder, who is Stephen Deninno's treating rheumatologist?

A I don't remember the exact detail, but I believe yes, I did.

Q Do you know Dr. Toder?

A I don't know him, no.

Q Okay. Do you know anything about

Dr. Toder's credentials?

A No, I don't.

Q Do you consider yourself to have expertise in the field of rheumatology?

A I'm board certified in internal medicine and gastroenterology. Internal medicine does have a strong knowledge base in all medical subspecialties. And as far as rheumatologic diseases, I am well-versed in rheumatologic diseases as previously discussed that are related to GI diseases, as many GI diseases do have overlap with other specialties. And it's important as part of your board certification and practice to be under -- have a good fund of knowledge in those disease processes that are part of both, you know, GI and other specialties.

Q As part of your practice as a gastroenterologist do you diagnose rheumatological conditions?

A When they are related to gastrointestinal disease, which is not infrequent.

Q Can you give me some examples?

A Yes. Again, specifically with IBS, those patients can have sacroiliitis, seronegative reactive arthritis. You know, there are a lot of

rheumatologic overlaps between specifically inflammatory bowel disease and -- and joint and back issues.

Q And as part of your practice do you treat rheumatological problems?

A Again, it's -- it's a little bit of a -- you know, rheumatologic problems by definition, again, just to define what you're referring to, you know, and getting back to what I said is previously, in certain GI disorders the rheumatologic -- you know, like ulcerative colitis and Crohn's are prime examples. I can give you others. But the arthritide -- so rheumatologic means -- we're talking about joint-related disease I would think. You know, again, it's a broad term.

But many times we are concurrently as gastroenterologists treating the GI manifestation and the rheuma -- you know, are the visceral issue, as well as the rheumatologic problem, such as joint pains or arthritide when they relate to specific GI pathology. So I guess the short answer is yes, at times.

Q Is it more likely that the person in the situation like that would be treating with you as a GI doctor and also be treating with a

rheumatological -- a rheumatologist?

A No. No, usually when the -- when it's related to a specific GI issue, it's usually treated by the gastroenterologist. You know, again, specifically for Crohn's. You know, interestingly, the rheumatologic medications sometimes are similar or the same drugs that we use in GI. But again, frequently in diseases like I'm referring to you wouldn't -- the patient wouldn't generally see a rheumatologist, unless there was a question of whether it was non-GI related disease.

So it really depends on patient by patient, but sometimes -- and again, not infrequently we do assess and treat rheumatologic symptoms related to GI disorders.

Q So the first example you gave me was inflammatory bowel disease, and you indicated that one of the rheumatological conditions that could be associated with that was seronegative reactive arthritis.

A Correct.

Q In your practice are you treating -- do you treat reactive arthritis?

A Seronegative reactive arthritis and inflammatory bowel disease, again, we treat the

bowel disease, but it actually treats both.
Q Okay. But I think you can try to -- you know, I'm trying to get an appreciation --
A Yeah, in this case --
(Clarification by the reporter)
(Record read page 133, line 4)
A Sorry. Yeah, so I mean, I'm certainly not a rheumatologist, but there is a significant overlap between disease -- you know, GI diseases frequently cause rheumatologic problems. And in those patients -- and again, I'm using the example specifically of inflammatory bowel disease, it's usually treated by the gastroenterologist primarily.
Q So and I'm just trying to understand. I'm not --
A That's fine. That's fine.
Q I'm not trying to give you a hard time.
A That's fine.
Q Somebody is in there. You have a patient, you have diagnosed them with inflammatory bowel disease, and now they are experiencing -- also experiencing symptoms of reactive arthritis. You're indicating to me that as part of your practice, you would make that diagnosis of reactive arthritis?
A Yes, and treat it.

Q And so, yes, that's my next question. And you would be prescribing, if necessary, medications for the treatment of the reactive arthritis?

A Correct, yes.

Q And --

A Again, when it's related to the bowel disease. In those situations, yes.

Q Okay. And you would be doing that without referring that person to a rheumatologist for the treatment of the reactive arthritis?

A Correct, because, you know, again, if you sent that patient to the rheumatologist, they would look at them like why -- you know, they would ask why is the gastroenterologist -- like, the rheumatologist would understand it's a primary GI disease, and it's usually treated by the gastroenterologist.

There are -- there are exceptions to that where I might be unsure of the diagnosis and I would send to a rheumatologist for confirmation if I thought it was something other than related to the inflammatory bowel disease. But in general, those patients I would treat myself.

MR. LEVITES: Is this a good stopping point, Shelley, or do you want to go a little bit longer

before we take a break?

MS. GRAVES: A break now is fine if you want. No problem.

MR. LEVITES: Come back at 2:20.

(Recess taken)

BY MS. GRAVES:

Q Dr. Storch, from your review of the medical records, I presume you're aware that Dr. Toder makes a diagnosis of reactive arthritis for Stephen Deninno?

A Yes.

Q Do you agree with Dr. Toder's diagnosis, simply as to reactive arthritis?

A I mean, based on his notes, it sounds like the patient has a reactive arthritis.

Q Is salmonella one of the recognized triggers for reactive arthritis?

A There are multiple reasons why people could get reactive arthritis. Obviously, this patient has a strong family history of -- of autoimmune disease, HLA-B27 --

Q Doctor, I'm going to interrupt you because again, I'm asking a specific question. And Attorney Levites --

A Yeah, that's fine.

Q -- can pull other things out of you if he would like.
A Yeah, that's fine.
If a patient is diagnosed with salmonella infection, that can later lead to a reactive arthritis.
Q Thank you.
Are you familiar with what other pathogens are triggers for reactive arthritis?
A Yes, Campylobacter can do it. I believe Shigella can do it as well.
Q Any others that come to mind?
A Those are the ones that come to mind.
Q You mentioned Vibrio in your report. Can Vibrio cause reactive arthritis?
A Yes, I believe so.
Q You have had the -- withdrawn.
You reviewed the October 30th, 2018, salmonella antibody test that had been ordered by Dr. Toder?
A Yes.
Q Are you familiar with that type of testing?
A I've never seen that test sent in clinical practice.
Q I think in your report you indicated that

you, yourself, have never ordered that test; is that correct?
A I have never ordered the test, no. That's correct.
Q When you just responded a moment ago that you had never seen that test in clinical practice, were you referring to yourself or something more broad?
A Yes, I've been in multiple university hospitals. You know, again, I've been practicing gastroenterology for 20 years. I've never seen it used.
Q Okay. With that in mind, are you familiar with that test?
A Now, or prior to reviewing this case?
Q Sure, let's do both. Prior to reviewing the case.
A Yeah, so prior to reviewing the case, no. But obviously since reviewing the case, I did look at the test.
Q Okay. And so what did you do in order to look at the test?
A I reviewed the company's -- again, it was a while ago, but what the company put out on the test, the recommendations, and specifically the -- the

note that you needed a positive stool to interpret the test.

Q I just want to be clear. Did you look at something other than the information that was on the test results itself, or are you referring to the information that was on the --

A Yeah, no, I looked --

(Clarification by the reporter)

(Record read page 138, line 7)

MS. GRAVES: Report or test is what I would have said.

THE REPORTER: And your answer?

A Mainly I looked at the report, but I also did some searching for the test and I couldn't find much. Again, I don't think I found anything on that test being used clinically.

BY MS. GRAVES:

Q In looking for that information, can you just indicate where -- where were you searching to try to find information on that test?

