UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO<br>*Plaintiffs*<br><br>v.<br><br>NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC.<br>*Defendants* | ) | CIVIL ACTION NO.:<br>3:22-CV-00580-SVN<br><br>OCTOBER 19, 2026 |

**PLAINTIFFS' OBJECTION TO MOTION TO PRECLUDE EXPERT WITNESS, BARRY GUSTIN, MD**

The plaintiffs, Stephen DeNinno and Mary DeNinno, hereby file this objection to the motion to preclude the plaintiffs' expert witness, Barry Gustin, MD, MPH, MA, MBA, Docs. 75, 75-1, filed by the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc.

**FACTUAL BACKGROUND**

On February 18, 2025, the plaintiffs disclosed their expert witness, Barry E. Gustin, MD, MPH, MA, MBA, and included, *inter alia*, his written report dated July 6, 2024, his second written report dated February 7, 2025, as well as his curriculum vitae. *See* Doc. 88-1. On March 9, 2026, Dr. Gustin authored a supplemental report. *See* Doc. 88-1 at 121-145. For simplicity, citations to Dr. Gustin's disclosure, reports, and curriculum vitae will be identified as "Gustin Rep." and will include the corresponding page number from Doc. 88-1.

On March 19, 2026, Dr. Gustin was deposed. The defendants filed Dr. Gustin's full deposition transcript under Doc. 75-4. To avoid duplicative filings of the same evidence, the plaintiffs incorporate by reference Dr. Gustin's deposition transcript as if fully submitted as an



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Exhibit to this objection — and will cite to Dr. Gustin's transcript filed by the defendants under as Doc. 75-4.

In addition to Dr. Gustin's report and deposition transcript, the plaintiffs submit additional exhibits and incorporate by reference other exhibits previously filed in this action. For example, the plaintiffs rely on, *inter alia*, the deposition transcript of J. Scott Toder, MD, Doc. 75-5, who is a board-certified rheumatologist and Stephen DeNinno's treating rheumatologist. The defendants do not seek to preclude Dr. Toder.

For simplicity purposes, the plaintiffs incorporate by reference as if set forth fully herein the factual background section from their memorandum in opposition to the defendants' motion for summary judgment.

## LAW

Rule 702 of the Federal Rules of Evidence provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied". *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court performs a "gatekeeping" function in deciding whether the expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In defining the gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

relevance and assistance to the trier of fact." *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH), 2024 WL 4866716, at *2 (D. Conn. Nov. 22, 2024).

## I. Dr. Gustin is qualified to offer his opinions in this case.

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

This Court has stated:

> "**A court must consider *the totality of a witness's background* when evaluating the witness's qualifications to testify as an expert**. . . . Just because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields. . . . Nonetheless, this inquiry falls within the broad discretion of the district court, which need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute."

*Cleaveland v. Home Depot USA Inc.*, 788 F. Supp. 3d 325, 335 (D. Conn. 2025), aff'd, No. 25-1582-CV, 2026 WL 904984 (2d Cir. Apr. 2, 2026) (internal quotation marks omitted; citations omitted; emphasis added).

"The Second Circuit and courts within this circuit have liberally construed expert qualification requirements." *Ultegra LLC v. Mystic Fire Dist.*, No. 3:09-CV-01284 (MPS), 2014 WL 12767451, at *1 (D. Conn. Feb. 14, 2014). "Liberality and flexibility in evaluating qualifications should be the rule [and] the expert should not be required to satisfy an overly narrow test of his own qualifications." *CSL Silicones, Inc. v. Midsun Grp. Inc.*, No. 3:14-CV-1897 (CSH), 2017 WL 6055380, at *2 (D. Conn. Dec. 7, 2017) (internal quotation marks omitted).

"[T]he Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case." *Conservation L. Found., Inc. v. Equilon Enters. LLC*, No. 3:21-CV-933 (VDO), 2026 WL 2935553, at *3 (D. Conn. Sept. 30, 2026) (citing *Stagl v. Delta Air*



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

*Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)). Moreover, "a lack of specialization is not a per se bar to qualification as an expert. If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018)*; see also Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *3 (D. Conn. Feb. 28, 2022) (quoting similar); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043–44 (2d Cir. 1995) ("'knowledge' connotes more than subjective belief or unsupported speculation.").[1]

Indeed, "[w]ork experience amounts to 'specialized knowledge' gained through 'experience, training, or education' within the meaning of Rule 702." *Packard v. City of New York*, No. 15-CV-7130 (AT) (SDA), 2020 WL 1479016, at *3 (S.D.N.Y. Mar. 25, 2020) (internal quotation marks omitted) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)). Thus, "[o]ne may become qualified as an expert based on practical experience, so that professional education is not a prerequisite." *CSL Silicones*, 2017 WL 6055380, at *2 (citing *United States v. Angelilli,* 660 F.2d 23, 39–40 (2d Cir. 1981), cert. denied, 455 U.S. 945 (1982)). "Alternatively, formal education may also suffice to qualify a witness as an expert in a particular field, and the lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 266 (D. Conn. 2017) (internal quotation marks omitted).

---

[1] *See also Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114 (1st Cir. 2010) ("[a]lthough credentials such as board certification in a particular medical specialty may indicate that an expert's opinion is 'entitled to greater weight,' such certification has 'never been held a prerequisite to qualification as an expert medical witness'").



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

The Second Circuit permitted an expert witness to testify concerning the causation of a patient's injuries based on the expert's background and specialized experience. In *McCullock,* 61 F.3d at 1043–44, the Second Circuit held that the physician — an ear, nose, and throat doctor with almost thirty years of experience — was qualified to testify to his diagnosis that fumes from a defendant's glue caused his patient's throat polyps. The court held that the expert was qualified even though there was not "a single piece of medical literature", because his causation diagnosis was based on a "range of factors," including, inter alia, "his care and treatment of [the plaintiff]; her medical history (as she related it to him and as derived from a review of her medical and surgical reports)"; the doctor's "training and experience"; and the use of a differential diagnosis. *Id.* Moreover, the Second Circuit held that any "**[d]isputes as to the strength of his credentials, faults in his use of [his diagnostic] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his [opinion].**" *Id.* at 1044 (emphasis added).[2]

As the Second Circuit stated, any "quibble[s]" with an expert's training or knowledge on specific points are "properly explored on cross-examination and [go] to [an expert's] testimony's weight and credibility—not its admissibility." *McCullock*, 61 F.3d at 1043; *see also Calovine v. City of Bridgeport*, No. 3:94-CV-00379 (WWE), 1998 WL 171443, at *8 (D. Conn. Jan. 27, 1998), *aff'd*, 166 F.3d 1199 (2d Cir. 1998) (allowing an expert to testify regarding a PTSD diagnosis despite the expert's lack of coursework on PTSD and explaining that any challenge to his qualifications was properly explored on cross-examination); *Seeley v. Home Depot U.S.A., Inc.*,

---

[2] Similarly, "[e]xperts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (collecting cases).



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

No. 17-CV-00584-PAB-NYW, 2018 WL 4275375, at *8 (D. Colo. Sept. 7, 2018) (finding that a physician's experience treating the injury at issue qualified him to testify regarding causation).

Here, the defendants' specific argument concerning Dr. Gustin's qualifications is not clear. The heading of the defendants' argument is that "Dr. Gustin is unqualified to offer opinions concerning causation of gastrointestinal and rheumatological conditions." Doc. 75-1 at 5. The defendants then argue that "Dr. Gustin is an emergency medicine doctor with no practice in infectious disease, internal medicine, rheumatology, or gastroenterology, with no published peer reviewed papers on any of the subjects of this case." *Id.* at 5-6; *see also id.* at 2.

Subsequently, the defendants cite to the district court decision in *Myers v. United States*, No. 02CV1349-BEN, 2014 WL 6611398 (S.D. Cal. Nov. 20, 2014), aff'd, 673 F. App'x 749 (9th Cir. 2016). In so doing, the defendants quote *Myers* and argue that "[i]n this case, the toxin is contaminated king crab, the illness is salmonella and resulting rheumatological and gastroenterological sequela, and Dr. Gustin has claimed that a single, flawed antibody test result established salmonella exposure upon which he bases his opinions." Doc. 75-1 at 6. The defendants also argue that like *Myers*, "Dr. Gustin admits there is no case reported in the medical literature of contaminated king crab causing salmonella infection. The same result must obtain here as in *Myers*." *Id.* at 7.

**A. The defendants' arguments that Dr. Gustin is not qualified should be considered waived, as they fail to adequately brief the issue, and instead, rely on conclusory statements without any discussion.**

At the outset, the defendants have not identified any opinions that Dr. Gustin allegedly offers relating to "gastroenterology, internal medicine, infectious disease, or rheumatology" that the defendants seek to preclude. Doc. 75-1 at 2. Rather, they only cite to his testimony indicating that he is not, e.g., board certified in gastroenterology, internal medicine, or rheumatology. *Id.* at


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

2-3.) *See Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d at 114 ("[a]lthough credentials such as board certification in a particular medical specialty may indicate that an expert's opinion is 'entitled to greater weight,' such certification has 'never been held a prerequisite to qualification as an expert medical witness'").

The defendants do not analyze the specific opinions concerning rheumatology and gastroenterology that they seek to preclude based on Dr. Gustin being allegedly unqualified. In other words, the defendants want the plaintiffs (and this Court) to guess the specific opinions to which Dr. Gustin is allegedly unqualified to testify. The plaintiffs will not attempt to decipher the defendants' arguments or what opinions from Dr. Gustin the defendants seek to preclude based on qualifications — nor should they be required to.

Accordingly, the defendants' arguments should be deemed waived for failure to adequately brief the issues. *See Michael H. v. O'Malley,* No. 3:23-CV-00161 (MPS), 2024 WL 2864171, at *3 n.5 (D. Conn. Jan. 17, 2024) ("[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"), quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001); *see also Lyn v. Inc. Vill. of Hempstead*, No. 03 CV 5041 DRH, 2007 WL 1876502, at *16 n. 13 (E.D.N.Y. June 28, 2007), *aff'd*, 308 F. App'x 461 (2d Cir. 2009) ("[i]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived").[3]

---

[3] *See also Loomis v. ACE Am. Ins. Co.*, 517 F. Supp. 3d 95, 111 n.13 (N.D.N.Y. 2021) (rejecting a defendant's argument to reject an affidavit for failure to expand on its conclusory argument).

**B. Notwithstanding subsection A, Dr. Gustin possesses extensive, specialized education and clinical experience directly relevant to foodborne illnesses and the specific issues in this case.**

Even assuming, arguendo, that this Court considers the defendants' arguments, it is evident that Dr. Gustin is qualified to offer his expert opinions in this case, as he possesses extensive, specialized education and clinical experience directly relevant to foodborne illnesses and the issues in this case.

A United States District Court opinion has discussed the issue of an emergency room physician and whether that physician could testify as to the etiology of gastrointestinal illnesses suffered by two plaintiffs in a food poisoning case. In *Thorsen v. Blazin Wings, Inc.*, No. 4:14-CV-0061-HLM, 2016 WL 11071725 (N.D. Ga. Jan. 25, 2016), two plaintiffs commenced an action against Buffalo Wild Wings, after it served them contaminated food, causing each to suffer serious gastrointestinal illnesses the following day. The plaintiffs' theory — which was supported by their expert emergency physician, Michael T. Hayes, MD — was that *the shared* boneless wings, celery, and potato wedges were contaminated with norovirus. The defendants filed a motion for summary judgment and a motion to exclude Dr. Hayes.

Dr. Hayes was board certified in internal medicine and practiced as an emergency room doctor. *Id.* at 9. Dr. Hayes contended

> "that he is qualified to opine on etiology, and that his opinions are reliable because his opinions are based on medical literature and his own experience, he is board certified in internal medicine, and, as an emergency room physician, he has treated countless patients who have experienced gastroenteritis. . . . Dr. Hayes notes that, when treating those patients, he takes 'an extensive history regarding what they have recently eaten and when they have eaten it, in an attempt to determine the etiology of their illness.'"

