UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO<br>*Plaintiffs*<br><br>v.<br><br>NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC.<br>*Defendants* | ) | **ORAL ARGUMENT REQUESTED**<br><br>CIVIL ACTION NO.:<br>3:22-CV-00580-SVN<br><br>OCTOBER 20, 2026 |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiffs, Stephen DeNinno and Mary DeNinno, submits this objection to the motion for summary judgment, Doc. 78, filed by the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc.

## FACTUAL BACKGROUND

The plaintiffs, Stephen DeNinno ("Stephen") and Mary DeNinno ("Mary"),[1] filed this lawsuit against the defendants, North Coast Sea-Foods Corp. ("North Coast") and Big Y Foods, Inc. ("Big Y"),[2] under the Connecticut Products Liability Act. (Compl. Doc. 1-2.) The lawsuit arises out of the purchase of king crab legs at a Big Y World Class Market on July 27, 2018. (*Id.*) The plaintiffs allege that the king crab legs purchased were contaminated with salmonella. (*Id.*) Under the Connecticut Products Liability Act (Connecticut General Statutes § 52-572m et seq.),

[1] Stephen and Mary may be referred to collectively as "the plaintiffs".

[2] North Coast and Big Y may be referred to collectively as "the defendants".



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

the plaintiffs assert claims of strict product liability, negligence, breach of express warranties, and breach of the implied warranty of merchantability against North Coast and Big Y. The plaintiffs allege that the defendants, acting as product sellers who manufactured, distributed, or retailed the subject XL King Crab legs, placed an adulterated, defective, and unreasonably dangerous food product into the stream of commerce. The plaintiffs claim the crab legs were contaminated with Salmonella.

**A. The Defendants**

Defendant North Coast Sea Foods is a processor of the king crab legs in this case. Doc. 97 at Response to Def. Facts ¶ 1. The defendant North Coast sold and distributed seafood products including the king crab legs in this case. Doc. 97 at AMF ¶ 1. Defendant Big Y Foods Inc is the retailer of the king crab legs in this case. Doc. 97 at Response to Def. Facts ¶ 2.

**B. Purchase of the Subject Crab at Big Y**

On July 27, 2018, Stephen purchased three pounds of frozen king crab legs ("subject crab") from a Big Y grocery store. Doc. 97 at Response to Def. Facts ¶ 3. The king crab legs product was advertised for sale by the defendants as a pre-cooked, frozen product imported from Russia. Doc. 97 at AMF ¶ 2. The subject crab was ordered by Mr. DeNinno from the fresh seafood counter where a seafood clerk removed the subject crab from a freezer display case and then weighed, labeled and packaged it in a plastic bag before handing it to Mr. DeNinno. Doc. 97 at AMF ¶ 1. 3. The subject crab was stored unpackaged and loose in a bin within the freezer display case along with other unpackaged frozen seafood products stored in other bins. Doc. 97 at AMF ¶ 4. Mr. DeNinno was not provided any instruction from North Coast or Big Y that the subject crab should be reheated before eating it. Doc. 97 at AMF ¶ 5. The Big Y packaging and label did not contain any instructions to reheat the subject crab. Doc. 97 at AMF ¶ 6.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

### C. Plaintiffs' Preparation and Consumption of the Subject Crab

Mr. DeNinno left the Big Y store at about 10:30am and drove fifteen minutes to his home placing the packaged crab directly into his refrigerator. Doc. 97 at AMF ¶ 7. In the early afternoon (1 p.m.–3 p.m.), Mr. DeNinno took the subject crab from the refrigerator, removed it from the Big Y packaging and thawed the crab legs under cold running water in a colander for ~10 minutes. Doc. 97 at AMF ¶ 8; Doc. 97 at Response to Def. Facts ¶ 4. Wearing new clean kitchen gloves he deshelled the crab legs using kitchen shears and dividing the crabmeat into two bowls. Doc. 97 at AMF ¶ 9. One bowl (~2 lbs.) was sealed and refrigerated for later use; the other (~1 lb.) was eaten at that time for lunch by Mr. DeNinno and Mrs. Deninno. Doc. 97 at AMF ¶ 10; ¶11; Doc. 97 at Response to Def. Facts ¶ 4. Using forks, the crabmeat was dipped into a bowl containing Big Y brand cocktail sauce (a portion poured from a previously unopened jar). Doc. 97 at AMF ¶ 11, 12, 13.

During the evening on July 27, 2018, Mrs. Deninno prepared a casserole using the remaining 2 lbs. of the refrigerated subject crab and pasta, butter, flour, milk and cheese – all ingredients were thoroughly cooked. Doc. 97 at AMF ¶ 13. A portion of the casserole was eaten by Mr. DeNinno and Mrs. Deninno promptly after removal from the oven. Doc. 97 at AMF ¶ 14.

### D. Acute Illness of July 28, 2018

At about 4am on Saturday, July 28, 2018, Mrs. Deninno woke due to the sudden onset of severe diarrhea and stomach cramps followed by vomiting, and Stephen experienced the onset of identical symptoms approximately 2 hours later (6am). Doc. 97 at AMF ¶ 43-44. Both spouses experience multiple episodes of severe diarrhea and stomach cramping through Tuesday, July 30. Doc. 97 at AMF ¶ 43-44. The diarrhea experience by both Mr. DeNinno and Mrs. Deninno was


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

non-bloody, profuse and liquidy with a very bad odor. Doc. 97 at AMF ¶ 45. The DeNinno's did not feel feverish between July 27 and July 30, 2018, nor did they feel feverish, ill or lethargic in the days leading up to their illness. Doc. 97 at AMF ¶ 46. The DeNinno's severe gastroenteritis symptoms occurred within 14–17 hours of consuming the lunchtime crab.

The DeNinnos each called their respective primary care doctors on July 30, 2018, described their symptoms and both were prescribed a 5-day antibiotic course. Mrs. Deninno completed her course of antibiotics, her symptoms were milder by Tuesday and she felt well by Wednesday, August 1, 2018 with no return of symptoms. Doc. 97 at AMF ¶ 43, 47-48.

Mr. DeNinno went to the emergency room on Tuesday, July 30, 2018. He had experienced upwards of 50 bouts of diarrhea on Monday and several bouts that morning. Doc. 97 at Response to Def. Facts ¶ 5. It was discovered at the emergency room that he was severely dehydrated and in acute renal failure. He was admitted to the hospital from July 31-August 1, 2018. He was treated with aggressive IV hydration and electrolyte replacement to stabilize his kidneys and magnesium levels. Doc. 97 at DMF ¶ 5-6. Laboratory blood work from Mr. DeNinno's July 31, 2018 admission at Backus Hospital revealed an elevated white blood cell count of 13,000 with a significant left shift (elevated immature neutrophils/bands), which is clinically indicative of an acute bacterial infection rather than a viral illness. Doc 97 at AMF ¶ 72. His acute illness was diagnosed by the discharge physician as "food poisoning". Doc 97 at AMF ¶ 71. Mr. DeNinno stopped taking the antibiotic prescribed at the direction of the hospital during his July 31–Aug 1, 2018 admission. Doc. 97 at AMF ¶ 48.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

### E. Safe Food Handling by the Plaintiffs

- **Handwashing**: Mr. DeNinno and Mrs. Deninno both performed handwashing with soap and water prior to food preparation, before eating lunch, and right before dinner on July 27, 2018. Doc. 97 at AMF ¶ 15.
- **Kitchen Sanitation**: Counters and sinks were cleaned nearly daily with sanitizing spray. Doc. 97 at AMF ¶ 22. The dishwasher contained an NSF-certified sanitizing rinse option used routinely to clean the DeNinno's kitchenware. Doc. 97 at AMF ¶23. Every 4-6 weeks, the dishwasher was cleaned using a cleaning tablet and the filter was washed out. Doc. 97 at AMF ¶24. All of the kitchenware used in the preparation and serving of the lunch and dinner meals was clean, no cutting boards were used. Doc. 97 at AMF ¶ 16.
- **Home Conditions**: The home was cooled by central air in July 2018. Doc. 97 at AMF 21.
- **Refrigerator Maintenance**: Maintained at a temperature range of 37–38°F with no history of temperature control issues. Doc. 97 at AMF ¶ 20.
- **Dogs:** The DeNinnos did not interact with their pet dogs while they prepared or ate either meal on July 27, 2018. Doc. 97 at AMF ¶ 19.

