UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO *Plaintiffs* | ) | **ORAL ARGUMENT REQUESTED** |
| v. | ) | CIVIL ACTION NO.: 3:22-CV-00580-SVN |
| NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC. *Defendants* | ) | OCTOBER 20, 2026 |

**STEPHEN DENINNO AND MARY DENINNO'S LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)2, the plaintiffs, Stephen DeNinno and Mary DeNinno, submit this Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment in connection with the Motion for Summary Judgment filed by the defendants, North Coast Sea-Foods Corp and Big Y Foods, Inc.

1. Defendant North Coast Sea Foods is the processor of the king crab legs in this case. Ex. A at 76.

**Plaintiffs' response to No. 1:** Admitted in part. The plaintiff admits the Defendant North Coast Sea Foods [hereinafter referred to as "North Coast"] is one of the processors of the king crab legs in this case. The plaintiff disputes that the Defendant North Coast is the only processor. The king crab was also processed at sea on a fishing vessel. Doc. XX-X at 19:6–22 [Mirisola Depo.]; Doc. XX-X at 86:4–11 [Cataldo Depo.]. Additionally, the evidence cited by the defendants, page 76 of the plaintiff Stephen DeNinno's deposition, does not state this proposed fact.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

2. Defendant Big Y Foods Inc is the retailer of the king crab legs in this case. Ex. A at 19.

**Plaintiffs' response to No. 2:** Admitted.

3. Stephen DeNinno purchased 3 pounds of frozen king crab legs on July 27, 2018. Ex. A at 71, 25.

**Plaintiffs' response to No. 3:** Admitted.

4. On July 27, 2018, DeNinno and his wife ate thawed king crab legs for lunch and reheated king crab legs with dinner. Ex. A at 29, 37.

**Plaintiffs' response to No. 4:** Admitted in part/denied in part. The plaintiffs admit the following: Stephen DeNinno and his wife Mary DeNinno ate thawed king crab legs for lunch and they ate king crab legs baked in a casserole at 375 degrees for about 45 minutes for dinner. Doc. 88-8 at ¶ 20, 22 [S. DeNinno Aff.]; Doc. 88-9 at ¶ 16, 18 [M. DeNinno Aff.]. Additionally, the evidence cited by the defendants, page 29 and 37 of the plaintiff Stephen DeNinno's deposition, do not concern the proposed fact that the plaintiffs "reheated king crab legs with dinner."

5. On July 31, 2018, at 2:54 p.m., DeNinno was admitted to Hartford Healthcare Backus Hospital. Ex. B at 1. He reported the following history on admission:

> The patient believes that he suffered from food poisoning from crab that he ate on Friday, he and his wife both felt ill with the identical illness shortly after. There are both treated with ciprofloxacin, the patient states that his wife is better but he continues to have significant loose stools, foul-smelling, yellowish. The patient states that he works in healthcare, he does not know any direct contact with anyone who has infectious diarrheal illness such as C. difficile. He denied any recent travel. He did have some crackers today, he has been nauseous all day.

Ex. B. at 4.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**Plaintiffs' response to No. 5:**

Admitted in part. The plaintiffs admit the following: On July 31, 2018, at 2:54 p.m., Stephen DeNinno was admitted to Hartford Healthcare Backus Hospital. As to the remainder, the plaintiff objects as that document speaks for itself and the defendants fail to set forth the entire "Associated Symptoms and Additional History" as indicated by the bolded language below:

> **This 59 year old male with a history of gout and hypertension presents to the emergency department with a complaint of vomiting and diarrhea for 3 days.** The patient believes that he suffered from food poisoning from crab that he ate on Friday, he and his wife both felt ill with the identical illness shortly after. There are both treated with ciprofloxacin, the patient states that his wife is better but he continues to have significant loose stools, foul-smelling, yellowish. The patient states that he works in healthcare, he does not know any direct contact with anyone who has infectious diarrheal illness such as C. difficile. He denied any recent travel. He did have some crackers today, he has been nauseous all day. **Been having diarrhea reportedly 50 times yesterday, 4 times today. He denies any significant pain at this time, he has been able to drink fluids**.

6. At admission, DeNinno's assessment and plan was as follows:

> 1. Acute gastroenteritis. We will continue IV fluids, Stool culture is pending. We will continue enteric precautions and start empiric antibiotics.
>
> 2. Acute renal failure. Continue IV fluids, hold diuretics. We will recheck kidney function in am.
>
> 3. HTN. Hold BP medications for now.
>
> 4. Prophylaxis. Venodynes.

Ex. B at 17.

**Plaintiffs' response to No. 6:** It is admitted that it is the "Assessment and Plan" contained at page 17, the record speaks for itself.

7. At the hospital, a stool sample test was ordered, but he could not produce a stool. Ex. A at 47.

**Plaintiffs' response to No.7:** Admitted.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

8. At discharge, DeNinno's final diagnoses were detailed as follows:

> Toxic effect or unspecified noxious substance eaten as food, accidental (unintentional), initial encounter
>
> Acute kidney failure, unspecified
>
> Hypomagnesemia
>
> Dehydration
>
> Essential (primary) hypertension
>
> Gout, unspecified

Ex. B at 1.

**Plaintiffs' response to No. 8:** Admitted in part. The plaintiffs admit those are the diagnoses contained at page 1 of the record, but that the Discharge Record indicates that the hospital physician diagnosed Stephen DeNinno with food poisoning. Ex. B at 12.

9. On August 14, 2018, DeNinno presented to Plainfield Backus Emergency Care Center. He reported the following history on admission:

> Is a 59-year old male with a history of gout and hypertension as well as remote history of post strep glomerulonephritis as a child, and recent hospitalization for gastroenteritis with acute kidney injury and dehydration. He presents to the ED today with some constant dull pain in his bilateral flanks which had him concerned. He states he called his primary care doctor and asked them to fax over some labs so he could check his kidney function. He states he never received a fax, and it was too late in the day by the time he finally reached someone, so he comes here for labs and reassurance. He states his bowels are back to normal. He does report some very mild left lateral abdominal pain. No problems urinating and no hematuria. He rates his pain a 3 out of 10.

Ex. C at 3.

**Plaintiffs' response to No. 9:** Admitted in part. The plaintiff admits this is what the record states, the document speaks for itself.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

10. On October 12, 2018, DeNinno presented to Orthopedic Partners. The history recited as follows:

> The patient is 60. He has previously had difficulties with his right knee. He has also been seen here in the past for ankle sprain, left thumb carpometacarpal joint arthritis, impingement syndrome in the right shoulder, and he comes in today for evaluation of his left knee. He has a history of gout, but he has not had a gout attack in some time, and he has never had one in his knee. He had the sudden onset of discomfort, pain and swelling in his left knee.
>
> He ended up with a bout of food poisoning that landed him in the hospital for two days. He has an ultrasound which was done at Our Lady of Fatima Hospital in North Providence. This showed a 4.1 x 0.9 x 1.9 left Baker's cyst.
>
> He has had x-rays done at Backus Hospital. These were done on September 29th and it showed osteoarthritic changes. These are nonweightbearing films. There is some narrowing of the medial joint space and some small osteophytes.

Ex. D at 1.

**Plaintiffs' response to No.10:** Admitted.

11. On October 12, 2018, DeNinno was diagnosed with left knee mild osteoarthritis, effusion and synovitis. The knee was aspirated. Ex. D at 1.

