UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN DENINNO & MARY DENINNO *Plaintiffs* | ) | |
| v. | ) | CIVIL ACTION NO.: 3:22-CV-00580-SVN |
| NORTH COAST SEA-FOODS CORP. d/b/a NORTH COAST SEAFOODS and BIG Y FOODS, INC. *Defendants* | ) | OCTOBER 20, 2026 |

**PLAINTIFFS' OBJECTION TO MOTION TO PRECLUDE EXPERT WITNESS, YOU SUNG SANG, MD**

The plaintiffs, Stephen DeNinno and Mary DeNinno, hereby file this objection to the motion to preclude the plaintiffs' expert witness, You Sung Sang, M.D., Docs. 77, 77-1, filed by the defendants, North Coast Sea-Foods Corp. d/b/a North Coast Seafoods and Big Y Foods, Inc.

The defendants seek to exclude the clinical diagnosis and causation opinions of Mr. DeNinno's treating board-certified gastroenterologist, Dr. You Sung Sang, by mischaracterizing the nature of a clinical differential diagnosis and cherry-picking deposition testimony out of context. Contrary to the defendants' assertions, Dr. Sang's opinions — that Mr. DeNinno suffers from Post-Infectious Irritable Bowel Syndrome with diarrhea ("PI-IBS") and secondary gastrointestinal malabsorption causing chronic hypomagnesemia resulting from his July 2018 acute foodborne infection — rest squarely on a reliable, scientifically accepted methodology: a rigorous, multi-year differential diagnosis. Because the defendants' criticisms go, at most, to the weight of Dr. Sang's testimony rather than its admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), their motion to preclude should be denied.



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

## FACTUAL BACKGROUND

On February 18, 2025, the plaintiffs disclosed You Sung Sang, MD, as a treating expert witness. Doc. 88-4 at 18. On June 3, 2026, Dr. Sang was deposed. The defendants filed Dr. Sang's full deposition transcript under Doc. 77-2. To avoid duplicative filings of the same evidence, the plaintiffs incorporate by reference Dr. Sang's deposition transcript as if fully submitted as an Exhibit to this objection — and will cite to Dr. Sang's transcript filed by the defendants as Doc. 77-2. The plaintiffs will also cite to the other evidence submitted by the defendants.

For simplicity purposes, the plaintiffs incorporate by reference as if set forth fully herein the factual background section from their memorandum in opposition to the motion for summary judgment.

## DR. SANG'S BACKGROUND

Dr. You Sung Sang is a board-certified gastroenterologist who has practiced in Norwich, Connecticut since 1995. Doc. 77-2 at 12:12–13:6 [Sang Dep.]. After graduating from Stuyvesant High School in 1982, Dr. Sang earned his Bachelor of Science degree from Columbia College in 1986 and his medical degree from Mount Sinai School of Medicine in New York City in 1990. *Id.* at 12:12–13:1 [Sang Dep.]. Following medical school, he completed a three-year internship and internal medicine residency at Beth Israel Medical Center in New York in 1993, and subsequently completed a two-year fellowship in gastroenterology at Nassau County Medical Center (now Nassau University Medical Center) in 1995. *Id.* at 12:12–13:1 [Sang Dep.]. Dr. Sang is licensed to practice medicine in the State of Connecticut and has maintained his board certification in gastroenterology for 30 years. *Id.* at 13:3–13:14 [Sang Dep.]. He is a Fellow of the American


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

College of Gastroenterology, a Fellow of the American Gastroenterological Association, and a Fellow of the Crohn's & Colitis Foundation. *Id.* at 13:8–13:14 [Sang Dep.].

Throughout his 31-year career in clinical practice at Connecticut GI — which is part of GI Alliance, a national gastroenterology organization of over 1,200 gastroenterologists — Dr. Sang has performed approximately 27,000 colonoscopies, treated nearly 10,000 patients suffering from Irritable Bowel Syndrome ("IBS"), and treated approximately 500 patients specifically diagnosed with Post-Infectious Irritable Bowel Syndrome. *Id.* at 12:12–13:1, 14:2–14:17, 70:17–71:10 [Sang Dep.]; Doc. 77-3 at 44, 67; Doc. 77-3 at 44, 67. Additionally, Dr. Sang regularly treats patients with foodborne illnesses and salmonella infections in his clinical practice. Doc. 77-2 at 20:7–20:14 [Sang Dep.].