A Yeah, in -- in my textbooks, in journals that I have in my office, on the internet. You know, again, this is about a year ago, so I don't remember exactly, but I wasn't able to find much on that test.

Q Did you read any -- did you find and read any literature about that antigen test?

A Again, I -- I -- I don't recall exactly, but I -- I was not able to find much literature on the test.

Q Do you know what the specific name of that test is?

A I mean, I can -- to the best of my -- it was like the Witt (phonetic) test or -- I forget exactly what the test was called. It was something like that. I apologize that I don't remember the exact name. Do you want to pull up the report for me and show it to me, or is that fine?

Q No, that's fine.

A And I did find it odd that the rheumatologist was sending a salmonella test, you know, that test. I was a little curious as to why -- why he chose to send that test.

Q Are you able to explain what that type of test shows with regard to salmonella?

A Again, you know, as per my recollection and -- and what was written on the report, it doesn't say anything if you don't have a positive stool, which obviously we didn't have. I would have to read -- I could read verbatim if you show me the

report, but it specifically says not -- not to be used without positive stool or some -- some such, which I assume Dr. Toder would have known if he ordered it.

Q Do you understand that the -- that it's an antibody test?

A Yes.

Q And what does an antibody test show?

A Antibody test checks for a molecule that's felt to be an immune molecule, again, specific antigen or protein. However, they are very nonspecific sometimes with a lot of overlap. So specifically in this scenario I believe that's likely why the company says out a positive stool that the results are not valid or -- again, I would have to see exactly what it said. But, you know, those tests are not perfect by any stretch.

Q So is it your assumption that its lack of specificity might result in --

A A false positive.

Q False positives?

A Correct. Again, the company is the one -- you know, the actual lab is the one saying not to -- you know, on the report not to use it unless there's a positive stool. Again, I apologize, I don't

remember the exact verbiage, but I'd be happy to read it if you pull up the report.

Q But you didn't do any research to learn more --

A Again, I did. I didn't find much, because it's not -- there's nothing in any of the textbooks that I -- you know, again, I'm a gastroenterologist. I take care of infections. Rheumatologists generally do not take care of these infections. And I -- I couldn't find anything in any of my literature to even comment on this test. So it's just odd.

Q You think it's unusual for a rheumatologist to be treating reactive arthritis?

A No, I think it's odd for them to order a test that a gastroenterologist who usually treats this disorder has never even heard of or seen.

Q You would agree that the positive -- or would you agree that the positive antigen test makes it more probable than not that Stephen Deninno was exposed to salmonella?

A Yeah, I --

MR. LEVITES: Objection. You can answer.

A Yeah, I would absolutely disagree. I mean, we don't have any stool culture to suggest that he

had an infection. On the report from the test itself it says --

BY MS. GRAVES:

Q I'm not asking you, sir --

A Yes.

Q -- whether it confirms that he was suffering from a salmonella infection in July of 2018. I'm simply asking you whether the test, the positive antibody test, confirms more probably than not that he had been exposed in the past to salmonella.

MR. LEVITES: Objection. You can answer.

A Yeah, the test has no clinical relevance, because I would never have ordered it.

BY MS. GRAVES:

Q That's not the question, sir.

A I don't know how to answer the question on a test that I wouldn't have ordered.

Q So you don't know the answer? You don't know --

A Oh, I know the answer. It has no clinical relevance, in my opinion -- in my medical opinion.

Q Okay. But that's not the question. The question is whether a positive antibody test for salmonella --

A I would not have sent an antibody test for

salmonella, so it has no clinical relevance. It's not something that we would use in our practice.

Q Are you a determinant of clinical relevance, sir?

A In my medical opinion, I'm a relevance in my opinion, yes.

Q Okay. Well, I'm not asking you whether you think it is relevant. I'm asking you whether the antibody test which was positive on October 30th, 2018, for salmonella with regard to Stephen Deninno more probably than not indicates that Stephen Deninno had been exposed to salmonella at a prior point in time?

A I don't think there was any --

MR. LEVITES: Objection. You can answer.

A Yeah, I don't think there was any reason to send that test. I don't think it has any clinical relevance without a positive stool.

MS. GRAVES: That's not the question. I'm going to move to strike his answer.

A I can't -- I can't answer the question because I don't think it's relevant.

BY MS. GRAVES:

Q I'm going to have Kathryn read the question again.

It's not a question of relevance, sir. It's a question of simply answering the question.

A I don't think there's any reason to send that test, so I can't give you -- I don't think it's -- no, I don't think that means anything. I think it means zero, because I would have never sent the test. It's a strange test for a rheumatologist to send. I don't think that proves anything. There's no stool.

MS. GRAVES: Kathryn, can you read the question again.

THE REPORTER: Yeah.

MS. GRAVES: Dr. Storch, could you do me the favor of focusing on the question and see if you can answer it, putting relevancy aside in your mind.

(Record read page 143, lines 7 - 13)

MR. LEVITES: Objection. You can answer, Doctor.

A No.

BY MS. GRAVES:

Q Do antibody tests when they are positive indicate in general that a person has been exposed to the -- in this case, salmonella?

MR. LEVITES: Objection. You can answer.

A I can't answer these questions because this

is not a standard medical test to send, so --

BY MS. GRAVES:

Q Do you know what an antibody test is for?

A Yes.

Q Is it to determine prior exposure?

A This would be longer than we have to discuss for me to explain to you how antibody tests work and how cross-reactivity works. Like, it's not a yes or no answer. So when you order a test that's not indicated in any GI textbook and you're asking me if it's relevant, it's impossible for me to answer the question.

Q I'm not asking you whether it's relevant. I'm just asking you simply whether the test -- an antibody test, if it is positive for the pathogen it is testing for, does it indicate prior exposure?

A Okay. Let me -- I'll answer the question --

MR. LEVITES: Objection. You can answer.

A Yeah, let me answer the question. I'm going to answer the question, and I don't think you're going to like my answer. But in gastroenterology specifically, we -- we do screening tests. So an example of a screening test would be for Hepatitis C.

So for Hepatitis C, we do a Hepatitis C -- the first test we do is a Hepatitis C ELISA, which is antibody for Hepatitis C. That antibody does not mean that you have Hepatitis C. It's a screening test.

So there are many patients that test positive for a Hepatitis C antibody, which you then have to follow up with a confirmatory test. That confirmatory test would be a Hepatitis C PCR. That's to see if you can amplify the virus.

Now, if the patient has a Hepatitis C antibody that's positive, and then they have a Hepatitis C PCR that's negative, they have the antibody, but they don't have Hepatitis C, and sometimes they never had Hepatitis C. They just have a cross-reactive antibody.

If they have Hepatitis C positive antibody and then you do PCR to replicate the virus and that virus comes back positive, they do have Hepatitis C. That's the confirmatory test.

So if you're asking me in a test that is not indicated for a disease if it comes back positive, if that means that they have the disease, similar to the Hepatitis C analogy that I'm giving you, that has no correlation, especially when the package

insert says you need to have had a positive stool test in order to use this test, which we don't have.

So it is impossible for me to answer your question, because it doesn't make any medical sense to me. I hope that's not too long of an answer.

BY MS. GRAVES:

Q Do you know anything about the cross-reactivity of this particular test?

A This test is not used in clinical practice, so it's -- to ask me about tests that aren't generally used, I mean --

Q You can just --

A -- no.