*Id.* In rejecting the defendants' argument that Dr. Hayes was not qualified, the Court stated:



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

> "Here, Defendant's contention that Dr. Hayes is not qualified to opine as to the etiology of the illnesses suffered by [the two plaintiffs] ignores the evidence in the record indicating that Dr. Hayes is board-certified in internal medicine and routinely determines etiology of gastrointestinal illnesses suffered by his patients who present to his emergency room for treatment. Any issues that Defendant raises as to Mr. Hayes' qualifications are matters that go to the weight to be afforded to Mr. Hayes' testimony, not to the admissibility of that testimony. The Court therefore rejects Defendant's argument that Mr. Hayes is not qualified to offer his expert opinions in this case."

*Id.* at 15; *see also Sandoval v. Hosp. Oriente, Inc.*, 770 F. Supp. 3d 412, 428 (D.P.R. 2025) (stating that although an expert was not a gastroenterologist — but rather, board certified in Internal Medicine and Emergency Medicine — the expert was qualified to testify as to gastrointestinal issues).

In the present case, the defendants attempt to pigeonhole Dr. Gustin as merely an "emergency room physician" without relevant qualifications. In so doing, the defendants argue that Dr. Gustin has "no specific education, training, or professional experience in gastroenterology, internal medicine, infectious disease, or rheumatology." Doc. 75-1 at 2. This assertion is demonstrably false and blatantly ignores Dr. Gustin's extensive medical training, his advanced degree in public health, and his 40 years of clinical experience treating the *exact* conditions at issue in this case.

Dr. Gustin's report, curriculum vitae and deposition testimony demonstrate comprehensive, "extensive" education and clinical experience directly relevant to foodborne illnesses and the issues in this case. Doc. 88-1 at 9-10, 102-115 [Gustin Rep.]; *see also* Doc. 75-4 at 15:12–18:25 [Gustin Dep.]. In addition to his medical degree for which he is board certified in Emergency Medicine, Dr. Gustin earned a Master's in Public Health ("MPH") from the University of California, Berkeley, where he graduated with a 4.0 GPA. Doc. 88-1 at 9-10, 103–104 [Gustin Rep.]; Doc. 75-4 at 16:22–17:15, 24:12–14 [Gustin Dep.]. His MPH program



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

*specifically focused* on infectious outbreak disease Foodborne and Waterborne, toxicology, epidemiology, and biostatistics. Doc. 88-1 at 10, 103 [Gustin Rep.].

Dr. Gustin also completed a Preventive Medicine, Occupational, and Environmental Medicine Residency Program at the University of California, San Francisco, with a concentration in epidemiology, infectious outbreak diseases, and toxicology. Doc. 88-1 at 10, 103 [Gustin Rep.]. Furthermore, Dr. Gustin completed fellowship training in Medical and Forensic Toxicology at the Bellevue Hospital Poison Control Center in New York. Doc. 88-1 at 9, 103 [Gustin Rep.]; *see also* Doc. 75-4 at 16:18–21, 41:15-20 [Gustin Dep.]. Dr. Gustin is also a Diplomat of the American Board of Forensic Medicine and a Fellow of the American College of Forensic Medicine. Doc. 88-1 at 9, 104 [Gustin Rep.].

As for professional experience in gastroenterology or infectious diseases, the defendants' arguments conveniently ignore Dr. Gustin's 40-year clinical career of emergency medicine practice. Doc. 88-1 at 10, 102–115 [Gustin Rep.]; *see also* Doc. 75-4 at 16:23–18:12, 231:22–23, 298:20–299:1 [Gustin Dep.]. Emergency medicine is a broad specialty that involves the diagnosis, management, and treatment of acute infectious diseases and gastrointestinal illnesses. Doc. 75-4 at 27:21–28:19; 298:20–299:1 [Gustin Dep.]. Over his career, Dr. Gustin has personally evaluated and treated hundreds, if not thousands, of patients presenting with gastroenteritis and food poisoning across emergency departments and urgent care clinics. Doc. 75-4 at 171:4–172:3, 297:21–298:19 [Gustin Dep.]; *see also* Doc. 88-1 at 10, 11-51 [Gustin Rep.]. He presently serves as a clinical attending physician at Sutter East Bay Medical Group, a county-based public health and primary care center. Doc. 88-1 at 10 [Gustin Rep.].

Moreover, Dr. Gustin's professional experience includes extensive work in clinical epidemiology and public health. Doc. 75-4 at 19:23–21:13 [Gustin Dep.]; *see also* Doc. 88-1 at

102–115 [Gustin Rep.]. He served as a Toxicology Consultant to the California Health Services Department regarding biohazards and food and water contamination. Doc. 88-1 at 107 [Gustin Rep.]. In this capacity, he performed case reviews of cohorts and cluster outbreaks affected by food poisoning, rendered opinions, and reviewed statistical data for the state. Doc. 75-4 at 45:4–19, 46:14–47:19 [Gustin Dep.]. He has evaluated patients presenting with various medical emergencies, including food and water poisoning, including salmonella gastroenteritis and has consulted with Health Departments and the State of California regarding individual and community-based water and food issues including sporadic Salmonella infections. Doc. 88-1 at 10 [Gustin Rep.]. Dr. Gustin has also published literature on these exact topics, including an article on waterborne and foodborne outbreak diseases published in the Harvard Journal Current Issues in Public Health. Doc. 75-4 at 25:20–26:23 [Gustin Dep.]; *see also* Doc. 88-1 at 10, 112 [Gustin Rep.].

As for any argument that Dr. Gustin "has not published any peer-reviewed articles about infectious diseases" — or as vaguely argued, "with no published peer reviewed papers on any of the subjects of this case" — that argument is not only false, it has been categorically rejected as a ground to preclude an expert: "Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (collecting cases).

As is evident, Dr. Gustin is qualified under *Daubert* to testify as to his opinions in this case, and any attempt to preclude Dr. Gustin on that basis fails.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**C. The defendants' reliance on *Myers v. United States* is factually and legally misplaced, and provides no support for preclusion of Dr. Gustin under Rule 702.**

The defendants argue that Dr. Gustin's opinions should be precluded because his testimony was given "no weight" by the district court in *Myers v. United States*, No. 02CV1349-BEN, 2014 WL 6611398 (S.D. Cal. Nov. 20, 2014), aff'd, 673 F. App'x 749 (9th Cir. 2016) ("*Myers*"). *See* Doc. 75-1 at 3.

The defendants' reliance on *Myers* represents an improper conflation of the Court's threshold gatekeeping role under Federal Rule of Evidence 702 with a fact-finder's ultimate assessment of evidentiary weight. In *Myers*, the district court was the trier of fact in a bench trial and evaluated the conflicting expert testimony after a full trial on the merits — the court did ***not*** exclude Dr. Gustin's testimony as inadmissible under Rule 702 or *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). A trial judge's decision as a factfinder to afford limited weight to an expert's trial testimony in a specific, unrelated bench trial has no legal bearing on whether (a) that expert meets the threshold gatekeeping standard of Rule 702 under *Daubert,* and (b) in an entirely separate action.

On pages 27-29 of this objection, the plaintiffs will also address other grounds raised by the defendants in connection with its misplaced reliance on *Myers*.

For the reasons set forth above, Dr. Gustin is qualified to offer his opinions in this case.

**II. Dr. Gustin's opinions regarding the king crab are not speculative or unreliable.**

As to the issue of reliability: "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "[I]n fulfilling its 'gatekeeping' function, district courts should 'make certain that an expert, whether


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . .'" *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

In *Daubert*, 509 U.S. at 593–94, "the Supreme Court identified several factors that may be considered in assessing reliability: (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Amorgianos*, 303 F.3d at 265 (quoting *Daubert*, 509 U.S. at 593–94)). With that said, "[t]hese factors . . . do not constitute a 'definitive checklist or test.' . . . Instead, the inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Kumho Tire*, 526 U.S. at 150).

"When assessing the admissibility of expert testimony, the court should refrain from considering the expert's conclusions unless the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.' *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); see *Daubert*, 509 U.S. at 595 ('The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.')." *Bernhard-Thomas Bldg Sys, LLC v. Weitz Co, LLC*, No. 3:04-CV-1317 CFD, 2010 WL 4929029, at *1 (D. Conn. Nov. 30, 2010); *see also Campbell ex rel. Campbell v. Metropolitan Property & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (arguments regarding gaps or inconsistencies in an expert's reasoning, or different



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

interpretations stemming from the testimony, "go to the weight of the evidence, not to admissibility").

"Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable." *In re Zyprexa*, 489 F.Supp.2d 230, 285 (2007) (citing *Daubert*, 509 U.S. at 594). It is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As stated by the Second Circuit, "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

**A. The defendants' argument that Dr. Gustin could not identify any reported cases in the scientific or medical literature of salmonella involving king crab is flawed and misrepresents his testimony.**

The defendants argue that Dr. Gustin could not identify any reported cases in the scientific or medical literature of salmonella involving king crab. Doc. 75-1 at 7. This argument is flawed, misrepresents his testimony and ignores the established scientific context of seafood contamination.

As previously noted, the Second Circuit has reasoned that an expert witness' opinions may be admissible *even though there is not a "single piece of medical literature"* to support the expert's opinions. *McCullock v. H.B. Fuller Co.*, 61 F.3d at 1043-1044; *see also Argonaut Ins. Co. v. Samsung Heavy Indus. Co.,* 929 F. Supp. 2d 159, 169 (N.D.N.Y. 2013) ("'[w]hile [the expert] may not have physically examined or tested [the vehicle] prior to writing his report, and while his opinion may not be grounded in a plethora of hard facts, data, studies, and scientific literature' is not a basis to exclude"'). "Disputes as to the strength of his credentials, faults in [an expert's] use of [his diagnostic] methodology, or *lack of textual authority* for his opinion, *go to the weight, not*


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

*the admissibility*, of his [opinion].” *Id.* at 1044 (emphasis added.); *see also Perkins v. Origin Medsystems, Inc.,* 299 F. Supp. 2d at 56 (citing *McCullock*); *Best v. Lowe’s Home Centers, Inc.*, 563 F.3d 171, 180–81 (6th Cir. 2009) (“there is no requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness”).

At the outset, the defendants mischaracterize Dr. Gustin’s opinion as asserting that king crabs become contaminated with salmonella in their natural ocean environment, only to dismiss that proposition as implausible. In doing so, the defendants ignore his testimony addressing the post-harvest contamination pathways that arise after the crab leaves the ocean. Dr. Gustin agrees that salmonella contamination does not typically arise from the crab’s natural ocean environment — but rather, it is more likely to occur during secondary processing, packaging, cooling, and human handling. Doc. 75-4 at 199:17–200:6, 208:4–16 [Gustin Dep.] and Doc. 88-1 at 131, 139–140 [Gustin Rep.].

Moreover, in direct contradiction to the defendants’ assertion, Dr. Gustin cited published scientific studies, public health outbreak reports, and federal regulatory alerts demonstrating that commercial, cooked crabmeat is a well-established vector for salmonella. Doc. 88-1 at 26–27, 71–72, 130–131 [Gustin Rep.]; *see also* Doc. 75-4 at 240:11–25 [Gustin Dep.]. Specifically, Dr. Gustin relied on scientific literature, such as the Heinitz study — Heinitz et al., Incidence of Salmonella in Fish and Seafood, 63 J. Food Prot. 579, 579–92 (2000) — published in the Journal of Food Protection, which successfully isolated salmonella from cooked crabmeat and established that handling is a primary source of contamination. Doc. 88-1 at 26–27, 71–72, 131 [Gustin Rep.]; *see also* Doc. 75-4 at 157:9–160:19, 221:4–222:9 [Gustin Dep.]. He also cited public health records, including (1) a Maine CDC investigation of a salmonellosis outbreak linked to crabmeat,

demonstrating that processed crabmeat is a recognized vector for salmonella, Doc. 88-1 at 131 [Gustin Rep.]; Doc. 75-4 at 240:11–25 [Gustin Dep.], and (2) FDA Import Alerts – U.S. Food & Drug Administration: Import Alert 16-81, 1/23/25 — confirming that salmonella contamination occurs during post-harvest handling and processing. Doc. 88-1 at 72, 131 [Gustin Rep.]; *see also see also* Doc. 75-4 at 208:7–13, 297:1–15 [Gustin Dep.]