### F. Plaintiffs' Dietary History

Other than the lunch and dinner as described above, the only other food product consumed by Mr. DeNinno or Mrs. Deninno on July 27, 2018 was a cup of coffee made at their home containing store bought ultra-pasteurized light cream stored in their refrigerator and used regularly. Doc. 97 at AMF ¶ 17. In July 2018, no other persons resided in the Deninno's home and no other persons ate lunch or dinner with them on July 27, 2018 or otherwise ate any of the lunchtime crab or dinner casserole. Doc. 97 at AMF ¶ 18.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Mr. DeNinno and Mrs. Deninno did not share any meals or food products from July 23 through July 26, 2018, other than the ultra-pasteurized store-bought refrigerated cream they each put in their routine morning coffee. Doc. 97 at AMF ¶ 25. During that work week, Mr. DeNinno was working extended hours at his place of employment arriving at about 6 a.m. and leaving abut 8 p.m. and was eating all lunches and dinners at his workplace cafeteria or restaurant take-out, bringing no leftovers home, bringing no food from home to work, and eating no snacks or meals at home except his morning coffee. Doc. 97 at AMF ¶ 26. During that timeframe, Mrs. Deninno did not cook at home any meals with raw chicken, turkey, pork, beef, or eggs or make any salads. Doc. 97 at AMF ¶ 27.

In August 2018, Mary DeNinna ate cocktail sauce from the same jar used on July 27, 2018 and did not experience any digestive symptoms. Doc. 97 at AMF ¶28.

**G. Excluded Alternative Sources**

Mr. DeNinno worked as an emergency preparedness coordinator at a hospital, he did not provide patient care or routinely work in patient care areas of the hospital and had no patient contact July 23 through July 27, 2018. Doc. 97 at AMF ¶29. Mrs. Deninno worked in an insurance agency which was a small office setting Doc. 97 at AMF ¶30. In the weeks leading up to July 27, 2018, neither Mr. DeNinno or Mrs. Deninno were in close contact with family, friends or coworkers who were sick with symptoms similar to the gastrointestinal symptoms they experienced commencing July 28, 2018. Doc. 97 at AMF ¶ 31.

In July 2018, the DeNinnos only pets were 4 four small and healthy dogs who were not sick during July or August of 2018. Doc. 97 at AMF ¶ 36. The dogs were fed only dry commercial kibble once per day, they were not fed any types of treats, raw food or chew treats like



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

pig ears, cow hoofs or rawhides. Doc. 97 at AMF ¶ 37. The dogs were not in contact with other dogs or animals or kenneled in 2018. Doc. 97 at AMF ¶ 38.

In the 12 months before July 27, 2018, the DeNinnos did not spend time on any farm or otherwise interact with livestock. Doc. 97 at AMF ¶ 39. From 2017 through 2018, neither Stephen or Mary DeNinno did any long-distance traveling, out-of-country vacations, camping or otherwise stayed by a river or lake, or used a swimming pool or a jacuzzi; drank non-potable water in 2017 or 2018; or worked or visited any childcare centers or otherwise took care of any diapered children or adults. Doc. 97 at AMF ¶ 32-34. Neither have never received a Typhoid vaccine or travelled to an endemic developing country. Doc. 97 at AMF ¶ 35.

**H. Downstream Medical Complications**

On August 14, 2018, Stephen presented at an emergency room with pain symptoms in his lower back and mild left lateral abdominal pain. Doc. 97 at Response to Def. Facts ¶ 9. Around the beginning of September 2018, Stephen had the sudden onset of symptoms of swelling and pain in his left knee, followed symptoms in his right knee by mid-October. Doc. 97 at AMF ¶ 73.

Dr. J. Scott Toder, a rheumatologist, evaluates Stephen DeNinno on 10/18/2018 and suspects his knee joint symptoms are reactive arthritis related to his acute illness in July 2018. Doc. 97 at AMF ¶ 74. On October 18, 2018, Dr. Toder aspirated 20 cc of synovial fluid from Mr. DeNinno's right knee; polarization microscopy performed by Dr. Toder showed no gout or pseudogout crystals, and laboratory analysis revealed an elevated white blood cell count of 4,000, confirming an inflammatory process rather than purely degenerative osteoarthritis or septic arthritis. Doc. 97 at AMF 80. The Widal test was ordered by Stephen DeNinno's treating rheumatologist on October 30, 2018 because Stephen DeNinno was complaining of the new onset of a bout of diarrhea that was persisting. Doc. 97 at AMF ¶ 75. Dr. Toder ordered the Widal test



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

after consulting with an infectious disease colleague because he wanted to ensure the diarrhea was not from an active infection. Doc. 97 at AMF ¶ 76. Dr. Toder also ordered a stool test on November 2, 2018 after the Widal test returned positive for Salmonella returned negative for Salmonella and other pathogens (Shigella, Shiga Toxin, VRE and Campylobacter). Doc. 97 at AMF ¶ 77. The Widal test specified that it was negative for Salmonella "O" antigen antibodies but positive for Salmonella "H"– type "b" antigen antibodies. Doc. 97 at Response to Def. Facts ¶ 15. Subsequent genetic testing confirmed that Mr. DeNinno carries the HLA-B27 gene, which predisposes individuals to develop severe, chronic reactive arthritis and spondyloarthropathy (including sacroiliitis and ankylosing spondylitis) following an enteric bacterial infection such as Salmonella. Doc. 97 at AMF ¶ 81.

Dr. Toder and infectious disease expert Dr. Thomas Cumbo ruled out alternative causes for Mr. DeNinno's inflammatory joint symptoms—including Lyme disease (via negative synovial and serum Lyme tests and lack of response to doxycycline), active gout (via low serum uric acid of 4.9 on Uloric, absence of crystals on office microscopy, and lack of response to colchicine), rheumatoid arthritis (via negative rheumatoid factor and joint distribution), fibromyalgia, and psoriatic arthritis Doc. 97 at AMF ¶ 82.