**Plaintiffs' response to No. 11:** Admitted.

12. On October 18, 2018, DeNinno presented to J. Scott Toder, MD. His "chief" complaint was left knee swelling for one-and-a-half months and history of gout on Uloric for years." Ex. E at 1.

**Plaintiffs' response to No.12:** Admitted in part. The plaintiff admits he presented to Dr. Toder on October 18, 2018 and complained of left knee swelling for one-and-a-half months, right knee swelling and pain that developed 2 days prior, a history of gout and on Uloric for years, and a history of food poisoning after eating crab and being hospitalized.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

13. On October 30, 2018, Dr. Toder stated "Off colchicine as the cause of diarrhea and did not help." Ex E at 4.

**<u>Plaintiffs' response to No.13:</u>** Admitted in part. The plaintiff admits this is what the record states, the document speaks for itself.

14. On October 30, 2018, Dr. Toder stated "Check Salmonella antibody since it is three weeks post diarrhea illness consistent with reactive arthritis." Ex E at 4.

**<u>Plaintiffs' response to No.14:</u>** Admitted in part. The plaintiff admits this is what the record states, the document speaks for itself.

15. On November 5, 2018, Our Lady of Fatima Hospital Laboratory ran a salmonella antibody test with the result "POSITIVE" for Salmonella H, Type B. The test result included the following disclaimer:

> Antibodies to Salmonella flagellar (H) and somatic (O) antigens typically peak 305 weeks after infection. A positive result in this assay is equivalent to a titer of >=1:160 by tube agglutination (Widal). Results should not be considered diagnostic unless confirmed by culture.

Ex F at 1.

**<u>Plaintiffs' response to No.15:</u>** Admitted in part. The test was "POSITIVE" for Salmonella H, Type B and "NEGATIVE" for Salmonella "O" antigen antibodies. The defendant refers to the run date of the record, but the blood draw date from the plaintiff was 10/30/2018. There is also a typo stating "typically peak 305 weeks" – it should be 3-5 weeks.

16. On January 6, 2019, DeNinno presented to Plainfield Backus Emergency Care Center. The emergency department providers note stated the following:

> Generalized weakness and tingling with differential diagnosis, including unlimited two: cardiac arrhythmia/ischemia, electrolyte disturbance, dehydration, anemia, infection/sepsis.



<u>Faulkner & Graves, P.C.</u>
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

> Examine work up as above with reassuring findings with exception of significant hypomagnesemia. IV replacement undertaken, with consultation by nephrology. Additional IV replacement recommended outpatient follow up and p.o. supplementation also recommended. Prescriptions will be made accordingly. Repeat EKG prior to discharge was also reassuring.

Ex C at 49.

**Plaintiffs' response to No.16:** Admitted.

## ADDITIONAL MATERIAL FACTS

1. The defendant North Coast sold and distributed seafood products including the king crab legs (hereinafter "subject crab") in this case. Doc 1-2 (Complaint); Doc. 96-3 at ¶2 (North Coast Answer).

2. The king crab legs product, including the subject crab, was advertised for sale by the defendants as a pre-cooked, frozen product imported from Russia. Doc. 96-1 at ¶ 3; Doc. 96-6 at 1, North Coast Resp. to Interrog. No. 2 (10/30/2023)

3. The subject crab was ordered by Mr. DeNinno from the Danielson/Killingly Big Y ("Big Y store") fresh seafood counter where the Big Y seafood clerk removed the subject crab from a freezer display case and then weighed, labeled and packaged it in a plastic bag before handing it to Mr. DeNinno. Doc. 78-3 at 21:4-16, 22:22-23:25, 25:11-22 (S. DeNinno Dep); Doc. 96-1 at ¶ 3.

4. The subject crab was stored unpackaged and loose in a bin within the freezer display case along with other frozen seafood products stored in other bins. Doc. 96-11 at 36:3-14; 52:16-53:15; 88:12-89 (Ferragatta Dep.)



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

5. Mr. DeNinno was not provided any instruction from North Coast or Big Y that the subject crab should be reheated or cooked before eating it. Doc. 78-3 at 109:19-22 (S. DeNinno Dep).

6. The Big Y packaging and label did not contain any instructions to reheat or recook the subject crab. Doc. 96-13 at 116:23-118:25 (Voga Dep); Doc. 96-17 at 48-51 (Douglas Dep.)Doc. 78-3 at 109:19-22 (S. DeNinno Dep).

7. Mr. DeNinno left the Big Y store at about 10:30am and drove approximately 15 minutes to his home where he placed the packaged crab directly into his refrigerator. Doc. 96-1 at¶4; Doc. 96-2 at ¶3; Doc. 78-3 at 25:24–26:11 (S. DeNinno Dep).

8. Between 1pm and 3pm, Mr. DeNinno took the subject crab from the refrigerator, removed it from the Big Y packaging and ran cold water over the crab legs in a colander in the kitchen sink for about 10 minutes to complete thawing. 96-1 at ¶8; 96-2 at ¶7

9. Wearing a pair of new rubber kitchen gloves, Mr. DeNinno used kitchen shears to cut away the shells of the subject crab and placed the crabmeat into two bowls. Doc. 96-1 at ¶9; Doc. 96-2 at ¶7, 8

10. About 2 lb. of the subject crabmeat was placed in a sealed bowl back into the refrigerator and used later that evening to make a casserole for dinner. Doc. 96-1 at ¶11; Doc. 96-2 at ¶8,15

11. A bowl containing about 1lb. of the subject crabmeat was eaten by the DeNinnos directly after preparation along with cocktail sauce and no other foods or ingredients. Doc. 96-1 at ¶12; Doc. 96-2 ¶9

12. A new jar of Big Y brand cocktail sauce was poured by Mrs. DeNinno into a dish and they used forks to dip the crabmeat into the bowl. Doc. 96-1 at ¶14; . Doc. 96-2 at ¶9



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

13. During the evening on July 27, 2018, Mrs. DeNinno prepared a casserole using the remaining 2 lbs. of the refrigerated subject crab and pasta, butter, flour, milk and cheese – all ingredients were thoroughly cooked. Doc. 96-2 at ¶15, ¶16; Doc. 96-1 at ¶20.

14. Shortly after removal from the oven, a portion of the casserole was eaten by Mr. DeNinno and Mrs. DeNinno with no other foods. Doc. 96-2 at ¶17; Doc. 96-1 at ¶22.

15. The DeNinnos each washed their hands with soap and water before preparing and eating lunch and dinner on July 27, 2018. Doc. 96-1 at ¶10, ¶15; ¶22; Doc. 96-2 at ¶10, ¶17, ¶18.

16. All of the kitchenware used in the preparation and serving of the lunch and dinner meals was clean, no cutting boards were used. Doc. 96-1 at ¶8, ¶9, ¶13; ¶14; ¶21, ¶22; Doc. 96-2 at ¶8, ¶9, ¶11, ¶14, ¶18.

17. The only other food product consumed by Mr. DeNinno or Mrs. DeNinno on July 27, 2018 was a cup of coffee made at their home containing store bought ultra-pasteurized light cream stored in their refrigerator and used regularly. Doc. 96-1 at ¶12, ¶23, ¶24; Doc. 96-2 at ¶9, ¶19; ¶20

18. In July 2018, no other persons resided in the Deninno's home and no other persons ate lunch or dinner with them on July 27, 2018 or otherwise ate any of the subject crab at lunch or in the dinner casserole.Doc. 96-1 at ¶25, Doc. 96-2 at ¶21.

19. The DeNinnos did not interact with their pet dogs while they prepared or ate either meal on July 27, 2018. Doc. 96-1 at ¶17; Doc. 96-2 at ¶13.