**<u>SUMMARY OF DR. SANG'S OPINIONS</u>**

Dr. You Sung Sang, a board-certified gastroenterologist with 31 years of clinical experience, opines to a reasonable degree of medical probability that Mr. DeNinno suffers from post-infectious diarrhea — which Dr. Sang uses interchangeably with Post-Infectious Irritable Bowel Syndrome with diarrhea ("PI-IBS") — and that this condition was proximately caused by the acute salmonella food poisoning Mr. DeNinno contracted after eating crab legs in July 2018. Doc. 77-2 at 12:12–13:6, 17:14–17:20, 24:23–25:8, 61:23–62:8, 70:17-70:23, 75:22–76:9 [Sang Dep.]; Doc. 77-3 at 3, 12, 22, 31, 44, 54, 67; Doc. 77-4 at 1. Dr. Sang reached this clinical diagnosis of exclusion by reviewing Mr. DeNinno's July 31, 2018 Backus Hospital admission records — which substantiated a severe, acute bacterial gastroenteritis resulting in dehydration, acute kidney injury, and an elevated white blood cell count with a neutrophil "left shift" consistent with salmonella — and by systematically ruling out alternative structural, mucosal, infectious, pancreatic, and medication-induced etiologies through multiple normal upper endoscopies, three



<u>Faulkner & Graves, P.C.</u>
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

colonoscopies with small bowel and colonic biopsies (in 2019, 2020, and May 2025), a negative Pill Cam study, negative stool studies, and numerous therapeutic medication trials. Doc. 77-2 at 9:13–9:25, 23:18–26:22, 30:19–32:16, 35:19–36:16, 37:11–38:20, 40:17–41:10, 50:3–51:11, 64:5–66:9, 71:12–73:25, 76:18–77:6, 79:20–80:21 [Sang Dep.]; Doc. 77-3 at 3–4, 12–13, 22–23, 31–32, 44–45, 54–56; Doc. 77-5 at 11, 44–45.

Dr. Sang further opines to a reasonable degree of medical probability that the July 2018 acute gastrointestinal infection altered Mr. DeNinno 's small-intestinal absorptive chemistry, directly causing chronic gastrointestinal malabsorption and resulting in persistent hypomagnesemia (as well as Vitamin B12 deficiency) as a consequence of his PI-IBS. Doc. 77-2 at 39:5–39:22, 41:24–43:25, 58:10–58:25, 61:23–62:19, 67:22–68:11, 76:10–77:13, 78:18–79:14, 80:22–82:4 [Sang Dep.]; Doc. 77-3 at 4, 13, 22, 31, 44, 55–56, 67. Dr. Sang bases this conclusion on the physiological principle that chronic magnesium depletion can only occur through renal losses or gastrointestinal losses; because a specialist nephrologist definitively ruled out renal wasting, and because Mr. DeNinno 's magnesium levels remain chronically low (requiring weekly intravenous magnesium infusions) even when his diarrhea is controlled or after proton pump inhibitors are discontinued, his hypomagnesemia is more likely than not driven by ongoing small-bowel malabsorption. Doc. 77-2 at 30:19–31:22, 42:9–43:25, 52:17–53:4, 54:10–55:4, 58:10–58:25, 60:23–61:4, 67:22–68:11, 76:10–77:13, 80:22–82:4 [Sang Dep.]; Doc. 77-3 at 4, 13, 22, 31–32, 44–45, 55–56; Doc. 77-5 at 8. Finally, because Mr. DeNinno 's post-infectious diarrhea and hypomagnesemia have persisted for over seven years despite extensive medication trials, Dr. Sang opines that his condition and symptoms are likely permanent and will require ongoing periodic office visits, laboratory testing, endoscopic procedures, and intravenous medication



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

infusions. Doc. 77-2 at 17:14–17:23, 39:5–39:22, 58:10–58:20, 61:23–62:24, 63:22–64:4 [Sang Dep.]; Doc. 77-3 at 67; Doc. 77-4 at 1.

## LAW

Rule 702 of the Federal Rules of Evidence provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court performs a "gatekeeping" function in deciding whether the expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In defining the gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH), 2024 WL 4866716, at *2 (D. Conn. Nov. 22, 2024).

As to the issue of reliability: "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[I]n fulfilling its 'gatekeeping' function, district courts should 'make certain that an expert, whether basing testimony upon professional studies or



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . .'" *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (quoting *Kumho Tire Co.*, 526 U.S. 137, 152 (1999)).

In *Daubert*, 509 U.S. at 593–94, "the Supreme Court identified several factors that may be considered in assessing reliability: (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Amorgianos*, 303 F.3d at 265 (quoting *Daubert*, 509 U.S. at 593–94)). With that said, "[t]hese factors . . . do not constitute a 'definitive checklist or test.' . . . Instead, the inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Old Gate Partners*, 2024 WL 4866716, at *2 (quoting *Kumho Tire*, 526 U.S. at 150).

"When assessing the admissibility of expert testimony, the court should refrain from considering the expert's conclusions unless the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.' *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); see *Daubert*, 509 U.S. at 595 ('The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.')." *Bernhard-Thomas Bldg Sys, LLC v. Weitz Co, LLC*, No. 3:04-CV-1317 CFD, 2010 WL 4929029, at *1 (D. Conn. Nov. 30, 2010); *see also Campbell ex rel. Campbell v. Metropolitan Property & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (arguments regarding gaps or inconsistencies in an expert's reasoning, or different


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

interpretations stemming from the testimony, "go to the weight of the evidence, not to admissibility").

"Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable." *In re Zyprexa*, 489 F.Supp.2d 230, 285 (2007) (citing *Daubert*, 509 U.S. at 594). It is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As stated by the Second Circuit, "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

## I. Factual mischaracterizations in the defendants' "Background" section are refuted by the record.

Before addressing the defendants' arguments, the plaintiffs will correct several foundational misstatements in the defendants' memorandum. First, the defendants assert without citation that "[n]one of his treating physicians . . . can causally connect the plaintiff's diarrhea or hypomagnesemia to the accident." Doc. 77-1 at 1–2; Doc. 77-2 at 37:11–38:4, 44:1–44:10 [Sang Dep.]. That is demonstrably false. Dr. Toder (Plaintiff's rheumatologist) — who is disclosed as an expert witness that the defendants are *not* seeking to preclude (*see* Doc. 75-5) — explicitly referred Mr. DeNinno to Yale for "Hypomagnesemia after salmonella" and repeatedly documented reactive arthritis and low magnesium secondary to the July 2018 Salmonella infection. Doc. 77-5 at 13–14, 17–33. Likewise, Dr. Farrell's April 30, 2020 Assessment & Plan explicitly identified "post infectious enteritis" and "GI loss or malabsorption" as primary etiologies following his July 2018 king crab salmonella infection. Doc. 77-5 at 11. As Dr. Sang pointed out when defense counsel tried to misread Dr. Farrell's note at deposition, Dr. Farrell never ruled out post-infectious enteritis or GI malabsorption. Doc. 77-2 at 37:11–38:20, 44:1–44:20, 59:12–59:20 [Sang Dep.].

Rather, Dr. Farrell's biopsy report simply showed no mucosal or structural disease (such as Celiac or Crohn's disease) to explain the malabsorption, and his post-procedure records continued to list "Diarrhea due to malabsorption" and "Malabsorption" while recommending office follow-up "to determine next step in plan/testing". Doc. 77-2 at 40:17–41:10, 44:1–44:20 [Sang Dep.]; Doc. 77-5 at 37, 77, 86, 120, 126–127.

Second, Defendants repeatedly highlight that Mr. DeNinno's three colonoscopies, upper endoscopies, capsule endoscopy, and mucosal biopsies were "normal". Doc. 77-1 at 1, 2, 3, 4, 10. Dr. Sang explained, however, that PI-IBS is by definition a functional and clinical diagnosis of exclusion in which visual endoscopies and microscopic mucosal biopsies must be normal; if structural or mucosal abnormalities were present, the diagnosis would be Inflammatory Bowel Disease (Crohn's or colitis) or Celiac disease, *not* PI-IBS. Doc. 77-2 at 23:18–24:14, 25:9–26:3, 40:17–41:23, 64:23–66:9, 67:11–67:21, 76:18–77:6, 79:20–80:21 [Sang Dep.]. Thus, the normal endoscopies and biopsies strengthen and validate Dr. Sang's diagnosis. Doc. 77-2 at 40:17–41:10, 80:11–80:21 [Sang Dep.].

Third, Defendants cite a sentence from Dr. Sang's June 3, 2024 note stating, "The patient's GI condition remains undiagnosed, with no confirmed IBD despite the presence of symptoms". Doc. 77-1 at 2; Doc. 77-3 at 56. In that very same June 3, 2024 encounter note, however, Dr. Sang explicitly listed "Irritable bowel syndrome with diarrhea" as the Visit Diagnosis and "1. Post-infectious diarrhea . . . Everything stemmed from bout of Salmonella food poisoning (7/2018)" as his primary Assessment. Doc. 77-3 at 51, 54, 59. As Dr. Sang clarified at his deposition, the sentence in the narrative simply meant that "no objective thing that could be clearly diagnosed, such as IBD [Inflammatory Bowel Disease]" had been found on biopsy because PI-IBS does not have an objective visual correlate. Doc. 77-2 at 59:1–59:11, 67:11–67:21 [Sang Dep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Accordingly, when viewed in their proper clinical context, the records fully corroborate — rather than contradict — Dr. Sang's diagnosis of Post-Infectious Irritable Bowel Syndrome with diarrhea and secondary gastrointestinal malabsorption.

**II. Dr. Sang's causation opinion regarding the July 2018 foodborne infection is based on objective hospital records, laboratory data, and standard clinical methodology — not improper "hearsay".**

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: (4) **Statement Made for Medical Diagnosis or Treatment**. A statement that: (A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803

The defendants' first argument — that Dr. Sang's testimony must be excluded because he colloquially referred to Mr. DeNinno 's salmonella history as "hearsay" during his deposition — betrays a fundamental misunderstanding of both Federal Rule of Evidence 703 and gastrointestinal medicine. Doc. 77-1 at 3–4, 8–9; Doc. 77-2 at 23:18–24:14 [Sang Dep.]. A treating physician is expressly permitted under Rules 702, 703, and 803(4) to rely on a patient's self-reported clinical history, symptom onset, and medical records from other providers in forming a diagnosis and causation opinion. Fed. R. Evid. 703, 803(4); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043–44 (2d Cir. 1995). When Dr. Sang — a physician who had never been deposed before — used the lay term "hearsay," he was simply explaining that because he first saw Mr. DeNinno in March 2021 (two-and-a-half years after the July 2018 hospitalization), he did not personally perform a stool culture in July 2018 and instead relied on Mr. DeNinno's clinical history and prior specialist testing. Doc. 77-2 at 6:16–6:17, 18:22–19:6, 23:18–24:14 [Sang Dep.]