Q -- simply say, "I don't know."

A I don't know.

Q Thank you.

Your report seems critical of Dr. Toder for ordering a stool test on November 13th, 2018. Can you explain to me why?

A Can you show me exactly where that is?

Q Sure. Do you need me to pull up the report?

A Yeah, if you just tell me the page and paragraph.

Q Yep, sure. It's on page 3. And it is the paragraph in the large paragraph in the middle. And

it is one --

A Yeah, so the -- the patient wasn't actively having diarrhea at that time I believe. So many times, you know, again, in gastroenterology, we see doctors send stool tests when people aren't having diarrhea, and typically the result is, like, unable to run test because it has to be a liquid diarrhea stool in order for the lab to do it.

Q So the reason you don't think that Dr. Toder should have ordered that stool test is because you believe that Stephen Deninno was not having diarrhea at that time?

A Again, I don't recall the exact record, but I don't believe he was having diarrhea at that time.

Q If he was having diarrhea at that time, would it have been appropriate for Dr. Toder, in your opinion, to have ordered a stool test?

A It would not have been unreasonable to do a stool test if he was having diarrhea at that time.

Q How long after a salmonella infection might a person continue to shed the organism in their feces?

A For -- you know, they -- they have to be having diarrhea. The exact length of time, again,

it can be a chronic salmonella infection, there is such a thing, but the patient would have diarrhea.

Q In that same paragraph further down there's a sentence that starts out -- well, I'll read it. It says, "Stool specimens on the same date are clearly negative by culture and by antigen testing."

Are you indicating that the stool sample ordered at that time was negative by culture and antigen testing for salmonella?

A I -- I don't recall what I was referring to in that sentence. I'd have to see the stool test.

Q Would they have done antigen testing on -- for salmonella on a stool culture?

A There are some antigens that you could do by stool test. I -- I don't know. Again, I would need to see the stool test. I don't recall what I was referring to. Do you want to pull that up for me, that page?

Q Sure. But is salmonella something that you can do an antigen test on a stool culture for?

A It's usually PCR or a culture.

Q This is the November 13th, 2018 --

A Uh-huh.

Q -- stool culture.

A Yes, it is a -- there's a Campylobacter

antigen, so obviously that's what I was referring to.

Q Okay. And that was negative?

A Correct.

Q And there's no antigen testing of salmonella on this, correct?

A No, that's correct. Yeah, I left that -- there's -- Campylobacter was accidentally omitted from my report.

Q And what is the -- what is the Shigella toxin?

A Shigella. It's close. It's all right.

Yeah, shigella toxin is a -- a protein, a toxic protein, that's secreted by Shigella. It's a different bacteria.

Q Okay. And that wasn't detected either?

A Correct.

Q There's one other. Might as well clear it up.

A Yes, please.

Q What's the, "No VRE isolated"?

What is VRE, Doctor?

A Vanco-resistant enterococcus maybe. I'm not -- I'm not sure.

Q Okay.

A It's not a common pathogen.
Q Okay. Do you agree that reactive arthritis is an inflammatory arthritis caused by infection?
A Not always, no.
Q In your opinion, what are the other ways in addition to infection that reactive arthritis is caused?
A Yeah, again, some patients could just have -- there are other autoimmune diseases that could lead to reactive arthritis, as we previously discussed. Like, again, in my specialty, inflammatory bowel disease can cause a reactive arthritis.
Q Well, is inflammatory bowel disease caused by --
A It's not an infection, no. It's not an infection. Sorry.
Q Can inflammatory bowel disease be caused by infection?
A It's not. I mean, generally not thought to be. It's a seronegative arthritis. You know, specifically reactive arthritides can happen spontaneously and they can be related to infection, but not always.
Q And so inflammatory bowel disease is

something that can cause reactive arthritis?
A Seronegative arthritis can cause a seronegative arthritis. Reactive --
Q Just explain to me -- I used the word "reactive arthritis," you're using seronegative. So what's the difference?
A I'm not a rheumatologist, so I can only speak on things that are caused by GI disease.
Q That's fine.
A Yeah.
Q But you seem to be correcting my use of the word reactive arthritis and changing it to seronegative. And all I'm asking you to do is tell me what is the difference between seronegative arthritis and reactive arthritis.
A I mean, I don't -- reactive arthritis would be reactive -- it's tough, because we're assuming diagnoses. Arthritis can be caused by many things, so it's -- it's very hard to answer the question without, like, a two-hour discussion.
Q Okay.
A There are other things that cause -- there are other things that cause reactive arthritis and seronegative arthritis. I can't give a lecture on the exact differences of arthritides.

Q Okay. The question I was trying to get clarification on, though, is is there a difference between reactive arthritis and seronegative arthritis? Are those two different things?

A I believe they are the same. Reactive would mean it's reacting to something. Seronegative would mean you don't have a rheumatoid factor. Again, the -- you know, I think the -- the nuance is Dr. Toder would give you more into [sic]. As a gastroenterologist, you know, again, we would just call them seronegative arthritis.

Q So if you're treating a patient for a GI issue and they are presenting with arthritis that you feel is related to that GI condition, you would not diagnose it as reactive arthritis, per se, you would diagnose it as seronegative?

A Again, we just don't use these terms in gastroenterology, so I apologize. Yeah, again, I would just leave it as there are different things that can cause reactive arthritis, and they can be infectious, but not always. If I didn't think it was related to a GI disease, I would send to a rheumatologist.

Q All right. But reactive arthritis falls under that umbrella in your mind of --

A Yes, that's fine.
(Clarification by the reporter)
Q Withdrawn.
Reactive arthritis falls under that umbrella of seronegative arthritis in your mind?
A Yes.
Q If you know, what other types of arthritis are considered seronegative?
A Again, something related to inflammatory bowel disease or some other autoimmune disease causing the -- causing the arthritis.
Q Is rheumatoid arthritis a seronegative arthritis?
A No, that's kind of a distinction. That's a -- that's a -- that's a rheumatoid factor positive usually, although it doesn't have to be.
Q Do you know what common markers for testing rheumatoid arthritis are besides I know you mentioned --
A Yeah, I mean --
(Clarification by the reporter)
* (Record read page 154, lines 18 - 20)
BY MS. GRAVES:
Q -- rheumatoid factor?
A Rheumatoid factor would be the main --

obviously this is outside of my specialty in general, unless it's related to GI disease. However, I would consider rheumatoid factor to be the main one, and then also ANA.

Q And so rheumatoid arthritis is not an arthritis you would typically treat?

A That's correct.

Q Okay. Do you know whether Steve Deninno tested negative for rheumatoid arthritis?

A Based on the fact -- I -- I don't remember specifically, but based on the fact that he had a reactive arthritis and he wasn't diagnosed with rheumatoid arthritis, the assumption would be that if he had a rheumatoid factor positive, again, I'm extrapolating a little bit, but Dr. Toder would have diagnosed him with reactive arthritis, I believe.

Q And, Dr. Toder [sic], what is HLA-B27?

A It's a specific genetic type that puts a patient at risk for multiple diseases. In GI we generally think about it for ankylosing spondylitis, which is a problem of the lower spine and sacrum. And again, it's one of those diseases that specifically can be related to inflammatory bowel disease like Crohn's disease or ulcerative colitis.

Q Do you have particular expertise in genetic markers?