While Dr. Gustin acknowledged that the broader scientific literature on which he relies evaluates crab generally rather than restricting its analysis to the "king crab" subspecies, he testified that "crab is crab," that the specific species of "king crab" is scientifically irrelevant to how the pathogen is transmitted, and that all crab species consist of identical biological muscle tissue subject to the exact same post-cook handling, secondary processing, and distribution contamination pathways. Doc. 75-4 at 160:14–19, 207:18–208:24, 240:7–241:6, 283:12–284:7 [Gustin Dep.] and Doc. 88-1 at 140 [Gustin Rep.]. Furthermore, Dr. Gustin detailed how the secondary processing of king crab in the United States — wherein bulk frozen crab legs are thawed, cut into leg and claw form, and re-frozen — directly exposes edible shoulder meat to workers, equipment, and processing surfaces, establishing a biologically plausible mechanism for salmonella contamination prior to retail sale. Doc. 75-4 at 178:11–179:14, 208:7–13, 282:15–283:11, 296:21–297:15 [Gustin Dep.] and Doc. 88-1 at 140–141 [Gustin Rep.].

Finally, the defendants' own expert, Thomas Montville, Ph.D, a food microbiologist, also agrees with Dr. Gustin's opinions that king crab can be contaminated with salmonella. As Dr. Montville testified at his deposition:

Q. Is it your opinion that crab meat cannot be infected by salmonella?

A. No.

Q. What is your opinion in that regard?


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

A. My opinion is based on food handling practices, that it's possible that poor food handling practices, specifically, improperly washed hands or contamination from surface to surface, could result in salmonellosis.

Q. So are you indicating to me that improper food handling practices could result in the contamination of crab meat with salmonella?

A. Yes.

***

Q. But do you agree that king crab would be susceptible to contamination by salmonella if exposed to it in the processing environment in some manner?

A. Yes.

***

Q. Could salmonella contaminate a crab shell, the outside of crab shell?

A. It could, yes.

Q. If a shell, crab shell was contaminated, could a worker's hand transfer it to the exposed meat?

A. Yes.

Doc. 80-3 at 84:10-22; 87:25-88:4; 152:22–153:3; *see also* 114:5–116:21, Exs. 8, 9, 10 [Montville Dep.].

Likewise, the defendants' gastrointestinal expert, Dr. Ian Storch, testified that seafood generally, and King Crab specifically, is susceptible to contamination by Salmonella. Doc. 81-3 at 88:18-20; 82:17-83:19 [Storch Dep.].

Thus, any argument that Dr. Gustin should be precluded because he could not identify any reported cases in the scientific or medical literature of salmonella specifically involving king crab is flawed.

**B. The defendants' argument that Dr. Gustin had no explanation of why there was no outbreak notice for the king crab or any other reported sicknesses the CDC, state health departments, or the defendants should be rejected.**

The defendants also argue that the lack of an outbreak notice to the CDC, state health departments, or the defendants *somehow* renders Dr. Gustin's opinion invalid. Doc. 75-1 at 7–8. Dr. Gustin thoroughly explained, however, that many instances of foodborne illness are entirely sporadic — including the plaintiffs in the present case — and are never formally recognized as part of a widespread public health outbreak. Doc. 88-1 at 29, 38, 76, 134–135, 142 [Gustin Rep.]. The absence of formally reported cases does not medically or scientifically exclude the possibility that a limited quantity of the king crab product was contaminated during a discrete handling event. Doc. 88-1 at 135 [Gustin Rep.] and Doc. 75-4 at 177:22–178:24 [Gustin Dep.]. Dr. Gustin further testified that the lack of an official outbreak notification fails to account for unreported cases among other consumers who may have recovered quickly without long-term adverse health effects. Doc. 75-4 at 235:18–24 [Gustin Dep.] and Doc. 88-1 at 29 [Gustin Rep.]. Instead of relying on an arbitrary outbreak threshold, Dr. Gustin observed that the Plaintiffs' simultaneous and severe gastrointestinal illnesses actually constitute a classic two-person household cluster. Doc. 88-1 at 130, 145 [Gustin Rep.] and Doc. 75-4 at 20:16–21:7, 93:15–21 [Gustin Dep.]. He concluded that this tightly linked onset of symptoms following a shared exposure to the king crab legs represents a well-recognized public health pattern for a point-source foodborne illness. Doc. 88-1 at 130, 145 [Gustin Rep.] and Doc. 75-4 at 93:4–21, 171:4–23 [Gustin Dep.]. Therefore, the defendants' insistence on a widespread outbreak notice fundamentally misapprehends the epidemiological reality of sporadic foodborne infections and fails to undermine Dr. Gustin's sound causation methodology. Doc. 88-1 at 29, 38, 76, 134–135, 142 [Gustin Rep.].


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

In fact, the defendants' expert witness, Thomas Montville, Ph.D., acknowledged that salmonella is one of the leading causes of foodborne illness. Doc. 80-3 at 77:25-78:2 [Montville Dep]; that 95% of foodborne salmonellosis cases occur as sporadic illnesses, Doc. 80-3 at 76:12-15 79:25–80:15 [Montville Dep]; and that only 1 in every 30 salmonella infections are ever diagnosed according to the CDC, Doc. 80-3 at 78:3-9 [Montville Dep]. He conceded that it is possible sporadic illness cases of salmonellosis associated with crab legs exist. Doc. 80-3 at 82:24-83:4 [Montville Dep]; *see also* Plaintiffs' Motion to Preclude Montville, Doc. 80 at 24-26 (limitations of the NORS system as it relates to sporadic cases); *see also* https://www.cdc.gov/salmonella/about/index.html.

Notwithstanding the above, it is also important to note that "king crab" – from Russia – has been the subject of recalls by the FDA for other foodborne bacterial contamination; namely, involving listeria:

(1) 2016: https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=148594; and

(2) 2005: https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=42116.

The defendants' assertion that the plaintiffs cannot prove causation without pinpointing the when, where or how that salmonella entered the subject crab is contrary to law and food safety science. Under FDA regulations (21 U.S.C. § 342), food that is contaminated with salmonella is considered adulterated, in that it is unsafe, containing poisonous or harmful substances that can make people sick. Salmonella species are not endemic to seafood; therefore, the United States Food and Drug Administration (FDA) expects zero or non-detectable levels of salmonella in seafood and considers seafood that is contaminated with salmonella to be adulterated regardless of whether it is intended to be cooked before consumption or it is ready-to-eat (RTE). Id. (Food Import Alert 16-81)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Furthermore, Dr. Gustin conducted a rigorous differential etiology, systematically ruling out all alternative sources of infection and home contamination to establish that the king crab was contaminated at the time of purchase and consumption. Here, both spouses experienced the synchronized, explosive onset of severe acute gastroenteritis within two hours of each other on the early morning of July 28, 2018—just 12 to 17 hours after sharing a lunch of thawed, pre-cooked king crab legs with cocktail sauce—which is the classic epidemiological hallmark of a point-source, high-inoculum foodborne exposure ingested within the standard 6-to-36-hour incubation window for non-typhoidal Salmonella. Doc. 88-1 at 29–33, 38, 40, 44, 62–66, 71, 74–76, 129–130, 140 [Gustin Rep.]; Doc. 75-4 at 87:8–14, 93:15–21, 171:13–22, 173:11–25, 285:7–14 [Gustin Dep.]. Following public health investigation protocols, Dr. Gustin systematically eliminated every other dietary exposure: (1) the spouses shared no lunches or dinners during the preceding four and a half days (July 23–26) while Mr. DeNinno worked 14-hour shifts, and biological variability makes it implausible that a meal shared five days earlier would produce simultaneous, explosive onset within 120 minutes; (2) their morning coffee cream was ultra-pasteurized, kept at 37–38°F, and used daily without incident; (3) the commercially bottled cocktail sauce was poured into a clean bowl, never recalled, and eaten again by Mrs. DeNinno from the exact same jar weeks later without illness; and (4) the dinner crab casserole was boiled (212°F), simmered (180–205°F), and baked at 375°F for 40 to 50 minutes until bubbling throughout, far exceeding the 165°F thermal death point of Salmonella and leaving the unheated lunchtime crabmeat as the sole shared vector capable of delivering live bacteria. Doc. 88-1 at 27–32, 37, 40, 42, 50–51, 62–68, 73–75, 96–99, 129–130, 143 [Gustin Rep.]; Doc. 75-4 at 209:9–15, 242:7–14, 291:13–294:20 [Gustin Dep.].

Dr. Gustin likewise ruled out all non-foodborne vectors and any post-purchase contamination in the DeNinnos' kitchen. Doc. 88-1 at 27–32, 35, 37–38, 41–43, 47–49, 70, 72–


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

73, 130, 132–135, 140, 143–145 [Gustin Rep.]; Doc. 75-4 at 280:20–281:15, 294:20–296:24 [Gustin Dep.]. Person-to-person and environmental fomite transmission were excluded because they involve low doses and require sequential incubation periods resulting in staggered rather than simultaneous onset; workplace/nosocomial, travel, waterborne, and zoonotic exposures were excluded because neither spouse had sick contacts, Mr. DeNinno was an administrator with no patient contact (and became ill after his wife), the couple had not traveled or swum in six months, and their four kibble-fed dogs were completely healthy; and viral or other bacterial pathogens (Shigella, Campylobacter, Yersinia, E. coli) were ruled out by Mr. DeNinno's clinical presentation (13,300 WBC with a left shift, Mrs. DeNinno's response to Ciprofloxacin, and no bloody/greenish stools or fever), his positive Salmonella H-antigen Type b titer (>1:160), and his subsequent HLA-B27-positive reactive arthritis and chronic malabsorption. Doc. 88-1 at 14, 18–19, 25–29, 31, 33–38, 41–43, 47–49, 62, 64, 66–67, 72, 97–98, 122–125, 132–134, 144–145 [Gustin Rep.]; Doc. 75-4 at 71:24–72:5, 78:1–18, 87:15–22, 131:17–135:9, 164:14–166:7, 173:23–175:14, 217:6–218:25, 253:4–23, 276:1–10, 280:7–282:10 [Gustin Dep.].

Finally, home contamination was ruled out because Mr. DeNinno transported the frozen crab home in 15 minutes, refrigerated it immediately at 37–38°F in an air-conditioned home, sanitized the sink with 409 spray, washed his hands, wore new gloves, thawed the crab under cold running water for 10 minutes in a colander, cut the shells with shears (using no cutting board), placed the meat in clean bowls—all sanitized in an NSF/ANSI Standard 184-certified 150°F sanitizing rinse dishwasher—and consumed the lunchtime crab immediately. Doc. 88-1 at 30–32, 37–38, 42, 62, 65–66, 68, 70, 73, 95–97, 99 [Gustin Rep.]; Doc. 75-4 at 200:25–201:3, 222:24–223:9, 292:6–24, 294:20–296:24 [Gustin Dep.].


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

## III. Dr. Gustin's opinion that Mr. DeNinno's acute gastrointestinal illness was caused by salmonella is not speculative or unreliable.

The defendants argue that Dr. Gustin's opinion that Mr. DeNinno's acute gastrointestinal illness of July 28, 2018 (hereinafter referred to as "acute illness") was caused by a Salmonella infection is based on a "single, flawed test" thereby making his opinion speculative and unreliable and subject to preclusion. Doc. 75-1 at 8-10. Specifically, the test referred to by the defendants is an October 30, 2018 blood test (hereinafter referred to as "the Widal test") ordered by Mr. DeNinno's treating rheumatologist, Dr. Toder. The Widal test returned positive for the presence of Salmonella H, Type b antibodies. Doc. 75-6 [10/30/18 Widal test]. The laboratory report from the Widal test contains a standard disclaimer that reads "Results should not be considered as diagnostic unless confirmed by culture" (hereinafter referred to as "disclaimer"). *Id.* The defendants insist that the Widal test was "flawed" because there was no confirmation of Salmonella by positive stool culture in compliance with the disclaimer and that as a result the Widal test is not "diagnostic." The defendants' argument misconstrues the purpose for the disclaimer and wrongly assert the Widal test to be invalid. Moreover, the defendants' argument is misleading as they oversimplify Dr. Gustin's use and reliance on the results of the Widal test in their effort to preclude his opinion.