Over the course of treatment, Mr. DeNinno developed additional classic manifestations of HLA-B27 reactive spondyloarthropathy, including bilateral hand dactylitis, Achilles tendon enthesitis, costochondral joint inflammation, and MRI-confirmed sacroiliitis/fusion in the sacroiliac (SI) joint. Doc. 97 at AMF ¶ 83. To manage his chronic reactive arthritis, Mr. DeNinno has required ongoing immunosuppressive biologic therapies, cycling through Humira, Remicade, Cimzia (which had to be discontinued in January 2023 after causing hospitalized immune-mediated pneumonitis), Rinvoq, Xeljanz, and currently intravenous Simponi Aria every eight



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

weeks alongside methotrexate and Celebrex. Doc. 97 at AMF ¶ 84. Both Dr. Toder and Dr. Cumbo opine to a reasonable degree of medical probability that Mr. DeNinno's reactive arthritis was triggered by his July 2018 Salmonella infection, is permanent, and will require lifelong biologic and anti-inflammatory therapy. Doc. 97 at AMF ¶ 85.

Following his July 2018 hospitalization, Mr. DeNinno's bowel habits never consistently returned to normal, and he began experiencing chronic, intermittent bouts of loose, watery stools and fecal urgency (up to 8–9 bowel movements per day during flares). Doc. 97 at AMF ¶ 86. Repeat stool culture by infectious disease specialist Dr. Vinod Thomas in May 2019 tested negative for active Salmonella, Shigella, and Campylobacter, ruling out a chronic active infection. Doc. 97 at AMF ¶ 87 Extensive gastrointestinal evaluations across three gastroenterology practices—including a March 19, 2019 endoscopy/colonoscopy by Dr. John Cribb at University Gastroenterology (which showed patchy erythema, a possible ileocecal valve ulcer, and focal mild chronic active colitis), an unrevealing video capsule ("PillCam") study, a July 16, 2020 upper endoscopy and colonoscopy with biopsies by Dr. James Farrell at Yale New Haven Health (which showed healing mucosa with only mild, nonspecific lamina propria inflammation and no evidence of celiac disease, microscopic colitis, or inflammatory bowel disease), and a May 23, 2025 endoscopy/colonoscopy at Connecticut GI—ruled out Crohn's disease, ulcerative colitis, celiac disease, microscopic colitis, and pancreatic insufficiency. Doc. 97 at AMF ¶ 88.

Mr. DeNinno underwent multiple medication trials for his diarrhea, including over-the-counter Imodium, pancreatic enzymes (Creon), Lomotil, and a 14-day course of the antibiotic Xifaxan in 2021, none of which permanently resolved his condition. Doc. 97 at AMF ¶ 89. Certain biologic agents and corticosteroids prescribed by Dr. Toder for Mr. DeNinno's reactive arthritis (such as Cimzia, Rinvoq, Xeljanz, and prednisone) provided temporary, ancillary relief



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

for his diarrhea, though symptoms repeatedly flared when biologic agents lost efficacy or were discontinued. Doc. 97 at AMF ¶ 90.

Gastroenterologists Dr. Jeremy Spector and Dr. You Sung Sang, along with Dr. Cumbo and Dr. Toder, diagnosed Mr. DeNinno with post-infectious diarrhea (used interchangeably with post-infectious irritable bowel syndrome with diarrhea, or PI-IBS-D). Doc. 97 at AMF ¶ 91. Dr. Sang and Dr. Cumbo opine that it is medically more likely than not that Mr. DeNinno's post-infectious diarrhea was proximately caused by his July 2018 Salmonella food poisoning from crab legs and that the condition is permanent, requiring ongoing medical management, testing, and procedures. Doc. 97 at AMF ¶ 92.

On January 6, 2019, Mr. DeNinno presented to the Plainfield Backus Emergency Care Center with stroke-like symptoms, including right-sided paresthesias, where laboratory workup revealed a profoundly low serum magnesium level of 0.6 mg/dL (hypomagnesemia) alongside hypokalemia. Doc. 97 at AMF ¶ 93. Over the ensuing years, Mr. DeNinno required repeated emergency department visits and evaluations for symptomatic hypomagnesemia, as well as deficiencies in vitamin B12 and zinc. Doc. 97 at AMF ¶ 94. Mr. DeNinno underwent comprehensive evaluations by a nephrologist (Dr. Maroun Azar in February 2019) and an endocrinologist (Dr. Joseph Tucci in December 2019 and January 2020), which ruled out renal magnesium wasting and endocrine disorders (such as hyperaldosteronism) as causes of his hypomagnesemia. Doc. 97 at AMF ¶ 95. Additionally, his physicians conducted medication holidays by temporarily discontinuing his proton pump inhibitor (Dexilant) and his diuretic blood pressure medication (hydrochlorothiazide/Tribenzor), as well as stopping oral magnesium oxide to ensure it was not exacerbating his diarrhea; however, his magnesium levels remained critically low, ruling out medication-induced hypomagnesemia. Doc. 97 at AMF ¶ 96. Even during


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

periods when Mr. DeNinno's diarrhea improved or temporarily resolved on Creon, Lomotil, prednisone, or biologic agents, his serum magnesium levels failed to normalize, consistently hovering between 1.0 and 1.4 mg/dL (below the normal reference range of 1.5–2.5 mg/dL). Doc. 97 at AMF ¶ 97.

Dr. Sang, Dr. Cumbo, and Dr. Toder explain that because oral magnesium supplementation was ineffective at maintaining his levels and renal losses were excluded, Mr. DeNinno's hypomagnesemia (and concurrent vitamin B12 deficiency) is more likely than not the result of physiological damage and altered chemical absorption in the small intestine caused by his July 2018 Salmonella infection and resulting post-infectious bowel syndrome. Doc. 97 at AMF ¶ 98. Because oral supplementation cannot correct his malabsorption, Mr. DeNinno underwent surgical placement of a tunneled central venous access port on November 11, 2020, and requires permanent, weekly intravenous magnesium infusions alongside monthly vitamin B12 injections to prevent life-threatening electrolyte depletion. Doc. 97 at AMF ¶ 99.

## I. Prior Medical History

In the twelve months prior to July 27, 2018, Mr. DeNinno was not experiencing any issues with diarrhea or other gastrointestinal illnesses aside from gastric reflux for which he took a proton pump inhibitor medication daily Doc. 97 at AMF ¶ 40. Likewise, Mrs. DeNinno was not experiencing any issues with diarrhea or other gastrointestinal illnesses Doc. 97 at AMF ¶ 41. Neither had ever been diagnosed with a salmonella infection, suspected or confirmed prior to July 27, 2018. Doc. 97 at AMF ¶ 42. Prior to the July 2018, Stephen DeNinno had no history of reactive arthritis, gastrointestinal malabsorption, hypomagnesemia, or chronic low back and knee pain. Doc. 97 at AMF ¶ 57.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**J. Notification to Defendants**

Mr. Deninno reported the food poisoning incident to Big Y on August 2, 2018, Big Y informed North Coast by letter on August 3, 2018 and Mr. DeNinno was contacted directly by an employee of North Coast on August 14, 2018 to whom he provided details concerning the incident and his illness. Doc. 97 at AMF ¶ 49. Directly after being notified of Mr. DeNinno's claimed food poisoning by the subject crab, neither Big Y or North Coast took steps to identify the dates which they were in possession and control of the subject crab product or any product identification number or other tracking data connected to the subject crab and Defendants have been unable to provide that information to date. Doc. 97 at AMF ¶ 50.