20. The DeNinno's refrigerator was maintained at a temperature range of 37–38°F with no history of temperature control issues. Doc. 96-1 at ¶ 5–6; Doc. 96-2 at ¶ 4–5.

21. The DeNinno's home was cooled by central air in July 2018. Doc. 96-1 at ¶ 7; Doc. 96-2 at ¶ 6.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

22. The DeNinnos cleaned their counters and sinks nearly daily with sanitizing spray in 2018. Doc. 96-1 at ¶ 16; Doc. 96-2 at ¶ 12.

23. The dishwasher contained an NSF-certified sanitizing rinse option used routinely by the DeNinnos to clean their kitchenware. Doc. 96-1 at ¶ 38; Doc. 96-2 at ¶ 35.

24. Every 4-6 weeks, the dishwasher was cleaned using a cleaning tablet and the filter was washed out. Doc. 96-1 at ¶ 38.

25. Mr. DeNinno and Mrs. DeNinno did not share any meals or food products from July 23 through July 26, 2018, other than the ultra-pasteurized store-bought refrigerated cream they each put in their routine morning coffee. Doc. 96-1 at ¶23, ¶ 31; Doc. 96-2 at ¶ 26.

26. From July 23 through July 26, 2018, Mr. DeNinno was working extended hours at his place of employment arriving at about 6 a.m. and leaving abut 8 p.m. and was eating all lunches and dinners at his workplace cafeteria or restaurant take-out, bringing no leftovers home, bringing no food from home to work, and eating no snacks or meals at home except his morning coffee. Doc. 96-1 at ¶ 31; Doc. 96-2 at ¶19, ¶26; Doc. 78-3 at 8:19-21, 19:16–20:12, 44:2–6 (SD Depo).

27. From Monday, July 23 through Thursday, July 26, 2018, Mrs. DeNinno did not cook at home any meals with raw chicken, turkey, pork, beef, or eggs or make any salads. Doc. 96-2 at ¶26.

28. At some point in August 2018, Mary DeNinna ate cocktail sauce from the same jar used on July 27, 2018 and did not experience any symptoms of vomiting, nausea, diarrhea or other digestive upset afterwards. Doc. 96-2 at ¶28.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

29. Mr. DeNinno worked as an emergency preparedness coordinator at a hospital, he did not provide patient care or routinely work in patient care areas of the hospital and had no patient contact July 23 through July 27, 2018. Doc. 96-1 at ¶ 34.

30. Mrs. DeNinno worked in an insurance agency which was a small office setting. Doc. 96-2 at ¶31.

31. In the weeks leading up to July 27, 2018, neither Mr. DeNinno or Mrs. DeNinno were in close contact with family, friends or coworkers who were sick with symptoms similar to the gastrointestinal symptoms they experienced commencing July 28, 2018. Doc. 96-1 at ¶ 33; Doc. 96-2 at ¶ 30.

32. From 2017 through 2018, neither Stephen or Mary DeNinno did any long-distance traveling, out-of-country vacations, camping or otherwise stayed by a river or lake, or used a swimming pool or a jacuzzi. Doc. 96-1 at ¶ 39-41; Doc. 96-2 at ¶ 36-38.

33. From 2017 through 2018, neither Stephen or Mary DeNinno drank any non-potable water. Doc. 96-1 at ¶ 42; Doc. 96-2 at ¶ 39.

34. From 2017 through 2018, neither Stephen or Mary DeNinno worked or visited any childcare centers or otherwise took care of any diapered children or adults. Doc. 96-1 at ¶ 43; Doc. 96-2 at. ¶ 40.

35. Neither Stephen or Mary DeNinno have never received a Typhoid vaccine or travelled to an endemic developing country. Doc. 96-1 at ¶ 44; Doc. 96-2 at ¶ 41.

36. In July 2018, the DeNinnos only pets were 4 four small and healthy dogs who were not sick during July or August of 2018. Doc. 96-1 at ¶ 35, 37; Doc. 96-2 at ¶ 32, 34.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

37. The DeNinnos 4 dogs were fed only dry commercial kibble once per day, the dogs were not fed any types of treats, raw food or chew treats like pig ears, cow hoofs or rawhides. Doc. 96-1 at ¶ 36; Doc. 96-2 at ¶ 33.

38. The DeNinnos 4 dogs were not in contact with other dogs or animals or kenneled in 2018. Doc. 96-1 at ¶ 36; Doc. 96-2 at ¶ 33.

39. In the 12 months before July 27, 2018, the DeNinnos did not spend time on any farm or otherwise interact with livestock. Doc. 96-1 at ¶ 37; Doc. 96-2 at ¶ 34.

40. In the twelve months prior to July 27, 2018, Mr. DeNinno was not experiencing any issues with diarrhea or other gastrointestinal illnesses aside from gastric reflux for which he took a proton pump inhibitor medication daily Doc. 96-1 at ¶ 45.

41. In the twelve months prior to July 27, 2018, Mrs. DeNinno was not experiencing any issues with diarrhea or other gastrointestinal illnesses. Doc. 96-2 at ¶ 42

42. Neither Steven DeNinno or Mary DeNinno had ever been diagnosed with a salmonella infection, suspected or confirmed prior to July 27, 2018. Doc. 96-1 at ¶ 46; Doc. 96-2 at ¶ 43.

43. At about 4am on Saturday, July 28, 2018, Mrs. DeNinno experienced the sudden onset of severe diarrhea and stomach cramps followed by vomiting and she continued to experience multiple episodes of severe diarrhea, stomach cramping and vomiting through Monday, July 30 with ongoing but much milder symptoms on Tuesday, July 31, 2018. Doc. 96-2 at ¶ 22-23; Doc. 96-1 at ¶ 26.

44. At about 6am on Saturday, July 28, 2018, Mr. DeNinno experienced the sudden onset of severe diarrhea, stomach cramps and vomiting and he continued to experience multiple



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

episodes of severe diarrhea and stomach cramping through the morning of Tuesday, July 30, 2018. Doc. 96-1 at ¶ 26-27; Doc. 96-2 at ¶ 22; Doc. 78-3 at 38:8–39:12 (S. DeNinno Dep.).

45. The diarrhea experience by both Mr. DeNinno and Mrs. DeNinno was non-bloody, profuse and liquidy with a very bad odor Doc. 96-1 at ¶ 28; Doc. 96-2 at ¶ 23.

46. The DeNinno's did not take their temperature between July 27 and July 30, 2018, they did not feel feverish, nor did they feel feverish, ill or lethargic in the days leading up to when their symptoms began July 28, 2018. Doc. 96-1 at ¶ 29, 32; Doc. 96-2 at ¶ 24, 27.

47. Mrs. DeNinno called her primary care doctor (Dr. Meila), on July 30, 2018, described her symptoms and was prescribed a 5-day antibiotic (Cipro) course that she completed and felt well by August 1, 2018 with no return of symptoms. Doc. 96-2 at ¶ 25, 29.

48. Mr. DeNinno called his primary care doctor (Dr. Rekkas) on July 30, 2018, described his symptoms and was prescribed a course of antibiotic (Cipro) and stopped taking the antibiotic at the direction of the hospital during his July 31–Aug 1, 2018 admission. Doc. 96-1 at ¶ 30.

49. Mr. DeNinno reported the food poisoning incident to Big Y on August 2, 2018, Big Y informed North Coast by letter on August 3, 2018 and Mr. DeNinno was contacted directly by an employee of North Coast on August 14, 2018 to whom he provided details concerning the incident and his illness. Doc. 96-1 at ¶ 48; Ex B to Big Y 9/15/2023 Production Compliance.