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Moreover, Dr. Sang did not rely solely on Mr. DeNinno's word; he independently reviewed and verified the objective medical records from Mr. DeNinno's July 31, 2018 admission and August 1, 2018 discharge at Backus Hospital, as well as the Yale and University GI records. Doc. 77-2 at 9:6–9:25, 20:3–20:6, 71:25–73:25 [Sang Dep.]; Doc. 77-3 at 4, 13, 35, 48, 59; Doc. 77-5 at 8, 11. Those records establish that Mr. DeNinno and his wife both ate the same king crab legs on July 28, 2018, and both developed acute gastroenteritis symptoms hours later, which Dr. Sang explained is classic clinical evidence of an acute foodborne infection. Doc. 77-1 at 1; Doc. 77-2 at 24:23–25:8, 71:25–72:14, 77:7–77:13 [Sang Dep.]; Doc. 77-5 at 8, 11.

Mr. DeNinno presented to Backus Hospital on July 31, 2018, with severe nausea, vomiting, abdominal cramping, and diarrhea that caused acute dehydration and acute kidney injury (renal failure). Doc. 77-2 at 31:23–32:16, 71:25–72:14, 73:22–73:25 [Sang Dep.]; Doc. 77-3 at 35, 48, 59; Doc. 77-5 at 1, 3, 8, 11. The Backus Hospital laboratory panel dated July 31, 2018 (marked as Plaintiff's Exhibit A at the deposition) showed an objectively elevated white blood cell count with a "left shift" (elevated neutrophils), which Dr. Sang testified is a hallmark of an acute bacterial infection — such as Salmonella — and distinguishes Mr. DeNinno's illness from a common viral gastroenteritis. Doc. 77-2 at 3:19–3:20, 63:13–63:18, 72:15–74:6, 77:23–78:8 [Sang Dep.]. The Backus Hospital physicians treated Mr. DeNinno with antibiotics precisely because the elevated white blood cell count with a left shift and acute kidney injury indicated a severe bacterial infection. Doc. 77-2 at 77:23–78:17 [Sang Dep.].

The record also explains why no stool culture was performed during that hospitalization: Mr. DeNinno was so severely dehydrated (to the point of acute kidney failure) during his 24-to-36-hour admission that his bowels temporarily stopped producing stool, which Dr. Sang testified is a well-recognized clinical occurrence in severely dehydrated gastroenteritis patients. Doc. 77-



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

2 at 31:23–32:24, 71:25–72:8 [Sang Dep.]. Subsequent antibody testing recorded in the medical chart (and relied upon by Dr. Toder and Dr. Farrell at Yale) was positive for Salmonella, while a later repeat test by an infectious disease specialist confirmed that the acute infection was no longer active. Doc. 77-2 at 23:18–24:14, 35:19–36:13, 44:21–45:7 [Sang Dep.]; Doc. 77-3 at 3–4, 12–13, 22–23, 31–32, 44–45, 54–56; Doc. 77-5 at 8, 11, 13. Most importantly, Dr. Sang testified that even if the specific bacterial organism or food vector could not be pinpointed by a stool culture, any severe acute gastrointestinal infection — whether bacterial or viral, and whether transmitted via poultry, eggs, fish, or crab legs — can trigger Post-Infectious Irritable Bowel Syndrome and alter intestinal absorptive chemistry. Doc. 77-2 at 21:19–22:13, 41:24–42:8, 67:22–68:11, 71:12–71:24, 75:17–76:4, 77:7–78:17 [Sang Dep.]. As Dr. Sang explained, seafood and crab legs are recognized vectors for salmonella in the medical literature, and the clinical diagnosis and treatment of PI-IBS depend on the occurrence of the acute infectious gastroenteritis itself, which is indisputably documented in the July 31, 2018 Backus Hospital admission records. Doc. 77-2 at 21:25–22:8, 71:12–72:14, 77:23–78:17 [Sang Dep.].

Accordingly, Dr. Sang's opinion is grounded in objective medical facts and standard clinical practice, not "subjective guesswork".

## III. Dr. Sang's opinion that the plaintiffs' chronic hypomagnesemia is caused by gastrointestinal malabsorption secondary to PI-IBS is a classic, reliable differential diagnosis

The defendants next argue that Dr. Sang's opinion linking Mr. DeNinno's chronic hypomagnesemia to gastrointestinal malabsorption from his post-infectious bowel disorder must be excluded because Dr. Sang used words like "hypothesis," "assumption," and "supposition" when answering leading deposition questions about the lack of a visual biopsy abnormality or a



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

specific cellular mechanism. Doc. 77-1 at 4–6, 9; Doc. 77-2 at 41:24–43:25, 58:10–58:25, 60:12–61:4, 68:12–69:10 [Sang Dep.].