A Understanding genetic markers is important to certain GI diseases, specifically ulcerative colitis, Crohn's disease, we look at it in celiac. And I am board certified in gastroenterology. So would I say I'm an expert in HLA typing? No. But specifically, you know, some HLA types it's important to have a good understanding to practice gastroenterology.

Q Do you agree that carriers of the genetic marker HLA-B27 put them at higher risk for reactive arthritis following a GI infection?

A Again, if they have a documented GI infection, yes, that would increase their risk of having a reactive arthritis later.

Q Well, it doesn't matter if it was documented or not. If they have got the marker, they are at higher risk for it, correct --

A Yeah, sure.

Q -- whether people can typically diagnose it in that manner or not?

A Respectfully, I would say they are at higher risk without a GI infection. And it's impossible to say that it's from the GI infection if you haven't

documented that they had the infection.

Q Okay. But --

A Like his brother and sister, yeah.

Q -- doesn't the medical literature indicate that carriers of the genetic marker HLA-B27 put a person at higher risk for reactive arthritis following a GI infection?

A I would say it puts them at high risk in general.

Q Higher risk for what in general? Higher risk for reactive arthritis no matter what?

A It generally puts them at higher risk for autoimmune -- certain autoimmune diseases. And again, in comment with specific GI infections which we listed previously. Not all GI infections in patients with HLA-B27 increase their risk. It would specifically have to be the ones that we listed earlier, which I'm not going to list again because I'm getting tired.

Q You agree that HLA-B27 doesn't cause reactive arthritis, correct?

A Patients with HLA-B27 can get reactive arthritis without exposure, I believe. But again, it is documented that with exposure to certain infections -- and again, it does not have to be

salmonella. There are other bowel infections that you can be exposed to that can cause -- including Vibrio, you know, which -- which can lead to seronegative arthritis. The other -- you know, there are multiple, multiple infections that can cause that.

Q Okay. I understand that. The point I was trying to make is that HLA-B27, the genetic marker --

A Yeah.

Q -- does not cause a person to have reactive arthritis?

If you have HLA-B27 --

A No. Again, not every -- not every patient with HLA-B27 develops reactive arthritis, if that's your statement. I would agree with that.

Q Is viral gastroenteritis a recognized trigger of reactive arthritis?

A No.

Q You agree that reactive arthritis and rheumatoid arthritis are entirely different rheumatological conditions?

A Based on -- we established a few questions ago, yes.

Q You agree that a salmonella infection is not

a recognized cause of rheumatoid arthritis?
A Yes.
Q You agree that rheumatoid arthritis is not associated with HLA-B27?
A To the best of my knowledge.
MR. LEVITES: Objection. You can answer.
A Yeah, to the best of my knowledge, that's correct.
BY MS. GRAVES:
Q What type of arthritis does Stephen Deninno's sister have?
A I don't -- I don't recall. They both had autoimmune diseases. I'd have to see the records. I don't remember what they have. But it was in the note, I believe. It just said -- I wrote it in my record. Again, I don't recall. It says the sister had arthritis and the brother had neuropathy. I believe it was a history -- it was in one of the histories given by Mr. Deninno, I believe.
Q All right. If we turn to your report on page 4.
A Yes.
Q The first full paragraph starts, "The patient had HLA-B27 and reactive arthritis/sacroiliitis which is clearly genetic as

it runs in his family."

A Yes.

Q Are you saying that Mr. Deninno has reactive arthritis and sacroiliitis because he has the HLA-B27 marker?

A I believe that if he didn't have the marker, he wouldn't have it. But I believe that predisposes him to those things. And it does not have to be from a salmonella infection.

Q But it could be?

A Again, maybe he ate the same food that his sister ate.

Q His sister, sir, has rheumatoid arthritis. Did you know that?

A No, it wasn't written in the notes.

Q Did you look to find out what type of arthritis she had?

A I only reviewed the records that I was provided with.

Q Did you have Mr. Deninno's deposition transcript?

A I don't recall.

Q And you don't recall seeing in any of the other medical records the type of arthritis his sister had?

A I don't recall.
Q Did you ask for clarification from defense counsel as to what type of arthritis his sister had?
A I don't recall.
Q Do you know anything about the brother's autoimmune neurologic disease?
A Again, only what was reported in the history as in my report.
Q What is the basis for your statement that, "Although there is a link between salmonella infection and seronegative arthritis in patients with HLA-B27, in this case it is clearly linked to Mr. Deninno's genetics and not an external cause"?
A There's no stool culture positive for salmonella.
Q That's your answer?
A Correct.
MS. GRAVES: I apologize. Can we take a five-minute break?
MR. LEVITES: Yeah, no problem.
(Recess taken)
BY MS. GRAVES:
Q Dr. Storch, I want to turn to post-infectious IBS. Is that a recognized medical diagnosis?

A Yes.

Q And I think -- I apologize we might have hit a couple of these --

A Uh-huh.

Q -- but that's a condition that you treat in your office?

A Yes.

Q And can you tell me with what frequency you treat post-infectious IBS?

A I would say daily to weekly basis. It's common.

Q Do you have an opinion as to whether Stephen Deninno suffers from post-infectious IBS?

A It -- it's certainly possible. So irritable bowel syndrome is a disorder where patients have symptoms of diarrhea, you know, abdominal pain, usually abdominal that gets better or worse with a bowel movement.

For a quote, unquote, real irritable bowel syndrome there's very specific criteria. Although in general practice, we don't always use that criteria. It's got to be greater than six months. Again, abdominal pain that gets better then worse or worse with a bowel movement. There's diarrhea predominant and constipation predominant. So it

gets very specific in the textbook.

Again, practicing gastroenterologists usually use it relatively loosely. And it's really -- there's no difference between post-infectious irritable bowel syndrome and regular irritable bowel syndrome, except that post-infectious irritable bowel syndrome usually has some sort an inciting presumed infectious kickoff to the problem.

Q Okay. Thank you for the explanation, but so the question still holds, though. Do you have an opinion as to whether Stephen Deninno more likely than not suffers from post-infectious irritable bowel syndrome?

MR. LEVITES: Objection. You can answer.

A Yeah, I don't think the -- again, as I stated, the notes from the gastroenterologists are not clear enough on the specific diagnoses, you know, based on Rome criteria and things that we use to make that diagnosis. However, I wouldn't doubt that he had a post-infectious irritable bowel syndrome. I think it's certainly in the realm of possibility.

BY MS. GRAVES:

Q And in that regard, if we presume -- or

withdrawn.

I understand that you don't -- you don't agree what the infecting agent is of his acute gastrointestinal infection of July 28, 2018. But with regard to the diagnosis of Mr. Deninno with post-infectious irritable bowel syndrome, would you agree it's -- it was most likely kicked off by that gastrointestinal infection?

MR. LEVITES: Objection. You can answer.

A It's very hard to tell without speaking with him. You know, again, the notes aren't that clear that he had horrific symptoms that started right after this episode. It did happen -- you know, he clearly in his notes say that it happened after he had this ER visit, but it's not clear from the notes that -- that he started having severe symptoms.

Again, he doesn't have Rome -- he doesn't meet strict Rome criteria for IBS. Although, again, we do use it loosely sometimes. So it's impossible for me to tell from the notes that I have whether that's true or not. But again, it is possible.

BY MS. GRAVES:

Q You said a couple of times in your answer that it's not clear if he had severe symptoms. So I guess I need to understand what symptoms you -- what

you mean by severe symptoms and what would qualify in your mind for that diagnosis.