### A. Background

The following is relevant to the consideration of the reliability of Dr. Gustin's expert opinion that the acute illness suffered by the plaintiffs was caused by a salmonella infection. Salmonella is a bacterium. Doc. 88-1 at 24, 29 [Gustin Rep.]; Doc. 75-5 at 132:9-11 [Toder Dep.]; Doc. 78-10 at 4 [Gibofsky Report]. The sudden gastrointestinal symptoms (nausea, vomiting, abdominal cramps and diarrhea) experienced by Stephen DeNinno and Mary DeNinno beginning July 28, 2018 are typical of a Salmonella infection. Doc. 75-5 at 132:12-18 [Toder Dep.]; Doc.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

88-1 at 40, 76 [Gustin Rep.]; Doc. 81-3 at 122:25-123:8 [Storch Dep.]. Bloodwork performed during Stephen DeNinno's July 31, 2018 hospitalization revealed an elevated white blood count with a left shift, clinically indicating that his acute illness was caused by a bacterial infection. Doc. 75-4 at 150:15-151:11, 173:23-174:4, 253:4-254:3 [Gustin Dep.]; Doc. 78-4 at 26 [Backus Hospital, 7/31/2018]; Doc. 88-6 at 90:9-91:13 [Gibofsky Dep.]; Doc. 75-5 at 131:4-132-8 [Toder Dep.]. As noted by the defendants, Stephen DeNinno was unable to produce a stool sample during his hospitalization. Doc. 75-1 at 8. For that reason, the bacterial source of his acute illness was not identified by stool culture during his hospital admission. His acute illness was however diagnosed as "food poisoning". Doc. 78-4 at 12 [Backus Hospital, 7/31/2018 Discharge Summary].

Several weeks after his July 31, 2018 hospitalization, Stephen DeNinno experienced the onset of sudden joint pain and swelling in his left knee. In mid-October 2018, he experienced a sudden onset of similar joint pain and swelling in his right knee. Doc. 78-7 at 1 [Toder, 10/18/2018]. Stephen DeNinno sought evaluation by a rheumatologist, Dr. J. Scott Toder, on October 18, 2018. Based on Stephen DeNinno's medical history and his evaluation of Stephen DeNinno, Dr. Toder suspected his bilateral knee symptoms were from reactive arthritis triggered by his acute illness. *Id.*[4] Reactive arthritis is an inflammatory arthritis that occurs when a bacterial pathogen, such as Salmonella, triggers an autoimmune response causing joint symptoms several weeks to months after the infection. Reactive arthritis is not an active infection; it is the body's subsequent response to the prior triggering infection. Doc. 88-1 at 25, 29, 43 [Gustin Rep.]; Doc.

[4] Dr. Toder clarified at his deposition that his 10/18/2018 treatment note for Stephen DeNinno contains errors giving the false impression of multiple acute illnesses in the month of July 2018 and confirmed that Stephen DeNinno reported only one acute gastric illness having occurred 07/28/2018. Doc. 75-5 at 136:2-137:7 [Toder Dep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

75-5 at 38:16-39:5, 40:17-41:15, 133:17-23 [Toder Dep.]; Doc. 78-10 at 4 [Gibofsky Report]; Doc. 88-6 at 43:17-44:8, 45:20-46:5 [Gibofsky Dep.].

The Widal test was ordered by Stephen DeNinno's treating rheumatologist on October 30, 2018 because Stephen DeNinno was complaining of the new onset of a bout of diarrhea that was persisting. Doc. 75-5 at 51:1-52:23, 71:14-73-7, 133:1-16 [Toder Dep.] Dr. Toder ordered the Widal test after consulting with an infectious disease colleague because he wanted to ensure the diarrhea was not from an active infection. Doc. 75-5 at 76:20-77:13 [Toder Dep.] Dr. Toder also ordered a stool test on November 2, 2018 after the Widal test returned positive for Salmonella. Doc. 88-2 at 5 [Toder, 11/02/2018]. The stool test returned negative for Salmonella and other pathogens (Shigella, Shiga Toxin, VRE and Campylobacter). Doc. 88 at 3 [11/13/2018 stool test]; Doc. 88-1 at 19, 33 [Gustin Rep.]; Doc. 75-5 at 99:5-13, 137:20-138:1 [Toder Dep.]

**B. Opinion of Treating Rheumatologist, Dr. J. Scott Toder**

Dr. Toder is board-certified in internal medicine and rheumatology, has been a practicing rheumatologist for over forty years including serving as chief of the rheumatology department at a hospital. Doc. 75-5 at 19:19-20:4 [Toder Dep.]. On February 18, 2025, the plaintiffs made timely disclosure of Dr. Toder as an expert witness. Doc. 88-4 [Expert Disclosure Treating Physicians]. The defendants deposed Dr. Toder on June 2, 2026. It is Dr. Toder's medical opinion, *inter alia,* that Stephen DeNinno's acute illness was more likely than not caused by a Salmonella infection and that the acute illness resulted in Stephen DeNinno's development of reactive arthritis.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Doc. 75-5 at 129:17-130:2, 137:13-19, 128:24-129:16 [Toder Dep.][5] The defendants did not file any motion to challenge or preclude Dr. Toder as an expert witness, or any of his disclosed opinions.

In addition to Dr. Gustin's ability to offer his own independent opinions, it is also permissible for him to rely on the opinion of Dr. Toder. An expert "is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case." *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015); *see also Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *8 (D. Conn. Feb. 28, 2022) (same).

**C. The Disclaimer: Prior Exposure vs. Active Infection**

It is the opinion of Dr. Gustin, as well as Dr. Toder, that Stephen DeNinno's October 30, 2018 Salmonella positive Widal test, coupled with the negative November 13, 2018 stool culture, confirmed that Stephen DeNinno did not have an active, acute Salmonella infection in October 2018. Doc. 88-1 at 33 [Gustin Rep.]. Doc. 75-5 at 102:9-14, 112:16-19 [Toder Dep.]. Dr. Gustin and Dr. Toder's medical opinions are entirely in conformance with the Widal disclaimer. Contrary to the defendants' claim, the negative stool culture did not invalidate the Widal test – rather it directed the clinical meaning of the positive Salmonella H, type b finding. Doc. 88-1 at 125 [Gustin Rep.]. In other words, that Stephen DeNinno's November 13, 2018 stool culture was negative clinically indicates that the positive Salmonella antibody finding was more likely than not a result

[5] The defendants also disclosed an expert rheumatologist, Dr. Alan Gibofsky, who testified that he does not disagree with Dr. Toder's diagnosis of reactive arthritis. Doc. 88-6 at 47:21-48:7 [Gibofsky Dep.]. He agreed that Stephen DeNinno's initial knee joint symptoms arose within a medically appropriate timeframe to support the opinion that the reactive arthritis was triggered by his acute illness. *Id.*, at 110:13-18 [Gibofsky Dep.]. He testified Stephen DeNinno's acute illness was more likely than not bacterial and that the symptoms were consistent with a Salmonella infection, though not exclusive to Salmonella. *Id.*, at 89-92 [Gibofsky Dep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

of a prior exposure to Salmonella and that it was not diagnostic for an active Salmonella infection in October 2018.

Dr. Gustin explains the Widal test measures two distinct types of antibodies: (1) the "O" (somatic) antigen antibodies, appear earlier in the course of infection (about 7-14 days after the onset of symptoms), and (2) the "H" (flagellar) antigen antibodies, which rise late (about 3-5 weeks post-infection). Doc. 88-1 at 33 [Gustin Rep.]. Stephen DeNinno's Widal test specified that it was negative for Salmonella "O" antigen antibodies but positive for Salmonella "H"– type "b" antigen antibodies. Doc. 75-6 [10/30/2018 Widal report]; Doc. 88-1 at 33 [Gustin Rep.];[6] Doc. 75-4 at 187:22-24 [Gustin Dep.]. O-antigen antibodies appear early and disappear early. While H-antigen antibodies appear later than the O-antigen antibodies, persist for several months, rarely more than a year, and disappear later than the O-antigen antibodies. Doc. 88-1 at 33 [Gustin Rep.]. Per the lab report the H-antigen tested positive at a titer of >1:160. Doc. 75-6 [10/30/2018 Widal report]. A positive H-antigen at that titer level signifies in medical probability a past exposure to Salmonella by Stephen DeNinno. Doc. 88-1 at 33 [Gustin Rep.]; Doc. 75-4 at 133:18-134:1 [Gustin Dep.]. Dr. Toder likewise opined that the positive salmonella antibody on the Widal test indicated that at some time weeks to months before the blood test was done, Stephen DeNinno had been exposed to Salmonella. Doc. 75-5 at 91:4-10 [Toder Dep.].

The defendants heralding of the disclaimer in their effort to persuade the Court that the Widal test result is unreliable is misleading and illogical in the context that it has been used by Dr. Gustin and Dr. Toder. Diagnosis of an active Salmonella infection requires a positive confirmatory

[6] Dr. Gustin's Report dated 7/6/2024 contains a typo throughout that reads "H-antigen typhi type b". Doc. 88-1 at 28, 33, 36, and 38 [Gustin Rep.]. The word typhi is in error and should be omitted. Dr. Gustin pointed out the repetitive error during his deposition. Doc. 75-4 at 57:11-22 [Gustin Dep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

culture because there is a risk of a false positive for acute infection because a positive antibody result can be triggered by prior exposure via a prior infection with Salmonella or prior immunization with a typhoid vaccine. Doc. 88-1 at 34 [Gustin Rep.]. Doc. 75-4 at 129:9-20, 133:18-134:1 [Gustin Dep.]. Thus, a positive stool culture is important so that treatment for active infection is not undertaken in reliance on a positive Widal test finding alone. Both Dr. Gustin and Dr. Toder's medical interpretation of Stephen DeNinno's Widal test are in conformance with the disclaimer – namely that Stephen DeNinno's positive H-antigen antibody finding was due to a prior exposure to non-typhoidal Salmonella, not an active, acute Salmonella infection at the time of his testing in October 2018. That was confirmed by the negative November 13, 2018 stool culture.

Defendants' assertions concerning the unreliability of the Widal test and certain literature cited by Dr. Gustin concerning it is also misleading. Defendants point to several exchanges between defense counsel and Dr. Gustin at his deposition concerning literature cited by Dr. Gustin in his initial report asserting that they stand for the opposite proposition for which Dr. Gustin cited them for. Doc 75-1 at 9 [Def. MOL]. This is simply not true. In fact, Dr. Gustin credibly brought to light the issue of false positives in his initial expert report noting the specificity of the Widal test to be about 80%, meaning there is an approximate 20% false positive rate for healthy individuals. Doc. 88-1 at 34 [Gustin Rep.]. It is there that Dr. Gustin cites to one of the studies (Sapkota) that the defendants erroneously imply Dr. Gustin disagrees with. Doc 75-1 at 9 [Def. MOL]. The literature being discussed at the various pages of the deposition cited by the defendants in their brief all concern regions where Salmonella is endemic to the country and the writers are concerned with identifying the reliability of the Widal test and other tests for the purpose of accurate diagnosis in the clinical setting of an active infection, primarily concerned with treatment


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

of Typhoid Fever. Doc. 75-4 at 182:7-188:5, 190:11-194:13 [Gustin Dep.]. The primary risks articulated for false positives stem from the Widal test yielding a positive finding in reaction to a past immunization for Typhoid fever (vaccination being common in those regions) or a patient's past exposure(s) to Salmonella (as past exposures are common due to the prevalence of Salmonella in those regions). It is in consideration of the literature in that context, that Dr. Gustin's bases his opinion that "when the Widal test is positive as it was for the Salmonella H-antigen, when the individual has not remote history of prior bacterial infections including no history of prior Salmonella exposures, no travel to endemic areas, and no prior vaccinations for typhoid fever, when the individual is not in the acute early course of illness, and when his current illness is not in an endemic setting, a positive Widal Salmonella H-antigen test is sufficient evidence to confirm that the individual is most likely in the recovery stage after a recent Salmonella infection. Doc. 88-1 at 34 [Gustin Rep.]; Doc. 75-4 at 133:9-134:3; 193:2-12 [Gustin Dep.].

While the Widal test, like many diagnostic tests in medicine, can give a false positive, Dr. Gustin gave due consideration using his experience, literature review and medical judgment as to its likelihood in the context of Stephen DeNinno. In *Thorsen v. Blazin Wings, Inc.,* 2016 WL 11071725 (U.S.D.C., N.D. Georgia, 1/25/2016), a food poisoning case without stool culture or other positive diagnostic testing for a pathogen, the Court rejected the defendant's contention that the causation opinions of Dr. Hayes - a board certified internist and emergency room doctor with significant experience like Dr. Gustin routinely treating patients with gastrointestinal illness in the emergency room setting - were not reliable stating: "All of the concerns the defendant points out are, once again, matters that go to the weight to be afforded to Dr. Hayes' testimony, not to its admissibility. The Court simply cannot determine that Dr. Hayes' testimony is pure speculation". *Id.* at *15. The Court emphasized:


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

> [T]he gatekeeping function under Rule 702 is not intended to supplant the adversary system or the role of the jury: vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Adams v. Lab. Corp. of Am*., 760 F.3d 1322, 1334 (11th Cir. 2014) (per curiam) (internal quotations marks and citation omitted.). Indeed, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. *Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotations and citations omitted). . . . Rather, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (internal quotations and citations omitted).