**K. North Coast – Supply Chain and Lack of Records**

North Coast purchased the subject crab originally as a frozen, pre-cooked XL King Crab Sections (a shoulder cluster with legs and claws) that were caught overseas on Russian vessels and supplied to North Coast by a company called Arctic Seafoods. Doc. 97 at AMF ¶ 51. The king crab sections were cooked and then frozen onboard the Russian vessels after being caught. Doc. X 97 AMF ¶ 52. North Coast did not verify that Arctic Seafoods followed safe food-handling practices, and it did not obtain documentation regarding the specific cooking and freezing processes used by the Russian vessels. Doc. 97 at AMF ¶ 53. Multiple companies were involved in the storage, shipping and transporting of the subject crab from Russia to the United States, North Coast does not have safe food handling records, including temperature monitoring records, for any of these companies concerning the subject crab and does not know the dates these companies were specifically in possession of the subject crab. Doc. 97 at AMF ¶ 54.

With regards to its own records, North Coast has been unable to identify any records of any kind specific to the subject crab, including order and purchase records, temperature monitoring



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

records for the North Coast's processing facility or trucks, sanitation records for the production room on the date the subject crab was produced, purchase records, shipping records. Doc. 97 at AMF ¶ 55. North Coast believes it received the subject crab in an Arctic Seafood delivery of April 3, July 26, October 2 or November 20, 2017. Doc. 97 at AMF ¶ 69.

**L. North Coast's Handling and Processing the Subject Crab**

The subject crab was processed in the "saw room", a specific production room at North Coast's Dry Dock seafood processing facility in Boston, where the king crab sections would be removed from the Arctic Seafoods packaging by North Coase production line workers, cut by a band-saw into individual legs and claws, placed in a basket and manually dipped into a bin of cold water to apply a protective ice "glaze" over the newly exposed meat and then repacked into twenty-pound North Coast cardboard boxes and returned to the freezer to await distribution. Doc. 97 at AMF ¶ 56.

In the time period, that the subject crab would have been processed, the saw room was also used to process unfrozen, raw fish including tuna, swordfish, and scallops. Doc. 97 at AMF ¶ 57. Processing raw fish and pre-cooked products in the same processing room increases the risk that a pre-cooked product will be contaminated. Doc. 97 at AMF ¶ 58.

During the time frame that North Coast would have been in possession of the subject crab, North Coast employees were only told in general terms to stay home if they were sick – no specific guidance was provided as to the types of sickness symptoms that would require them to stay home. Doc. 97 at AMF ¶ 70.

**M. North Coast's HACCP Plan and the NC Box**

Printed on the outside of the twenty-pound cardboard North Coast boxes used for their king crab leg product, including the subject crab, was the explicit instruction ("heating instruction"): "HEAT BEFORE SERVING. Boil, steam or broil for 4 minutes." Doc. 97 at AMF ¶ 59. Big Y

would have received the subject crab in a North Coast bulk product box with the heating instruction. Doc. 97 at AMF ¶ 60.

North Coast HACCP Plan documents evidence that North Coast intended for its king crab product to be reheated by the consumer to ensure it was safe for consumption. Doc. 97 at AMF ¶ 63. The HACCP Plan Hazard Analysis for the subject king crab product addresses biological hazards - pathogenic bacteria is identified as not being a potential biological hazard that would require specific control by North Coast at two critical control points (specifically cutting and Weight/Pack/Label) for the stated reason that the product "will be thoroughly heated prior to serving". Doc. 97 at AMF ¶ 61. Further, the Hazard Analysis indicated that the "Intended Use and Consumer" was that the product was "To be consumed heated/cooked by end user" as did the HACCP Plan document stating "Heated & or recooked by end user". Doc. 97 at AMF ¶ 62. The heating instruction on the box was part of North Coast's HACCP plan for the subject king crab product. Doc. 97 at AMF ¶ 64.

However, Big Y did not reheat or recook the subject king crab product before selling it to consumers including the subject crab sold to Mr. DeNinno. Doc. 97 at AMF ¶ 65. Big Y's packaging and label on the subject crab sold to Mr. DeNinno did not contain any instructions to reheat or recook the subject crab. Doc. 97 at AMF ¶ 5-6.

**N. Audits of North Coast and Big Y show contamination risk violations**

On various government audits (09/26/2014, 08/04/2015, 07/26/2017 leading up to the 7/2018 date of incident) of the subject NCS facility, violations were identified revealing deficiencies in sanitation for the prevention of cross contamination. There were also sanitation and sanitation-related deficiencies found after the 7/2018 date of incident (10/10/2018, 09/08/2022, 09/12/2022), including HACCP Plan deficiencies, equipment issues, deficient


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

sanitation monitoring records, lack of pest control monitoring, and instances of unlabeled product with no date in the cooler. Doc. 97 at AMF ¶ 66.

On internal audits of the Big Y seafood department at the Danielson/Killingly grocery store, violations were identified revealing deficiencies in employee sanitation practices and procedures including employees observed "entering a walk in cooler then handling unpackaged food product without washing their hands and changing their gloves" (03/06/2017), missing temperature checks for a display case (2/27/2018) and 2 different loose seafood products touching in the service case (06/07/2018). Doc. 97 at AMF ¶ 67.

**O. Big Y Freezer Display Case**

There was no set cleaning frequency for the Big Y frozen seafood case that contained the subject crab, no written procedure for cleaning the case, nor was the frozen case ever completely defrosted so that the case interior could be thoroughly cleaned and sanitized. Doc. 97 at AMF ¶ 68.

**P. Salmonella And Causation Facts**

Seafood, including crab, is a documented vector for *Salmonella* contamination resulting from contaminated water or post-cooking handling, cutting, cooling ice, packaging, and processing. Doc. 97 at AMF ¶ 101. With regard to the susceptibility to contamination by Salmonella, there is no physiological difference between crabmeat from a king crab and crabmeat from another species – the crabmeat from a king crab like other crabmeat can be contaminated by Salmonella if exposed in the processing environment. Doc. 97 at AMF ¶ 102.

Salmonella species are not endemic to seafood; therefore, the United States Food and Drug Administration (FDA) expects zero or non-detectable levels of salmonella in seafood and considers seafood that is contaminated with salmonella to be adulterated regardless of whether it is intended to be cooked before consumption or it is ready-to-eat (RTE). Doc. 97 at AMF ¶



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

111. Freezing does not kill *Salmonella*; once crabmeat is contaminated with *Salmonella*, the bacteria survive in frozen storage and remain infectious when thawed and consumed. Doc. 97 at AMF ¶ 103. Salmonella can contaminate the outside of a crab shell and a food handler can transfer Salmonella from the shell to exposed meat. Doc. 97 at AMF ¶ 112. *Salmonella* contamination does not alter the appearance, color, smell, or texture of food. Doc. 97 at AMF ¶ 104.

Because Mr. DeNinno refrigerated the frozen crab legs at 37°F to 38°F within 15 minutes of purchase, thawed them briefly under cold running water in an air-conditioned home (68°F), and consumed them immediately with his wife using sanitized kitchenware, there was insufficient time and no suitable temperature environment in the DeNinnos' home for a low-level contamination to multiply into the infectious dose required to cause their rapid, severe, simultaneous illness; thus, the high *Salmonella* load was present on the crab prior to purchase. Doc. 97 at AMF ¶ 105.