50. Directly after being notified of Mr. DeNinno's claimed food poisoning by the subject crab, neither Big Y or North Coast identified the dates which they were in possession and control of the subject crab product or any product identification number or other tracking data connected to the subject crab and Defendants have been unable to provide that information to date. Doc. 96-6 at Int. 2 (NC-10/30/2023); Doc. 96-4 at Int. 3 (BY -11/15/2023).


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

51. North Coast purchased the subject crab originally as a frozen, pre-cooked XL King Crab Sections (a shoulder cluster with legs and claws) that were caught overseas on Russian vessels and supplied to North Coast by a company called Arctic Seafoods. Doc. 96-15 at 15-16, 18-19 (Mirisola Dep.); Doc 96-14 at 86 (Cataldo Dep.); Doc 96-6 at Int. 2, 3, 4 (NC-10/30/23)

52. The king crab sections were processed, cooked and frozen onboard the Russian vessels after being caught. Doc. 96-15 at 19 (Mirisola Dep.); Doc 96-14 at 86 (Cataldo Dep.)

53. North Coast did not verify that Arctic Seafoods followed safe food-handling practices, and it did not obtain documentation regarding the specific cooking and freezing processes used by the Russian vessels. Doc. 96-14 at 85:24–86:24 (Cataldo Dep.)

54. Multiple companies were involved in the storage, shipping and transporting of the subject crab from Russia to the United States, North Coast does not have safe food handling records, including temperature monitoring records, for any of these companies concerning the subject crab and does not know the dates these companies were specifically in possession of the subject crab. Doc. 96-6 at Int. 2, 3, 4 (NC-10/30/23); Doc. 96-14 at 85:24–86:24 (Cataldo dep.)

55. North Coast has been unable to identify any records of any kind specific to the subject crab, including order and purchase records, temperature monitoring records for the North Coast's processing facility or trucks, sanitation records for the production room on the date the subject crab was produced, purchase records, shipping records. Doc. 96-7 at Prod. 6, 23, 25, 27, 28, 38, 41 (NC-10/30/23);

56. The subject crab was processed in the "saw room", a specific production room at North Coast's Dry Dock seafood processing facility in Boston, where the king crab sections would be removed from the Arctic Seafoods packaging by North Coase production line workers,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

cut by a band-saw into individual legs and claws, placed in a basket and manually dipped into a bin of cold water to apply a protective ice "glaze" over the newly exposed meat and then repacked into twenty-pound North Coast cardboard boxes and returned to the freezer to await distribution. Doc. 96-15 at 38:25–39: 16, 66:3–67:3, 88:13–89:1, 89:21-23, 22:16–28:22, 94:7–11, 99:24–101:15 (Mirisola Dep.); Doc. 96-6 at Int. 4, 14 (NC-10/30/23)

57. In the time period that the subject crab would have been processed, the saw room was also used to process unfrozen, raw fish including tuna, swordfish, and scallops. Doc. 96-10 at 83 (Brisbois); Doc. 96-15 at 22-23 (Mirasola Dep. )

58. Processing raw fish and pre-cooked products in the same processing room increases the risk that a pre-cooked product will be contaminated. Doc. 80-3 at 87:3-89:15 (Montville Dep); Doc. 70-3 Hodges Dep. at 141:10-20.

59. Printed on the outside of the twenty-pound cardboard North Coast boxes used for their king crab leg product, including the subject crab, was the explicit instruction ("heating instruction"): "HEAT BEFORE SERVING. Boil, steam or broil for 4 minutes." Doc. 96-15 at 40:5–22, 52:9–54:12 (Mirisola Depo); Doc. 96-16 (Photo -Ex. 10 to Mirisola Depo); Doc. 96-5 at Prod. 7 (BY – 9/15/2023)

60. Big Y would have received the subject crab in a North Coast bulk product box with the heating instruction. Doc. 96-17 at 44:17-23 (Douglas Dep.)

61. North Coast's HACCP Plan Hazard Analysis for the subject king crab product addresses biological hazards - pathogenic bacteria is identified as not being a potential biological hazard that would require specific control by North Coast at two critical control points (specifically cutting and Weight/Pack/Label) for the stated reason that the product "will be



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

thoroughly heated prior to serving". Doc 96-7 at 34-36 (10/30/2023NC Prod. #9, Ex. R); Doc. 96-14 at 35-44 (Cataldo Depo).

62. North Coast's HACCP Plan Hazard Analysis for the subject king crab product indicated that the "Intended Use and Consumer" was that the product was "To be consumed heated/cooked by end user" as did the HACCP Plan document stating: "Heated & or recooked by end user". Doc. 96-7 at 31-36 (Prod. #9, Ex. R and Q – NC 10/30/2023)

63. North Coast intended for its king crab product to be reheated by the consumer to ensure it was safe for consumption. Doc. 96-10 at 27:12-23 (Brisbois Dep.); (Prod. #9, Ex. R and Q – NC 10/30/2023)

64. The heating instruction on the box was part of North Coasts HACCP plan for the subject king crab product. Doc. 96-15 at 55:1-22 (Mirisola Depo)

65. Big Y did not reheat or recook the subject king crab product before selling it to consumers including the subject crab sold to Mr. DeNinno. Doc. 96-15 at 49:4-8 (Mirisola Dep.); Doc. 78-3 at 109:19-22 (S. DeNinno Dep).

66. On various government audits (09/26/2014, 08/04/2015, 07/26/2017 leading up to the 7/2018 date of incident) of the subject NCS facility, violations were identified revealing deficiencies in sanitation for the prevention of cross contamination. There were also sanitation and sanitation-related deficiencies found after the 7/2018 date of incident (10/10/2018, 09/08/2022, 09/12/2022), including HACCP Plan deficiencies, equipment issues, deficient sanitation monitoring records, lack of pest control monitoring, and instances of unlabeled product with no date in the cooler. Doc. 96-12

67. On internal audits of the Big Y seafood department at the Danielson/Killingly grocery store, violations were identified revealing deficiencies in employee sanitation practices


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

and procedures including employees observed “entering a walk in cooler then handling unpackaged food product without washing their hands and changing their gloves” (03/06/2017), missing temperature checks for a display case (2/27/2018) and 2 different loose seafood products touching in the service case (06/07/2018). Doc. 96-5 at Prod 25, Ex. K (BY-9/15/2023)

68. There was no set cleaning frequency for the Big Y frozen seafood case that contained the subject crab, no written procedure for cleaning the case, nor was the frozen case ever completely defrosted so that the case interior could be thoroughly cleaned and sanitized. Doc. 96-11 at 118-129 (Ferragatta Dep.)

69. North Coast believes it received the subject crab in an Arctic Seafood delivery of April 3, July 26, October 2 or November 20, 2017. Doc. 96-7 at 2-3, Prod No. 2 (NC 10/30/23)

70. During the time frame that North Coast would have been in possession of the subject crab, North Coast employees were only told in general terms to stay home if they were sick – no specific guidance was provided as to the types of sickness symptoms that would require them to stay home in the Employee Handbook. Doc 96-10 at 101-102 (Brisbois Depo); Doc 96-15 at 135-137 (Mirisola Depo); Doc. 96-7 at 88 (Ex. U- Emp. Handbook to NC Prod - 10/30/2023).