**A. Dr. Sang applied a differential diagnosis.**

Dr. Sang explained the exact physiological and deductive reasoning underlying his opinion. There are only two physiological pathways by which a patient can suffer chronic magnesium depletion (hypomagnesemia): renal (kidney) losses/wasting, or gastrointestinal losses (either through malabsorption in the small intestine or intestinal secretion/wasting). Doc. 77-2 at 42:9–42:15, 43:15–43:25, 60:23–61:4, 80:22–82:4 [Sang Dep.]. Mr. DeNinno underwent a comprehensive nephrology workup at Brown University in February 2019, which definitively ruled out renal magnesium losses. Doc. 77-2 at 9:13–9:25, 42:9–42:15, 43:15–43:25, 60:23–61:4, 81:4–82:4 [Sang Dep.]; Doc. 77-3 at 4, 13, 22, 31, 44, 55; Doc. 77-5 at 8. Because renal losses were medically excluded by a specialist nephrologist, the magnesium loss must be occurring in the gastrointestinal tract. Doc. 77-2 at 42:9–42:15, 43:15–43:25, 60:23–61:4, 81:4–82:4 [Sang Dep.].

Dr. Sang also ruled out the possibility that Mr. DeNinno had pre-existing low magnesium prior to July 2018, explaining that a patient could not safely live for any prolonged period with magnesium levels plummeting to 0.8–1.1 mg/dL (requiring weekly IV infusions through a chest port) without becoming severely symptomatic, as Mr. DeNinno did after the 2018 infection. Doc. 77-2 at 31:13–31:22, 47:10–48:2, 58:10–58:20 [Sang Dep.]; Doc. 77-3 at 4, 15, 23, 34, 47, 56, 58; Doc. 77-5 at 8. Moreover, Dr. Sang and the plaintiffs' prior gastroenterologists ruled out proton pump inhibitor (Dexilant) toxicity by discontinuing Dexilant; whereas PPI-induced hypomagnesemia resolves within days of stopping the drug, Mr. DeNinno's severe hypomagnesemia and diarrhea persisted unabated off Dexilant. Doc. 77-2 at 30:19–31:22, 47:2–



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

47:9 [Sang Dep.]; Doc. 77-3 at 4, 13, 22, 31, 44, 55. Through three colonoscopies, multiple upper endoscopies, a Pill Cam study, stool studies, and extensive small bowel and colonic biopsies in 2019, 2020, and 2025, Dr. Sang and the prior gastroenterologists also systematically ruled out Celiac disease, Crohn's disease, ulcerative colitis, microscopic colitis, pancreatic insufficiency, and chronic infection. Doc. 77-2 at 23:18–26:22, 35:19–38:20, 40:6–41:23, 44:21–45:2, 50:3–50:20, 64:5–66:9, 79:20–80:21 [Sang Dep.]; Doc. 77-3 at 3–4, 12–13, 22–23, 31–32, 44–45, 54–56; Doc. 77-5 at 11, 44–45, 58–60.

Crucially, the defendants ignore that Mr. DeNinno does not suffer from isolated hypomagnesemia; his laboratory panels also demonstrated zinc deficiency and a persistent Vitamin B12 deficiency requiring monthly cyanocobalamin injections. Doc. 77-2 at 35:19–36:5, 39:5–39:22, 41:24–42:8, 58:10–58:20, 67:22–68:11, 78:18–79:14 [Sang Dep.]; Doc. 77-3 at 1, 4, 9, 13, 18, 22–23, 28, 31–32, 41, 44–45, 51, 55–56; Doc. 77-5 at 2, 8, 11. Because both magnesium and Vitamin B12 are absorbed in the small intestine, Dr. Sang testified that the concurrent deficiency of both nutrients confirms an active malabsorptive process in the small intestine, even during periods when Mr. DeNinno's diarrhea is controlled. Doc. 77-2 at 52:17–53:4, 58:10–58:25, 67:22–68:11, 80:22–82:4 [Sang Dep.]; Doc. 77-3 at 56.

Thus, by systematically ruling out renal losses, medication toxicity, and structural mucosal diseases while identifying concurrent small-bowel nutrient deficiencies, Dr. Sang employed a classic, medically reliable differential diagnosis to conclude that Mr. Deninno's chronic hypomagnesemia is caused by gastrointestinal malabsorption secondary to his post-infectious bowel disorder.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

### B. The absence of weight loss or macronutrient malabsorption is medically consistent with selective micronutrient malabsorption.

The defendants fault Dr. Sang because Mr. DeNinno did not lose weight and could still absorb macronutrients (fats, carbohydrates, and proteins), and because Dr. Sang candidly stated he did not know the exact cellular reason why only the absorptive mechanisms for magnesium and Vitamin B12 were damaged. Doc. 77-1 at 5–6, 9; Doc. 77-2 at 39:5–39:22, 68:12–69:10, 78:18–79:14 [Sang Dep.]. Yet Dr. Sang provided a clear, scientifically sound explanation: different nutrients, minerals, and chemicals are absorbed by different specialized cellular mechanisms in the small intestine. Doc. 77-2 at 68:18–69:5 [Sang Dep.]. Because magnesium and Vitamin B12 have no caloric properties, a patient whose small-bowel injury selectively impairs magnesium and Vitamin B12 absorption —while sparing fat, carbohydrate, and protein absorption (as confirmed by Mr. DeNinno's negative stool fat test) — will not experience weight loss, unlike a patient with uncontrolled Celiac or Crohn's disease. Doc. 77-2 at 35:19–36:5, 38:21–39:22, 68:18–69:5, 78:18–79:19 [Sang Dep.]; Doc. 77-3 at 4, 13, 23, 32, 45, 55; Doc. 77-5 at 11.