A Yeah, so as I said, the standard -- there are criteria for irritable bowel syndrome diagnosis, which is usually six months of symptoms with either diarrhea or constipation predominant, with abdominal pain that either gets better or worse with a bowel movement.

So, you know, I'm just saying academically by strict criteria, the notes from the treating physicians, you know, he's complaining of diarrhea. He -- and I apologize that I'm not directly answering this question, but I'm answering why I can't answer your question.

He's complaining of diarrhea. He has an endoscopic evaluation, which includes endoscopy, colonoscopy, and capsule which are negative, so he's given a diagnosis of irritable bowel syndrome. And specifically because he relates subjectively that it happened after the time of that ER visit, it's called post-infectious irritable bowel.

With the data that I have from the notes it's hard to see definitively, but it's certainly within the realm of possibility. I don't have enough to say yes or no. And, obviously, I haven't

spoken to or examined the patient.

Q And thank you. I understand that answer.

In your earlier answer, though, a couple of times you referred to severe symptoms. And I'm just trying to get a little bit of a qualification --

A Yeah, so this -- maybe --

Q -- with regard to that phrase.

A So I guess maybe severe is not the right way to phrase it. But what I meant by severe is more the abdominal pain that's better or worse with a bowel movement. There is such a thing as functional diarrhea where people just have diarrhea and, you know, they are reporting diarrhea, which is a vague symptom. It can mean multiple bowel movements. It can mean loose bowel movements. You know, it can mean going to the bathroom multiple sometimes a day.

When a patient says they have diarrhea, it's vague. And a gastroenterologist really needs to tease out what that is. That's not really done here. Again, if a patient's having diarrhea and you don't find a cause, meaning stool tests are negative, et cetera, et cetera, you would call that maybe a functional diarrhea.

When I said severe symptoms, I guess what I'm talking about is abdominal pain that gets better

or worse with a bowel movement, which is a criteria for, you know, making that diagnosis, which is not specifically reported. I don't -- you know, to the best of my recollection.

Q And so you're saying that abdominal pain is a -- in other words, does the person -- for the criteria is the person required to have abdominal pain with each episode of diarrhea?

A Again, it's generally -- for strict diagnosis, yes. In clinical practice, we don't always -- you know, again, we use the term very loosely. But in strict diagnostic criteria, yes, you need to have pain that gets better or worse with a bowel movement.

Q With every bowel movement?

A I don't know if it's with every -- you know, again, it's like, I don't know, if they only had it in two bowel movements and not in the other two you would say they don't have IBS. I don't know that we're that strict --

Q I have to ask the question, Doctor.

A No, that's fine. That's fine. But generally, it would be like a general statement that they -- they have abdominal pain that gets better or worse with a bowel movement. I don't believe it has

to be -- I wouldn't say they don't have it if it wasn't every single time they go to the bathroom.

Q Was there any information in Stephen Deninno's medical records that you reviewed or elsewhere that you found to be inconsistent with the diagnosis of post-infectious IBS?

MR. LEVITES: Objection. You can answer.

A Other than what I already stated with a strict diagnosis, I didn't find any issue with the gastroenterologist suggesting that that's what he had.

BY MS. GRAVES:

Q Is a positive stool culture identifying an infectious pathogen at the time of a patient's acute infection required in order to make a medical diagnosis of post-infectious IBS?

A As I said, you know, it's -- it's commonly -- you know, the most common GI infection is viral. And viral can set off a post-infectious IBS. So, no, it's not required, because, you know, most of the time it's going to be viral.

Q If you're treating a patient with a working diagnosis of post-infectious IBS, is there any type of diagnostic testing you would send the patient for in an effort to confirm the diagnosis?

A It depends on the case, but it's an exclusion diagnosis, so an endoscopic evaluation would be common, endoscopy, colonoscopy and capsule, which the patient had, and a stool test to rule out infection. You know, maybe a computerized tomography to rule out any pathology of the abdomen.

Q Does post-infectious IBS cause structural changes to the gut?

A No. If there are structural changes to the gut, we would not call it IBS. It would have a different -- it would be called something else.

Q So the purpose of the endoscopy and colonoscopy and capsule are to determine if there is some other diagnosis; is that correct?

A Correct. Yes, absolutely fair. We would say to exclude another diagnosis.

Q How does a gastrointestinal infection cause post-infectious IBS?

A Theoretic -- I can give a theoretical answer. You know, again, as you suggested, it's an exclusion diagnosis. So you exclude other causes, so there's no organic cause of -- of disease on -- on any of the testing performed.

We don't -- we don't know the exact reason,

but kind of the theory is that there's a motility issue after the infection or a hypersensitivity. A brain/gut interaction. You know, there's some nerve impulse issue that's either causing diarrhea or symptoms of diarrhea.

Again, as I stated previously, you know, in -- in definitive terms when you're talking about diarrhea, there are textbook diagnoses of diarrhea just like IBS, so it would be, like, based on stool volume, which you would check -- you would do a stool weight over a 24-hour period or 48-hour period to define how much stool the patient is making to make a definition -- to make a diagnosis of diarrhea. We generally don't do that.

In irritable bowel syndrome, technically that would be normal, but the patient still has a feeling of diarrhea despite not having electrolyte abnormality, dehydration, all those other things. And when we look at the tissue, there's no issue with the tissue.

But the -- it's felt to be either a motility issue with or an issue with brain/gut interaction. You know, those are sort of the terms we use.

Q And for us nonGIs, what is brain/gut interaction?

A Right. So brain/gut interaction is we feel that there's a connection between the brain and the GI tract where the signals going back and forth which is felt to be serotonin mediated are off. So, you know, again, there's sort of a theory that, you know, maybe too high a level of serotonin or too low a level of serotonin can cause either constipation or diarrhea.

You know, I always explain to patients who have had drugs over the years that affect serotonin levels between the brain and the GI tract that have had significant improvement in symptoms, which is kind of sort of proof of concept. But these are all kind of theoretical reasons.

Because again, we don't have -- people ask me all the time, like, you know, after a colonoscopy, you know, and to your point, did you make a diagnosis of -- did you see any IBS. But as you mention, IBS is actually an exclusion diagnosis. So by -- in light of the fact that you didn't see anything, that's what would support the diagnosis of IBS.

Q Looking at your report again, page 4 at the top of the page the first -- so the incomplete paragraph that's at the top of the page.

A Yes.

Q Towards the bottom of the paragraph it says, "Dr. Sang is suggesting a diagnosis of IBS, a disease caused by 'brain/gut interaction' or stress, based on lack of any 'organic' findings after an extensive workup."

Is that your way of saying what we just talked about?

A Correct, yes.

Q The words in quotes, are those your words or Dr. Sang's words?

A Those would be my words. Yeah, again, if I could clarify, you know, organic, brain/gut interaction we discussed obviously. Organic I put it in quotes because it just keeps the report shorter. Organic would be -- you know, the way I explain it to patients, anything you can scan, scope or biopsy or culture. You know, something with a tangible diagnoses, you know, which again, the doctor doesn't have here, and hence the diagnosis of IBS.

Q You added here into your report in this sentence besides the brain/gut interaction, and in your testimony you mentioned motility, nerve impulse, but you also have here stress?

A Right.

Q And so tell me about stress.