*Id.*

Defendants further assert that Dr. Gustin at his deposition continued to insist "against all the authority to the contrary, that the use of the Widal test for diagnostic purposes was reliable and proper in DeNinno's case. Even though Dr. Gustin had never ordered the test for a patient, he claimed contrary to the studies he cited it was used 'all the time to determine that prior infection with Salmonella occurred'" Doc. 75-1 at 9 citing to page 289 of Dr. Gustin's deposition transcript. It is important to note Dr. Gustin testified earlier at page 231 that while he had never ordered a Widal test in the emergency room for a patient, he had on many occasions reviewed them in records of patients with post infection arthritic conditions. As discussed, there is a distinction between attempting to use a positive Widal test to diagnose an acute, active infection in the emergency room and using a positive Widal test to confirm prior exposure to Salmonella as a clinical evidence for consideration in making a clinical diagnosis - as Dr. Toder and he undertook to do here - in the context of a man with a medical history of an acute gastrointestinal illness and subsequent complication of reactive arthritis. The defendants argument is an attempt to conflate these two different circumstances.

Moreover, as will be discussed below, in forming his expert opinion that Stephen DeNinno's acute illness was more likely than not due to infection by Salmonella, Dr. Gustin



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

utilized additional corroborating clinical facts – not pure reliance on the Widal test's positive finding as argued by the defendants – thereby employing a reliable differential diagnosis methodology – a methodology well-recognized as satisfying *Daubert* and providing a valid basis for expert opinion. Doc. 75-4 at 288:6-291:4 [Gustin Dep.].

**D. Defendants' reliance on *Meyers v. United States.***

The defendants' argument relies heavily on comparing this matter to *Myers v. United States,* 2014 WL 6611398 (U.S.D.C., S.D. California, Nov. 20, 2014) and arguing that Dr. Gustin's opinion is based on a single, flawed test. In *Meyers,* the plaintiff claimed her minor daughter was negligently exposed to toxic levels of Thallium, a metal, alleging that the metal migrated in wind-blown dust to their yard from a landfill where dirt had been moved as a part of a clean-up of by the United States Navy cleaned of a military base. Amongst other injuries, plaintiff claimed her minor daughter suffered alopecia (loss of hair) from thallium poisoning. *Id*., at *1. Dr. Gustin was disclosed by the plaintiffs in *Myers* to express a toxicological opinion on behalf of the plaintiff that the minor plaintiff had been exposed to dangerous levels of Thallium. *Id*., at *40.

The *Myers* decision cited by the defendants is not a decision on a motion to preclude, rather it is the articulation of the Court's findings and conclusions of law as fact finder after a bench trial. Dr. Gustin testified as an expert witness during this trial. It is true that the court did not give weight to certain testimony of Dr. Gustin in making its findings. However, the court's findings are factually specific to the *Meyers* matter which was not a food poisoning case, did not involve Salmonellosis or any of the related medical conditions claimed here, nor did it involve the Widal antigen test.

In *Myers*, the toxicology test at issue was a urine test for Thallium concentration. All of the minor's urine samples during the relevant time indicated normal Thallium levels except for



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

three showing elevated levels. At trial, the court made an evidentiary finding that each of those three lab reports showing elevated levels were unreliable because they did not meet lab standards and were therefore, invalid. *Id.*, at *35-41. Two of three tests with elevated Thallium were not "reported out"– a term of art - when a lab does not "report out" the results of a test, it means the lab lacked confidence in accuracy of the test results based on uninterpretable results or some type of analytical error at the lab. *Id.* As to the third test, though it was "reported out" by the lab, the court credited evidence offered at the trial that the lab tech performed the test using "junk science" in that she used an "inaccurate method, in violation of lab protocols." *Id.*, at *35.

Dr. Gustin was not offered as an expert to testify to and assert the validity of the lab reports that were in question in *Myers*. Rather Dr. Gustin, as well as various treating physicians in the case, had accepted the urine test results as having been *validly* performed as a foundation of their opinions that the minor plaintiff had been exposed to a toxic level of Thallium. *Id.*, at *37, fn. 25 and *40. On that basis, Dr. Gustin's opinion testimony was not credited by the Court finding his opinion lacked a reliable foundation due to the lab tests having been proven to have been "flawed" due to laboratory error rendering invalid results. *Id.* In stark contrast, there is absolutely no evidence in the present case that the October 30, 2018 Widal test was invalid due to inaccurate method or laboratory error or violations of lab protocols. The *Meyers* case does not support the notion that Dr. Gustin's testimony in the present matter is unreliable.

**E. Defendants' Experts' Testimony Concerning the Widal Test**

The defendants' expert microbiologist, Dr. Thomas Montville, testified he was generally familiar with the type of antigen test (Widal) performed on Stephen DeNinno; that the October 30, 2018 Widal test evidenced that Stephen DeNinno had been exposed at some point in time to Salmonella; that it is a scientific fact that the Salmonella antibodies can persist in the blood for



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

months; and that Stephen DeNinno's positive Widal test was not inconsistent with a July 27, 2018 infection. Doc. 80-3 at 70:2-71:14 [Montville Dep.]. Dr. Montville further agreed that this type of evidence of prior exposure can be used by a medical doctor in conjunction with other clinical information concerning the patient to make a clinical diagnosis that an acute gastrointestinal illness was caused by Salmonella. Doc. 80-3 at 72:1-73-4 [Montville Dep.]. Dr. Montville testified it was his expert opinion that Stephen DeNinno and Mary DeNinno were more likely than not suffering from salmonellosis on July 28, 2018. *Id.* at 67:16-19.

The defendants' expert rheumatologist Alan Gibofsky testified he is not familiar with the Widal antibody test; he did not conduct any research on it for his opinions; and he is not intending to offer any opinions about it. Doc. 88-6 at 97:22-98:4, 100:2-6 [Gibofsky Dep.]. The defendants' expert gastroenterologist also testified he was not familiar with the Widal antibody test, that he found little information about it when he researched it and that because it was a test that he himself would never personally order, it was his opinion it had no clinical relevance. Doc. 81-3 at 136:18-143:2 [Storch Dep.].

**F. Differential Diagnosis - Salmonella as infection source**

Dr. Gustin conducted a reliable differential diagnosis, weighing multiple clinical factors to conclude that Stephen DeNinno's acute illness was more likely than not caused by Salmonella. *Id.* At Dr. Gustin's deposition he was asked:

> Q. And is your opinion in this matter that Mr. DeNinno suffered from a Salmonella infection which onset on July 28th of 2018 based solely on the positive Widal test?
>
> A. No. It's based on the full clinical epidemiologic workup of the patient, addressing each and every potential factor and going through the steps, including or eliminating or thinking about them. It's a complex procedure. It's not simple. The doctors do it regularly. You have to look at the exposure history. You have to look at the timing. You have to look at the symptom pattern. You have to look at known complications, if there are complications down the road. If there happened to be lab



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

tests or hospital visits, that's included. You've got to look at that. And then you've got to go through this exercise of determining alternative causes of the illness, in terms of what caused that illness, and the alternative causes of the infection source, the source of attribution. . . .

Q. And was the Widal test on of those pieces in your analysis?

A. Yes. It's one tool.

Doc. 75-4 at 288:6-289:14 [Gustin Dep.].

Dr. Gustin's report dated July 6, 2024, articulates his detailed and systematic review and analysis as to his opinion that Salmonella was the cause of the DeNinnos' acute illness. *See* Doc. 88-1 at 33-35, 38-49 [Gustin Rep.]. The following factors, *inter alia*, were considered:

- An October 30, 2018 Widal test that was positive for Salmonella H, type b and negative for the O antigen, coupled with a November 13, 2018 stool culture negative for Salmonella (and other pathogens), signifies a <u>prior</u> exposure to Salmonella in the weeks or months before the October 30, 2018 blood test as explained in subsection c above.

- Stephen DeNinno had never had a Typhoid vaccine, nor travelled to a third world developing country, making a false positive Widal test significantly less likely. Doc. 88-1 at 35, 38 [Gustin Rep.]; Doc. 75-4 at 133:23-24; 193:2-5 [Gustin Dep.].

- Stephen DeNinno had no medical history of acute gastroenteritis in the year prior to the Widal test other than the acute illness of July 2018 thereby making it more likely than not that the prior exposure to Salmonella indicated by the Widal test was at the time of the acute illness. Doc. 88-1 at 38 [Gustin Rep.].

- The sudden onset of severe gastrointestinal symptoms on July 28, 2018 experienced by both Stephen DeNinno and Mary DeNinno, the nature of their respective symptoms (abdominal pain, non-bloody diarrhea, nausea, and vomiting,) and the duration of the acute illness (self-limiting illness of 3-5 days) were entirely consistent with non-typhoidal Salmonella gastroenteritis. Doc. 88-1 at 33, 35, 40, 47, 76 [Gustin Rep.].

- Salmonella is a bacterium. Doc. 88-1 at 29 [Gustin Rep.]. Bloodwork performed during Stephen DeNinno's July 31, 2018 hospitalization for the acute illness revealed an elevated white blood count with a left shift, clinically indicating that his acute illness was caused by a <u>bacterial</u> infection. Doc. 75-4 at 150:15-151:11,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

173:23-174:4, 253:4-254:3 [Gustin Dep.]; Doc. 78-4 at 26 [Backus Hospital, 7/31/2018]. See also Doc. 88-6 at 90:9-91:13 [Gibofsky Dep.]; Doc. 75-5 at 131:4-132-8 [Toder Dep.].

- The Widal test was positive for Salmonella Type b – one of the most common serovars causing bacterial gastroenteritis in the United States. Doc. 88-1 at 25, 38 [Gustin Rep.].

- As set forth in subsection III.A above, Stephen DeNinno was diagnosed with reactive arthritis in October 2018. Reactive arthritis is a known complication of a Salmonella enteric infection – the onset window for joint symptoms after a triggering infection is within 2 months after resolution of the infection. Stephen DeNinno's onset of symptoms approximately one month after the acute illness is consistent with a July 27 infection by Salmonella. Doc. 88-1 at 29, 39, 43, 47, 76 [Gustin Rep.]. Whereas a suggestion that Stephen DeNinno may have been exposed to a Salmonella infection in the first half of 2018 would not be consistent.

- Dr. Gustin considered and further determined viral gastroenteritis was less probable based on the DeNinnos' symptoms, the lack of prodromal (gradual) symptoms, the near simultaneous spousal onset of symptoms, and downstream medical complications of Stephen DeNinno. Doc. 88-1 at 31, 42-43, 132-133 [Gustin Rep.]. Doc. 75-4 at 209:5-211:21; 242:15-24 [Gustin Dep.].

- Dr. Gustin identified other possible bacterial pathogens (e.g. Shigella, Campylobacter, Yersinia and E.Coli) warranting consideration as alternative causes of gastroenteritis and triggers for reactive arthritis – his evaluation of each led him to likewise eliminate these other bacteria as the probable source of the acute illness. Doc. 88-1 at 48-49 [Gustin Rep.]; Doc. 75-4 at 131:17-132:12; 216:10-218:25; 241:10-242:14 [Gustin Dep.].[7]

[7] In their Memorandum of Law, the defendants assert that Dr. Gustin did not provide scientific support for his testimony that certain bacterial pathogens could be ruled out based on the absence of cross-reactivity with the H antigen of the Widal test. Doc. 75-1 at 10 citing to Ex C at 132, 193. However, as evidenced by those deposition transcript pages cited in their brief, defense counsel never asked Dr. Gustin to identify the scientific support for that statement. Defense counsel cannot now assert Dr. Gustin's testimony as faulty on the basis of question he never asked. Moreover, defense counsel omits that Dr. Gustin additionally relied on differences between Salmonella and those other pathogens with regards to symptoms, medical complications and other factors as identified in the citations to Dr. Gustin's report and deposition above.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Notably, "[c]ourts regularly affirm the legitimacy of employing differential diagnostic methodology. Most circuits have held that a reliable differential diagnosis satisfies Daubert and provides a valid foundation for admitting an expert opinion. The circuits reason that a differential diagnosis is a tested methodology, has been subject to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." Fed. Judicial Ctr. & Nat'l Acads. of Scis., Eng'g, & Med., Reference Manual on Scientific Evidence, p. 1001, fn. 323 (4th ed. 2025) (internal quotations and citations omitted). *See Perkins v. Origin Medsystems, Inc.,* 299 F.Supp.2d 45, 57 (D. Conn. 2004).