The light cream used by the DeNinnos in their morning coffee on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because it was ultra-pasteurized, high in fat (a poor medium for *Salmonella*), stored at 37°F to 38°F, and consumed daily before and after the incident without illness. Doc. 97 at AMF ¶ 106. The cocktail sauce eaten with the crab at lunch on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because it was commercially bottled, had a highly acidic pH (3.2 to 3.7) that prevents *Salmonella* growth, was poured into a separate clean bowl rather than dipped into directly, and was consumed again by Mrs. DeNinno with shrimp several weeks later without causing any illness. Doc. 97 at AMF ¶ 107



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

The macaroni and cheese casserole eaten for dinner on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because the pasta was boiled, the cheese sauce was simmered, no eggs were used, and the entire casserole was baked at 375°F for about 45 minutes until bubbling and browned—exceeding the 165°F internal temperature threshold that kills *Salmonella* in seconds. Doc. 97 at AMF ¶ 108

Non-food transmission pathways—including nosocomial/workplace exposure, person-to-person transmission, fomite transmission, water exposure, travel, and household pets—have been ruled out because Mr. DeNinno was a non-patient-facing hospital administrator, neither spouse had contact with sick individuals or traveled, their four dogs were completely healthy and asymptomatic, and any person-to-person, pet, or fomite exposure involves a low inoculum that would result in a staggered, sequential illness rather than a simultaneous, explosive onset in both spouses. Doc. 97 at AMF ¶ 109.

Other bacterial, viral, and parasitic pathogens (such as *Shigella*, *Campylobacter*, *Yersinia*, *E. coli* O157:H7, *Vibrio*, *C. difficile*, and norovirus/rotavirus) have been ruled out by differential diagnosis based on the DeNinnos' clinical presentation, the simultaneous short-incubation onset prior to any antibiotic use, the positive *Salmonella* H-antigen Widal test (which does not cross-react with the other bacteria), and Mr. DeNinno's subsequent HLA-B27 reactive arthritis and chronic gastrointestinal sequelae. Doc. 97 at AMF ¶ 110.

Mr. and Mrs. DeNinno contracted acute *Salmonella* gastroenteritis on July 27, 2018, which directly caused Mr. DeNinno's acute renal failure, reactive arthritis, chronic diarrhea, and malabsorption syndrome. Doc. 97 at AMF ¶ 100. The king crab legs purchased from Big Y on July 27, 2018 were contaminated with *Salmonella* prior to purchase, and consuming the



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

contaminated crabmeat at lunch on July 27, 2018 caused both Mr. and Mrs. DeNinno to contract acute *Salmonella* gastroenteritis. Doc. 97 at AMF ¶ 113.

## STANDARD OF LAW

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "It is the movant's burden to show that no genuine factual dispute exists . . . ." (Internal quotation marks omitted.) *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). If the movant meets its initial burden, "the non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial." *Gorss Motels, Inc. v. Lands' End, Inc.*, No. 3:17-CV-00010 (VAB), 2020 WL 264784, at *5 (D. Conn. Jan. 16, 2020). "The role of the court in deciding a motion for summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, *while resolving ambiguities and drawing reasonable inferences against the moving party*." (Emphasis added; internal quotation marks omitted.) *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010).

## ARGUMENT

### I. The plaintiffs' product liability claims are sufficiently supported with admissible expert testimony that the king crab caused Stephen DeNinno to develop Salmonellosis.

The defendants assert that the plaintiffs' product liability claims must fail for lack of admissible expert testimony that the king crab caused Stephen DeNinno to develop salmonellosis and relies on the Court's granting of the motions to preclude expert testimony filed by the defendants in this case directed at Dr. Barry Gustin, Dr. Thomas Cumbo, and Dr. You Sung Sang. *See* Docs. 75 [Gustin], 76 [Cumbo] and 77 [Sang]. The plaintiffs have herewith filed objections to defendants' respective motions. *See* Docs. 88, 88-1 [Gustin], 92, 92-1 [Cumbo] and 98 [Sang].


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

The plaintiffs incorporate by reference as if set forth fully herein all legal and factual arguments from the aforesaid objections, inclusive of any exhibits referenced therein, in opposition to this motion for summary judgment. The defendants have failed to provide a legitimate basis for the exclusion of any of these experts as they are each sufficiently qualified and their opinions withstand scrutiny under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The plaintiffs have met their "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied" as to each challenged expert witness. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Accordingly, and as will be set forth fully in Section II below, the plaintiffs' product liability claims are thereby sufficiently supported with admissible expert testimony based on the testimony of Dr. Gustin, Dr. Cumbo, Dr. Sang and other experts, including Dr. Toder.

## II. Plaintiff otherwise failed to adduce evidence that the king crab was contaminated with salmonella.

Defendants assert that even if plaintiffs' experts are permitted to offer their opinions, defendants are still entitled to summary judgment because "there is no competent evidence that DeNinno had salmonella, or that the king crab was infected with salmonella." Doc. 78-1 at 6 (Def. MOL). Defendants' argument must fail however as the plaintiffs have established sufficient evidence via the factual record and the plaintiffs' expert opinions demonstrating a complete chain of causation, inclusive of ruling out alternative sources of the Salmonella, ruling out contamination by the plaintiffs' food handling, and identifying systemic food safety failures by the Defendants -that created an unreasonably dangerous condition that more likely than not resulted in Plaintiffs' *Salmonella* infections.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**A. There is sufficient evidence that Stephen DeNinno's 7/28/2018 acute illness was caused by salmonella.**

That Stephen DeNinno's 7/28/2018 acute illness was caused by Salmonella is supported by the causation opinions of the plaintiffs' experts Dr. Toder, Dr. Gustin, Dr. Cumbo, and Dr. Sang. As stated above, the defendants have filed motions to preclude Dr. Gustin, Dr. Cumbo and Dr. Sang on this same issue. The plaintiffs have herewith filed objections to defendants' respective motions and this issue has been fully briefed therein, including the defendants' criticisms of the Widal test and its disclaimer and lack of a confirmatory stool sample. *See* Docs. 88, 88-1 [Gustin], 92, 92-1 [Cumbo] and 98 [Sang]. The plaintiffs incorporate by reference as if set forth fully herein the legal arguments from the aforesaid objections, inclusive of any exhibits referenced therein, in opposition to this motion for summary judgment.

Further, it is the plaintiff's treating rheumatologist Dr. J. Scott Toder medical opinion, *inter alia,* that Stephen DeNinno's acute illness was more likely than not caused by a Salmonella infection and that the acute illness resulted in Stephen DeNinno's development of reactive arthritis. Doc. 75-5 at 129:17-130:2, 137:13-19, 128:24-129:16 [Toder Dep.]. The defendants did not file any motion to challenge or preclude the plaintiff's treating rheumatologist Dr. J. Scott Toder as an expert witness, or any of his disclosed opinions. On February 18, 2025, the plaintiffs timely disclosed Dr. Toder as an expert witness. Doc. 88-4 [Expert Disclosure Treating Physicians]. Dr. Toder is board-certified in internal medicine and rheumatology, has been a practicing rheumatologist for over forty years including serving as chief of the rheumatology department at a hospital. Doc. 75-5 at 19:19-20:4 [Toder Dep.].