71. During his Backus Hospital admission of 7/31/2018 to 8/1/2018 his acute illness he was treated with with aggressive IV hydration and electrolyte replacement to stabilize his kidneys and magnesium levels and the discharge physician diagnosed his acute illness as “food poisoning”. Doc. 78-4 at 12 (Backus Hospital, 7/31/2018 Discharge Summary).

72. Laboratory blood work from Mr. DeNinno's July 31, 2018 admission at Backus Hospital revealed an elevated white blood cell count of 13,000 with a significant left shift (elevated immature neutrophils/bands), which is clinically indicative of an acute bacterial



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

infection rather than a viral illness. Doc. 76-3 at 111:21–112:21, 138:14–19, 202:23–203:18, 206:13–19 [Cumbo Depo.]; Doc. 77-2 at 72:15–73:25, 78:4–8 [Sang Depo.]; Doc. 75-5 at 85:24–86:6, 131:4–132:11 [Toder Depo.]. Doc. 78-4 at 26 [Backus Hospital, 7/31/2018]; Doc. 88-6 at 90:9-91:13 [Gibofsky Dep.]; Doc. 75-5 at 131:4-132-8 [Toder Dep.].

73. Around the beginning of September 2018, Stephen had the sudden onset of symptoms of swelling and pain in his left knee, followed symptoms in his right knee by mid-October. Doc. 88-2 at 1 (Toder 10-/18/2018); Doc. 78-3 at 47:23–48:10, 80:10–20, 81:3–20, 82:1–4 (S.DeNinno Dep.)

74. Dr. J. Scott Toder, a rheumatologist, evaluates Stephen DeNinno on 10/18/2018 and suspects his knee joint symptoms are reactive arthritis related to his acute illness in July 2018. Doc. 88-2 at 1 (Toder 10/18/2018).

75. The Widal test was ordered by Stephen DeNinno's treating rheumatologist on October 30, 2018 because Stephen DeNinno was complaining of the new onset of a bout of diarrhea that was persisting. Doc. 75-5 at 51:1-52:23, 71:14-73-7, 133:1-16 [Toder Dep.]; Doc. 88-2 at 4.

76. Dr. Toder ordered the Widal test after consulting with an infectious disease colleague because he wanted to ensure the diarrhea was not from an active infection. Doc. 75-5 at 76:20-77:13 [Toder Dep.]

77. Dr. Toder also ordered a stool test on November 2, 2018 after the Widal test returned positive for Salmonella returned negative for Salmonella and other pathogens (Shigella, Shiga Toxin, VRE and Campylobacter). Doc. 88-2 at 5 [Toder, 11/02/2018].

78. The plaintiff's history from his 1/6/2019 Plainfield Backus Emergency Care Center admission for hypomagnesemia indicated that:



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Patient notes he has had chronic diarrhea after having been hospitalized for dehydration and renal failure status post excessive diarrhea. Rheumatology and is primary care physician following him. His diarrhea has become more prevalent over the past 3-4 weeks, despite Negative outpatient stool testing that was done extensively by self report. Patient notes that while his stool results were reassuring, he did have blood work demonstrated antibodies to salmonella, but because of the lack of stool findings, it was agreed that he did not require treatment. Had positive antibody test for Salmonella, but stool culture was negative so chronic diarrhea not treated. He denies fever, chills, chest pain, dyspnea, abdominal pain, nausea/vomiting, change in color of his stool, but notes that over the past several hours and yesterday, he has developed a diffuse tingling sensation throughout his body without any obvious focality. No weakness.

79. Prior to the July 2018, Stephen DeNinno had no history of reactive arthritis, gastrointestinal malabsorption, hypomagnesemia, or chronic low back and knee pain. Doc. 78-3 at 49, 89 (S.DeNinno Dep.)Doc. 92-1 at 10–11, 13–15 [Cumbo Report]; Doc. 76-3 at 87:6–9, 88:8–17, 104:17–23, 201:19–25 [Cumbo Depo.]; Doc. 77-2 at 47:10–25 [Sang Depo.]; Doc. 77-5 at 8, 11 [YNHH Records]; Doc. 75-5 at 55:10–22, 135:21–136:1 [Toder Depo.].

80. On October 18, 2018, Dr. Toder aspirated 20 cc of synovial fluid from Mr. DeNinno's right knee; polarization microscopy performed by Dr. Toder showed no gout or pseudogout crystals, and laboratory analysis revealed an elevated white blood cell count of 4,000, confirming an inflammatory process rather than purely degenerative osteoarthritis or septic arthritis. Doc. 76-3 at 153:13–23, 157:8–12 [Cumbo Depo.]; Doc. 77-5 at 8, 18–19 [YNHH Records]; Doc. 75-5 at 44:16–24, 46:8–48:24, 59:10–14, 67:20–68:24, 70:6–15, 117:4–6 [Toder Depo.].

81. Subsequent genetic testing confirmed that Mr. DeNinno carries the HLA-B27 gene, which predisposes individuals to develop severe, chronic reactive arthritis and spondyloarthropathy (including sacroiliitis and ankylosing spondylitis) following an enteric bacterial infection such as Salmonella. Doc. 92-1 at 10, 12–13 [Cumbo Report]; Doc. 76-3 at 86:15–17, 157:14–18, 158:8–14 [Cumbo Depo.]; Doc. 77-2 at 46:14–18, 57:5–7 [Sang Depo.];



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Doc. 77-3 at 4, 13, 23, 32, 45, 56 [CT GI Records]; Doc. 77-5 at 14, 29, 33 [YNHH Records]; Doc. 75-5 at 13:19–20, 16:13–25, 40:8–13, 63:22–64:5, 109:9–12, 126:18–128:23 [Toder Depo.].

82. Dr. Toder and infectious disease expert Dr. Thomas Cumbo ruled out alternative causes for Mr. DeNinno's inflammatory joint symptoms—including Lyme disease (via negative synovial and serum Lyme tests and lack of response to doxycycline), active gout (via low serum uric acid of 4.9 on Uloric, absence of crystals on office microscopy, and lack of response to colchicine), rheumatoid arthritis (via negative rheumatoid factor and joint distribution), fibromyalgia, and psoriatic arthritis. Doc. 92-1 at 13–14 [Cumbo Report]; Doc. 76-3 at 83:13–20, 85:3–13, 151:1–158:20, 211:21–212:12 [Cumbo Depo.]; Doc. 77-5 at 8, 18–20 [YNHH Records]; Doc. 75-5 at 45:8–48:24, 51:21–52:8, 61:1–62:11, 69:14–72:13, 114:20–119:14, 138:21–141:12 [Toder Depo.].

83. Over the course of treatment, Mr. DeNinno developed additional classic manifestations of HLA-B27 reactive spondyloarthropathy, including bilateral hand dactylitis, Achilles tendon enthesitis, costochondral joint inflammation, and MRI-confirmed sacroiliitis/fusion in the sacroiliac (SI) joint. Doc. 76-3 at 151:11–14, 158:8–14 [Cumbo Depo.]; Doc. 77-2 at 45:8–12, 57:8–16 [Sang Depo.]; Doc. 77-3 at 4, 13–14, 23, 32, 45, 56 [CT GI Records]; Doc. 77-5 at 8, 24, 28, 29 [YNHH Records]; Doc. 75-5 at 14:20–18:8, 63:22–64:5, 109:5–12, 121:16–18, 143:11–144:18 [Toder Depo.]; Opinion Ltr. of J. Scott Toder, M.D. at 1 (Feb. 4, 2025).