Furthermore, Dr. Sang explained that functional chemical malabsorption does not produce structural tissue damage visible under a standard biopsy microscope, and that there is no clinical laboratory test capable of measuring stool magnesium levels. Doc. 77-2 at 41:11–42:24, 67:11–67:21, 77:2–77:13, 81:15–82:4 [Sang Dep.]. Dr. Sang also noted that he had researched the medical literature upon first meeting Mr. DeNinno and found case reports of post-infectious diarrhea resulting in low magnesium levels, and observed that hypomagnesemia may be under-recognized in PI-IBS patients simply because physicians do not routinely order magnesium panels. Doc. 77-2 at 19:13–19:19, 47:15–48:2, 60:3–60:22 [Sang Dep.]. Despite defense counsel's repeated efforts to get him to label his conclusion "conjecture," Dr. Sang testified unequivocally to a reasonable degree of medical probability — based on his 31 years of experience and several

years of treating Mr. DeNinno — that it is "more likely than not" that the July 2018 infection altered Mr. DeNinno's gastrointestinal chemistry, resulting in PI-IBS and malabsorption of magnesium. Doc. 77-2 at 12:12–13:1, 17:15–17:23, 41:24–42:24, 60:3–60:11, 61:23–62:19, 63:22–64:4, 68:18–69:5, 75:22–77:13, 81:4–81:14 [Sang Dep.]; Doc. 77-3 at 67; Doc. 77-4 at 1.

## IV. Mr. DeNinno's presentation fits the clinical diagnostic criteria for PI-IBS, and Dr. Sang's opinion does not rest on mere temporal proximity.

The defendants' third argument — that Dr. Sang "admitted DeNinno's presentation was inconsistent with" PI-IBS regarding symptom onset, the Rome Criteria, and response to biologic medications, and that Dr. Sang relied solely on a post hoc ergo propter hoc fallacy — misstates the deposition record on every point. Doc. 77-1 at 6–7, 10.

### A. Symptom Onset and Persistence (>3 Months)

The defendants claim that Mr. DeNinno 's diarrhea did not begin until late October 2018 (three months after his July 31, 2018 hospitalization) and that Dr. Sang admitted this was "inconsistent with the diagnosis". Doc. 77-1 at 1, 6, 10. In reality, Dr. Sang testified that while an acute salmonella infection typically resolves within one to two weeks, PI-IBS is defined by bowel symptoms that may temporarily lessen or fluctuate ("get a little bit back to normal, but then reoccur") and persist for greater than three months after the inciting infection. Doc. 77-2 at 27:3–27:13, 28:16–30:8, 71:12–71:24, 76:18–76:24 [Sang Dep.]. When defense counsel showed Dr. Sang a single line from an August 14, 2018 note (13 days post-discharge) stating his bowels were back to normal, Dr. Sang explained that intermittent diarrhea alternating with normal stools is a classic hallmark of IBS: "It's not like he has diarrhea constantly all the time. . . . He doesn't have constant diarrhea, if you want to describe it as you know, watery, liquid diarrhea every day, and again, that's not that atypical for Irritable Bowel Syndrome". Doc. 77-2 at 27:17–29:6 [Sang Dep.].



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

Furthermore, the medical records submitted by the defendants, Exhibit D, Doc. 77-5, confirm that Mr. DeNinno was actively complaining of diarrhea and taking medications for his joint and bowel symptoms throughout October 2018 and thereafter, reporting to Dr. Sang that "I've never been the same bowel movement-wise ever since the infection". Doc. 77-2 at 27:17–28:4, 75:22–76:4 [Sang Dep.]; Doc. 77-5 at 17, 20. Even when defense counsel posed a hypothetical asking whether a completely normal three-month gap before recurrence would change his diagnosis, Dr. Sang did not abandon his diagnosis; he testified that while a completely normal three-month hiatus would be "unusual," in Mr. DeNinno's case the ongoing unexplained low magnesium and persistent bowel irregularity confirmed PI-IBS. Doc. 77-2 at 30:9–30:18, 76:18–76:24 [Sang Dep.].