A Stress would be like -- you know, there's a lot of overlap between irritable bowel syndrome and diseases like fibromyalgia, depression. You know, so anxiety and stress can definitely -- you know, emotional stress can sometimes play into irritable bowel syndrome. That's what's meant.

Q All right. And you have indicated that Dr. Sang is suggesting a diagnosis of IBS. But Dr. Sang is -- his opinion is post-infectious IBS, correct?

A They are the same -- you know, it's like two -- two versions of the same flavor. Again, the only difference between post-infectious IBS, as I previously stated, and IBS is that post-infectious IBS is an IBS with a subjective start to the symptoms with -- with the presumed infection. There's really not much difference clinically.

Q Is there a belief with post-infectious IBS that the infecting agent has caused some sort of change that's resulted in the IBS?

A No. The -- again, the theory -- there's no -- there's no physiologic change. You know, if -- I mean, obviously, God forbid, you did an

autopsy, but there's nothing on pathology -- you know, if he did a biopsy, if he did a full thickness -- if he resected a piece of the bowel, you know, I don't know how to say this, but you wouldn't -- for any IBS you're not going to find any -- it's an exclusion diagnosis, which means you have excluded everything else, and that's how you come to the diagnosis.

You know, again the only, you know, call it Dutch chocolate versus regular chocolate. You know, the only difference in the flavor is that the post-infectious IBS is an IBS, just like regular IBS, that started after presumed infection. And we see that. You know, that's a common entity. It's not an uncommon entity.

Q So it's your testimony that post-infectious IBS is not caused by any type of physiological change?

A Theoretically -- again, in -- philosophically there could be a change, but there's no organic -- there's no organic -- as I said, there's no organic change that can be diagnosed on any test.

Q Well, okay. So are you indicating that as far as the tests that medicine uses at the present

day and age --
A Yes.
Q -- those tests are not going to capture some sort of physiologic change from post-infectious IBS?
A Correct.
Q Is it possible that in -- deeper into the body, if you will, you know, beyond what those tests are able to detect there is some type of physiological change?
MR. LEVITES: Objection. You can answer.
A That's way outside -- it's like saying is AI going to take over the world and we're all going to be like robots or something.
BY MS. GRAVES:
Q Then the answer would be yes?
A I mean, I can't answer that. I don't know what medical science is going to develop in the future. I mean, I have no idea.
Q I guess maybe I'm not asking it in the best way, especially not being a doctor.
A Yeah, that's fine.
Q Like an apple --
A Yeah.
Q -- and an --
A Yeah. Yeah.

Q -- we can talk to each other, but --

I understand what you're saying to me that -- you know, colonoscopies, endoscopies, you know, they are not going to see physiological change.

And I guess I'm just asking whether -- whether current medical thought is that it's that post-infectious IBS may be caused by physiological change, but it's something we're not seeing, for lack of the better word, I'm going to say on the surface?

MR. LEVITES: Objection. You can answer.

A Yeah, it's so hard to answer. You know, from an academic perspective, again, is it motility, is the way your brain is sensing the signals from the GI tract. You know, those are kind of the things that we think are the cause. You know, the serotonin transmission. I mean, but -- but it is nothing -- there's nothing physiologic about the integrity of the bowel. I guess that's the main thing.

So specifically in this case, you know, to incite hypomagnesemia as a cause, there's no way -- there's nothing in the GI tract that would cause an electrolyte abnormality from post-infectious

irritable bowel syndrome, because if there was a disorder that was causing electrolyte abnormality, then it wouldn't be IBS.

You know, because then you would say if there was a problem with the integrity of the GI tract, IBS goes out the window and that's the diagnosis. Then you would be saying the patient has Crohn's disease. You know, that's -- that's totally different.

BY MS. GRAVES:

Q Are bacterial infections more commonly regarded as triggers for post-infectious IBS than viral infections?

A So viral infections are more common, so do cause -- you know, in my clinical experience they cause a lot of episodes of IBS. But yes, bacterial infections are felt to be more commonly inciting for post-infectious IBS.

Q Do you agree that statistically 1 in 10 people develop post-infectious IBS after a bout of infectious enteritis?

MR. LEVITES: Objection. You can answer.

A I never -- you know, in my clinical practice, I don't know. I -- I haven't paid enough attention to say whether that's true or not.

BY MS. GRAVES:

Q Did you review any records or have any information that suggests to you that Stephen Deninno suffered from IBS symptoms before his gastrointestinal infection in July of 2018?

A I don't believe I have any records of his -- again, I would have to review. It was a year ago. But I think the beginning of the records were his ER visit, so I don't think I reviewed anything before, although I can't recall.

Q Fair to say if you had seen something in his history or in prior records indicating that he had previously suffered from IBS symptoms or similar symptoms, you would have noted that in your report?

A I would -- I can't be 100 percent sure, but I would -- I would think that's a reasonable assumption.

Q With regard to Mr. Deninno's March 3rd, 2019, endoscopy and colonoscopy, there was a finding of erythema --

A Erythema.

Q Erythema, sorry.

A Yeah.

Q -- and ulceration in the ileocecal valve and terminal ileum. Do you recall that?

MR. LEVITES: Objection. You can answer.
A Yeah, I mean, I'd have to pull up the report, but I don't remember.
BY MS. GRAVES:
Q Okay. I can pull it up. I'm just trying to find the date on it for you. It's not jumping out at me. Can you --
A Yeah. Yeah, it's okay. No, this is the endoscopy. You can go down a little bit.
Q Yeah.
A That's a colon. That's it. I see it.
Q Sorry.
A Can you go down? They have the biopsies there, too. Oh, it's just sent to the lab.
Q Do you want me to keep going, see if there's more?
A Yeah, I mean, it's -- that's fine. That's fine. Can you go up?
Q Yeah.
A I mean, it doesn't -- it doesn't really mean much. Do you have the biopsy results from those? I don't remember. I think it just showed not much. These are just the jars. I don't think -- the path is probably in a separate report.
Q Yeah.

A You know, but ultimately, like, that could suggest -- and again, the report is kind of like a weak report. Like patchy erythema is like very nondescript. And the doctor is not describing, like, deep ulcerations consistent -- you know, when you see this kind of stuff, it's usually nonspecific.

If a gastroenterologist believes the patient has Crohn's disease, which would be, you know, the concern with those type of findings, you know, a standard report would say deep ulceration in terminal ileum and ileocecal valve consistent with inflammatory bowel disease, not patchy erythema and ulceration.

It's -- you know, again, they would have -- this doctor to make anything of it would have diagnosed the patient with Crohn's disease, which he was never diagnosed with, so -- this is not post-infectious IBS. So if he --

Q Well, because as you have indicated, that's not something --

A No, I'm just saying that based on the fact that this doctor is not diagnosing the patient with Crohn's, you know, he's just over -- overcalling the report. You know, again, if you show me the

pathology, it would be interesting to see what that was. Again, I just don't remember. I apologize.

And just for your information, Ms. Graves, you know, Crohn's disease can cause a seronegative arthritis, as we've discussed.

Q Okay. Here we go. I think this is the one --

A Yeah.

Q -- report.

A Okay. Yeah. Yeah, so they -- so they read the biopsies. The biopsies are read as normal. Focal -- chronic mild focally active colitis. I mean, that's a very nondescript diagnoses, which is obviously the gastroenterologist doesn't feel it's Crohn's. If they did feel it was Crohn's, then that would lock up the fact that he has a seronegative arthritis and HLA-B27 related to Crohn's disease.