Moreover,

> . . . the proper focus under Daubert is whether an expert's testimony rests on evidence reliably derived from scientific methodology and is relevant to the facts of the case, not whether plaintiffs' experts can prove the point of their testimony. *Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C.Cir.1996) ("The dispositive question is whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial.") (citation omitted). Indeed, establishing reliability should not mean that plaintiffs "have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994); *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1312 (11th Cir.1999) (accord); *In re Ephedra*, 393 F.Supp.2d at 193 ("Daubert's dictum about scientific validity" is not "authority for increasing the burden of proof imposed by substantive law"). Reliability under Daubert does not depend on "the correctness of the expert's conclusions but [on] the soundness" of the methodology. *Daubert II*, 43 F.3d [1311, 1318 (9th Cir. 1995)].

*McClellan v. I-Flow Corporation,* 710 F. Supp. 2d at 1101-1102.

Defendants' assertions concerning certain literature cited by Dr. Gustin concerning the Widal test is misleading. Defendants point to several exchanges between defense counsel and Dr. Gustin at his deposition concerning three studies cited by Dr. Gustin in his initial report asserting that they stand for the opposite proposition for which Dr. Gustin cited them for. This is simply



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

not true. In fact, Dr. Gustin credibly brought to light the issue of false positives in his initial expert report noting the specificity of the Widal test to be about 80%, meaning there is an approximate 20% false positive rate for healthy individuals. Doc. 88-1 at 34 [Gustin Rep.]. Dr. Gustin there cites to one of the three studies (Sapkota) the defendants erroneously imply Dr. Gustin disagrees with. Doc 75-1 at 9 [Def. MOL]. The 3 studies referenced in the deposition transcript pages cited by the defendants in their brief are all studies of regions where Salmonella is endemic to the country and researchers are concerned with identifying the reliability of the Widal test and other tests for the purpose of accurate diagnosis in the clinical setting of an active infection, primarily concern for Typhoid Fever. As indicated by the studies, the primary risks for false positives stem from the Widal test yielding a positive finding in reaction to a past immunization for Typhoid fever (vaccination being common in those regions) or a patient's past exposure(s) to Salmonella (as past exposures are common due to the prevalence of Salmonella in those regions). It is in consideration of the studies in that context, that Dr. Gustin's bases his opinion that "when the Widal test is positive as it was for the Salmonella H-antigen, when the individual has not remote history of prior bacterial infections including no history of prior Salmonella exposures, no travel to endemic areas, and no prior vaccinations for typhoid fever, when the individual is not in the acute early course of illness, and when his current illness is not in an endemic setting, a positive Widal Salmonella H-antigen test is sufficient evidence to confirm that the individual is most likely in the recovery stage after a recent Salmonella infection. Doc. 88-1 at 34 [Gustin Rep.]; Doc. 75-4 at 133:9-134:3; 193:2-12 [Gustin Dep.].

While the Widal test, like many diagnostic tests in medicine, can give a false positive, Dr. Gustin gave due consideration using his experience, literature review and medical judgment as to its likelihood in the context of Stephen DeNinno. In *Thorsen v. Blazin Wings, Inc.,* 2016 WL

11071725 (U.S.D.C., N.D. Georgia, 1/25/2016), a food poisoning case without stool culture or other positive diagnostic testing for a pathogen, the Court rejected the defendant's contention that the causation opinions of Dr. Hayes - a board certified internist and emergency room doctor with significant experience like Dr. Gustin routinely treating patients with gastrointestinal illness in the emergency room setting - were not reliable stating: "All of the concerns the defendant points out are, once again, matters that go to the weight to be afforded to Dr. Hayes' testimony, not to its admissibility. The Court simply cannot determine that Dr. Hayes' testimony is pure speculation". *Id.* at *15. The Court emphasized:

> [T]he gatekeeping function under Rule 702 is not intended to supplant the adversary system or the role of the jury: vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Adams v. Lab. Corp. of Am*., 760 F.3d 1322, 1334 (11th Cir. 2014) (per curiam) (internal quotations marks and citation omitted.). Indeed, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. *Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotations and citations omitted). . . . Rather, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (internal quotations and citations omitted).

*Id.*

## IV. Post hoc ergo proper hoc fallacy

The defendants argue that Dr. Gustin's opinions are based on a *post hoc ergo propter hoc* fallacy – in other words, that his opinions rely merely on the temporal relationship between exposure and illness. Doc. 75-1 at 10-11. The defendants summarily apply this argument to two separate aspects of his opinion – a) temporal proximity as to the source Salmonella infection and b) temporal proximity as to downstream medical complications of the infection.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**A. The law recognizes that temporal relationship between cause and effect has proper and significant value to an expert opinion.**

The defendants support their *post hoc ergo propter hoc* argument with *Flemings v. Merck & Co. (In re Fosomax Prods. Liab. Litig.)* 2009 WL 4042769 (S.D.N.Y., Nov. 23, 2009). In *Flemings*, a plaintiff's family physician was precluded from offering an expert opinion in a products liability suit in which the plaintiff claimed her osteonecrosis of the jaw (exposed bone and necrotic gum tissue) was caused by her use of a biphosophonate medication manufactured by Merck for treatment of osteoporosis. There was evidence that after discontinuing Fosomax, the plaintiff's jaw began to heal and the family physician premised his opinion of causation on that evidence. The family physician testified that he had not researched any medical literature to support his conclusion that stopping Fosomax aided in the healing process- rather he testified there had been some talk ("a hum") in the medical and dental community of a possible relationship between Fosomax and osteonecrosis, and he suspected he had heard about it in a course or read something about it. He further testified that "I can't say" whether Fosamax either caused or contributed to the plaintiff's osteonecrosis. The defendant Merck argued that the family physician's opinion was merely "inadmissible *post hoc ergo propter hoc* (i.e. after the fact, therefore because of the fact) argument." The court precluded the family physician's opinion noting he offered no other reason for his diagnosis other than the temporal relationship and "a little hum in the medical and dental community", that he had not performed a differential diagnosis, nor had he attempted to rule out other possible causes of the plaintiff's injury.

Importantly, in discussing the *post hoc ergo propter hoc* argument, the *Fleming* court took care to <u>specifically note that the temporal relationship between cause and effect can have proper significant value to an expert opinion</u>:


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

> An expert's consideration of the temporal relationship between cause and effect does not make his expert opinion per se inadmissible. Several courts "have looked favorably on medical testimony that relies heavily on a temporal relationship between an illness and a causal event." Heller v. Shaw Indus., Inc., 167 F.3d 146, 154 (3d Cir.1999); see also Zuchowicz v. U.S., 140 F.3d 381, 385 (2d Cir.1998). A strong temporal relationship between the injury and its alleged cause may be one of several factors considered by a medical doctor to reliably determine causation, but, standing alone, relying wholly on a temporal relationship is not sound scientific methodology that is admissible under Rule 702 and Daubert. See, e .g., Zuchowicz, 140 F.3d at 385 (admitting an expert's opinion that was based in part on a temporal relationship, but also a "differential etiology method of excluding all other possible causes"); In re Zyprexa Prod. Liab. Litig., No. 04 MD 1596, 2009 WL 1357236, at *2 (E.D.N.Y. May 12, 2009) ("A medical expert must adequately consider possible alternative causes of an alleged disease, avoiding speculative analysis that automatically implicates a drug in the temporal chain."); Figueroa v. Boston Scientific Corp., 254 F.Supp.2d 361, 367 (S.D.N.Y.2003) (admitting an expert opinion based in part on temporal proximity "[b]ecause the record shows that [the expert's] opinion is based on more than his consideration of timing"); cf. Silivanch v. Celebrity Cruises, Inc., 171 F.Supp.2d 241, 257 (S.D.N.Y.2001) ("A temporal relationship by itself provides no evidence of causation. But such a temporal relationship can corroborate other proof of a causal nexus ....").

*Id*. at 7.

Under Federal Rule of Evidence 702 and *Daubert*, an expert's consideration of the temporal relationship between an exposure and an illness does not render the opinion *per se* inadmissible. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–95 (1993); *Flemings* at *7. Defendants' contention that Dr. Gustin relied on temporal proximity alone to conclude that contaminated king crab infected Mr. DeNinno with *Salmonella* and caused his subsequent medical complications mischaracterizes the record and ignores his rigorous differential etiology.

**B. Temporal Proximity as to the Source of the Salmonella Infection**

The defendants assert Dr. Gustin's opinion as to the source of the salmonella infection to simply be that "because DeNinno and his wife got sick after eating the crab, it had to be the crab .



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

. . that caused them to be sick – it cannot, in his view, be another unrelated cause." Doc. 75-1 at 11. The defendant supports its argument with a reference to page 174 of Dr. Gustin's deposition testimony and suggesting the testimony supports their argument that Dr. Gustin based his opinion on the mere fact that Stephen DeNinno and Mary DeNinno became sick after eating the crab. However, that is an egregious misrepresentation of Dr. Gustin's testimony. Placed into context by reading pages 171:4 to 175:17, it is evident that Dr. Gustin is in fact explaining the multiple criteria considered and satisfied by his differential etiology analysis – quite the opposite of what the defense asserts. Doc. 75-4 at 171:4-175:17 [Gustin Dep.].

Moreover, it is clear by Dr. Gustin's reports and testimony that Dr. Gustin did not rely merely on the temporal proximity of the crab consumption to their illness but rather evaluated a classic epidemiological point-source cluster involving synchronous, explosive onset of acute gastroenteritis in both Mr. and Mrs. DeNinno approximately fourteen to seventeen hours after consuming their first shared meal in four and a half days. Doc. 88-1 at 30-32, 36–38, 43, 71 [Gustin Rep.]; Doc. 75-4 at 93:15–21, 171:13-172:14, 291:13-20 [Gustin Dep.].

Dr. Gustin provided detailed explanation that the near simultaneous onset of severe symptoms of gastroenteritis (within about 2 hours of each other) is strong evidence that the incubation period of the Salmonella was short and that it was a high dose exposure to the spouses from the same infective source at the same time, classic of a shared food source. If an infection occurred in two individuals 4 ½ days or more before symptom onset, then it would be unlikely for the individuals' symptoms to present within two hours of each other 4 ½ days or more later due to immunological and physiological differences in their body's response to the infecting organism. He explained that the acuity and severity of their symptoms makes it medically more probable than not that their infection occurred at some point 6-24 hours after eating Salmonella contaminated

food. The usual incubation period for Salmonella being 6-72 hours. The DeNinnos shared no food sources together, other than ultra pasteurized cream from Monday, July 23, 2018 through Thursday, July 26, 2018. Dr. Gustin reasonably ruled out foods eaten by either spouse Monday through Thursday on that basis. Doc. 88-1 at 30-33, 36-38, 43, 44, 75, 129-130 [Gustin Rep.]; Doc. 75-4 at 171:13-172:14 [Gustin Dep.].

As evidenced in Section II of this brief, Dr. Gustin analyzed and established the plausibility of crab as a vector. Dr. Gustin also analyzed and reasonably ruled out the other potential food items as well as post-purchase cross-contamination in the DeNinno home based on established scientific principles. *See* Doc. 88-1 at 29–32, 37–38, 40, 42, 72–78 [Gustin Rep.]; Doc. 75-4 at 291:13–296:18 [Gustin Dep.]. With regard to other shared foods: the coffee cream was ultra-pasteurized and the carton was used daily without other incident, the cocktail sauce was commercially bottled, had an acidic pH below 3.8 and was consumed weeks later by Mrs. DeNinno without illness, and the other ingredients of the dinner casserole were boiled and simmered and then baked with the crab at 375 degrees Fahrenheit for thirty-five to forty-five minutes, sufficient to exceed the 165-degree threshold required to eradicate *Salmonella*. Doc. 88-1 at 29–32, 37, 40, 73–74 [Gustin Rep.]; Doc. 75-4 at 292:25–294:18 [Gustin Dep.].