Moreover, the defendants also disclosed an expert rheumatologist, Dr. Alan Gibofsky, who testified that he does not disagree with Dr. Toder's diagnosis of reactive arthritis. Doc. 88-6 at 47:21-48:7 [Gibofsky Dep.]. He agreed that Stephen DeNinno's initial knee joint symptoms arose



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

within a medically appropriate timeframe to support the opinion that the reactive arthritis was triggered by his acute illness. *Id.*, at 110:13-18 [Gibofsky Dep.]. He testified Stephen DeNinno's acute illness was more likely than not bacterial and that the symptoms were consistent with a Salmonella infection, though not exclusive to Salmonella. *Id.*, at 89-92 [Gibofsky Dep.].

The defendants' expert microbiologist, Dr. Thomas Montville, testified he was generally familiar with the type of antigen test (Widal) performed on Stephen DeNinno; that the October 30, 2018 Widal test evidenced that Stephen DeNinno had been exposed at some point in time to Salmonella; that it is a scientific fact that the Salmonella antibodies can persist in the blood for months; and that Stephen DeNinno's positive Widal test was not inconsistent with a July 27, 2018 infection. Doc. 80-3 at 70:2-71:14 [Montville Dep.]. Dr. Montville further agreed that this type of evidence of prior exposure can be used by a medical doctor in conjunction with other clinical information concerning the patient to make a clinical diagnosis that an acute gastrointestinal illness was caused by Salmonella. Doc. 80-3 at 72:1-73-4 [Montville Dep.]. Dr. Montville testified it was his expert opinion that Stephen DeNinno and Mary DeNinno were more likely than not suffering from salmonellosis on July 28, 2018. *Id.* at 67:16-19.

The plaintiffs have presented sufficient evidence that would allow a reasonable jury to find in their favor on this issue.

**B. There is sufficient evidence that the source of the Salmonella infection was the king crab.**

The plaintiffs' case is not based upon the "mere fact DeNinno and his wife became sick after eating king crab" as argued by the defendants, rather it is based on reliable differential diagnosis implemented by the plaintiffs' experts. In that regard, that the king crab was the source of the Salmonella is supported by the causation opinions of the plaintiffs' expert Dr. Gustin, Dr. Cumbo and Dr. Sang each determining to a reasonable medical probability, that the acute illness



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

suffered by Stephen and Mary DeNinno on July 28, 2018 was caused by Salmonella from the subject crab. The defendants have filed motions to preclude Dr. Gustin, Dr. Cumbo and Dr. Sang opinions on this issue. The plaintiffs have herewith filed objections to defendants' respective motions and their opinions that the source of the salmonella infection was the subject are fully briefed therein, including defendants complaints concerning temporal proximity and claims concerning no other "reported instances of king crab contamination with salmonella – here or in any other instance ever". See, Doc. 88 (Gustin), Doc. 92 (Cumbo), Doc. 98 (Sang). The plaintiffs incorporate by reference as if set forth fully herein the legal arguments from the aforesaid objections, inclusive of any exhibits referenced therein, in opposition to this motion for summary judgment. Dr. Toder also testifies that based it was more probable than not that the cause of the Salmonella infection was subject crab. Doc. 75-5 at 88:22-25; 145:13-19. The plaintiffs have presented sufficient evidence that would allow a reasonable jury to find in their favor on this issue.

**C. There is sufficient evidence that the king crab was contaminated with Salmonella at the point of sale to Stephen DeNinno.**

The defendants argue that the plaintiffs cannot prove their case because they cannot establish precisely where, how, or why the subject crab product was contaminated with *Salmonella*. Defendants' argument disregards the detailed causation analyses performed by Dr. Gustin and the comprehensive causation analysis and food safety evidence provided by Plaintiffs' chemical engineer and food safety expert, Dawn Hill.

Further the defendants' assertion that the plaintiffs cannot prove causation without pinpointing the when, where or how that *Salmonella* entered the subject crab is contrary to law and food safety science. Under FDA regulations (21 U.S.C. § 342), food that is contaminated with salmonella is considered adulterated, in that it is unsafe, containing poisonous or harmful



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

substances that can make people sick. See Doc. X at 12 (Hill Report). Salmonella species are not endemic to seafood; therefore, the United States Food and Drug Administration (FDA) expects zero or non-detectable levels of salmonella in seafood and considers seafood that is contaminated with salmonella to be adulterated regardless of whether it is intended to be cooked before consumption or it is ready-to-eat (RTE). *Id.* Doc. 80-10 at 1 (FDA Seafood Import Alert 16-81).

Moreover, Dr. Gustin conducted a rigorous differential etiology, systematically ruling out all alternative sources of infection and home contamination to establish that the king crab was contaminated at the time of purchase and consumption. Here, both spouses experienced the synchronized, explosive onset of severe acute gastroenteritis within two hours of each other on the early morning of July 28, 2018—just 12 to 17 hours after sharing a lunch of thawed, pre-cooked king crab legs with cocktail sauce—which is the classic epidemiological hallmark of a point-source, high-inoculum foodborne exposure ingested within the standard 6-to-36-hour incubation window for non-typhoidal Salmonella. Doc. 88-1 at 29–33, 38, 40, 44, 62–66, 71, 74–76, 129–130, 140 [Gustin Rep.]; Doc. 76-3 at 103:19–21, 131:17–132:3, 133:10–134:7, 136:18–137:3, 181:3–8 [Cumbo Dep.]. Following public health investigation protocols, Dr. Gustin systematically eliminated every other dietary exposure: (1) the spouses shared no lunches or dinners during the preceding four and a half days (July 23–26) while Mr. DeNinno worked 14-hour shifts, and biological variability makes it implausible that a meal shared five days earlier would produce simultaneous, explosive onset within 120 minutes; (2) their morning coffee cream was ultra-pasteurized, kept at 37–38°F, and used daily without incident; (3) the commercially bottled cocktail sauce was poured into a clean bowl, never recalled, and eaten again by Mrs. DeNinno from the exact same jar weeks later without illness; and (4) the dinner crab casserole was boiled (212°F), simmered (180–205°F), and baked at 375°F for 40 to 50 minutes until bubbling



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

throughout, far exceeding the 165°F thermal death point of Salmonella and leaving the unheated lunchtime crabmeat as the sole shared vector capable of delivering live bacteria. Doc. 88-1 at 27–32, 37, 40, 42, 50–51, 62–68, 73–75, 96–99, 129–130, 143 [Gustin Rep.]; Doc. 76-3 at 135:18–136:25, 139:1–20, 215:14–19 [Cumbo Dep.].

Dr. Gustin likewise ruled out all non-foodborne vectors and any post-purchase contamination in the DeNinnos' kitchen. Doc. 88-1 at 27–32, 35, 37–38, 41–43, 47–49, 70, 72–73, 130, 132–135, 140, 143–145 [Gustin Rep.]; Doc. 76-3 at 140:6–23 [Cumbo Dep.]. Person-to-person and environmental fomite transmission were excluded because they involve low doses and require sequential incubation periods resulting in staggered rather than simultaneous onset; workplace/nosocomial, travel, waterborne, and zoonotic exposures were excluded because neither spouse had sick contacts, Mr. DeNinno was an administrator with no patient contact (and became ill after his wife), the couple had not traveled or swum in six months, and their four kibble-fed dogs were completely healthy; and viral or other bacterial pathogens (Shigella, Campylobacter, Yersinia, E. coli) were ruled out by Mr. DeNinno's clinical presentation (13,300 WBC with a left shift, response to Ciprofloxacin, and no bloody/greenish stools or fever), his positive Salmonella H-antigen Type b titer (>1:160), and his subsequent HLA-B27-positive reactive arthritis and chronic malabsorption. Doc. 88-1 at 14, 18–19, 25–29, 31, 33–38, 41–43, 47–49, 62, 64, 66–67, 72, 97–98, 122–125, 132–134, 144–145 [Gustin Rep.]; Doc. 76-3 at 101:13–103:24, 112:3–21, 125:8–11, 133:10–135:9, 138:1–19, 180:6–181:8, 189:2–10, 203:1–13, 206:4–207:12 [Cumbo Dep.]. Finally, home contamination was ruled out because Mr. DeNinno transported the frozen crab home in 15 minutes, refrigerated it immediately at 37–38°F in an air-conditioned home, sanitized the sink with 409 spray, washed his hands, wore new gloves, thawed the crab under cold running water for 10 minutes in a colander, cut the shells with shears (using no cutting board),