84. To manage his chronic reactive arthritis, Mr. DeNinno has required ongoing immunosuppressive biologic therapies, cycling through Humira, Remicade, Cimzia (which had to be discontinued in January 2023 after causing hospitalized immune-mediated pneumonitis), Rinvoq, Xeljanz, and currently intravenous Simponi Aria every eight weeks alongside


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

methotrexate and Celebrex. Doc. 92-1 at 11, 13, 23–24, 33–35 [Cumbo Report]; Doc. 76-3 at 95:18–22, 149:1–23 [Cumbo Depo.]; Doc. 77-2 at 54:5–57:7, 64:8–14, 66:25–67:4 [Sang Depo.]; Doc. 77-3 at 2, 4, 10, 13, 22, 29, 31–32, 44–45, 55–56 [CT GI Records]; Doc. 77-5 at 2, 8 [YNHH Records]; Doc. 75-5 at 39:6–20, 106:19–107:5, 109:16–20, 142:4–16 [Toder Depo.]; Opinion Ltr. of J. Scott Toder, M.D. at 1 (Feb. 4, 2025).

85. Both Dr. Toder and Dr. Cumbo opine to a reasonable degree of medical probability that Mr. DeNinno's reactive arthritis was triggered by his July 2018 Salmonella infection, is permanent, and will require lifelong biologic and anti-inflammatory therapy. Doc. 92-1 at 1–2, 12–13, 15 [Cumbo Report]; Doc. 76-3 at 62:23–63:9, 149:2–150:4, 201:5–9, 205:8–11 [Cumbo Depo.]; Doc. 75-5 at 30:14–31:12, 33:7–12, 129:6–21, 137:13–19, 141:13–143:10 [Toder Depo.]; Opinion Ltr. of J. Scott Toder, M.D. at 1 (Feb. 4, 2025).

86. Following his July 2018 hospitalization, Mr. DeNinno's bowel habits never consistently returned to normal, and he began experiencing chronic, intermittent bouts of loose, watery stools and fecal urgency (up to 8–9 bowel movements per day during flares). Doc. 92-1 at 10–12 [Cumbo Report]; Doc. 76-3 at 200:1–24, 201:5–25 [Cumbo Depo.]; Doc. 77-2 at 25:1–8, 27:24–30:8, 48:4–8, 66:21–24, 76:1–9 [Sang Depo.]; Doc. 77-3 at 3–4, 12–14, 22–23, 31–32, 44–45, 54–56 [CT GI Records]; Doc. 77-5 at 8, 11, 20, 28, 30, 120 [YNHH Records]; Doc. 75-5 at 51:19–52:18, 72:14–76:5, 106:8–107:5, 135:16–20 [Toder Depo.].

87. Repeat stool cultures ordered by Dr. Toder in November 2018 and infectious disease specialist Dr. Vinod Thomas in May 2019 tested negative for active Salmonella, Shigella, and Campylobacter, ruling out a chronic active infection. Doc. 92-1 at 14 [Cumbo Report]; Doc. 76-3 at 146:15–19, 192:18–195:6 [Cumbo Depo.]; Doc. 77-2 at 35:19–36:16, 44:21–45:7 [Sang



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Depo.]; Doc. 77-3 at 3–4, 12–13 [CT GI Records]; Doc. 75-5 at 53:3–8, 79:20–80:4, 99:5–13, 102:9–14, 112:9–19, 137:20–138:3 [Toder Depo.].

88. Extensive gastrointestinal evaluations across three gastroenterology practices—including a March 19, 2019 endoscopy/colonoscopy by Dr. John Cribb at University Gastroenterology (which showed patchy erythema, a possible ileocecal valve ulcer, and focal mild chronic active colitis), an unrevealing video capsule ("PillCam") study, a July 16, 2020 upper endoscopy and colonoscopy with biopsies by Dr. James Farrell at Yale New Haven Health (which showed healing mucosa with only mild, nonspecific lamina propria inflammation and no evidence of celiac disease, microscopic colitis, or inflammatory bowel disease), and a May 23, 2025 endoscopy/colonoscopy at Connecticut GI—ruled out Crohn's disease, ulcerative colitis, celiac disease, microscopic colitis, and pancreatic insufficiency. Doc. 92-1 at 11, 14–15, 28–29 [Cumbo Report]; Doc. 76-3 at 90:14–25, 91:23–95:9, 97:15–17, 145:15–25, 147:2–148:14, 174:15–176:8 [Cumbo Depo.]; Doc. 77-2 at 9:16–25, 16:25–17:2, 19:21–20:6, 23:14–26:22, 35:19–38:20, 39:23–41:20, 50:3–20, 64:14–66:9, 79:20–80:21 [Sang Depo.]; Doc. 77-3 at 3–4, 12–13, 22–23, 31–32, 44–45, 54–56 [CT GI Records]; Doc. 77-5 at 8, 11–12, 44–49, 58–65, 120, 122–127 [YNHH Records]; Doc. 75-5 at 105:13–106:7 [Toder Depo.].

89. Mr. DeNinno underwent multiple medication trials for his diarrhea, including over-the-counter Imodium, pancreatic enzymes (Creon), Lomotil, and a 14-day course of the antibiotic Xifaxan in 2021, none of which permanently resolved his condition. Doc. 77-2 at 26:8–12, 33:7–20, 35:13–18, 48:4–8, 51:12–52:16, 66:21–25, 74:11–18 [Sang Depo.]; Doc. 77-3 at 2–4, 8, 10–14, 17, 22–23, 31–32, 44–45, 54–56 [CT GI Records]; Doc. 77-5 at 8, 11 [YNHH Records].


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

90. Certain biologic agents and corticosteroids prescribed by Dr. Toder for Mr. DeNinno's reactive arthritis (such as Cimzia, Rinvoq, Xeljanz, and prednisone) provided temporary, ancillary relief for his diarrhea, though symptoms repeatedly flared when biologic agents lost efficacy or were discontinued. Doc. 92-1 at 11 [Cumbo Report]; Doc. 76-3 at 95:15–96:13, 97:5–8, 149:7–23 [Cumbo Depo.]; Doc. 77-2 at 53:20–56:25, 57:24–58:9, 64:8–15, 66:21–67:10 [Sang Depo.]; Doc. 77-3 at 31–32, 44–45, 55–56 [CT GI Records]; Doc. 75-5 at 106:13–107:5, 122:6–18 [Toder Depo.].

91. Gastroenterologists Dr. Jeremy Spector and Dr. You Sung Sang, along with Dr. Cumbo and Dr. Toder, diagnosed Mr. DeNinno with post-infectious diarrhea (used interchangeably with post-infectious irritable bowel syndrome with diarrhea, or PI-IBS-D). Doc. 92-1 at 12, 15 [Cumbo Report]; Doc. 76-3 at 62:23–63:4, 91:6–22, 143:24–144:6, 145:15–21, 146:20–147:1, 150:18–151:2, 174:15–175:6, 210:24–211:13 [Cumbo Depo.]; Doc. 77-2 at 17:14–23, 23:10–25:18, 26:23–27:13, 29:19–30:18, 38:5–11, 41:1–10, 49:16–50:2, 61:23–62:24, 65:20–22, 71:12–72:14, 74:9–76:25 [Sang Depo.]; Doc. 77-3 at 1, 3, 8–9, 12, 17–18, 22, 28, 31, 41, 44, 51, 54, 67 [CT GI Records]; Doc. 77-4 at 1 [Sang Opinion Ltr.]; Doc. 75-5 at 109:5–8, 124:21–125:4 [Toder Depo.]; Opinion Ltr. of You S. Sang, M.D. at 1 (Jan. 17, 2025).