**B. Satisfaction of the Rome Criteria.**

The defendants argue that Mr. DeNinno did not meet the Rome Criteria for IBS because Dr. Sang's office notes from 2021–2024 state in the boilerplate subjective history that the patient "currently denies significant abdominal pain or discomfort" and denies "abdominal cramping relieved by defecation". Doc. 77-1 at 2, 6, 10; Doc. 77-2 at 33:21–35:10 [Sang Dep.]; Doc. 77-3 at 4–5, 13–14, 23, 32, 45–46, 55–56, 64. Dr. Sang directly rebutted this argument at his deposition by testifying unequivocally that Mr. DeNinno does meet the Rome Criteria — which include a change in bowel habits for greater than three months, diarrhea or constipation, associated abdominal discomfort, and relief with bowel movements ("and he has all of those"). Doc. 77-2 at 26:23–27:13 [Sang Dep.]. Dr. Sang further explained that in IBS, abdominal pain and cramping should not be constant: "Yes, but it doesn't have to be constant. . . . In fact, it shouldn't be constant. If it's constant, it's not IBS; it's something else". Doc. 77-2 at 34:7–34:13 [Sang Dep.]. Thus, the fact that Mr. DeNinno denied experiencing abdominal pain or cramping at the specific moment of



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

those office visits ("currently denies" or "recently") had no negative bearing on his IBS diagnosis whatsoever. Doc. 77-2 at 34:2–35:10 [Sang Dep.].

In addition, the medical records affirmatively document that Mr. DeNinno did experience episodes of abdominal pain and cramping over the course of his illness — including during his July 2018 admission, in his Yale Medical History ("Diarrhea and abdominal pain"), and during his May 8, 2025 office visit with Dr. Sang when he presented with "worsening abdominal pains" and "belly pain" alongside worsening diarrhea. Doc. 77-2 at 64:5–64:22, 73:22–73:25 [Sang Dep.]; Doc. 77-5 at 3, 41, 78, 120. Moreover, as Dr. Sang noted, the Rome Criteria are merely clinical guidelines, whereas the core diagnostic requirement for PI-IBS is ruling out organic diseases like Crohn's and Celiac disease—which was exhaustively done here. Doc. 77-2 at 25:9–26:3 [Sang Dep.].

**C. Intermittent response of diarrhea to biologic agents prescribed for reactive arthritis.**

The defendants assert that Dr. Sang's diagnosis is unreliable because he could not explain why biologic medications (such as Cimzia, Rinvoq, and Xeljanz) and steroids prescribed by Mr. DeNinno's rheumatologist for his HLA-B27 reactive spondyloarthropathy intermittently improved his diarrhea while leaving his magnesium levels low. Doc. 77-1 at 6–7, 10; Doc. 77-2 at 54:5–55:24, 57:1–57:7, 57:24–58:25 [Sang Dep.]; Doc. 77-3 at 31–32, 44–45, 55–56. Far from undermining Dr. Sang's methodology, his testimony demonstrates his scientific rigor. Because biologic medications are often used to treat Inflammatory Bowel Disease (Crohn's or ulcerative colitis), Mr. DeNinno's intermittent improvement on those drugs prompted Dr. Sang to test the hypothesis of whether Mr. DeNinno might have a latent or intermittent Inflammatory Bowel Disease. Doc. 77-2 at 54:13–55:4, 64:5–66:9, 79:20–80:21 [Sang Dep.]. When Mr. DeNinno's diarrhea worsened in May 2025 while on another biologic (Simponi Aria), Dr. Sang expedited a



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

repeat colonoscopy and upper endoscopy with multiple small intestine and colonic biopsies while Mr. DeNinno was actively having diarrhea "to try to catch a maybe very weird inflammatory bowel disease that kind of comes and goes". Doc. 77-2 at 64:5–66:9, 79:20–80:18 [Sang Dep.].

When those May 23, 2025 biopsies once again came back negative for Crohn's disease, ulcerative colitis, or microscopic colitis, Dr. Sang testified that this negative result strengthened and reaffirmed his clinical diagnosis of exclusion: Post-Infectious Irritable Bowel Syndrome with diarrhea. Doc. 77-2 at 64:23–66:9, 80:11–80:21 [Sang Dep.]. Furthermore, the fact that Mr. DeNinno 's magnesium levels remained low (around 1.0–1.4 mg/dL) even when biologics or prednisone temporarily halted his diarrhea proved to Dr. Sang that the hypomagnesemia is driven by persistent small-intestinal malabsorption rather than mere fluid loss from watery stools. Doc. 77-2 at 52:17–53:4, 54:13–55:10, 58:10–58:25, 67:22–68:11, 81:4–81:14 [Sang Dep.]; Doc. 77-3 at 32, 45, 56, 58.

**D. Dr. Sang relied on differential etiology and established medical literature, not mere temporal proximity.**

Finally, the defendants' claim that Dr. Sang "simply relied on temporal proximity" (post hoc ergo propter hoc) is a textbook distortion of both his testimony and the law. Doc. 77-1 at 1, 10. As for *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 411 n.92 (S.D.N.Y. 2005) — which was cited by the defendants — the court rejected an attempt by a non-clinician toxicologist to infer from a single study patient — who had pre-existing advanced liver fibrosis (NASH) that progressed to cirrhosis during six months on Rezulin — that the drug can cause "silent" liver injury without elevating liver enzymes. As the *Rezulin* court explained, because advanced liver fibrosis frequently progresses to cirrhosis naturally without the drug, and because the plaintiffs' clinical expert admitted he did not know the patient's clinical history and could not rule out natural progression, assuming the drug caused the cirrhosis based solely on sequence was a post hoc ergo



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

propter hoc fallacy. More broadly, the *Rezulin* court held that the experts could not rely on differential diagnosis to prove specific causation because their underlying general causation theory — that Rezulin causes "silent" apoptotic liver injury — had never been observed clinically and had "no acceptance outside this litigation," whereas differential diagnosis requires that the suspected cause be medically capable of causing the injury (general causation). *In re Rezulin*, 369 F. Supp. 2d at 423, 435–37 (noting also that District of Connecticut precedent in *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 57 (D. Conn. 2004), construing *McCullock,* 61 F.3d at 1043–44 (2d Cir. 1995), takes an even broader view of differential diagnosis)). Indeed, the *Rezulin* court expressly distinguished its novel "silent" injury theory from clinically recognized conditions supported by "generally accepted, empirically verified (though not necessarily perfectly understood) physiological processes". *Id.* at 437.