Q Okay. And so those findings, the patchy --

A Yeah, that could be.

Q -- erythema --

A Again, in the right clinical setting to the gastroenterologist, which he didn't diagnose, especially in the setting of HLA-B27 and seronegative arthritis would lead you to be worried about something like Crohn's disease.

Q And I understand. Thank you. I do understand what you're saying.

A Yeah. Yeah.

Q But on the opposite side of it, that's not what they felt this showed.

A Right.

Q So I guess my question is whether with that in mind, is there anything else that would be indicative of --

A No, it would either be -- either be an overcall or they missed the diagnosis of Crohn's disease.

Q And your use of the word "overcall" meaning that --

A Meaning that that wasn't clinically significant, and the biopsies are -- those -- I mean, generally, this finding with these biopsies would be suggestive of -- especially in a patient like Dr. Deninno [sic] -- Deninno would be worrisome for Crohn's disease, but they don't make that diagnosis.

Q And I'm going to go to, if I can find it, this is the July 16th, 2020, colonoscopy.

A Yeah.

Q Sorry.

A Yeah, that's fine. So this one's being read as normal.

Q And there's just -- if we look under 5 and 7, there is some notes with some indications, if you could just give me your thoughts on what those indicate.

A It's very -- 5 is very nonspecific, meaning it doesn't make or break a diagnosis. And again, 7 is very nonspecific. Doesn't make any specific diagnosis, hence not clinically significant I would say either of them.

Q Okay. And just for my education --

A Yeah.

Q -- what is it that the -- that's being -- you know, it says colonic, colonic?

A Yeah, so I mean, I can explain if you want me to just translate what it says.

Q Yeah. Yeah.

A I mean, it says, like, nothing. But, you know, I can translate the words. So mucin depletion, going to number 5, the colonic mucosa shows mild mucin depletion and reactive changes. Mucin -- and again, it says, like, mild. It's almost like they are saying it's not really there, but it is.

Mucin depletion you can see with inflammatory bowel disease. Just the -- there's mucin in the crypts, in the cells of the colonic wall. When that's sort of excreted or put out into the lumen or you get a decrease in mucin, that could be suggestive of inflammatory bowel disease, like ulcerative colitis or Crohn's disease.

Which again, if they are suggesting this in Mr. Deninno, then the rest of the argument is out. It's mild and nonspecific. So they are saying -- they are saying okay, I'm telling you it's there, but it's really nothing, right? Nonspecific, meaning I'm not making a diagnosis of ulcerative colitis or Crohn's disease. And they specifically say, "diagnostic features of chronic," meaning ulcerative colitis or Crohn's disease, "active colitis" meaning acute infection, or "microscopic colitis," that's a disease where you see things microscopically that can cause diarrhea or abdominal pain that we don't see on the colonoscopy are not appreciated.

It kind of says we're seeing some findings that might be suggestive of ulcerative colitis, but they are mild and nonspecific, but they are not there.

Q It's not sufficient enough to make --
A No, they're --
(Clarification by the reporter)
Q It's sufficient, but not sufficient enough to make the diagnosis?
A Yeah, not even sufficient. It says, like -- the first sentence kind of says there's findings suggestive of a colitis, but then the last sentence says there's no diagnostic criteria for colitis. So it kind of doesn't make -- it's kind of like talking out of both sides of their mouth. There's something there, but there's nothing there.
Q Okay. And how about in number 7 --
A Yeah, number --
(Clarification by the reporter)
Q How about in number 7 where it states the mucosa shows a mild increase in lamina propria inflammation?
A So usually if you're seeing an inflammation in the bowel that's going to cause a problem, it would be in the mucosa. This is showing a mild inflammation. I don't even -- you know, they are kind of hedging a little bit, in the lamina propria, which is a deeper layer. It doesn't really give you any clinical inclination that something's going on.

And then they say a single focus. That means in one spot. I assume this is under high power, which is like a microscopic area. It shows rare neutrophils in the lamina propria. Those are just inflammatory cells in one spot. Like, I'm not sure why they would even comment on that. I think that's a little odd.

And then they say there is no evidence of crypitis or crypt abscess. Crypitis and crypt abscess are things that you would see with ulcerative colitis and Crohn's disease, chronic bowel diseases. So they are saying there's something there, but there's nothing there, similar to the prior statement. And it says the changes are mild and nonspecific.

It's just like a lot of words that don't say anything. It's not -- it's not a good report. You know, if I was worried about this patient in my clinical practice, I would call the pathologist and ask them to addend the report or -- or tell me what they are saying, because it doesn't really make that much sense. I don't know if that doctor did that.

Q And the lamina propria, what were you saying? That's a layer --

A It's a layer within the bowel wall. And

they are saying there's one focus, which under high power, like, again, I'm not even sure what -- you know, I'm not saying this pathologist is bad. I don't know the pathologist. But either they are bad, or they are really good.

Either way, I would -- if it was my patient, I would call -- and I was worried about specific pathology, like hypomagnesemia, I might call the pathologist and say, look, we really have a problem with this patient. Can you explain what this means, because it's -- it's odd. Both of those are odd, as well as the other report that showed the ulceration and then not much on the path report. They are a little odd.

Q What is your expertise with regard to hypomagnesemia?

A You know, hypomagnesemia, I mean, what is my -- I don't understand. I'm board certified in internal medicine, and certainly diseases that cause hypomagnesemia, you know, workup of hypomagnesemia, you know, usually those things -- the true expert would be a nephrologist, you know, because a lot of times it's a kidney issue.

But from a GI perspective specifically, if -- you know, if you have severe diarrhea, you can

get hypomagnesemia.

Q In Mr. Deninno's matter nephrology ruled out his kidneys as the cause of his hypomagnesemia; is that correct?

A I believe that's correct, yes.

Q So in your practice do you -- do you treat patients with hypomagnesemia?

A I treat diarrhea, which can lead to hypomagnesemia. So do I treat it directly? No. But indirectly, if they had Crohn's disease or ulcerative colitis or an infection, we would treat the underlying cause to prevent or alleviate the hypomagnesemia.

Q And you can tell me if I've got this wrong, but my -- my understanding is that with regard to GI being the cause of hypomagnesemia, it could be as a result of GI loss or a malabsorption issue; is that -- am I saying that somewhat correctly anyway?

A Yes. Yes. Yes. I would agree with that, yes. So either -- either you're not -- yes, either you're not absorbing the magnesium or you're excreting the magnesium. Either way, it would have to be a significant pathology within the luminal GI tract to lose magnesium.

And usually there would be other electrolyte

issues as well. Bicarbonate, potassium. It's usually not just magnesium, but magnesium is one of the issues. Albumin, you know, would be low. You know, that could be another issue.

Q Do you know whether Mr. Deninno has been low on any other electrolytes?

A Again, the records that I reviewed were -- I keep saying the same thing, but I don't remember them exactly. However, I remember the main issue was a magnesium loss, you know, from the different consultants, including the nephrologist.

Q And so can you -- if -- if hypomagnesemia is from GI loss, can you explain what that would mean?

A Yeah. So when patients have diarrhea, specifically from a damaged -- so mucosa I always explain is kind of like the skin of the GI tract, so that's the outer layer. When you have a problem or damage to the outer layer or the mucosa of the GI tract, you can lose -- again, all the things that we do; you know, potassium, magnesium. You can lose protein. We call it a protein losing enteropathy. That means the bowel is damaged and you're losing protein.