Dr. Gustin analyzed and found improbable post-purchase contamination in the DeNinno's kitchen: The purchased frozen crab was brought home directly from the store, a 15 minute drive, promptly refrigerated at 37 to 38 degrees in store packaging, thawed briefly under cold running water in a clean colander in a sanitized sink, handled by Stephen DeNinno with new gloves and washed hands, only in contact with clean, dishwasher-sanitized kitchenware, prepared in an air conditioned environment and eaten promptly after preparation. The DeNinnos washed their hands


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

prior to handling and consuming the crab. Doc. 88-1 at 30–31, 37–38, 42, 65–66, 73 [Gustin Rep.]; Doc. 75-4 at 292:4–24, 294:20–296:18 [Gustin Dep.].

Dr. Gustin differential etiology analysis also considered and ruled out non-food sources, including person-to-person, environmental fecal-oral transmission, and the DeNinnos' dogs. Doc. 88-1 at 27, 29, 35, 37, 47, 68, 72, 134, 144-145 [Gustin Rep.]; Doc. 75-4 at 156:24-157:8; 164:11–168:7, 174:25-175:8, 281:3–282:10 [Gustin Dep.]. He explained:

> Person-to-person or environmental fecal oral transmission requires that one individual first acquire the infection, develop symptomatic illness with intestinal shedding of organisms, contaminate the environment, and only then expose the second individual, who must subsequently undergo a full incubation period before becoming ill. In other words, one spouse would necessarily have become ill first, followed later by the second spouse.
>
> That pattern is not what occurred here. Both spouses developed severe gastroenteritis at roughly the same time. The suggestion that the infection arose from a contaminated door handle, toilet flush lever, or other environmental surface is similarly unsupported. While fomite transmission is theoretically possible, it typically involves small numbers of organisms, which would be expected to produce either no illness or a longer incubation period rather than the abrupt onset of severe illness observed in this case.
>
> In addition, fomite transmission (organisms on doorknobs, handles) would still require the same sequential process of infection between the spouses involving environmental contamination, and a second incubation period. Such mechanisms therefore produce staggered illness, not the simultaneous onset seen here. The epidemiological pattern -two individuals with a shared exposure who develop severe gastroenteritis within the same narrow time window- is characteristic of a common source exposure most commonly contaminated food . . ..

Doc. 88-1 at 144-145 [Gustin Rep.].

With regard to the DeNinnos dogs, they were not ill, they ate dry commercial kibble and no other dog treats during the day and oral-fecal route transmission from dogs is not common. Doc. 88-1 at 27, 29, 37, 72 [Gustin Rep.]. The defendants' assertion that Dr. Gustin arbitrarily dismissed the DeNinnos' four healthy dogs as a source of *Salmonella* ignores his scientifically reasoned basis for doing so. Dr. Gustin explained that fomite or fecal-oral transmission from an



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

asymptomatic pet involves a low bacterial inoculum that produces a mild, staggered, and sequential illness rather than a simultaneous, fulminant gastroenteritis in two spouses within hours of each other. Also noting scientific literature showing that asymptomatic *Salmonella* carriage in household dogs is exceedingly rare at 0.23 percent. Doc. 88-1 at 72, 134, 144 [Gustin Rep.]; Doc. 75-4 at 164:11–168:7, 281:20–282:10 [Gustin Dep.].

The defendants criticism of Gustin's testimony that DeNinno "was exposed to an 'extremely large inoculum' that would produce 'more severe effects' despite DeNinno having presented to the hospital with no diarrhea during his stay and no fever in nonsensical. Mr. DeNinno was admitted to the hospital on July 31, 2018 in acute kidney failure due to dehydration from his profuse diarrhea since the morning of July 28, 2018. Doc. 78-4 [Backus Admission]. When the defendants questioned why Mr. DeNinno had no fever or diarrhea during his hospital stay on July 31, 2018, Dr. Gustin provided a sound physiological explanation grounded in medical literature: non-typhoidal *Salmonella* serogroup B typically presents with low-grade or absent fever, and because acute *Salmonella* enteritis is self-limiting over three to five days, Mr. DeNinno's rectal vault was empty by the afternoon of July 31, 2018 when he was admitted to the hospital and his intestinal peristalsis had transiently shut down by day four following upwards of fifty episodes of diarrhea over the days prior. Doc. 75-4 at 91:2-94:17; 255:13-256:10 [Gustin Dep.]; Doc. 88-1 at 14, 26, 32-33 [Gustin Rep.].

The defendants' complaint that Dr. Gustin initially relied on factual summaries from counsel, rather than personally interview Mr. or Mrs. DeNinno provides no basis for preclusion. Federal Rule of Evidence 703 expressly permits an expert to base an opinion on facts or data in the case that the expert has been made aware of. Pursuant to F.R.C.P. Rule 26(a)(2)(B)(iii), the factual summaries were timely and properly disclosed within Exhibit 2 of his expert disclosure.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

See Doc. 88-1 [Gustin Rep.]. Moreover, at the time of his disclosure on February 14, 2025, Dr. Gustin had also reviewed the sworn deposition transcripts of both Mr. and Mrs. DeNinno, substantially corroborating the factual information contained in the summaries. See Doc. 88-1 [Gustin Rep.]. Further, Stephen DeNinno and Mary DeNinno have provided affidavits attesting to the information provided in the factual summaries and will also testify to said facts at trial. Doc. 88-8 [S. DeNinno Aff.]; Doc. 88-9 [M. DeNinno Aff.]

The defendants' contention that Dr. Gustin relied on temporal proximity alone to conclude that contaminated king crab infected Mr. DeNinno with *Salmonella* and caused his subsequent medical complications mischaracterizes the record and ignores his rigorous differential etiology. It is quite clear that Dr. Gustin scrutinized the factual context of this case, reviewed medical and scientific literature, and conducted a reliable differential diagnosis analyzing temporal proximity, combined with biological plausibility and exposure context, thereby adequately supporting his opinion that the crab sold to Stephen DeNinno was infected with Salmonella resulting in the acute illness suffered by Stephen DeNinno and Mary DeNinno on July 28, 2018.

**C. Temporal Proximity as to Downstream Medical Complications**

The defendants argue that Dr. Gustin opines that because Stephen DeNinno "developed other health issues in the months and *years* afterwards that he did not have before, *in addition to the many pre-existing conditions he did have before*, the crab "has to create those complications downstream" and referring to Stephen DeNinno's reactive arthritis, chronic inflammatory diarrhea and chronic malabsorption syndrome. Doc. 75-1 at 11 [Def. MOL]. First, the defendants' above quoted assertion is further misleading as phrased. Dr. Gustin has not related any pre-existing conditions that Stephen DeNinno suffered to the Salmonella infection. Prior to the infection of July 27, 2018, Stephen DeNinno did not suffer from reactive arthritis, any diarrheal issues,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

hypomagnesemia or malabsorption issues. Doc. 78-3 at 49:13-16, 51:5-8, 89:11-18 [Stephen DeNinno Dep.]. The downstream complications Dr. Gustin related to the Salmonella infection were all onset within six months of the infection. The history of his reactive arthritis diagnosis by Dr. Toder with onset of his symptoms in early September 2018 is set forth in Section III.A. By October 2018, medical records show Stephen DeNinno was again having diarrhea. Doc. 78-7 at 4 [Toder Med Records]. Recurrence of diarrhea and a severe episode of hypomagnesemia is documented in Stephen DeNinno's January 6, 2019 hospital admission (Note: he also experienced hypomagnesemia due the acute illness when he was hospitalized on July 31, 2018). See Section III.A; Doc. 78-5 at 3; Doc. 78-2 ¶ 8; Doc. 88-1 at 43, 76 [Gustin Rep.].

Secondly, and as indicated the preceding subsection, the testimony from page 174 referenced by the defendants is asserted out of context. Dr. Gustin's testimony that the *Salmonella* infection had to create the downstream complications was not an expression of blind temporal dogma, but rather his explanation of the criteria required to evaluate whether a single pathogen accounts for a patient's entire clinical syndrome, during which he also ruled out other alternative causes. Doc. 75-4 at 171:4-175:17 [Gustin Dep.].

The defendants' argument concerning the downstream complications is vague and minimal complaining erroneously that Dr. Gustin never explained his methodology and that "without an understanding of the medical authorities upon which Dr. [Gustin] bases his opinion the Court is left to speculate as to its legitimacy." Doc. 75-1 at 11 [Def. MOL], quoting from *Flemings*, supra at *25. It is a well-settled rule in the Second Circuit and the District of Connecticut that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation or record analysis, are deemed waived. Because it is not the obligation of the Court to manufacture record support or flesh out skeletal, conclusory assertions that a moving party failed to develop,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

the defendants' undeveloped attack on Dr. Gustin's methodology connecting Stephen DeNinno's downstream complications to the Salmonella infection should be summarily rejected on this basis alone. *See Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir. 2005) (deeming argument waived where party devoted only a single conclusory sentence to the issue).

*Salmonella* enteritis is a primary trigger of reactive arthritis, and it is also known to cause intestinal inflammation and immune dysregulation resulting in chronic diarrhea and malabsorption, particularly in patients who possess the HLA-B27 genetic marker. Doc. 88-1 at 25, 36, 39-41, 45-46, 76-77 [Gustin Rep.]. Unlike the excluded treating physician in *Fleming*s who admitted knowing very little about the subject, conducted no literature research, performed no differential diagnosis, and could not state whether the product caused the plaintiff's injury, Dr. Gustin conducted a reliable and thorough differential diagnosis analyses supported by medical literature that is clearly set forth in detail in his expert reports. Compare *Flemings*, 2009 WL 4042769 at *6–8 *with.* Doc. 88-1 at 24-51, 71-77 [Gustin Rep.]. As a part of his differential diagnosis, Dr. Gustin satisfied *Daubert*'s requirement to address and reasonably exclude alternative causes for the downstream medical conditions claimed. Doc. 88-1 at 42—43, 47-50, 125-126, 127-128, 132-133, 135-138 [Gustin Rep.]. Doc. 75-4 at 108:21–110-4, 111:11–113:8, 131:17–132:12, 241:10–242:24, 251:12–253:3 [Gustin Dep.].

## V. Dr. Gustin should be permitted to express his opinion that Stephen DeNinno's hypomagnesemia was more likely than not caused by the acute illness.

With respect to hypomagnesemia, Dr. Gustin detailed the well-established, textbook physiological mechanisms by which *Salmonella* invades intestinal epithelial cells via endocytosis in the ileum, replicates within vacuoles, triggers pro-inflammatory cytokines, causes persistent mucosal inflammation and immune dysregulation in HLA-B27 positive hosts, impairs epithelial cellular transport channels (such as TRPM6 and TRPM7) and microbiome balance at the



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

microvillus level, and impairs bile salt metabolism and nutrient absorption. Doc. 88-1 at 24-25, 39, 40-41, 44–46, 49–50, 75–77, 126–127, 135–137 [Gustin Rep.]; Doc. 75-4 at 123:20–125:2, 139:9–18, 256:14–258:11, 260:1–11 [Gustin Dep.].

Dr. Gustin also specifically addressed and ruled out alternative causes of Mr. DeNinno's hypomagnesemia: a 24-hour urine test proved Mr. DeNinno had no renal magnesium wasting; discontinuing his diuretic (HCTZ) did not resolve the deficiency; and when his gastroenterologist, Dr. John Cribb, discontinued his proton pump inhibitor (Dexilant) in March 2019 to test whether chronic PPI use was down-regulating his intestinal magnesium channels, Mr. DeNinno's serum magnesium failed to improve, compelling Dr. Cribb to conclude in April 2019 that the medication was not the culprit. Doc. 88-1 at 15-16, 20–22, 49–50, 126–127, 137–138 [Gustin Rep.]; Doc. 75-4 at 256:14–257:15, 262:4–18 [Gustin Dep.]

That Dr. Gustin candidly acknowledged during cross-examination at his deposition that a subsequent July 2020 normal terminal ileum biopsy presented a discrepancy regarding structural ileitis, and that resuming Dexilant could be a contributing factor worth re-evaluating after the initial ileitis resolved, demonstrates his scientific objectivity rather than a methodological failure. *See* Doc. 75-4 at 261:13–262:22 [Gustin Dep.]. He thoroughly explained that micronutrient malabsorption and post-infectious enteropathy occur at the microscopic, cellular, and functional transport level even when gross endoscopic mucosa appears normal, as objectively proven by the fact that high-dose oral magnesium failed to raise Mr. DeNinno's serum levels while intravenous magnesium infusions reliably corrected them. *See* Doc. 88-1 at 15-16, 20–22, 49–50, 126–127, 137–138 [Gustin Rep.]; Doc. 75-4 at 106:6–24, 123:20–125:2, 256:14–262:22 [Gustin Dep.].