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

placed the meat in clean bowls—all sanitized in an NSF/ANSI Standard 184-certified 150°F sanitizing rinse dishwasher—and consumed the lunchtime crab immediately. Doc. 88-1 at 30–32, 37–38, 42, 62, 65–66, 68, 70, 73, 95–97, 99 [Gustin Rep.]; Doc. 76-3 at 140:7–14 [Cumbo Dep.].

The plaintiffs further incorporate by reference as if set forth fully herein the legal arguments from contained in the Plaintiffs' Objection to Motion to Preclude Dr. Gustin, inclusive of any exhibits referenced therein, in opposition to this motion for summary judgment. Doc. 88.

Further, as detailed in Ms. Hill's Expert Disclosure and Report 96-9, plaintiffs have established a complete chain of causation and identified systemic food safety failures by both Defendants—North Coast Sea-Foods Corp. ("NCS") and Big Y Foods, Inc. ("BYF")—that created an unreasonably dangerous condition resulting in Plaintiffs' *Salmonella* infections. See Doc. 96-9 at 7-25 (Hill Report). The material facts in support of Ms. Hill's expert opinions are found above in the Background Section at subsections A,B,C, E, J and K-O.

Ms. Hill has twenty years of experience in industrial food manufacturing, including food safety and quality assurance, relevant to Good Manufacturing Practices (GMPs) of food products as well as the safety of finished food products for the prevention of consumer hazards such as foodborne illnesses, physical contaminants, and other injurious hazards. She is experienced in food safety, human safety, including incident investigations, risk analysis, allergen cross contact prevention, bacterial cross contamination, Hazard Analysis and Critical Control Points (HACCP) programs as well as gap analysis to address and/or prevent HACCP program failures, and consumer complaints. See Doc. X at 8 (Hill Report), See Doc. X at 25 (Hill CV). <u>Notably, the defendants have not filed any Motion to Prelude Ms. Hill as an expert or any of her opinions</u>.

Ms. Hill ruled out cross-contamination of the subject crab by the DeNinnos to a reasonable degree of professional certainty as not probable. It is her expert opinion that the plaintiffs



<u>Faulkner & Graves, P.C.</u>
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

implemented safe food handling precautions in their kitchen, including regularly sanitizing their sink, washed kitchenware in an NSF/ANSI Standard 184 certified sanitizing dishwasher, "which can achieve a 99.999% reduction of bacteria, proper refrigeration of the subject crab at 37–38°F, proper hand washing, clean kitchen gloves while deshelling, and using clean kitchenware in the preparation and meals. She opines the cooked casserole containing the crab and other ingredients was cooked at an adequate 375°F for 45 minutes—more than adequate to exceed the safe internal temperature of 145°F/165°F required to eliminate pathogens. Consequently, expert analysis concludes within a reasonable degree of technical certainty that the subject crab consumed cold at lunch was not contaminated by the Plaintiff's food handling practices or kitchen. See Doc. X at 22, 24 (Hill Report). Her opinions are supported by the material facts summarized in Background Section C and E.

Ms. Hill's expert analysis further establishes distinct, scientifically backed pathways of liability and proximate cause for both Defendants.

**1. North Coast's Deficiencies Created a High Risk of Contamination and Failed to Provide Adequate Warnings**

**a. North Coast's Systemic Food Safety and Administrative Failures:**

North Coast failed to meet the standard of care in its processing operations, creating an unmitigated risk of *Salmonella* contamination, including the subject crab (Hill Report at pp. See Doc. 96-9 at 6–10, 16, 17 (Hill Report).

One egregious violation is a safety warning "HEAT BEFORE SERVING -BOIL, STEAM OR BROIL FOR 4 MINUTES" (hereinafter "box instruction") contained on the Δ NC's bulk box that was not properly conveyed by Δ NC to Δ Big Y, and as a result, it was neither heeded, or passed on to the consumer, by Δ Big Y. See Background Facts Section M; Doc. 96-9 at 18-22



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

(Hill Report). In further explanation, the Δ NC as a seafood processor is required by the FDA to follow a HACCP plan (Hazard Analysis and Critical Control Points) and identify food safety hazards that are reasonably likely to occur and to develop plans for the control of those hazards. North Coast's HACCP Plan and the accompanying Hazard Analysis identify the "intended use" of the crab as "To be consumed heated/cooked by end user". It further identifies pathogenic bacteria as a potential hazard, but declines the need for implementation of a specific control to prevent the hazard at the "Cutting" and "Weigh/Pack/Label" stages of production by shifting the responsibility to the end user - stating as justification for exclusion that the crab "will be thoroughly heated prior to serving." Doc. 96-6 NC Prod. #9, Ex. R and Q (10/30/2023).

The Δ NC's corporate designee as to the HACCP plan (Mirisola) testified the box instruction was part of that HACCP plan. Doc. 96-15 at 55:1-22 (Mirisola Depo) Further, their Quality Assurance department representative testified the crab required reheating to be safe for consumption. Doc. 96-10 at 27:12-23 (Brisbois Dep.) As explained by Ms. Hill, "A CCP is a step in a food production process at which control can be applied to prevent or eliminate a food safety hazard to acceptable levels. The USDA Guidebook for the Preparation of HACCP plans states: 'CCPs are to address food safety hazards only, not quality parameters.' The North Coast instruction printed on the outside of the box was the precautionary action, or control required to be taken before using or consuming the product in order to mitigate or eliminate the biological hazard of pathogenic bacteria, and not just a product quality instruction or suggestion. Doc. 96-9 at 19 (Hill Report).

The North Coast also failed to use a proper signal word with the box instruction to convey it as a safety instruction, e.g. "Warning" or "Safe Cooking Instructions" in accordance with the American National Standards Institute (ANSI) for Product Safety Signs and Labels, or ANSI Z535.4 -2011. Doc. 96-9 at 20 (Hill Report). The 2 managers of the store's seafood department



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

testified they misconstrued the box instruction as merely a non-safety oriented cooking suggestion. *Id.;* Doc. 96-17 at 44-45 (Martin Dep.); Doc. 96-11 at 73-75 (Ferragatta Dep.) Δ Big Y admits they did not pass the safety warning designed to prevent the risk of pathogenic hazards on to the consumer, nor did Δ Big Y itself follow the box instruction and heat the crab before it was placed for display in the seafood case or sold. Furthermore, the crab was represented by Δ Big Y as "pre-cooked" deceptively leading consumers to believe nothing further was required for safe consumption.