92. Dr. Sang and Dr. Cumbo opine that it is medically more likely than not that Mr. DeNinno's post-infectious diarrhea was proximately caused by his July 2018 Salmonella food poisoning from crab legs and that the condition is permanent, requiring ongoing medical management, testing, and procedures. Doc. 92-1 at 1–2, 12, 15 [Cumbo Report]; Doc. 76-3 at 62:23–63:9, 146:20–25, 201:5–202:22, 210:24–211:13 [Cumbo Depo.]; Doc. 77-2 at 17:14–23, 61:23–62:24, 75:22–76:9 [Sang Depo.]; Doc. 77-3 at 67 [CT GI Records]; Doc. 77-4 at 1 [Sang Opinion Ltr.]; Opinion Ltr. of You S. Sang, M.D. at 1 (Jan. 17, 2025).


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

93. On January 6, 2019, Mr. DeNinno presented to the Plainfield Backus Emergency Care Center with stroke-like symptoms, including right-sided paresthesias, where laboratory workup revealed a profoundly low serum magnesium level of 0.6 mg/dL (hypomagnesemia) alongside hypokalemia. Doc. 92-1 at 10–11, 17 [Cumbo Report]; Doc. 76-3 at 200:14–201:9 [Cumbo Depo.]; Doc. 77-5 at 8 [YNHH Records].

94. Over the ensuing years, Mr. DeNinno required repeated emergency department visits and evaluations for symptomatic hypomagnesemia, as well as deficiencies in vitamin B12 and zinc. Doc. 92-1 at 10–11, 17–22 [Cumbo Report]; Doc. 77-2 at 35:19–23, 39:7–22, 58:10–20, 68:5–11 [Sang Depo.]; Doc. 77-3 at 1, 4–5, 13–15, 22–24, 31–33, 44–47, 55–58 [CT GI Records]; Doc. 77-5 at 8, 11, 29, 34 [YNHH Records].

95. Mr. DeNinno underwent comprehensive evaluations by a nephrologist (Dr. Maroun Azar in February 2019) and an endocrinologist (Dr. Joseph Tucci in December 2019 and January 2020), which ruled out renal magnesium wasting and endocrine disorders (such as hyperaldosteronism) as causes of his hypomagnesemia. Doc. 92-1 at 11, 15, 24, 29 [Cumbo Report]; Doc. 76-3 at 202:11–18, 208:5–17 [Cumbo Depo.]; Doc. 77-2 at 9:19–20, 42:11–15, 43:15–25, 60:23–61:4, 81:10–82:4 [Sang Depo.]; Doc. 77-3 at 4, 13, 22, 31, 44, 55 [CT GI Records]; Doc. 77-5 at 8, 11, 30–31 [YNHH Records]; Doc. 75-5 at 107:11–108:13, 110:13–24, 111:20–112:7 [Toder Depo.].

96. Additionally, his physicians conducted medication holidays by temporarily discontinuing his proton pump inhibitor (Dexilant) and his diuretic blood pressure medication (hydrochlorothiazide/Tribenzor), as well as stopping oral magnesium oxide to ensure it was not exacerbating his diarrhea; however, his magnesium levels remained critically low, ruling out medication-induced hypomagnesemia. Doc. 92-1 at 15 [Cumbo Report]; Doc. 76-3 at 176:11–



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

177:22, 202:14–18 [Cumbo Depo.]; Doc. 77-2 at 30:19–31:22, 47:2–9, 48:3–8, 50:21–51:11 [Sang Depo.]; Doc. 77-3 at 2, 4, 11, 13–14, 22–23, 31–32, 44–45, 55–56 [CT GI Records].

97. Even during periods when Mr. DeNinno's diarrhea improved or temporarily resolved on Creon, Lomotil, prednisone, or biologic agents, his serum magnesium levels failed to normalize, consistently hovering between 1.0 and 1.4 mg/dL (below the normal reference range of 1.5–2.5 mg/dL). Doc. 77-2 at 33:7–20, 35:13–18, 38:17–20, 51:21–52:25, 54:5–18, 55:5–19, 58:1–25, 67:22–68:11, 80:24–81:14 [Sang Depo.]; Doc. 77-3 at 4, 13, 15, 22–23, 25, 31–32, 34, 44–45, 47, 55–56, 58 [CT GI Records]; Doc. 77-5 at 8 [YNHH Records]; Doc. 75-5 at 122:6–123:16 [Toder Depo.].

98. Dr. Sang, Dr. Cumbo, and Dr. Toder explain that because oral magnesium supplementation was ineffective at maintaining his levels and renal losses were excluded, Mr. DeNinno's hypomagnesemia (and concurrent vitamin B12 deficiency) is more likely than not the result of physiological damage and altered chemical absorption in the small intestine caused by his July 2018 Salmonella infection and resulting post-infectious bowel syndrome. Doc. 92-1 at 1–2, 12, 15 [Cumbo Report]; Doc. 76-3 at 62:23–63:9, 96:1–22, 201:5–202:22 [Cumbo Depo.]; Doc. 77-2 at 30:12–18, 39:5–22, 41:11–43:25, 52:21–53:4, 58:10–25, 59:12–61:4, 62:9–19, 67:11–69:5, 76:1–17, 77:7–13, 79:1–14, 80:24–82:4 [Sang Depo.]; Doc. 77-3 at 4, 13, 22, 31, 44, 55–56 [CT GI Records]; Doc. 75-5 at 107:16–108:13, 110:13–24, 111:20–112:7, 123:1–125:4 [Toder Depo.]; Opinion Ltr. of J. Scott Toder, M.D. at 1 (Feb. 4, 2025).

99. Because oral supplementation cannot correct his malabsorption, Mr. DeNinno underwent surgical placement of a tunneled central venous access port on November 11, 2020, and requires permanent, weekly intravenous magnesium infusions alongside monthly vitamin B12 injections to prevent life-threatening electrolyte depletion. Doc. 92-1 at 11, 12, 17–22, 24–



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

28, 30 [Cumbo Report]; Doc. 76-3 at 96:14–22 [Cumbo Depo.]; Doc. 77-2 at 39:19–22, 47:15–25, 51:25–52:9, 55:17–21, 58:10–20, 61:23–62:24, 67:4–5 [Sang Depo.]; Doc. 77-3 at 1, 4–6, 9, 13, 16, 18, 22–25, 28, 31–35, 41, 44, 46, 48, 51, 55–57, 59, 67 [CT GI Records]; Doc. 77-4 at 1 [Sang Opinion Ltr.]; Doc. 75-5 at 110:4–7, 123:20–124:3 [Toder Depo.]; Opinion Ltr. of J. Scott Toder, M.D. at 1 (Feb. 4, 2025); Opinion Ltr. of You S. Sang, M.D. at 1 (Jan. 17, 2025).

100. Mr. and Mrs. DeNinno contracted acute *Salmonella* gastroenteritis on July 27, 2018, which directly caused Mr. DeNinno's acute renal failure, reactive arthritis, chronic diarrhea, and malabsorption syndrome. Doc. 92-1 at 11–13, 15 [Cumbo Rep.]; Doc. 88-1 at 4, 29, 36, 38–39, 50, 76–77, 128, 138 [Gustin Rep.]; Doc. 76-3 at 62:18–63:4, 150:18–23, 204:5–206:3, 210:24–211:13 [Cumbo Depo.]; Doc. 75-4 at 171:4–7, 234:3–13 [Gustin Depo.].