Here, unlike the litigation-driven theory excluded in *Rezulin*, causation is firmly established by accepted medical science and clinical differential diagnosis. First, Dr. Sang — a practicing clinical gastroenterologist, not a non-clinician retained toxicologist — testified that Post-Infectious Irritable Bowel Syndrome is a real, universally recognized, and medically accepted clinical diagnosis in which an acute bacterial or viral gastroenteritis alters the intestinal flora and absorptive or secretory factors, causing chronic bowel dysfunction that can persist for decades. Doc. 77-2 at 12:12–13:6, 70:17–71:24, 74:9–75:21 [Sang Dep.]. Even though medical science does not yet understand the exact intracellular mechanism of action, Dr. Sang supported general causation with his own 31 years of clinical experience treating approximately 500 PI-IBS patients, case reports in the medical literature of post-infectious diarrhea resulting in hypomagnesemia, and a famous, well-documented outbreak at a Canadian gastroenterology conference where one-third



Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

of the infected gastroenterologists and nurses developed decades-long post-infectious diarrhea. Doc. 77-2 at 60:3–60:11, 68:18–69:10, 70:17–71:24, 74:9–75:21 [Sang Dep.].

Second, temporal course is an essential clinical criterion of PI-IBS rather than a logical fallacy: when Dr. Sang testified that the "timing" and "time course" differentiate PI-IBS from standard IBS, he was explaining that because PI-IBS and standard IBS share identical symptoms, the defining diagnostic feature of "Post-Infectious" IBS is that the chronic bowel dysfunction and malabsorption begin following an acute infectious gastroenteritis in a patient who had normal bowel function and no severe electrolyte abnormalities prior to the infection. Doc. 77-2 at 23:18–25:8, 47:10–48:2, 49:23–50:2, 71:12–71:24, 75:22–76:9 [Sang Dep.]. Far from relying on timing alone or ignoring the patient's clinical history as in *Rezulin*, Dr. Sang arrived at his causation opinion only after reviewing Mr. DeNinno's complete medical history and conducting a multi-year differential workup that systematically ruled out every other conceivable cause of chronic diarrhea and hypomagnesemia — including renal wasting, Celiac disease, Crohn's disease, ulcerative colitis, microscopic colitis, NSAID ileitis, pancreatic insufficiency, chronic active infection, PPI (Dexilant) toxicity, and oral magnesium toxicity. Doc. 77-2 at 9:6–9:25, 23:18–26:22, 30:19–31:22, 35:19–38:20, 40:17–41:23, 42:9–43:25, 44:21–45:2, 50:3–51:11, 64:5–66:9, 76:10–77:13, 80:11–82:4 [Sang Dep.]; Doc. 77-3 at 3–4, 12–13, 22–23, 31–32, 44–45, 54–56; Doc. 77-5 at 8, 11, 44–45. Combining a medically accepted general causation process (acute infectious gastroenteritis causing PI-IBS and malabsorption), a direct temporal nexus, and the systematic clinical exclusion of alternative causes satisfies Rule 702.

Accordingly, because Dr. Sang's opinions rest on a rigorous, multi-year differential diagnosis grounded in accepted medical science rather than mere temporal coincidence, Defendants' motion to preclude his testimony under Rule 702 and *Daubert* should be denied.


Faulkner & Graves, P.C.
501 Ocean Avenue ▪ New London, CT 06320 ▪ Tel: (860) 442-9900 ▪ Fax: (860) 443-6428 ▪ Juris No. 103027

**CONCLUSION**

Based on the foregoing, the plaintiffs' objection should be sustained, and the defendants' motion to preclude Dr. Sang should be denied.

THE PLAINTIFFS,
STEPHEN AND MARY DENINNO

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves (ct14094)
Kevin G. Smith, Esquire (ct29416)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
kgs@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428

**CERTIFICATE OF SERVICE**

I, Shelley L. Graves, certify that on October 20, 2026, a copy of this document was or will immediately be served upon all parties of record via the court's ECF system:

Kevin J. O'Leary
Benjamin H. Levites
Coughlin Betke LLP
175 Federal Street.
Boston, MA 02110

By: /s/ *Shelley L. Graves* (ct14094)
Shelley L. Graves, Esquire (ct14094)
Faulkner & Graves, P.C.
501 Ocean Avenue
New London, Connecticut 06320
slg@faulknerandgraves.com
(P): (860) 442-9900
(F): (860) 443-6428