As you said, sometimes there can be an absorption issue with something like celiac disease.

You know, these are all problems with the mucosa of the GI tract. So you would need to identify mucosal issue that's leading to either malabsorption or loss.

And irritable bowel syndrome would not cause any of those things. Again, if you are having any of those things related to GI tract symptoms, that would be an exclusion of IBS. It would not be an IBS at that point.

Q And when you say IBS will not cause hypomagnesemia, you mean to include post-infectious IBS as well?

A Correct.

Q Would you agree that the fact that oral magnesium was ineffective for Steve Deninno and he's required parenteral administration of magnesium on a weekly basis renders it more likely than not that he has a problem with gut absorption of magnesium?

MR. LEVITES: Objection. You can answer.

A Yeah, there's no -- as far as my review of the records, no one knows why he has this. And from a GI perspective, lack of any deficiency in the -- in the GI tract as per his physicians that saw him -- obviously we just reviewed some -- some pathology diagnoses, but the treating physicians did

not feel there was any active GI disease.

And even the biopsies that we just reviewed do not explain a reason for a GI malabsorption or excretion. So no, I would disagree with that. You know, we would -- as a gastroenterologist, we would base it on the examination of the mucosa, the tissue, look for an underlying disease, which was not identified in him, so it's impossible to say that this is GI tract in origin.

BY MS. GRAVES:

Q Does the vast majority of magnesium absorption take place in a part of the small intestine known as the jejunum and ileum?

A Again, I believe it is absorbed mostly in the small bowel. Again, the findings or any issues with the small bowel would be seen on capsule endoscopy, which he had and was negative.

Q So those areas may not be seen on the regular endoscopy?

A They are not -- they are not seen. That's why we do capsule. So upper GI tract is an endoscopy, lower GI tract is a colonoscopy, small bowel is a capsule endoscopy. And/or also you get information if you're worried about lymphoma or, you know, some sort of infiltrative malignancy, you

know, you could do that with a CAT scan, which I believe he had as well, and that would show adenopathy or thickening, which I don't believe was seen on any imaging that he had.

Q And the small capsule endoscopy would see the small bowel fully?

A Correct. Generally, yes.

Q And what do you mean by "generally"?

A Sometimes the capsule can be incomplete, so you swallow it and it doesn't get through the whole small bowel. I believe -- again, I reviewed the records a year ago. I believe his capsule endoscopy did get to the colon, which would mean that in him, it did view the whole small bowel, but it doesn't always. Sometimes the video turns off before it hits the colon.

Q Do you agree that if Mr. Deninno had been suffering from low magnesium prior to July 2018 at the levels he's had consistently since January of 2019 through the present, that those symptoms would have required medical care?

MR. LEVITES: Objection. You can answer.

A Yes.

BY MS. GRAVES:

Q What is an ileoscopy?

A Ileoscopy.

Q Ileoscopy.

A Yeah, those -- no judgment on those. Those are hard.

Ileoscopy just -- so colonoscopy looks at the colon. The ileum -- the end of the small intestine is call the ileum, or the last portion of the small intestine is called the ileum. So in general, if we do a screening colonoscopy, for example, we would just check the colon.

If -- if we were concerned about Crohn's disease or a problem with the small bowel, the scope can just be tipped down the ileocecal valve, which is the connection between the small intestine and the colon. So you could put the colonoscope into the ileum. And it's kind of a fancy term. It's not that impressive. It just means you tipped the scope into the ileum and look in, and we call it ileoscopy and look in. It's not that fancy.

MS. GRAVES: If we want to just take another five-minute break, I think I'm pretty close, Ben. So I just want to look at my notes.

MR. LEVITES: Great. Sounds good.

(Recess taken)

BY MS. GRAVES:

Q Dr. Storch, just with regard to hypomagnesemia, did you do -- in your work on this matter did you do any specific literature search or medical research concerning hypomagnesemia?

A No, I did not.

MS. GRAVES: Okay. Thank you. I don't have any other questions for you.

MR. LEVITES: Nothing further, Doctor. Thank you.

THE WITNESS: Thank you.

THE REPORTER: Attorney Levites, can I get your transcript order?

MR. LEVITES: We didn't go over that in the beginning, he's going read and sign.

THE REPORTER: Right, I figured that. You want a regular PDF?

MR. LEVITES: Yes, just a plain PDF.

THE REPORTER: Okay. Thank you.

MR. LEVITES: Thank you.

(Time Noted: 4:18 p.m.)

* * * * *

INSTRUCTIONS FOR READING AND SIGNING

Attached or enclosed is your copy of the transcript for the above-mentioned deposition, the reading and signing of which were not waived. After reviewing your copy of the deposition, please make any corrections on the attached errata sheet (NOT on the deposition transcript itself). After noting any corrections, if any, on the errata sheet, please then sign the errata and signature page before a Notary Public.

Within the required thirty (30) days, please return ONLY the notarized signature page and errata sheet, along with a copy, to the attorney who took the deposition, as well as a copy to our office. Please contact our office if you have any questions.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO, ET AL., | : | CIVIL ACTION NO.: |
| Plaintiffs, | : | 3:22-CV-00580-RNC |
| vs. | : | |
| NORTH COAST SEA-FOODS CORP., | : | |
| ET AL., | : | |
| Defendants. | : | MAY 30, 2026 |

VIDEOCONFERENCE DEPOSITION OF:
IAN STORCH, D.O.

J U R A T

I, IAN STORCH, D.O., do hereby certify that the foregoing testimony given by me on May 30, 2026, is true and accurate, including any corrections noted on the Errata Sheet, to the best of my knowledge and belief.

______________________
IAN STORCH, D.O.

Subscribed and sworn to before me this _____ day of ___________, 2026

____________________
Notary Public

My Commission Expires:___________________

ERRATA SHEET

Please note any error(s) and/or correction(s) thereof on this sheet. The rules require a reason for any change or correction. It may be general, such as "to correct stenographic error," or "to clarify the record," or "to confirm with the facts."

This must be accomplished within thirty (30) days from the date on Errata Sheet. A copy should be sent to the attorney who took the deposition. All other counsel of record should be sent a copy, along with a copy to our office for our records.

3:22-CV-00580-RNC
DENINNO, ET AL. V. NORTH COAST SEA-FOODS, ET AL.
DEPOSITION OF: IAN STORCH, D.O.
TAKEN: MAY 30, 2026

| Page | Line | Correction | Reason for Change |
|---|---|---|---|
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |

_______________________________
IAN STORCH, D.O.

Subscribed and sworn to before me this _____ day of
___________________, 2026.

My Commission Expires:________________

STATE OF CONNECTICUT)
COUNTY OF NEW LONDON)

I, Kathryn Little, a Notary Public within and for the State of Connecticut, do hereby certify that I took the deposition of IAN STORCH, D.O., an expert witness in the above-entitled action, pursuant to the Federal Rules of Civil Procedure, on May 30, 2026, at 2001 Marcus Avenue, Suite East 240, New Hyde Park, New York, commencing at 9:00 a.m.

I further certify that said witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, and that the testimony was taken by me stenographically and thereafter reduced to writing under my supervision; and that I am not an attorney, relative or employee of any party hereto nor otherwise interested in the event of this cause.

In witness whereof, I have hereunto set my hand and affixed my seal this 21st day of June 2026.

Kathryn Little

My Notary Public Commission Expires: March 31, 2031