At most, any tension between his comprehensive written analysis of functional malabsorption and his deposition testimony regarding the 2020 biopsy goes to the weight of his



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

opinion on that single downstream symptom, not the admissibility of his overarching causation testimony. *See Kumho Tire*, 526 U.S. at 152; *In re Acetaminophen*, 707 F. Supp. 3d at 335, 346 (noting that individual disputes and inconsistencies are "best explored on cross-examination").

## VI. Dr. Gustin's Application of the Bradford Hill Criteria

### A. Waiver

As a threshold matter, the Court should decline to consider the defendants' challenge to Dr. Barry E. Gustin's Bradford Hill analysis because the defendants have failed to adequately brief the issue, thereby waiving the argument. In their Memorandum of Law, the defendants compress their entire attack on Dr. Gustin's twelve-page Bradford Hill analysis into a single, cursory paragraph consisting almost entirely of string-cited parenthetical quotes plucked out of context from *In re Acetaminophen – ASD-ADHD Products Liability Litigation*, 707 F. Supp. 3d 309 (S.D.N.Y. 2023),[8] without a single citation to Dr. Gustin's reports or deposition transcript and without any substantive analysis of how Dr. Gustin actually applied the nine criteria in this case. Doc 75-1 at 13-14.

It is a well-settled rule in the Second Circuit and the District of Connecticut that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation or record analysis, are deemed waived. Because it is not the obligation of the Court to manufacture record support or flesh out skeletal, conclusory assertions that a moving party failed to develop, the defendants' undeveloped attack on Dr. Gustin's Bradford Hill methodology should be summarily rejected on this basis alone. *See Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir.

---

[8] Additionally, as a point of clarification Dr. Gustin was not an expert witness in *In re Acetaminophen* –the manner in which the defendants provide direct quotes from *In re Acetaminophen* directly after Dr. Gustin's name may inadvertently give that impression. Doc 75-1 at 14 .



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

2005) (deeming argument waived where party devoted only a single conclusory sentence to the issue). [9]

**B. Dr. Gustin used the Bradford Hill Criteria (hereinafter "Bradford Hill) to further analyze and structure the clinical reasoning he utilized in his differential diagnosis and causation analysis.**

The defendants' contention that Dr. Barry E. Gustin's causation opinions must be excluded under Federal Rule of Evidence 702 based on *In re Acetaminophen – ASD-ADHD Products Liability Litigation*, 707 F. Supp. 3d 309 (S.D.N.Y. 2023), fundamentally misapprehends both the holding of that decision and the methodology Dr. Gustin actually employed in this case.
The challenge to Dr. Barry Gustin's application of the Bradford Hill criteria fundamentally conflates the general causation analysis required in novel pharmaceutical mass torts with the differential diagnosis and differential etiology methodology applied here by Dr. Gustin to an acute, two-person household foodborne illness cluster. Doc. 75-4 at 20:8–21:13 [Gustin Dep.].

Dr. Gustin used Bradford Hill to further analyze and structure the clinical reasoning he utilized in his differential diagnosis and causation analysis. As agreed by Dr. Gustin at his deposition, Bradford Hill's main use is by epidemiologists assessing a causal relationship between an exposure and a disease across broad populations through population studies (e.g. does tobacco cause cancer). Dr. Gustin explained however that in clinical medicine and public health, the principals of Bradford Hill are relevant and useful in assessing causation to evaluate disease patterns, point-source exposures, and medical causation in an individual patient or a small household cluster. Doc. 75-4 at 20:8–21:13; 204:10-24; 207:2-12 [Gustin Dep.].

---

[9] If the Court does not sustain the plaintiffs' objection to this argument on wavier grounds and the defendants' argument in fact extends beyond what the plaintiffs addresses in the subsection B below - based upon plaintiffs' good faith attempt to deduce what the focus of the defendants argument is - the plaintiffs respectfully request additional time to respond after further articulation by the defendants is made.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Dr. Gustin did not purport to use Bradford Hill as a standalone population study on a single individual, as the defendants erroneously assert. Rather, as Dr. Gustin explained in his reports and deposition testimony, he first reached his specific causation opinions through the standard, universally accepted medical and clinical epidemiological methodologies of differential diagnosis and differential etiology including, *inter alia*, evaluating the two-person household cluster, the tight 14-to-17-hour incubation window following the DeNinnos' only shared meal in four and a half days, review of the DeNinno's medical records, prior medical history, Mr. DeNinno's bloodwork evidencing a left shift indicative of bacterial infection, classic symptoms and presentation of gastric enteritis in the spouses, the strongly positive *Salmonella* H-antigen serological titer (1:160), the downstream onset of HLA-B27 reactive arthritis, and the systematic exclusion of alternative causes. *See* Doc. 88-1 at 28–39, 71-77 [Gustin Rep.]; Doc. 75-4 at 87:1–25, 130:7–25, 150:18–151:15, 171:13–175:17, 253:4–254:3, 288:6–296:24, 297:22–298:19 [Gustin Dep.]. After establishing causation through this comprehensive differential diagnosis, Dr. Gustin included a section titled "Further Testing to Establish Causation: Bradford Hill Criteria for Causation" to test and demonstrate in organized fashion that the links in his clinical causation chain were harmonious with, and supported by, the classical epidemiological criteria. Doc. 88-1 at 39-51 [Gustin Rep.]; Doc. 75-4 at 20:3–21:13; 204:10–24, 206:13–18, 207:2–12 [Gustin Dep.].

Indeed, *In re Acetaminophen* expressly affirms that both the Bradford Hill framework and the "weight of the evidence" approach—which involves a series of logical steps used to infer to the best explanation—are generally accepted and reliable methodologies under Rule 702. *See In re Acetaminophen*, 707 F. Supp. 3d at 336–37 (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795–96 (3d Cir. 2017)). Far from misapplying a population-level metric to a single individual in a vacuum, Dr. Gustin utilized the Bradford Hill factors as a


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

structured, corroborative framework to further analyze his clinical differential diagnosis and differential etiology.

The defendants' assertion that Dr. Gustin conducted an impermissible "shared" Bradford Hill analysis on "multiple associations at once" distorts both *In re Acetaminophen* and the structure and purpose of Dr. Gustin's Bradford Hill analysis. Doc. 75-1 at 13-14 [Def. MOL]. The litigation in *In re Acetaminophen* involved an unproven hypothesis of general causation, whereas this case involves well-established medical pathogeneses applied to a specific exposure. In *In re Acetaminophen*, the plaintiffs' experts attempted to establish general causation—whether prenatal exposure to therapeutic doses of acetaminophen is capable of causing autism spectrum disorder ("ASD") and attention-deficit/hyperactivity disorder ("ADHD") in the general population—in the face of explicit consensus from the FDA and international medical societies that the scientific literature was mixed and unable to support a determination of causality. *See In re Acetaminophen*, 707 F. Supp. 3d at 317–18, 330–34. The court excluded the experts' "transdiagnostic" Bradford Hill analysis because the experts lumped together distinct neurodevelopmental disorders with no shared diagnostic criteria in order to mask the glaring absence of studies linking acetaminophen to ASD, thereby obscuring the weaknesses in the underlying epidemiological data. *See id.* at 334, 339–42. Here, by contrast, Dr. Gustin did not conduct an improper "transdiagnostic" analysis to invent a novel general causation theory; rather, he evaluated a single primary infectious exposure—foodborne non-typhoidal *Salmonella*—and well-recognized downstream clinical complications in an HLA-B27 positive patient. Furthermore, rather than conflating distinct inquiries, Dr. Gustin explicitly separated his Bradford Hill evaluation into three distinct postulates—a) whether Mr. DeNinno suffered acute *Salmonella* gastroenteritis, (b) whether the King Crab legs were the food vector for the *Salmonella* infection, and (c) whether Mr. DeNinno's


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

downstream reactive arthritis, chronic diarrhea, and malabsorption syndrome were triggered by the *Salmonella* gastroenteritis—and analyzed each transparently. Doc. 88-1 at 39-51 [Gustin Rep.].

The defendants next cherry pick several quotations from *In re Acetaminophen* that assert Dr. Gustin "failed to engage meaningfully with inconsistencies among the studies, inconsistencies which exist to a remarkable degree: and "ignores specificity: when the causal connection is complex, it is particularly important for the epidemiologist to consider whether the studies upon which she is relying adequately considered confounding effects." Doc. 75-1 at 14. The defendants give no context to the accusation, no indication as to the studies referred to, not even a cite to any of the 12 pages in Dr. Gustin's initial report where he sets forth his analysis under Bradford Hill. To the extent, these quotes relate back to their argument concerning the Widal test, the plaintiffs rely on the opposition set forth above in Section III.E.

The defendants further assert Dr. Gustin's hypotheses as to biological plausibility fail because, as with the hypomagnesemia, he failed to offer an expert opinion "purporting to identify the physiological processes that would cause the development of that condition that can survive scrutiny under Rule 702." The plaintiffs presume the only claimed failure concerns hypomagnesemia as nothing else is referenced by the defendants. In that regard the plaintiffs rely on the opposition set forth above in Section V.

The defendants' last complaint that Dr. Gustin "performed no tests and considered no studies" that would provide admissible evidence of causation misstates the law and ignores the extensive literature cited throughout his reports. An expert physician is not required to personally conduct laboratory experiments to testify under Rule 702, and the page citation the defendants pluck from *In re Acetaminophen*, 707 F. Supp. 3d at 351, merely observed that ethical rules


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

prohibit experimental human exposure studies and that animal studies alone could not establish general causation for acetaminophen. *See In re Acetaminophen*, 707 F. Supp. 3d at 351; But s*ee Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (recognizing that an expert may base testimony upon "professional studies or personal experience"); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000) (holding that an expert need not conduct his own tests and may rely on existing data and peer-reviewed literature). In this case, Dr. Gustin reviewed the entirety of the plaintiffs' clinical medical records, laboratory and serology results, endoscopic and biopsy reports, and deposition transcripts, and grounded his causation analysis in scientific literature and his professional training, education and experience. Because Dr. Gustin's methodology reflects the exact level of intellectual rigor that characterizes the practice of clinical medicine and public health investigation, the defendants' criticisms go at most to the weight of his testimony for cross-examination, not its admissibility under Rule 702. *See Kumho Tire*, 526 U.S. at 152; *In re Acetaminophen*, 707 F. Supp. 3d at 335, 346 (noting that individual disputes and inconsistencies are "best explored on cross-examination"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").

Finally, and notably, the basic tenet of the Bradford Hill Criteria of Causation is that none of the nine criteria when taken alone can bring indisputable evidence for or against a cause and effect hypothesis, and none are absolutely required to establish a causal relationship. Doc. 88-1at 39 [Gustin Rep.]. *See Cook v. Rockwell Int'l Corp.,* 580 F.Supp. 2d 1071, 1098 (D. Colo. 2006) (rejecting argument that plaintiff failed to provide sufficient evidence of causation based on failing to meet four of the Hill factors).


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**VI. Dr. Gustin's Report of 3/9/2026 should not be precluded.**

As Dr. Gustin testified, he wrote the March 9, 2026 supplemental report to comment on his review of the four defense expert reports. Doc. 75-4 at 225:19-226:10 [Gustin Dep.]. The report was emailed to defense counsel on March 10, 2026 and his deposition took place nine days later on March 19, 2026. The deposition of the defense experts took place weeks to months later as follows: Mr. Hodges on April 8, 2026; Dr. Montville on April 14, 2026 and May 30, 2026; Dr. Gibofsky on May 30, 2026; and Dr. Storch on June 16, 2026. They have not identified any new opinions by Dr. Gustin disclosed in that report. Indeed, the opinions fall within the ambit of the opinions expressed in his original expert disclosure, inclusive of his initial two reports. The defendants have not substantiated their claim of prejudice.

## CONCLUSION

Based on the foregoing, the plaintiffs' objection should be sustained, and the defendants' motion to preclude Dr. Gustin should be denied.

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on October 19, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428