Ms. Hill opines:

> By North Coast not having adequate safe cooking instructions with the proper wording printed on their product boxes that were received by Big Y, they deprived the public, including the DeNinnos, of a proper warning of the presence of the biological hazard of pathogenic bacteria that should have been included in conjunction with the North Coast instruction.
>
> North Coast's failure to properly provide adequate safe cooking instructions with the proper wording printed on their crab product boxes contributed to Big Y's failure to recognize this North Coast instruction as a food safety warning, and therefore Big Y did not include this North Coast instruction on the bag containing crab product that was purchased by and handed directly to the customers. North Coast failure in this regard violated standard of care for food safety and was a cause of the Dinos illness.

Doc. 96-9 at 22 (Hill Report)

Other North Coast deficiencies include:

- **Inadequate Sick Employee Policies:** North Coast lacked an adequate employee health and illness policy or training regarding transmissible foodborne illness symptoms, like Salmonellosis, creating a direct vector for human-to-food pathogen transfer. *Id.* at 13-14
- **Absence of Standard Operating Procedures (SOPs):** North Coast had no written SOPs or food safety procedures for its facility, including the saw room where the crab product was produced. *Id.* at 14



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

- **Lack of Transport Temperature Monitoring:** North Coast maintained no procedures or logs to verify that product temperatures were maintained at or below 0°F during transport from cold storage to its processing facility. *Id.* at 15-16.
- **Government Audit Violations:** Massachusetts Health Department and U.S. Department of Commerce audits revealed recurring sanitation deficiencies for the prevention of cross-contamination and HACCP violations at North Coast's facility. *Id.* at 14-15. In this regard: "On various government audits (09/26/2014, 08/04/2015, 07/26/2017 leading up to the 7/2018 date of incident) of the subject NCS facility, violations were identified revealing deficiencies in sanitation for the prevention of cross contamination. There were also sanitation and sanitation-related deficiencies found after the 7/2018 date of incident (10/10/2018, 09/08/2022, 09/12/2022), including HACCP Plan deficiencies, equipment issues, deficient sanitation monitoring records, lack of pest control monitoring, and instances of unlabeled product with no date in the cooler. There were also major deficiencies found during an October 25, 2022, audit by the United States Department of Commerce Seafood Inspection Program that were deficiencies in sanitation for the prevention of cross contamination. Insufficient sanitation increases the risk for growth of potentially harmful bacteria. Proper sanitation maintains cleanliness for the prevention of harmful bacteria that cause food borne illness." *Id.*
- **Complete Lack of Microbiological Testing:** North Coast performed zero microbiological testing on crab products or processing environments between 2013 and 2018. *Id.* at 15.
- **Insufficient Consumer Complaint Investigation Policies:** The lack of a written



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

policies and procedures for consumer complaint investigation coupled with not having a standard document retention period (records not kept for more than 1 year) works to prevent the identification of issues within North Coast that increases the likelihood of a serious impact on public health. *Id.* at 16.

**B. Big Y Foods, Inc.'s Sanitation Deficiencies and Failure to Pass Along Warnings**

In addition to Big Y's failure to recognize and pass along the heating instruction on the North Coast Box to consumers, Ms. Hill also will opine to the following deficiencies by Big Y:

1. **Store-Level Sanitation and Temperature Control Deficiencies:**
   - Big Y maintained no temperature logs for the frozen display case the subject crab was stored in. *Id.* at 17.
   - Big Y had no set cleaning frequency, written procedures, or defrosting schedules for its frozen display case. *Id.* at 17.
   - On internal audits of the Big Y seafood department documented violations of employee sanitation, improper handwashing/gloving and missing temperature logs *Id.* at 18. Doc. 96-5 at (9/15/2023 Big Y Prod. 25, Ex. K)

Thus, through expert witness Dawn Hill, Plaintiffs have provided reliable, expert-backed scientific evidence establishing:

1. Both Defendants breached the standard of care through extensive sanitation, administrative, and handling failures, creating the dangerous condition. Doc. 96-9 at 13-18, 23 (Hill Report);

2. Both Defendants failed to convey adequate food safety warnings mandated by North Coast's HACCP plan to the end consumer (Hill Report at pp. 29–21, 23–24).

3. Plaintiffs properly handled and prepared the food, ruling out secondary domestic



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

contamination. Doc. 96-9 at 22-24 (Hill Report); and

4. The biological hazard of *Salmonella* in the crab product created an unreasonably dangerous condition that within the bounds of professional certainty resulted in Plaintiffs' illness Doc. 96-9 at 13, 24 (Hill Report);

Ms. Hill will on this basis express her opinions stated in terms of professional certainty that:

With regards to the prevention of contamination of the crab product it is likely that the deficiencies of North Coast and Big Y's respective food safety practices created an increased risk of a product contaminated with salmonella being placed into the stream of commerce by the defendants, including the subject crab product and that the defendants failed to meet the standard of care to prevent contamination of the crab product creating a dangerous condition for consumers, including the DeNinnos. Doc. 96-9 at 16, 18 (Hill Report).

The plaintiffs have presented sufficient evidence through the expert opinions of Dr. Gustin and Ms. Hill that would allow a reasonable jury to find in their favor on this issue.

**D. Caselaw Cited by Defendants**

All of the case law cited by the defendant is distinguishable from the case at hand. In *Stradford v. 2K16 Restaurants, LLC,* No. FBTCV196089854S, 2021 WL 2182863 (Conn. Super. Ct. May 5, 2021), an alleged food poisoning case, the plaintiff had no expert to opine that her illness was in any way casually related to the food consumed at the defendant's restaurant. In *Jefferson v. PRRC, Inc.,* No. HHDCV126035765S, 2016 WL 1099258, at *3 (Conn. Super. Ct. Feb. 23, 2016), the plaintiff had offered no expert evidence to support her claim that her symptoms were caused by food poisoning and what medical evidence existed contradicted her claims. Golden Hawk. *Bucknor v. Sabatini*, No. HHD-CV225074442-S, 2026 WL 446186, at



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

*3-4 (Conn. Super. Ct. Feb. 11, 2026) was a legal malpractice case where the underlying case at issue was a food poisoning case – once again, plaintiff had not expert on causation.

The plaintiff has well credentialed experts establishing the causal connections necessary in this case as identified above.

**III Hypomagnesemia**

The defendant asserts that they are entitled to partial summary judgment as to the plaintiff's claims related to hypomagnesemia "because there is no competent evidence of a causal connection that meets the standard under *Daubert*." Doc. 78-1 at 9 (Def. MOL). There is sufficient evidence that SD suffered hypomagnesemia as result of his acute illness caused by the Salmonella infection via the expert opinions of Dr. Cumbo, Dr. Sang and Dr. Gustin. Their expert testimony on this issue is challenged in the defendant's motions to preclude these experts' opinions on hypomagnesemia. See, Doc. 75 (Gustin), 76 (Cumbo) and 77 (Sang). The plaintiffs have herewith filed objections to defendants' respective motions. See, Doc. 88 (Gustin), Doc. 92 (Cumbo), Doc. 98 (Sang). The plaintiffs incorporate by reference as if set forth fully herein the legal arguments from the aforesaid objections in opposition to this motion for partial summary judgment with regard to hypomagnesemia, inclusive of any exhibits referenced therein.

## CONCLUSION

Based on the foregoing, the plaintiffs' objection should be sustained, and the defendants' motion for summary judgment should be denied.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on October 20, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428