101. Seafood, including crab, is a documented vector for *Salmonella* contamination resulting from contaminated water or post-cooking handling, cutting, cooling ice, packaging, and processing. Doc. 88-1 at 26–27, 37, 41, 71–72, 131, 139–141 [Gustin Rep.]; Doc. 76-3 at 57:24–58:3, 72:21–22, 135:10–17, 140:2–5 [Cumbo Depo.]; Doc. 75-4 at 159:24–160:1, 160:17–19, 178:6–24, 200:1–6, 208:1–13, 240:9–10, 282:11–284:9, 296:25–297:15 [Gustin Depo.].

102. With regard to the susceptibility to contamination by Salmonella, there is no physiological difference between crabmeat from a king crab and crabmeat from another species – the crabmeat from a king crab like other crabmeat can be contaminated by Salmonella if exposed in the processing environment. Doc. 80-3Montville Dep. 115:8-12; 118:10-14; 87:25-88:

103. Freezing does not kill *Salmonella*; once crabmeat is contaminated with *Salmonella*, the bacteria survive in frozen storage and remain infectious when thawed and consumed. Doc. 88-1 at 27, 73, 139, 140, 145 [Gustin Rep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

104. *Salmonella* contamination does not alter the appearance, color, smell, or texture of food. Doc. 88-1 at 27, 62, 66, 72 [Gustin Rep.].

105. Because Mr. DeNinno refrigerated the frozen crab legs at 37°F to 38°F within 15 minutes of purchase, thawed them briefly under cold running water in an air-conditioned home (68°F), and consumed them immediately with his wife using sanitized kitchenware, there was insufficient time and no suitable temperature environment in the DeNinnos' home for a low-level contamination to multiply into the infectious dose required to cause their rapid, severe, simultaneous illness; thus, the high *Salmonella* load was present on the crab prior to purchase. Doc. 88-1 at 4, 36, 37–38, 42, 73, 99, 135, 140 [Gustin Rep.]; Doc. 76-3 at 140:7–14 [Cumbo Depo.]; Doc. 75-4 at 222:24–223:9, 291:5–296:24 [Gustin Depo.].

106. The light cream used by the DeNinnos in their morning coffee on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because it was ultra-pasteurized, high in fat (a poor medium for *Salmonella*), stored at 37°F to 38°F, and consumed daily before and after the incident without illness. Doc. 88-1 at 29, 30, 37, 96 [Gustin Rep.]; Doc. 75-4 at 293:10–21 [Gustin Depo.].

107. The cocktail sauce eaten with the crab at lunch on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because it was commercially bottled, had a highly acidic pH (3.2 to 3.7) that prevents *Salmonella* growth, was poured into a separate clean bowl rather than dipped into directly, and was consumed again by Mrs. DeNinno with shrimp several weeks later without causing any illness. Doc. 88-1 at 30, 37, 40, 50, 66, 67, 96, 97 [Gustin Rep.]; Doc. 75-4 at 292:25–293:9 [Gustin Depo.].

108. The macaroni and cheese casserole eaten for dinner on July 27, 2018 has been scientifically ruled out as the source of the *Salmonella* infection because the pasta was boiled, the



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

cheese sauce was simmered, no eggs were used, and the entire casserole was baked at 375°F for about 45 minutes until bubbling and browned—exceeding the 165°F internal temperature threshold that kills *Salmonella* in seconds. Doc. 88-1 at 30, 31–32, 40, 42, 50–51, 63, 66, 67, 73–74, 96, 99 [Gustin Rep.]; Doc. 75-4 at 293:22–294:18 [Gustin Depo.].

109. Non-food transmission pathways—including nosocomial/workplace exposure, person-to-person transmission, fomite transmission, water exposure, travel, and household pets—have been ruled out because Mr. DeNinno was a non-patient-facing hospital administrator, neither spouse had contact with sick individuals or traveled, their four dogs were completely healthy and asymptomatic, and any person-to-person, pet, or fomite exposure involves a low inoculum that would result in a staggered, sequential illness rather than a simultaneous, explosive onset in both spouses. Doc. 88-1 at 27, 29, 30, 31, 37, 42, 47, 64, 67, 72, 97–98, 133, 134, 144–145 [Gustin Rep.]; Doc. 76-3 at 133:10–135:9, 180:6–181:8, 189:2–10 [Cumbo Depo.]; Doc. 75-4 at 71:24–72:5, 82:13–21, 164:14–166:7, 174:25–175:8, 275:11–276:19, 278:1–25, 280:16–282:10 [Gustin Depo.].

110. Other bacterial, viral, and parasitic pathogens (such as *Shigella*, *Campylobacter*, *Yersinia*, *E. coli* O157:H7, *Vibrio*, *C. difficile*, and norovirus/rotavirus) have been ruled out by differential diagnosis based on the DeNinnos' clinical presentation, the simultaneous short-incubation onset prior to any antibiotic use, the positive *Salmonella* H-antigen Widal test (which does not cross-react with the other bacteria), and Mr. DeNinno's subsequent HLA-B27 reactive arthritis and chronic gastrointestinal sequelae. Doc. 92-1 at 11–12 [Cumbo Rep.]; Doc. 88-1 at 41–43, 47–49, 131–133 [Gustin Rep.]; Doc. 76-3 at 101:18–21, 103:5–24, 114:13–22, 126:1–129:7, 138:3–19, 206:4–208:4, 217:6–218:11 [Cumbo Depo.]; Doc. 75-4 at 82:8–21, 85:19–22,



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

131:17–132:12, 137:7–17, 173:4–175:17, 193:13–19, 216:10–218:25, 241:10–25, 275:1–278:25, 289:22–290:25 [Gustin Depo.].

111. Salmonella species are not endemic to seafood; therefore, the United States Food and Drug Administration (FDA) expects zero or non-detectable levels of salmonella in seafood and considers seafood that is contaminated with salmonella to be adulterated regardless of whether it is intended to be cooked before consumption or it is ready-to-eat (RTE). Doc. X at 12 (Hill Report); Doc. 80-10 (FDA Import Alert 16-81); Doc. 80-3 at 16:2-14; 19:1-8 (Montville Dep.)

112. Salmonella can contaminate the outside of a crab shell and a food handler can transfer Salmonella from the shell to exposed meat. ); Doc. 80-3 at 152:22-153:3 (Montville Dep.)

113. The king crab legs purchased from Big Y on July 27, 2018 were contaminated with *Salmonella* prior to purchase, and consuming the contaminated crabmeat at lunch on July 27, 2018 caused both Mr. and Mrs. DeNinno to contract acute *Salmonella* gastroenteritis. Doc. 92-1 at 12, 13, 15 [Cumbo Rep.]; Doc. 88-1 at 4, 29, 32, 36, 40, 42, 43, 50, 71, 77, 130, 138, 143 [Gustin Rep.]; Doc. 76-3 at 128:16–25, 135:4–13, 140:6–23, 215:14–19, 218:8–219:13 [Cumbo Depo.]; Doc. 75-4 at 171:4–25, 172:18–175:17, 178:1–24, 199:17–200:6, 234:3–21, 278:1–279:7, 291:5–297:15 [Gustin Depo.]; Doc. 75-5 at 83:22–84:22, 85:15–86:19, 88:13–89:2, 90:16–91:1, 129:17–21, 137:13–19, 145:13–19 [Toder Depo.]; Doc. 77-2 at 17:15–20, 22:1–8, 23:14–24:6, 62:3–8, 71:25–72:14, 73:9–25 [Sang Depo.].


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on October 20, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428